# Exhibit B

**In the Matter Of:**

*BOGGS v*

*BP EXPLORATION & PRODUCTION INC.*

---

*NAOMI ORESKES, PH.D.*

*October 15, 2024*

---

LEXITAS™

but you know us, we will do our darndest to give it to you as long as there is no legal objection, which at this time I can't think of one, but I am reserving work product.

MS. DESANTIS: Thank you, Mr. Durkee.

Q. All right. Doctor, in the course of your work on this case, did you communicate with any past or present officials of the United States government regarding the Deepwater Horizon incident?

A. No.

Q. You didn't consult with any toxicologists in researching the opinions contained in your report?

A. No.

Q. You didn't consult with any medical doctors in reaching the opinions contained in your report?

A. No.

Q. You didn't consult with any industrial hygienists in reaching the opinions contained in your report?

A. No. As I said already, I'm not passing judgment on the medical questions in this case.

Q. My question was simply, you didn't consult

with any industrial hygienists in preparing your report. Correct?

A. No.

Q. You didn't consult with anyone who trained response workers on safety procedures. Correct?

A. No.

Q. You didn't consult with anyone who determined what PPEs should be worn or used by response workers. Correct?

A. No, I did not consult any such people.

Q. You didn't consult with anyone who performed any environmental sampling or monitoring in connection with the Deepwater Horizon incident?

A. No, I did not.

Q. You didn't consult with anyone who analyzed environmental sampling or monitoring data in connection with the Deepwater Horizon incident. Correct?

A. No, I did not.

Q. You didn't consult with anyone who performed data quality assurance work in the course of the Deepwater Horizon incident?

A. No, I did not.

Would it be possible for me to just stipulate that I didn't consult anyone involved in

A. I wouldn't use the phrase "not aware" because, as I said, many of the documents I looked at did refer to Coast Guard involvement and Coast Guard responsibility.

But I was not being asked to pass expert judgment on the role of the Coast Guard. I was asked to pass judgment on the activities undertaken by BP, and I restricted my comments to the actions or inactions of BP and the agents that it hired, such as the consultants at ChemRisk. Well, ChemRisk is more complicated. Cardno ENTRIX. They keep changing their name. CTH.

So BP and people working -- BP -- people that BP had recruited to help and assist in its actions or inactions.

Q. So, Doctor, you were not asked to review the work of BP in the context of the work of the Coast Guard on this spill. Correct?

A. I don't really know how to answer that because obviously in some sense all of this is in the context of the Coast Guard because the Coast Guard is playing an active role in the response.

But I was not asked to comment or opine on the Coast Guard's role, whether they did or did not effectively fulfill their obligations. I was

go back and look at the report -- where they talk about the risk that if they're not sealed properly you could get wrong measurements.

And this is one reason why in general in science when you have the opportunity to collect multiple forms of data, in general, you would do that or you would consider it preferable to do that rather than just relying on one.

And so again, I come back to the biomonitoring because that's where we see clear evidence that people involved in the response raise the possibility that it would be good to do biomonitoring because it would produce higher quality data specific to the people at risk and because they did have evidence of workers who were suffering side effects consistent with exposure to high levels of hydrocarbons.

So if the air monitoring says everything is fine and yet people are getting sick, then yes, I would say -- at least in that case I would say that the air monitoring was inadequate. Something was going on that they were not accurately assessing.

Q. You have not identified in your report, Dr. Oreskes, any particular data set collected by

BP that you deemed to be unreliable. Correct?
A. Correct.
Q. And you have not identified any data set collected by any other entity as being unreliable. Correct?
A. Correct.
Q. And you're aware that NIOSH collected data in the course of the response. Correct?
A. Yes, I'm aware of that.
Q. You're aware that OSHA collected data in the course of the spill response?
A. Yes, I am aware.
Q. You are aware that EPA collected data in the course of the spill response?
A. Correct.
Q. You're aware that the CDC collected data in the course of the spill response. Correct?
A. Correct. I will point out that the CDC is one of the parties involved who specifically recommended the biomonitoring should be undertaken.
Q. And the U.S. Geological Survey collected data in the course of the spill response. Correct?
A. Actually, I don't think I came across

privy to the conversations that were taking place among the contractors.

