# EXHIBIT

# B

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| MICHAEL E. MANN, PH.D.,<br>Plaintiff,<br>v.<br>NATIONAL REVIEW, INC., *et al.,*<br>Defendants. | Case No. 2012 CA 008263 B<br>Calendar No. 1<br>Judge Alfred S. Irving, Jr. |

**DECLARATION OF NAOMI ORESKES, Ph.D.**

## I. EXPERT RETENTION AND OPINIONS

1. My name is Naomi Oreskes. I am the Charles Henry Lea professor of the history of science and affiliated Professor of Earth and planetary sciences at Harvard University in Cambridge, Massachusetts. I have been teaching at Harvard since 2013. Before that, over the course of a thirty-year academic career, I have taught both earth sciences and history of science at Dartmouth College, New York University, the University of California, San Diego, and the California Institute of Technology (Caltech). I have also worked as a professional geologist in the United States and Australia. A copy of my curriculum vitae is in the record in this matter.[1]

2. I have a Ph.D. from Stanford University in geological research and history of science. Prior to attending Stanford, I earned an B.Sc. (first class honours) in mining geology from the Royal School of Mines, Imperial College, University of London, where I graduated first in my class.

[1] *See* Defs. Competitive Enter. Inst. & Rand Simberg's Mot. in Limine to Exclude the Exp. Test. of Dr. Naomi Oreskes, DeLaquil Decl. ¶ 3, Ex. 2.

3. The purpose of this declaration is to set forth the basis of my opinion in this case relating to the character of scientific methods and their importance in the establishment of valid scientific claims. I also set forth the basis of my opinion in this case as to the significance of scientific expertise, and the critical importance of the peer review in the establishment of scientific knowledge. I will also articulate the methodology used in formulating my conclusions, particularly my conclusion that expertise and peer review are crucial factors to the establishment of reliable scientific knowledge.

4. In so doing, I am providing a discussion of historical principles and methods that are relevant to the consideration of the validity of scientific research and reliability of scientific claims.

5. Although characterized as "opinion," I was asked to provide a contextual exposition, based on my academic expertise, of the character and nature of scientific research, and the processes that lead to the establishment of warranted scientific conclusions. I was asked to do so in order to enable the jury, in weighing the facts presented, to reach its conclusions with knowledge of the larger context, framework, and processes and procedures used by the scientific community to produce, publish, and defend scientific research, and why these processes and procedures are relevant to truth and falsehood. The jury should benefit from an understanding of the methods that produce reliable scientific knowledge. I emphasize the critical role of the peer review process in establishing valid scientific claims. I also emphasize the importance of an understanding of who is qualified to perform scientific peer review, and why such qualification is essential to the establishment of reliable scientific knowledge. This contextual understanding of what it means to be a scientist working in a scientific community to establish scientific truth will aid the jury in rendering their own ultimate opinions as to the legal issues in this case.

## II. QUALIFICATIONS

6. My qualifications to provide an exposition on the topics under consideration derive from my education and training both as an earth scientist and a historian specializing in earth science. I am the author of the scholarly book, *Why Trust Science?* (2019), which lays out the nature and character of scientific research and considers the processes that contribute to the reliability of scientific findings. I have also authored or co-authored six other books on the history of earth and environmental science, all of which examine the historical development of scientific knowledge, and the evaluate the processes that contribute to or impede that development. These books include *The Rejection of Continental Drift: Theory and Method in American Earth Science* (1999), which examines the historical development of scientific methods in American earth science and their role in the early 20th century debate over the question of whether or not continents move; *Discerning Experts: The Practices of Scientific Assessment for Environmental Policy* (2019), which explores how scientists reach consensus on controversial issues, including climate change; and *Science on a Mission: How Military Funding Shaped What We Do and Don't Know about the Ocean* (2021), which tracks the 20th century development of scientific knowledge in the ocean sciences, including man-made climate change.

7. In addition, I have edited two additional books on the history of science and technology in the 20th century, and authored or co-authored over 150 other publications, including both scholarly and popular articles on the history and current practices of science. These articles have been published in leading scientific and mass media journals around the globe. I also write a monthly column on the practice of contemporary science, entitled *The Observatory*, for *Scientific American* magazine.

8. My research has been supported by the U.S. National Science Foundation, the U.S. National Endowment for the Humanities, the American Philosophical Society, NASA, and NOAA, as well as by other private sources and foundations.