So it could be quite easy to see how Professor Michaels or anyone else in a federal agency at that time might not have been aware of some of the things that we are now -- that we are aware of now.

And my argument is about what we're aware of now. Not what people knew in 2010, not what people knew in 2011, but what we know now.

Q. Doctor, you've been helpful trying to be very clear about what you are and are not maintaining in your report. I'm going to turn to that in a minute. You're going to want to have your report in front of you for reference in case you need it.

And I do want to be very clear about what you are and are not saying about BP.

So you say on page 76 of your report that "As a historian of science, I cannot say whether workers involved in the oil spill and clean-up were harmed by exposure to toxic substances." Do you see that?

A. Correct.

Q. You would agree that you similarly cannot

say whether any residents of Gulf Coast communities were harmed by exposure to toxic substances associated with the Deepwater Horizon incident?

A. Correct.

Q. And you would agree that you cannot say whether Mr. Boggs was harmed by exposure to toxic substances associated with the Deepwater Horizon incident. Right?

A. Correct.

Q. On pages 75 and 76 of your report, you state that "BP's claim that workers, currently suffering illness, cannot have sustained those harms because of the work related to the spill, is questionable at best." Right?

A. I'm sorry. Where on the page do I say that? Could you just --

Q. Page 75, bottom -- 75, top of 76.

A. Yes.

Q. And you don't say here that BP's claim is false, do you?

A. No, I don't say that it's false.

Q. And you don't BP's claim is a lie, do you?

A. No, I don't say it's a lie.

Q. You'd have characterized BP's statement as

A. Correct.

Q. You've not expressed an opinion here with respect to BP's claims with respect to residents of Gulf Coast communities. Right?

A. Correct. Because the data is mostly about response workers and what they know about exposures at that time. The question of local residents doesn't really come up in the documents that I reviewed.

Q. And you understand that Mr. Boggs is a resident and --

A. Yes, I understand why you're making that distinction.

Q. On page 76 of your report in your "Conclusions" section, you state that "The available evidence -- much of it from BP's own internal correspondence -- gives substantive reason to believe that the data offered up in evidence by BP is not reliable and therefore cannot be used to sustain the 'no harm' claim." Correct?

A. Correct.

Q. You don't say that the available evidence in fact proves that the data offered up in evidence by BP is not reliable. Correct?

has been shielded behind privilege, and we know that at least some of those data involve correspondence about technical matters.

And that, to me, is very, very troubling because we know -- and this has been found in a court of law -- that the tobacco industry abused attorney-client privilege as a way of hiding illegal activities from scrutiny.

And so when I see lawyers being cc'd on technical documents and people in BP even asking why are the lawyers even involved in this and it's not about a legal question, it's about a technical question, that, for me, is a big red flag.

Now, to prove it I would have to have a lot more documents, including the documents that we've asked for that your client has refused to deliver.

If you have documents that you think are exculpatory, I of course would be happy to see those documents.

But I wanted to raise this concern because I think the judge should be aware that -- let me think about the word.

It's very, very troubling to see so many documents being retained on the basis of privilege

Right?

A. Correct. I write that. I wrote that, yes.

Q. And you don't write that the calculated doses are wrong. Right?

A. No, I don't.

Q. You don't have information to conclude that the calculated doses are wrong. Right?

A. Correct. I do not say that they're wrong.

Q. And again, you write here about doses specifically with respect to workers. Correct?

A. Correct.

Q. And you render no conclusions with respect to residents of Gulf Coast communities. Right?

A. Correct.

MR. DURKEE: I hear a pause. It's 1:00 o'clock now. How much longer do you want to go before lunch?

MS. DESANTIS: This is a good break time if people want to stop for lunch.

Let's go off the record.

THE VIDEOGRAPHER: The time is 12:57. We are going off the record.