9. My work in history of science and matters in science and society has garnered numerous professional honors, including the Francis Bacon Medal in 2009, the American Geophysical Union Presidential Citation for Science and Society in 2014, the Herbert Feis Prize of the American Historical Association in 2015, the Public Service Award of the Geological Society of America in 2015, the Stephen Schneider Award for Outstanding Climate Science Communication in 2016, the Geological Society of America Mary C. Rabbitt Award in 2019, and the British Academy Medal in 2019. In 2018, I was awarded a John Simon Guggenheim Memorial Foundation Fellowship.[2]

10. I am an elected fellow of the American Association for the Advancement of Science, the American Academy of Arts and Sciences, and the American Philosophical Society. I have also served as a consultant to the U.S. Environmental Protection Agency, the U.S. National Academy of Sciences, and the Council of Canadian Academies, and I have testified as an expert to the U.S. Congress, the U.S. Nuclear Waste Technical Review Board, the California State Senate, and the Belgian House of Representatives. I served as an expert witness in the case of *Eastman Chemical Company v. Plastipure Incorporated*, Case No. A-12-CA-057-SS (W.D. Tex.). I serve on the boards of several non-profit organizations, including the National Center for Science Education.

11. I hold honorary doctorates from five universities: Clark (2021), ETH Zurich (2018), the University of British Columbia (2018); Roskilde University, Denmark (2016); Colgate (2015),

[2] *See generall*y, https://www.gf.org/fellows/all-fellows/naomi-oreskes/ (last visited Sept. 15, 2021).

as well as an honorary master's degree from Harvard University. I have also been a visiting named professor at the California Institute of Technology (Caltech) and have given invited lectures at universities and research institutes around the world.

## III. METHODOLOGY

### A. What Historians of Science Do

12. As a professional historian of science, I study the development of scientific knowledge. In doing so, I rely on the explicit and specific methodologies of my profession. This includes analyzing and understanding both the factual claims that scientists make, the evidence upon which they make those claims, the techniques they use to collect and generate data, and the methods they use to evaluate competing claims and decide which, if any, of these claims may be accepted as true. As Lynn K. Nyhart, Professor at the University of Wisconsin, explained recently in the *Wiley Companion to the History of Science*, the historian's task "is to tease out how certain forms of knowledge and practice . . . came to be understood as 'science,' what has sustained science socially, culturally, and materially; and who has benefit and who has suffers in its formation."[3] Historians also evaluate how and why specific knowledge claims have been accepted by scientists as factual and true, whereas other claims are rejected as untrue, uncertain, or possibly true but not yet established.

13. History is an academic discipline, like physics, biology, classics, or economics, that is represented by academic departments. Virtually all major universities and colleges around the world have History Departments. History is also one of the oldest and most well-established of

[3] Lynn K. Myhart, *Historiography of the History of Science*, A COMPANION TO THE HISTORY OF SCIENCE at 7–22 (Bernard Lightman ed., 2016).

disciplines; the study of history can be traced back to classical antiquity.[4] History of science, as a branch of history, can also be traced back to classical antiquity.[5] Like all scholarly disciplines, it has specific skills and methodologies that are developed through education, training, and practice.

14. Methodologically, historians do their work primarily through the critical reading and interpretation of original historical documents, generally referred to as "primary sources." Historians may also make use of oral sources, including formal oral histories and interviews conducted by historians with participants or other observers. If those interviews were conducted at the time of the events in question, they are considered primary sources. To place historical events into context and accurately interpret their meaning and significance, historians may also consult other cultural records, including but not limited to film, literature, advertisements, popular articles, public opinion surveys, and trial testimony.[6]

15. Historians also consult secondary sources—by which we mean the work of other historians or individuals who have described, interpreted, or commented on matters after the fact. Historians do not work in isolation; like most scholars, our work builds on the work of other scholars working in the same, similar, or comparable fields.

16. The goal of any historian is to develop an account that is as close as possible to the actual historical events, and, as much as possible, avoids the problems of false memory, wishful

---

[4] DONALD R. KELLEY, VERSIONS OF HISTORY FROM ANTIQUITY TO THE ENLIGHTENMENT (1991).

[5] LEONID ZHMUD, THE ORIGIN OF THE HISTORY OF SCIENCE IN CLASSICAL ANTIQUITY (Alexander Chernoglazov transl. 2006).

[6] Soraya de Chadavarian, *Using Interviews to Write the History of Science*, THE HISTORIOGRAPHY OF CONTEMPORARY SCIENCE AND TECHNOLOGY (Thomas Söderquist ed., 1997). *See also* Stephen P. Safran, *The First Century of Disability Portrayal in Film: An Analysis of the Literature*, 31 J. SPECIAL EDUC. 467 (Jan. 1, 1998). (illustrating an example of the use of film as a source in history).

thinking, assessing the past by the standards of the present, and other forms of bias. Historians are expected at all times to meet professional standards for rigor, completeness, and systematic analysis.

17. Reaching historical conclusions is an academic endeavor whereby the historian uses tools and resources available to him or her to develop reliable narratives or chronologies of events, and to reach conclusions based on those chronologies. Historical analysis is an exercise in compilation, review, categorization, and—above all—context-sensitive analysis of information. Historians work to understand events in context in order to answer the question: what does this document, or event, mean, in light of what we know about the context in which the document was created or the event occurred?[7] Historical documents may also be inconsistent or contradictory; the professional historian uses his or her background knowledge and special skills to help understand, explain, and resolve such inconsistencies and contradictions.