(Lunch recess, 12:57 p.m. to 1:40 p.m.)

by legal counsel and edited.

Q. With respect to Mr. Boggs and his case, we've previously discussed your awareness that Mr. Boggs was a resident and not a response worker. Correct?

A. Correct.

Q. And that your report contains analysis specific to response workers because it was drafted as a generic report. Correct?

A. Correct. Although I think many of the things that I have written could be applicable as well to community residents. But it is true that documents that I was looking at were specifically with respect to the cleanup operation.

Q. And you don't have any sections in your report focused on claims of residential exposure. Correct?

A. Correct.

Q. And you don't have any sections in your report about Mr. Boggs, the plaintiff. Correct?

A. Correct. My report is not case-specific.

Q. And in fact, his name doesn't even appear in your report. Right?

A. I believe that's correct.

Q. You've made it clear that you base your

opinions in this case on a review of documents supplied to you by plaintiff's counsel. Correct?

A. And publicly available materials related to the spill.

Q. And to the extent that you are relying on documents to support your opinions that are publicly available, you have cited those materials in your report. Correct?

A. Correct. To the best of my ability and knowledge.

Q. And you have stated that methodologically, historians do their work primarily through critical reading and interpretation of documents. Correct?

A. Correct.

Q. Critical reading is part of your methodology as a historian of science. Right?

A. Correct.

Q. And interpretation of documents is part of your methodology. Correct?

A. Correct.

Q. And you've stated that, like most historians, your methodology relies primarily on the finding, reading, and interpretation of historical documents. Right?

A. Correct.
Q. It's true that you maintain that your methodology is consistent with standards and practices in your discipline. Correct?
A. Correct. I think it would be fair to say I wouldn't be hired as a Harvard professor if they weren't.
Q. And are there written standards for work in your discipline?
A. That's a good question.
So as I suggested before, interestingly enough, not really. History isn't like biochemistry where there are methods sections or, like, risk analysis where the National Academy of Sciences has published guidelines for risk assessment, or model validation where the National Academy of Science has published guidelines.
We don't have that kind of formal written guidelines for historical research. Maybe we should, but we don't.
Q. And there's no one single methodology in your discipline as an historian of science. Right?
A. True. But I would argue that's true of all sciences as well, that we talk about the

scientific method, but that's false and misleading.

Scientific methods are very varied even within individual disciplines. There often is more than one method that could be used.

Q. You've actually stated it in your report on page 11. There is no one single methodology in your discipline as an historian of science. Right?

A. That's correct.

Q. And the exact methodologies used by historians of science in diverse cases will vary. Right?

A. That's correct.

Q. And you've said that historians like yourself must conform their testimony to the historical method requiring them to respect the pastness of the past by grappling with the complexity and inconsistency of the historical record and dealing appropriately with contrary evidence. Correct?

A. That is correct.

Q. And your method requires you to respect the pastness of the past. Right?

A. That is correct.

Q. And your method requires you to grapple with the complexity of the historical record. Right?

A. That is correct.

Q. You write that your skills as a professional historian are special skills in which historians are trained. Right?

A. Correct.

Q. And are these special skills in which professional historians are trained itemized in any methodological document that you can think of?

A. No. The only thing I can think about is, again -- I mean, it's interesting. So one of the methods of history is oral history, doing interviews with people after the fact.

In general, that's not a method that I prefer because I think we know that there's a high level of fallibility because people's memories are highly fallible.

It's one reason I wouldn't interview people today about an event that happened 14 years ago unless I had no alternative or there was some particular reason why I thought it would be useful in that case.

Other historians would disagree with me,

A. Correct.
Q. You have to do more than nod your head.
A. Sorry. Yes. Correct. Yes. Correct.
Q. And so in your field for the history of science, there are not written standards regarding critical thinking to be used. Correct?
A. Well, as I said, there are books that discuss what the standards of history are. If by "written standards" you mean formalized standards that everyone agrees to or that have been voted upon by some absolute authority, then correct, there is no such written standard of that type.
Q. Your methodology is not peer-reviewed, is it?
A. I'm sorry. What do you mean by --
Q. The methods that you use as a historian of science.
A. Of course it is. Every time I submit a paper for peer review, the method is implicitly being reviewed.
Q. There is not a method that is written for historians of science describing your methodology. Correct?
A. I'm sorry. I'm really not being deliberately obtuse, but I really don't understand

that question.