18. The job of the historian is to locate relevant historical documents, to judge their credibility, and to interpret their meaning by understanding the context in which they were produced. A good deal of historical training consists of special skills developed to enable historians to locate sources, to judge their credibility, and to interpret their meaning. This is an important reason for specialization: a historian typically specializes in a particular time, place, or topic, in order to be able to judge the meaning and credibility of historical sources from that time or place and pertaining that topic. Professional training and specialization are essential for developing the special skills and background knowledge that enable historians to make these judgments.

19. Evidence is crucial to historical interpretation. All historians seek to make judgements and form conclusions that hew as closely as possible to the available historical

[7] *United States v. Philip Morris USA*, Case No. 1:99-cv-02496-PLF (Doc. No. 3668) (D.D.C.), United States' Written Direct Examination of Dr. Allan M. Brandt at p. 26.

documentation. As Allan M. Brandt, Professor of the History of Science at Harvard University, explained in testimony on behalf of the U.S. Department of Justice in the case of *United States v. Philip Morris*, historical understanding "requires the collection and evaluation of evidence and the development of careful conclusions that are fundamentally based on the substantiating materials."[8]

20. Because similar events may carry different connotations in different historical settings or at different historical times, a key aspect of historical work is to situate events and claims in the specific time, place, and cultural setting in which they occurred. This also applies to the interpretation of words and terms: because the same word or term may carry different connotations in different settings, historians must interpret the use of words and terms in context. This is a sensitive task: even in the same time and place, a word or term may carry different connotations to different individuals and groups, or to the scientific community versus the general public.[9] Historians call this process of interpreting events and language in context "contextualization." Contextualization is essential to interpreting the meaning and significance of historical claims and events. Historians will sometimes praise work that they admire as "fully contextualized." A great deal of historical training aims to help the historian to develop the necessary skills for contextualization.

21. Because history is a qualitative, interpretive social science, it does not have formal testing protocols, in the way that some natural sciences do. Nor does the concept of a "error rate" apply. Rather, historians evaluate work by the quantity and quality of the sources found and used and the consistency of the arguments made with the documentary evidence.

---

[8] *Id*.

[9] Susan Joy Hassol & Richard Somerville, *Communicating the science of climate change*, 64 PHYSICS TODAY 48 (Oct. 1, 2011), *available at* https://physicstoday.scitation.org/doi/10.1063/PT.3.1296 (last visited Sept. 15, 2021).

22. In principle, any literate person can read historical documents, but in practice a person lacking historical expertise is at substantial risk of misconstruing those documents. This is especially true in the history of science, where specialized terms abound, and where words are often used in ways that diverge from their vernacular meanings.

23. Because of their special skills and abilities, historians have testified as experts in a in a large number and wide variety of legal cases in the United States and elsewhere.[10]

[*Remainder of page intentionally left blank*]

[10] *See* Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Court*, 78 N.Y.U. L. REV. 1518 (Oct. 2003), *available at* https://www.nyulawreview.org/issues/volume-78-number-4/historians-at-the-gate-accomodating-expert-historical-testimony-in-federal-courts/ (last visited Sept. 15, 2021); Nancy Wood, *Memory on Trial in Contemporary France: The Case of Maurice Papon*, 11 HISTORY AND MEMORY 41 (Spring/Summer 1999); THE PAPON AFFAIR: MEMORY AND JUSTICE ON TRIAL (Richard Golsan ed. 2000); Elisabeth Bumiller, *A Historian Defends His Leap From Past To Present*, The New York Times (Jan. 31, 1998); Roger Cohen, *U.S. Historian Relates How Vichy France Served Nazis* (Nov. 1, 1997); Laura Maggi, *Bearing Witness for Tobacco*, The American Prospect (Nov. 9, 2001), *available at* http://prospect.org/article/bearing-witness-tobacco (last visited Sept. 15, 2021); Brian W. Martin, *Working with Lawyers: A Historian's Perspective*, 30:2 OAH Newsletter 1 (May 2002), *available at* https://archives.iupui.edu/handle/2450/6017; John A Neuenschwander, *Historians as Expert Witnesses: The View from the Bench*, 30:3 OAH Newsletter 1 (Aug. 2002), *available at* https://archives.iupui.edu/handle/2450/6017 (last visited Sept. 15, 2021); *Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d (BNA) 1705, 1717–18 (1999) (noting testimony on historical connotations of word "redskin" in dispute over validity of trademarks held by Washington Redskins); *Naujalis v. INS*, 240 F.3d 642, 645 n.7 (7th Cir. 2001) (noting historian's testimony on deportee's links to Nazi regime); *United States v. Szehinskyj*, 104 F. Supp. 2d 480, 482–83 (E.D. Pa. 2000) (same); *United States v. Dailide*, 953 F. Supp. 192, 196 n.4 (N.D. Ohio 1997) (same).