Q. So you've previously said in your deposition that you, yourself, have not written a peer-reviewed article describing your methodology as an historian of science. Correct?

A. Correct. Because we don't do that as historians. Historians don't do that.

Q. And to your knowledge, there is not a peer-reviewed article describing the methodology of an historian of science. Correct?

MR. DURKEE: Objection, asked and answered.

You can answer.

A. As far as I'm aware. It's possible that such an article exists. But if it does, I'm not aware of it.

Q. And your methodology as an historian of science doesn't have objectively defined metrics. Right? It's not that kind of work?

A. Again, I don't really know what you mean by "objectively defined methods."

Q. So you don't have metrics that govern your particular kind of work? It's not math. Right?

A. No. History is not math. We can agree on that.

Q. Right. And would you say that there is a generally accepted method for determining scientific dishonesty in your field of the history of science?

A. Oh, in history of science. That's an interesting question.

Well, again, I would say there are practices. I mean, when you said "metrics" a minute ago what came to mind was footnotes. Because rightly or wrongly, sometimes historians judge each other by the quantity of footnotes.

And I would say if there's a concern about fraud in history, most commonly that would center on the sources and whether or not a person had made up the sources or claimed sources that weren't really there or claimed the sources said things they didn't say.

I mean, there would be a set of practices that people would pursue. But again, I'm not aware of any written documents that would stipulate how one would establish that.

Q. Okay. So you're not aware of a written document that sets forth a generally accepted method for determining scientific dishonesty in your field. Right?

A. I'm not aware of any such document.
Q. In your testimony in the case of Mann versus National Review, you were retained by the plaintiff in that case. Is that correct?
A. Correct.
Q. And your testimony was excluded by the court. Am I correct?
A. No, not correct. I testified in that case.
Q. And was your testimony limited in that case?
A. Yeah. It was limited because my original report involved a defendant who later was excluded from the case. So the portions of my report and my testimony that involved that defendant were excluded from the case.
Q. Okay. So you state in your report that historical analysis is an exercise in, above all, context-sensitive analysis. Right?
A. Uh-hmm.
Q. I need you to say "yes" or "no."
A. I'm sorry. I'm sorry. Yes, I said that. Correct.
Q. And you maintain that proper contextualization is essential to interpreting the

meaning and significance of historical events. Right?

A. Yes.

Q. So, Doctor, the file of documents that plaintiff's counsel provided to you and that was then provided to us responsive to the subpoena request totals 1,491 documents. We've counted them.

Have you-all counted them?

A. No, I have not counted them, but I'm willing to take your word that it's 1,491.

Q. Okay. And we know you've not read all 1,491 documents. Right?

A. Yes. Sorry. I'm sorry. It's getting late. I'm getting tired. I apologize.

Q. That's okay. Let's make sure we're clear on the record.

You did not read all 1,491 documents that were provided to you by plaintiff's counsel. Right?

A. No, I did not. I read many hundreds, but I did not read every one of the 1,491.

Q. And in your report you cite to 118 of the documents that were provided to you by plaintiff's counsel. Again, we counted.

A. Okay.

Q. Did you count?

A. No, I didn't count.

Q. You know, of course, that there are many more documents about the Deepwater Horizon incident and response than the 1,491 that were provided to you by plaintiff's counsel. Right?

A. Yes, I'm aware of that.

Q. And we've mentioned today in questioning some of the documents that were not provided to you by plaintiff's counsel. Right? We went through some reports?

A. Yeah. Some of the public reports. Yes.

Q. And we've talked to you about some documents today that you've not reviewed whether or not they were provided to you by plaintiff's counsel. Correct?