24. The list of cases notably includes those involving politically controversial issues such as abortion, gender discrimination, gay rights, voting rights, and more.[11] Historians have also been involved in legal cases as authors or co-authors of amicus briefs.[12]

### B. Historical Documents as Evidence

25. The goal of history, as a discipline, is the reconstruction and understanding of the past based on evidence. Historians distinguished between two main types of evidential materials: "primary sources," which were generated at the time of the events, and "secondary sources," which were generated at a later time, often but not necessarily by other historians.

26. The chief form that primary source evidence in history takes is documents, typically preserved in archives, including (but not limited to) the archives of universities, research

---

[11] *See*, as follows:

On Gender Discrimination: *EEOC v. Sears, Roebuck & Co.*,628 F. Supp. 1264, 1314–15 (N.D. Ill. 1986) (noting competing testimony on history of American women's alleged lack of interest in nontraditional jobs such as commission sales). *See generally* Thomas Haskell & Sanford Levinson, *Academic Freedom and Expert Witnessing: Historians and the Sears Case*, 66 TEX. L. REV. 1629 (1988).

On Gay Rights Cases: Daniel Hurewitz, *Sexuality Scholarship as a Foundation for Change: Lawrence v. Texas and the Impact of the Historians' Brief*, 7 HEALTH AND HUMAN RIGHTS 205 (2004); George Chauncey, *What Gay Studies Taught the Court: The Historians' Amicus Brief in Lawrence v. Texas*, 10 GLQ: A JOURNAL OF LESBIAN AND GAY STUDIES 509 (2004); John Finnis, *"Shameless Acts" in Colorado: Abuse of Scholarship in Constitutional Cases*, 7 ACAD. QUESTIONS 10 (Winter 1994) (discussing expert testimony on ancient Greeks' stance toward homosexual relationships); Martha C. Nussbaum, *Platonic Love and Colorado Law: The Relevance of Ancient Greek Norms to Modern Sexual Controversies*, 80 VA. L. REV. 1515 (1994) (same); *Goodridge v. Dep't of Pub. Health*, 14 Mass. L. Rep. 591 (Super. Ct. 2002).

On Voting Rights: *See, e.g.*, *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1020 (2d Cir. 1995) (noting historical testimony on discriminatory intent of laws and practices that allegedly infringe right to vote); *Irby v. Fitz-Hugh*, 693 F. Supp. 424, 427 (E.D. Va. 1988) (same); *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1356 (M.D. Ala. 1986) (same). *See generally* Peyton McCrary, *Yes, But What Have They Done to Black People Lately? The Role of Historical Evidence in the Virginia School Board Case*, 70 CHI.-KENT L. REV. 1275 (1995) (examining historical evidence of discriminatory intent provided by plaintiffs in Virginia school board case); Peyton McCrary & J. Gerald Hebert, *Keeping the Courts Honest: The Role of Historians as Expert Witnesses in Southern Voting Rights Cases*, 16 S.U. L. REV. 101 (1989) (surveying testimony provided by historians in voting rights cases).

[12] *See* Michael Grossberg, *Friends of the Court: A New Role for Historians*, American Historical Association, Perspectives on History (Nov. 1, 2010), *available at* https://www.historians.org/publications-and-directories/perspectives-on-history/november-2010/friends-of-the-court-a-new-role-for-historians (last visited Sept. 15, 2021).

institutions, government agencies, the Library of Congress and U.S. or other national or imperial archives. Historical methodology relies primarily on the finding, reading, and interpreting of historical documents, and to use these documents to construct historical narratives that both recount and explain historical events. Historians also rely on secondary sources, which consists of the work of other people, often other historians, who have studied or otherwise commented on the same events, related events, or potentially comparable events. These secondary sources offer the historian insight into what other people, including other historians, have concluded about the questions under consideration; a historian may accept this prior work and build upon it, revise it, or challenge it.

27. Historians typically present their findings primarily through books, but also in papers presented at scholarly conferences and articles published in peer-reviewed journals, opinion pieces, and other outlets.

28. Like most historians, my methodology relies primarily on the finding, reading, and interpretation of historical documents. My methodology is consistent with the standards and practice of my discipline, and my academic work is published in peer-reviewed scholarly journals and in academic presses.

**C. History of Science as a Specialized Branch of History**

29. History of science in a branch of history. In this regard, its practices are comparable with other branches of history, such as U.S or European history, and it frequently overlaps in subject matter with these other branches. History of differs from other areas of history, however, in that its focus is on science. Therefore, the types of documentary materials that historians of science study are often technical, and historians of science typically have at least some, and sometimes extensive, training in the scientific fields that they study. In my case, I studied earth

science at both the undergraduate and graduate levels and earned several grants and prizes for my academic work in geology and mineralogy. I worked for several years in industry as a professional earth scientist. I have also taught earth science at the college level and published peer-reviewed scientific papers in earth science. I continue to attend scientific meetings and to work with earth scientists in areas of mutual interest. This background forms as essential basis for my understanding, analysis, and interpreting of the scientific work that I study as a historian of science.