A. Correct.

Q. And you're aware that what you have in your file and what you've cited in your report is a small fraction of the documentary evidence on the Deepwater Horizon spill and response. Right?

A. Yes. But I would point out there were many more documents that I asked to look at that I thought were relevant based on email chains and

A. Not in this situation.
Q. You need to let me finish my question.
A. Sorry, sorry.
Q. You're not claiming expertise as a chemist in this case. Right?
A. Correct.
Q. And you are not a toxicologist. Right?
A. Correct.
Q. You are not an industrial hygienist. Correct?
A. Correct.
Q. You're not a medical doctor. Right?
A. Correct.
Q. You're not a data scientist. Right?
A. Well, I mean, I do work -- I have formal training in statistics. I've published peer-reviewed articles in statistics.
Depending on your definition of "data science," I think I could say that I am a data scientist. But my opinions in this case are not about questions of data science.
Q. You're not claiming expertise as a data scientist in this case. Correct?
A. No.
Q. You're not claiming expertise in oil spill

relevant to this case. It is not the basis of my opinions, but I wouldn't say it was irrelevant.

Q. You're not claiming expertise in analysis of exposure to -- you're not claiming expertise in analysis of human exposure to toxins in this case. Correct?

A. No, I'm not testifying as an expert in those areas.

Q. And you're not claiming expertise in this case in assessing the potential toxicity of oil or constituents of oil. Right?

A. No, although there's a large body of scientific evidence of the toxicity of oil and its components. As a historian of science, it could be relevant for me to opine on that data.

Q. But you've not been specifically retained to assess the potential toxicity of oil in this case. Correct?

A. Correct.

Q. And you've not been retained to assess the potential toxicity of particulate matter 2.5 in this case. Correct?

A. Correct.

Q. And you have no expertise in assessing acute or chronic respiratory effects to community

Q. Your words in your expert report are based on emails and documents that are subject to interpretation. Right?

A. That's correct.

Q. And your interpretation is your interpretation. Correct?

A. That's correct.

Q. And you didn't subject your analysis in the Boggs matter to peer review. Right?

A. Well, I couldn't because it is subject to confidentiality. I would have actually been very happy to subject this work to peer review if that had been possible, but that's not possible by the constraints of this legal proceeding.

Q. And it's just not been possible for you to get verification through a peer-review process that your claims in Boggs are supported by evidence. Right?

A. I believe I just answered that question.

Q. Correct. Let's go to Tab 48. And let's mark that as Exhibit 22.

(Exhibit 22 marked for identification)

Q. We're looking at a document titled, "Rhetoric and frame analysis of ExxonMobil's climate change communications." Do you see that?

The reagents could be different. The humidity in the laboratory could be different. So the idea of an exact replication is an impossible standard in any science, including the sort of work that I do.

Q. And there's no established success rate for your methodology. Right?

A. Well, I'd say counsel would probably argue the success rate is whether we win or lose.

Q. But with respect to a success rate that you could point to for your methodology, there is no established success rate. Correct?

A. The notion of success is not a meaningful category of analysis in this case.

Q. And similarly, failure rate is not, in your opinion, a meaningful category of analysis for what you do?

A. Correct.

Q. There is no established failure rate for your methodology. Correct?

A. Again, failure rate isn't a meaningful term in this thing. But again, that would be true of most science.

Q. So, Doctor, I want to turn now to some of your opinions regarding decisions that you maintain were made by BP that failed to protect

A. Asked and answered.
Q. No. You can't say that. You have to answer. It's his objection if he wants to make it.
You weren't sitting there in those meetings. Correct?
A. Yes. You already asked that and I already answered it.
Q. And you don't know what was discussed in those meetings. Correct?
A. Correct. I do not.
MR. DURKEE: You've already established that.
Q. And you don't have any personal knowledge with respect to the Deepwater Horizon response at all, do you?
A. You've already established that.
Q. And the answer is no. Right?
A. I'm testifying as a historian looking at the documents after the fact to judge what did or did not transpire.
Q. And with respect to the email threads that you have cited throughout your report between various people, you don't have context to understand the relationships between those people