30. Like other branches of history, history of science relies for evidence primarily on historical documents. The type of documents historians of science rely on are primarily scientific documents or documents produced in the course of scientific work. In the history of science, relevant documents may include, but are not limited to, published scientific papers, unpublished field and laboratory notebooks, letters or other communications between scientists, drafts of scientific papers and peer review comments, drafts and final versions of grant proposals, personal letters between scientists or between scientists and other people in their lives, email correspondence, patent applications, and more. Typically, these materials are preserved in the archives of universities, research institutions, government agencies, and/ or the Library of Congress or U.S. national archives. Where archival records are incomplete, they may be supplemented with formal or informal interviews and conversations with living scientists, their family members, or other associates.

31. The purpose of reading and analyzing documentary records is to understand how scientists generate scientific ideas, how they test those ideas, and how they come to agreement as to which of these ideas may be valid and which should be discarded. In this respect, history of science overlaps with the academic discipline of philosophy of science, insofar as historians of

science attempt to answer epistemological questions about the reliability of scientific knowledge, including how the methods of science can yield truth about the natural world.

32. The act of historical recreation is an explicit project specific to that person's field of expertise. If the historian specializes in a different country of origin, the review will require skills in other languages. In the case of history of science, the review requires background understanding of the science under consideration. Historians of science must understand that particular science, both in terms of its factual claims and in terms of the historical development of scientific understanding that it represents.

33. Historians of science are especially qualified to speak to state of knowledge—the facts of the matter—in scientific debates that become matters of public concern. A historian of science, technology, medicine, or public health is qualified to explain the "state of the art" or the "consensus view" in a particular field or with respect to a particular question. For example, a historian of science is qualified to judge whether a scientific consensus prevailed on that question at any given time. If a consensus did prevail, the historian is able to judge whether any particular, specific claim was consistent with that consensus, or, alternatively represented a minority competing scientific opinion, a view that was mainstream but was superseded by later work, or a view that would have been by the scientific community at that time to be wrong, irrelevant, crankish, or pseudoscientific.[13] If there was no prevailing consensus, the historian is qualified to judge whether a particular view was considered by scientific experts to be a credible hypothesis, or not.

---

[13] *See Dietch v. A.W. Chesterton Co.*, Civil Action No. 13-C-1898 KAN (W. Va. Cir. Ct.), Pls' Resp. in Opp. to Defs' Mots. to Exclude the Test. of Pls' Expert Gerald Markowitz, Ph.D., Ex. 2 Affidavit (filed Oct. 17, 2014).

34. A historian should [also] be able to say whether a document was widely read or generally ignored.[14] Historians of science are also able to explain whether a particular claimant was working within the bounds of an acknowledged scientific discipline, and using accepted methodologies, or not. A historian of science can explain if a particular claim was accepted or rejected by relevant experts, and why.

35. A historian of science can explain what it means to be a "relevant expert," in terms of training, professional stature, acceptance by fellow experts, and how such expertise is obtained and sustained, and explain the difference between the normal disagreement and dissent that is part of the process of the scientific adjudication of claims and other forms of non-scientific disagreement. A historian of science can offer historically-based criteria to explain what distinguishes "experts" from non-experts, charlatans, and cranks, as well as what criteria distinguish science from other activities.

36. Historians of science have many of the same skills and abilities as other social and natural scientists. In addition, they have special knowledge of science and the development of scientific knowledge. Because of their special knowledge of science and its development over time, historians of science have served as expert witnesses in a large number and variety of legal cases in the United States in which scientific knowledge is a relevant factor in the case. These cases include, but are not limited to, disputes involving the teaching of "creationism" or "intelligent design" in science classroom; the history of tobacco and knowledge of its dangers; the history of knowledge about asbestos, lead paint, and vinyl chloride and other hazardous materials to which workers and consumers may have been exposed and suffered damage; and more. Testimony in these cases often involves the matter of "who knew what when;" the state of scientific

[14] *Id.*

information at a particular time or over a period of time; and the degree to which that scientific knowledge may also have been common knowledge.[15]

37. There is no one single methodology in history, any more than there is one methodology in physics, economics, or the study of English literature. Therefore, the exact methodologies used by historians in diverse cases will vary. What all historians have in common, however, is the use of documentary evidence to produce evidence-based accounts of the past, and it is this use of documentary evidence that forms the basis for the use of historical expert judgment in legal settings.[16] As Jonathan D. Martin, at the time a Law Clerk to the Honorable John G. Koeltl, United States District Court for the Southern District of New York, explained in 2003, "Historians are often called upon to give expert testimony at trial to help the jury understand the subject matter of the dispute in historical context. Just as scientists must adhere to the scientific method, historians must conform their testimony to the historical method, requiring them to respect the pastness of the past by grappling with the complexity and inconsistency of the historical record and dealing appropriately with contrary evidence."[17] These are special skills that all professional historians are trained to have.

38. By "the past," historians mean all events that have occurred, including the very recent past. Because of the spectacular growth of science in the late 20th and early 21st centuries,

---

[15] ALLAN BRANDT, THE CIGARETTE CENTURY (2007); Louis M. Kyriakoudes, *Historians' Testimony on "Common Knowledge" of the Risks of Tobacco Use: A Review and Analysis of Experts Testifying on Behalf of Cigarette Manufacturers in Civil Litigation*, 15:iv107-iv11 Tobacco Control (Nov. 27, 2006); Patricia Cohen, *History for Hire in Industry Lawsuits*, The New York Times (June 14, 2003), *available at* https://www.nytimes.com/2003/06/14/arts/history-for-hire-in-industry-lawsuits.html (last visited Sept. 15, 2021) (explaining that an estimated 23 consulting groups of historians had been established in the U.S. to testify in litigation as of the date of its publication in 1989); *Law: Historians Carrying More Weight in Court*, New York Times (Nov. 10, 1989); David Rosner & Gerald Markowitz, *The Trials and Tribulations of Two Historians: Adjudicating Responsibility for Pollution and Personal Harm*, 53 MEDICAL HISTORY 271 (2009).

[16] *See generally*, Martin, *supra*.

[17] *Id*. at 1518.

both in scale and cultural significance, a good deal of academic history of science focuses on the recent past, up to and including contemporary work. This is sometimes referred to as "contemporary history."[18] Contemporary history seeks to explain how our present scientific knowledge of the world has come to be, and to understand the basis for current scientific conclusions, including about politically controversial issues such as climate change and evolution. A good deal of my work involves the analysis of the recent past. In areas of recent and contemporary history, secondary sources may not be well developed, and so a historian will rely primarily on primary sources. In most of my work on the development of scientific knowledge in climate science, I rely primarily on primary source evidence. In my work on other areas of science I rely on both primary and secondary source evidence.

**D. The Specific Methodology of Consensus Analysis**

39. Some of my work focuses on the matter of scientific consensus. Since the path-breaking 1960s work of the Harvard physicist-turned-historian Thomas Kuhn, historians of science have understood that scientific work cannot be accounted for by a simplistic notion of "a scientific method." Rather, scientists use a variety of methods—including but not limited to direct observation of the natural world, laboratory experiments, numerical and physical modeling, clinical trials, and the creation of mental and mathematical models—to generate theories and develop evidence in support of those theories. Where evidence is sufficient, scientists may come to agreement on one theory as the best available explanation of the matter at hand; Kuhn called such agreement "consensus" and labelled the consensual framework under which the scientists

[18] THE HISTIOGRAPHY OF CONTEMPORARY SCIENCE AND TECHNOLOGY (Thomas Söderquist ed., 1997).

operated a "paradigm." Since the 1960s, many historians, philosophers, and sociologists of science have focused on consensus as a marker of scientific agreement.

40. In 2003, I undertook an analysis to determine whether there was a scientific consensus that man-made climate change was underway. Using an internet data base, the Web of Science, I analyzed the existing peer-reviewed literature relevant to the question. To do this, I developed a novel methodology: using abstracts of scientific papers to determine the state of scientific opinion and see whether than opinion was unified or disunified. My analysis showed that scientific opinion on the question of man-made climate change was highly unified. My analysis revealed that there was in fact a broad consensus among scientists publishing in the peer-reviewed literature that climate change was underway and dominantly caused by the measurable increase in atmospheric greenhouse gases due to human activity. My findings were published in the journal *Science*—the leading journal for peer-reviewed science in the United States. According to google scholar, as of this writing that paper has been cited 2665 times.

41. Since 2003, the methodology I developed—using the abstracts of peer-reviewed papers to evaluate the state of scientific consensus or disagreement—has been used by numerous other scholars. One paper that uses and extends my methodology is the 2016 paper by John Cook and colleagues, "Consensus on consensus: a synthesis of consensus estimates on human-caused global warming," which has been cited 1150 times. In 2018, I published a follow up paper that addressed potential sources of error in the scientific consensus. This paper, "The scientific consensus on climate change: How do we know we're not wrong?" has been cited 323 times.

42. In 2006, I became interested in the question of why some individuals and groups were reluctant to accept the scientific conclusion that man-made climate change was occurring. This led to the publication of my 2010 book, co-authored with historian of technology Erik M.

Conway, *Merchants of Doubt*. This book has been translated into nine languages and made into a documentary film by the same name. The key finding of the book was that leading "skeptics" of climate change had not found problems in climate science but were reacting negatively to climate science for political and ideological reasons.

**E. *Why Trust Science?* A Historical Analysis of Scientific Methodology**

43. The underlying bases for my opinions are set forth in greater detail in my 2019 book, *Why Trust Science?* In this book, I review the processes by which scientists come to agreement on contested issues, focusing particularly on the role of critical scrutiny—what Stanford Professor philosopher emerita, Helen Longino, has called "transformative interrogation"—in the vetting of scientific claims and the establishment of scientific facts. I argue that scientific facts can be distinguished from "opinions," "ideas," and "hypotheses" by one essential criterion: whether they have been subjected to and passed the critical scrutiny of other scientific experts. I argue the critical scrutiny of claims by communities of experts is an essential and defining feature of modern science. I further argue that scientific claims are claims that have been or are being vetted by relevant communities of scientific experts; scientific facts are the particular claims that have successful passed those vetting processes and been broadly accepted by those expert communities. Scientists may develop their ideas and data in many different ways, but for a claim to count as *scientific*, it must be vetted, and ultimately rejected or accepted, by experts with training and qualification in the relevant field. A claim that has not passed that vetting process cannot be considered scientific.

44. In contemporary science, peer review is the most important of the processes by which scientific claims are vetted by other scientific experts. Peer review can be understood as a

form of quality control: scientists review each other's work and reject work that does not meet community standards for logic, rigor, accuracy, precision, completeness, and persuasiveness.

45. Typically, the peer review process is highly demanding: few if any claims are accepted when first proposed. In the face of collegial critique, scientists may simply drop the claim and move on. Or they may collect more evidence to try to make the claim more persuasive. They may also re-analyze existing data or revise the original claim in light of their colleagues' critique. After some period of time—which may be as little as months or as much as decades—a scientist (or group of scientists) reaches the point where either their claim has been accepted by their colleagues or it has been rejected and they move on to more productive lines of research. The claims that have withstood this process of rigorous scrutiny and been accepted by all or most relevant experts are the claims that scientists accept as true. They are the claims that will be written in textbooks and taught in science classrooms.

46. The core of *Why Trust Science?* is a review of the various theories that have been put forward by scholars to explain how scientific knowledge develops, followed by an analytical review of five episodes in the history of science that I have studied—using primary and secondary sources—to understand the conditions under which scientific conclusions may not be trustworthy and public skepticism may be warranted.

My findings may be summarized as follows:

a. Scientific research is reliable by virtue of the social processes that scientists engage in, specifically the collective vetting and critical interrogation of claims through scientific workshop, meetings, conferences, and above all publication in peer reviewed journals, formal scientific assessments and reports of government scientific agencies and laboratories. The success of these processes rests on the evaluation of scientific claims by appropriate, qualified experts, and relies on the focused expertise that comes from specialization. In the area of climate change, it is the research of credentialed and qualified climate scientists that tells us the truth about the climate system, and how human activities may be altering it. It is also the

research of credentialed, expert scientists, that tells us the most likely outcome of these alterations.

b. The history of science shows that there is no one, singular scientific method that all scientists, in all disciplines, have used throughout the history of science. Rather, historical evidence shows that at different times, and in different disciplines, scientists have used different methods to good effect.

c. Peer review promotes objectivity by subjecting claims to independent scrutiny, and history shows that it has a proven track record of yielding empirically reliable results. Publication in a peer-reviewed journal, assessment, or report does not guarantee the accuracy of scientific results presented, but all scientific results are expected, at minimum, to pass the bar of peer review. Peer review is an essential aspect of contemporary scientific work because it subjects scientific claims to the scrutiny of experts who are qualified to judge the quality of the work.

d. In cases where we judge in retrospect that scientific work did not turn out to be trustworthy, we typically find there was not a scientific consensus regarding the matter under debate. In these cases, we may now have the impression that "everyone thought..." or "everyone believed...." but typically this is not, in fact, the case. In each of the cases I examined, there was no scientific consensus on the views that we now consider incorrect or otherwise problematic. For this reason, I further conclude that scientific consensus is a crucial criterion of evaluation: the presence of consensus tells us when scientists have reached agreement. Equally important, however, is that the absence of consensus tells us that scientists have not reached agreement, that further research is warranted, and that prevailing claims may not yet have reached the stage where they have earned our trust. Many scientific conclusions that appear problematic in hindsight had not in fact achieved scientific consensus at the time.

47. In drawing these conclusions, I relied on explicit and specific historical methodologies, including the use of both primary and secondary sources, and interpreting those sources in historical context, and basing any conclusions on the substantiating materials.

## IV. PEER REVIEW OF MY WORK AND METHODOLOGY

48. History of science is a social science, and it follows many of the same protocols and practices as natural science. One of these is the centrality of the critical vetting of claims by qualified experts through peer review. Historical papers published in scholarly journals are subject

to a peer-review process comparable to that of scientific papers published in scientific journals. Books published with academic presses are also subject to peer review, almost always at the stage of the book proposal and often at the stage of the completed manuscript, as well.

49. As part of the project of writing *Why Trust Science*?, I subjected my own claims to critical scrutiny, and revised those claims in light of that scrutiny. This process is described in the introduction to the book by Princeton professor Stephen Macado:

> This book grows out of the Princeton University Tanner Lectures on Human Values delivered by Professor Oreskes in late November 2016. On that occasion, four [*sic*] distinguished commentators, representing a variety of fields and perspectives, responded to Professor Oreskes's two lectures. This book contains the lectures, the four commentaries [by five authors], and an extended reply by Professor Oreskes, all revised and expanded.[19]

50. Thus, the book not only articulates the idea of transformative interrogation but also illustrates it. In addition to the general methodology that all historians use to formulate conclusions, explained above, the process or methodology of creating *Why Trust Science?* included my responding to the work of other scholars or experts. These other scholars were:

e. Susan Lindee, Janice and Julian Bers professor of history and sociology of science at the University of Pennsylvania, https://hss.sas.upenn.edu/people/m-susan-lindee

f. Marc Lange, Theda Purdue Distinguished Professor in philosophy of science at the University of North Carolina at Chapel Hill, https://philosophy.unc.edu/people/marc-lange/

g. Ottmar Edenhofer, director and chief economist at think tank Mercator Research Institute on Global Commons and Climate Change, https://www.mcc-berlin.net/en/institute/team/edenhofer-ottmar.html

h. Martin Kowarsch, scholar at think tank Mercator Research Institute on Global Commons and Climate Change, https://www.mcc-berlin.net/en/about/team/kowarsch-martin.html

---

[19] NAOMI ORESKES, WHY TRUST SCIENCE? at 2 (2019).

i. Jon A. Krosnick, Frederic O. Glover professor and social psychologist at Stanford University, https://politicalscience.stanford.edu/people/jon-krosnick

51. In addition to the open discussion and critical scrutiny of my work by these five distinguished scholars, the book was also submitted for peer review by Princeton University Press. Several anonymous peer reviewers raised questions about my arguments, to which I responded by making corrections, clarifications, or additions to the original arguments of the book. Thus, the final product was transformed in relation to the original. In this sense, the book is both an argument about how scientific knowledge develops and a model of that argument.

52. Like all scholarly work, *Why Trust Science?* builds upon the work of other scholars, by testing it, dissecting it, and analyzing it, to reach a common and shared understanding of issues and topics important to society. That process, in additional to the traditional process of any historian, led to my conclusions as to (1) my understanding of the character of scientific methods in the field of science today: (2) the importance of scientific expertise in establishing valid scientific claims; and (3) the critical role of scientific peer review in establishing accepted scientific knowledge.

53. The methodology I used to address these concepts in my expert testimony is the same methodology discussed in chapters 1 and 2 of *Why Trust Science?*, which explains in detail my acquired knowledge as to the history of science, its underlying philosophies, the development and use of diverse scientific methods, and my conclusions as to the centrality of peer review and scientific expertise. I cite over a hundred reference materials in formulating these chapters.

54. As set forth in the book, to formulate my opinion in this matter, I engaged in analysis and interpretation of historical documents and summaries, scholarly articles, and public information to formulate my own academic opinion.

55. Because historians are scholars, they must cite sources. As I did in my book and in my report, scholars use footnotes (or endnotes) to document their sources. This provides the evidentiary basis needed for an accurate recreation of the relevant area. It also enables other scholars to judge the basis of the claims being made. A history without citations or some comparable system of referencing is not considered reliable.

56. In principle, any person can read the references cited in my book, just as in principle any person can read historical documents, but a historian will do more than merely read documents and compile information. He or she will employ background knowledge to understand interpret these materials. He or she will situate the ideas or events under consideration by understanding its broader social and cultural context, and to analyze them in the broader landscape of contemporary events. When reviewing a particular document, the historian will try to discern how the document came to be, who wrote it, and why, and look for evidence as to what impact it had on the individual, community or society to whom it was addressed, as well as other potential impacts. And the historian will ask: what is it importance or relevance in a set of contemporaneous documents, particularly if this document seems to contradict others? The historian will thus try to judge the significance, credibility, and where possible the impact of the available documentary evidence.[20] In short: historians use the established tools of modern scholarship to investigate the origins, significance, and impact of historical events and artifacts to reach evidence-based conclusions about the past—including the very recent past—based primarily on documents.

57. In sum: the methodology for a historian can be formulated in general terms to include: (1) acquiring expertise and interpretive skill in the area the historian wishes to explore, (2) identification of relevant source materials, including both primary and (where available)

[20] *See, supra* n.7.

secondary sources; (3) review of materials relevant to that area, read through the lens of the expertise and skill required, (4) the application of critical thinking to organize the cited material to support any underlying conclusion; and (5) summary of that organized conclusion with reference to citations.

58. Using this background, knowledge, special skills, and methodology, I have developed the opinions expressed in this case. As explained above, these opinions are that scientific conclusions are developed by scientific experts, through the processes of peer review and other forms of vetting in communities with shared expertise. There is no one unique scientific method, but all scientific disciplines have some version of peer review, in which the "peers" are other credentialed, scientific experts. This process of review is a crucial part of what sets scientific conclusions apart from opinion, ideas, and even "hypotheses" and "theories" in the colloquial sense of those words. When considering the status of any scientific (or purported scientific) claim, it is crucial to assess the expertise of the person making the claim, whether that claim has emerged from the application of scientific methods of analysis, and whether it has passed through scientific peer review.

THIS CONCLUDES MY STATEMENT.

Dated: September 17, 2021

Naomi Oreskes