# EXHIBIT C

**In the Matter Of:**

*BOGGS v*

*BP EXPLORATION & PRODUCTION INC.*

---

*NAOMI ORESKES, PH.D.*

*October 15, 2024*

---

LEXITAS™

VOLUME 1
PAGES: 1-346
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

CHARLES A. BOGGS,
Plaintiff,
v.
BP EXPLORATION & PRODUCTION INC. AND BP AMERICA PRODUCTION COMPANY, et al.,
Defendants.

Civil Action No. 16-13476

** CONFIDENTIAL **

VIDEOTAPED DEPOSITION of NAOMI ORESKES, PH.D.

Tuesday, October 15, 2024

10:04 a.m.

Kirkland & Ellis LLP

200 Clarendon Street

Boston, Massachusetts

Michelle Keegan, RMR, CRR, CSR
Lexitas
508-478-9795 ~ 508-478-0595 (Fax)
www.LexitasLegal.com

A P P E A R A N C E S:

THE DOWNS LAW GROUP
By: C. David Durkee, Esq.
By: Kristian Toimil, Esq. (Zoom)
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Phone: (305) 444-8226
Email: ddurkee@downslawgroup.com
Email: ktoimil@downslawgroup.com
Counsel for Plaintiff Charles A. Boggs

KIRKLAND & ELLIS LLP
By: Rocky Khoshbin, Esq.
By: Andrew Hartford, Esq.
By: Vanessa Barsanti, Esq.
333 West Wolf Point Plaza
Chicago, Illinois 60654
Phone: (312) 862-4217
Email: rocky.khoshbin@kirkland.com
Email: andrew.hartford@kirkland.com
Email: vanessa.barsanti@kirkland.com
Counsel for Defendant BP Entities

KIRKLAND & ELLIS LLP
By: Karen McCartan DeSantis, Esq.
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone: (202) 389-5217
Email: karen.desantis@kirkland.com
Counsel for Defendant BP Entities



APPEARANCES (continued)

LISKOW & LEWIS
By: Devin C. Reid, Esq. (Zoom)
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Phone: (504) 581-7979
Email: dcreid@liskow.com
Counsel for Defendant BP Entities

Also Present:
Shawn Budd, Videographer



I N D E X

| Videotaped Deposition of: | Page |
|---|---|
| NAOMI ORESKES, PH.D. | |
| By Ms. DeSantis | 8, 341 |
| By Mr. Durkee | 338 |

E X H I B I T S

| No. | | Page |
|---|---|---|
| Exhibit 1 | BP's Re-Notice of Taking Videotaped Deposition of Dr. Naomi Oreskes | 14 |
| Exhibit 2 | Subpoena to Produce Documents | 15 |
| Exhibit 3 | October 2024 e-mail chain | 27 |
| Exhibit 5 | Expert Project Prepared For Downs Law Group, Naomi Oreskes, 24 July 2024 | 41 |
| Exhibit 6 | 8/9/23 Invoice | 33 |
| Exhibit 7 | 5/15/24 Invoice | 34 |
| Exhibit 8 | 6/6/24 Invoice | 34 |
| Exhibit 9 | Naomi Oreskes CV | 41 |
| Exhibit 10 | On Scene Coordinator Report, Deepwater Horizon Oil Spill, September 2011 | 85 |
| Exhibit 11 | Email, BP-B3_DLG_00181399 through -400 | 142 |
| Exhibit 12 | Memorandum dated August 25, 2010, Boggs-Oreskes-003332 through -333 | 149 |



EXHIBITS (continued)

| | | |
|---|---|---|
| Exhibit 13 | Deposition Transcript of Dr. John Howard, June 26, 2014, Boggs-Oreskes-021282 through -584 | 153 |
| Exhibit 14 | Gulf of Mexico Research Initiative Key Messages, February 2015 | 158 |
| Exhibit 15 | "GoMRI Research Program Overview" | 176 |
| Exhibit 16 | "Project Member Institutions GoMRI Research Board" | 184 |
| Exhibit 17 | "NIH to launch Gulf oil spill health study" | 193 |
| Exhibit 18 | Declaration of Vanessa Barsanti | 227 |
| Exhibit 19 | "Big oil is the new big tobacco. Congress must use its power to investigate" | 252 |
| Exhibit 20 | Brief of Amici Curiae Robert Brulle, Center for Climate Integrity, the Chesapeake Climate Action Network, Justin Farrell, Benjamin Franta, Stephan Lewandowsky, Naomi Oreskes, Geoffrey Supran, and the Union of Concerned Scientists in Support of Plaintiff-Appellee and Affirmance | 256 |
| Exhibit 21 | New York Times article, "What Exxon Mobil Didn't Say About Climate Change" | 265 |
| Exhibit 22 | Article, "Rhetoric and Frame Analysis of ExxonMobil's Climate Change Communications" | 267 |

EXHIBITS (continued)

| | | |
|---|---|---|
| Exhibit 23 | "Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts" | 269 |
| Exhibit 24 | Invoices to The Downs Law Group | 273 |
| Exhibit 25 | Email, STANTEC_00379016 through -018 | 275 |
| Exhibit 26 | "Water Column Injury Ephemeral Data Collections" | 278 |
| Exhibit 27 | Handwritten notes (Retained by Attorney Durkee) | 343 |

* There was no Exhibit Number 4 marked *

* All original exhibits retained by court reporter except for Exhibit 27 *

** Documents quoted on the record are transcribed as read **



P R O C E E D I N G S

THE VIDEOGRAPHER: Okay. We are on the record. This is the videographer speaking, Shawn Budd, with Lexitas Legal.

Today's date is October 15th, 2024, and the time is 10:04 a.m. We are here in Boston, Massachusetts, to take the video deposition of Dr. Naomi Oreskes in the matter of Charles A. Boggs versus BP Exploration & Production, et al.

Would counsel please introduce themselves for the record.

MR. DURKEE: David Durkee on behalf of Charles Boggs.

MS. DESANTIS: Karen McCartan DeSantis on behalf of the BP entities.

MR. HARTFORD: Andrew Hartford on behalf of the BP entities.

MS. BARSANTI: Vanessa Barsanti on behalf of the BP entities.

THE VIDEOGRAPHER: And would the people on Zoom like to introduce themselves?

MS. BARSANTI: I think they are just listening in. Nobody is going to ask questions.

THE VIDEOGRAPHER: The court reporter



today is Michelle Keegan.

Would you please swear in the witness.

NAOMI ORESKES, PH.D.,

having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR BP ENTITIES

BY MS. DESANTIS:

Q. All right. Good morning, Dr. Oreskes. My name is Karen DeSantis, as you know. I'll be asking you questions this morning on behalf of the BP entities.

Could you please state your full name for the record.

A. Naomi Oreskes.

Q. And what is your business address, Dr. Oreskes?

A. My business address, Science Center 371, 1 Oxford Street, Cambridge, Massachusetts 02138.

Q. And have you given a deposition before?

A. I have.

Q. How many times?

A. Twice.

Q. And in what matters were those depositions?



A. The first one was a lawsuit involving two chemicals, one chemical -- two chemical companies. Two chemical companies. One was suing another for product defamation under the Latham Act. That was in Texas.

And the other more recently was a defamation suit, Professor Mike Mann versus University of Pennsylvania, and that was heard in Washington, D.C.

Q. Did you testify at trial in either of those cases?

A. Yes. They both went to trial, and yes, I testified at trial.

Q. Have you testified at trial in any other cases?

A. No.

Q. Okay. I will be asking you questions today, as you know, because you have previously given depositions. And if you cannot hear or understand any of my questions, Dr. Oreskes, please let me know. If you don't notify me, I'm going to assume that you've both understood and heard my question.

Because the court reporter is going to be taking down everything that we say, it's important

Page 10

that you answer my questions verbally --
A. Yes, I understand.
Q. -- rather than a nod or a shake of the head.
It is also important that we try not to talk over each other, as she will be taking down everything that we say.
If you need to take a break for any reason, just let me know and we will take a break as long as there is not a question pending.
A. Understood.
Q. Fair enough?
A. Understood.
Q. Do you understand that you're under oath?
A. I do.
Q. And you have the same obligation to tell the truth as if you were testifying in court?
A. I understand that.
Q. Is there any reason that you will not be able to testify fully and truthfully today?
A. No, there is no reason.
Q. Okay. Did you bring any documents with you today?
A. I did. Yes.
Q. What did you bring with you?

Page 11

A. I brought a copy of my own expert report in this case, and I brought a fact sheet in which I summarized what I thought were some of the key facts in that report as well as other key facts, like when the spill occurred, how many people were killed, what fines BP has paid in relation to this case.
Q. Okay. May I ask that you bring out that fact sheet, please.
A. Sure.
Q. And may I see it, please?
A. Sure.
Q. I'm going to ask that we have copies of that made, Doctor, because we'll mark that as an exhibit and then everybody at the table can have one of your fact sheets.
A. Okay.
Q. Thank you.
Did you do anything to prepare for your deposition today?
A. Yes. I spoke with lawyers for the plaintiff, I reread my own deposition -- not deposition; report -- and I reread a few of the documents that I had consulted in writing that report just so that it would be fresh in my

Page 12

memory.
Q. Do you recall what documents you reviewed?
A. Well, as I just said, I reviewed my own report.
I also reviewed -- and I have it here if you'd like to see it -- particular -- a particular document I thought was important.
The defendants in their own expert reports had implied that no other federal agency, because they had worked with BP on the spill and because they had approved the plans in advance, that somehow this implied that they also approved what BP actually did.
And I thought that was not true, and so I pulled that one particular document. It's an email from Ian Zelo, who was the oil spill coordinator for NOAA's Assessment and Restoration Division, on June 21, 2010, where he severely criticized the BP sampling plan.
And so I excerpted part of that document, and I made a copy of it, which I'm happy to share.
Q. We'll ask you for that as well.
MR. DURKEE: Just for the record, the first group of documents she identified, do you want them to be marked as 4?

Page 13

MR. KHOSHBIN: Yes, please.
MR. DURKEE: And then the second is going to be marked as?
MR. KHOSHBIN: 10.
MR. DURKEE: 10?
MS. DESANTIS: We're going to hold on and not mark them yet. Let's make copies of them, if we could, and then we'll go ahead and mark them as exhibits.
A. I should also add, if I may, in my key facts, it's not all facts. There are -- in some of the expert reports that were submitted on behalf of the defense, there were attacks on my character, my reputation.
And so in my key facts I also have a few comments of my own in response to those attempts to impugn my objectivity and my reputation.
Q. So, Dr. Oreskes, other than the fact document and then the second document that you referenced, the email thread, are there any other documents that you brought with you to the deposition today?
A. No. As I said, the other --
Q. Other than the report?
A. -- is my report.

Page 14

Q. You mentioned, of course, you reviewed your report, you reviewed your fact sheet, and then you reviewed the email that you mentioned.
Are there any other documents that you reviewed in preparation for your deposition?
A. Yes. As I said, I looked at -- in my own report I referred to documents. I looked again at a couple of those documents, but I didn't make copies of all of them. The only one I made a copy of was the Zelo email.
Q. Do you recall which documents you reviewed?
A. No.
(Exhibit 1 marked for identification)
Q. I'm going to ask you to take your notebook that's in front of you marked "Binder 1" and open that document -- open that notebook. And if you could please look at Tab 1 in that document, you will see behind it an exhibit that has been marked as Exhibit 1.
A. Yes.
Q. That is BP's notice of taking your videotaped deposition.
Have you seen that document before?
A. No, I have not.

Page 15

Q. That is the document that asks you to appear here today. And you are here.
A. Oh, I see. Sorry. I don't remember it being videotaped. There was a document that I saw asking me to be here today. I don't remember a document about videotaping, but it's possible I may have seen it.
Q. All right. That is the notice that's asking you to be here today. And as you know, this is your videotaped deposition.
I'm going to ask you now to turn to Tab 2. And Exhibit 2 is behind Tab 2. It is a subpoena to produce documents in this matter issued to you.
(Exhibit 2 marked for identification)
Q. Have you seen this document before?
A. I'm not sure if I have or haven't. If this is with respect to the documents that I reviewed as part of writing my report, my understanding is that plaintiff's counsel was responsive to that request.
Q. All right. And so you understood the plaintiff's counsel was going to be providing to counsel for the BP entities the documents that were requested in that subpoena on your behalf. Is that correct?

Page 16

A. That's my understanding.
Q. All right. Do you have knowledge as to whether or not plaintiff's counsel had your complete file of documents for work on this case?
A. My understanding is that they did.
Q. All right. Did you send plaintiff's counsel your file?
A. No. Because everything that I reviewed was materials that had been supplied to me by them, which mostly had been supplied to them by your clients.
And the only other materials that I looked at were materials that are in the public record, such as the presidential commission on the spill. And all of those are fully documented in my report.
Q. All right. Did you actually review all of the documents in the file that was sent to you by plaintiff's counsel?
A. No. I mean, do you want me to go into the process by which we reviewed documents? I'm not quite sure what you're asking.
Q. Yeah.
A. Okay. So I did not look at every single document that was supplied to me. I work with a

Page 17

research assistant, Nina Elkadi, who is a Harvard graduate who worked with me as an undergraduate, who is an exceptionally able researcher.
And when I was asked to be involved in this case, I proposed to counsel that she would assist. And they agreed, and she signed the required confidentiality agreements.
Our process consisted of a preliminary review in which she -- well, first we looked -- first we talked about -- I don't know how much detail you want here.
But she looked at the documents that were provided in the various productions and then she made judgments about documents that she thought we would be interested in.
In many cases, we went through documents together. We talked about whether they were salient or not to the issues that we thought we had expertise on in the case.
If I considered that the documents weren't salient to my expertise, were not things that I would comment on, then we didn't pursue those further. And we made it clear to plaintiff's counsel that that was beyond my expertise. So it was, in whatever way, not something that I thought

Page 18

I was in a position to be reviewing.
And so that was our process in the initial stages for sort of narrowing down what were the areas that I would comment on as an expert.
And then after that going forward, Nina used those criteria to cull documents and would create new files, then, of the documents that she thought I should look at. And then I would review those documents.
So I did not review every document that was supplied, and so many of the things that were responsive to this could well be things that I never looked at.
Q. All right. And they could also -- with respect to the file that was sent to you by plaintiff's counsel, there are documents in there that you did not consider in drafting your expert report. Is that correct?
A. Wait. Say that again. Sorry.
Q. Okay. With respect to the file of documents that was provided to you by plaintiff's counsel, there are some documents in that file that you did not consider --
A. Sure.
Q. -- for purposes -- wait. You have to let

Page 19

me finish the question.
A. Sorry.
Q. -- that you did not consider for purposes of preparing your report?
A. Correct. If we judged them not to be salient to my areas of expertise and therefore areas I would appropriately comment on, we simply passed on reviewing those documents.
Q. Is it fair to say that any documents that you considered for the purposes of preparing your report are cited in your expert report?
A. I believe so. Yes. I mean, unless I made an error, which is possible. Nobody is perfect.
But yes, I would say that any document that I relied on to write my report would be cited in a footnote. And that would also be true of publicly available material as well.
Q. All right. So the universe of documents that you relied on to support your expert opinions in this case are cited in your footnotes. Correct?
A. Correct. Unless there was an error, which is -- I don't want to swear that we never made a mistake.
But in general, yes, our process would

Page 20

be -- and Nina would have checked and double-checked every -- every footnote that I put in, Nina would have checked that footnote against the documents to make sure that we were, in fact, correcting those.
And in fact, I do know that when we were reviewing the final documents, because the Bates numbering system, every single page has its own number, we did catch a couple of errors in which I, like, referred to -- maybe it was the first page and I didn't realize the quotation went on to a second page or something like that.
And so Nina worked to check and double-check that errors of that type were corrected.
And I recall there was one error that counsel found in which there was some issue that came up where your -- you'd have to ask counsel for the exact details.
There was some concern that something was cited that shouldn't have been cited, and we remedied it. You'd have to ask counsel for the details on that.
As far as I know, we made every effort and did our due diligence to make sure that every

Page 21

document was accurately cited and in each case that the citations were to the appropriate Bates numbers referring to the appropriate pages.
Q. To the best of your knowledge, your expert report of July 24th, 2024, cites to the documents that you relied on to support your opinions in this case?
A. Yes, to the best of my knowledge. Certainly we made every effort to do that.
Q. All right. As you look at the subpoena that we just referred to behind Tab 2, I'd like to direct your attention particularly to Request L, which is at the top of page 3.
And L requests "Copies of any and all Documents that you relied on that describe the procedural" . . . "or scientific methodology/methodologies and formulae that you used in preparing your opinions or the Report."
Do you see that?
A. Yes, I see it.
Q. Did you provide any such documents responsive to L?
A. Well, the description of my procedures and scientific methodologies is in my expert report.
Q. All right. So the full description of the

Page 22

methodology that you followed to render your opinions in this case is in your expert report dated July 24th, 2024?
A. Well, it would depend on your definition of "full." I've been in my profession for 40 years, so I can't say that I could tell you every single book that I ever read that would inform my methodology. That would be an impossible request.
But the whole point of the first section of my report is to describe as accurately and fully as possible what the methodologies of history of science are and how and why they are relevant and useful in a case of this type.
Q. So your report dated July 24th, 2024 recites your methodology as you follow it as an historian of science. Correct?
A. And as broadly understood by other historians of science who have done similar work.
So you will see there are footnotes in that section to other historians of science, people like my colleague Alan Brandt at Harvard who have also done work of this kind and have themselves produced expert reports of this type.
Q. And your expert report dated July 24th,

Page 23

2024, describes your methodology as a historian in science that you followed in this particular case as well. Correct?
A. Correct.
Q. Doctor, looking at Request M in the subpoena, Exhibit 2, it requests, "Copies of any and all articles you have published in peer-reviewed journals discussing any methodology/methodologies of formulae that you followed in formulating your opinions in this case." Do you see that?
A. Yeah, I see it.
Q. Do you have any articles that you have published in peer-reviewed journals discussing any methodology/methodologies or formulae that you have followed in formulating your opinions in this case?
A. That's an odd question for a historian. Obviously formula is an irrelevant request for a person who does the sort of work that I do.
I have not published any articles that specifically deal with methodologies relevant to doing work of this type, so it wouldn't be a relevant question.
Q. So you've never published an article in a

Page 24

peer-reviewed journal on the methodology that you followed to formulate your opinions in this case. Correct?
A. Correct.
Q. Have you ever seen an article authored by someone else published in a peer-reviewed journal on the methodology that you followed to formulate your opinions in this case?
A. Yeah. It's an interesting question.
Q. Is the answer "yes," though? You said "yeah."
A. I'm thinking about it. Give me a moment to think.
So when I was preparing this report -- because I'm aware of Daubert. I am aware of what Daubert challenges are. I'm aware of what the expectations of courts are with respect to these issues.
I did spend some time thinking about this question because history is an interesting field. It's not like biochemistry or toxicology where people routinely write articles on methods or where articles have methods sections. It's not normal practice in history to have a methods section of a peer-reviewed article.

Page 25

So to ask for that would be to ask for something that wouldn't normally exist. And that's interesting because it makes history different from, say, toxicology or biochemistry.
But as you know and as I explain in my report, nevertheless many historians have testified in many cases, in many jurisdictions, on many different types of topics.
So there's no question that history has been accepted in multiple jurisdictions by multiple judges as an academic field that has methods.
But in history, our methodologies tend to be more implicit. They tend to be more embedded. We don't have the kinds of explicit discussions of methodology that you would find, as I said, for example, in a biochemistry case.
However, because of that I did think about that problem. And there are some articles, one in particular that I know I cite in my report, where I believe he was a clerk at the time, wrote an article on exactly this issue. And that is cited in my report because I recognize that it is important for us to be clear about what our methodologies are.

Page 26

So I've done the best I could in my report to be clear about that issue.
Q. But back to my question, which is, have you seen an article authored by someone else published in a peer --
A. Well, I just said -- sorry, sorry, sorry.
Q. Have you ever seen an article authored by someone else published in a peer-reviewed journal on the exact methodology that you followed in formulating your opinions in this case?
A. As I said, I quote an article. I believe it was published in the Law Review. And I would point out that I understand that the peer review processes in Law Review are not the same as the peer review processes in scientific papers. But I would consider that that would be a relevant paper on the methodology that I used in this case.
Q. Do you recall the author?
A. No. But it's in the report and I could look it up.
Q. And it's a Law Review piece?
A. I believe it was a Law Review piece. But again, I'd have to double-check on that.
Q. We'll come back to that.
But other than that Law Review article

Page 27

that you just mentioned, are there any other articles authored by someone else --
A. Not --
Q. -- that you've seen published in a peer-reviewed journal that explain the exact methodology that you followed for formulating your opinions in this case?
A. Not offhand, that I can remember.
Q. I'd like to ask you to turn to Tab 3 in your notebook, and we've marked the document behind Tab 3 as Exhibit 3.
(Exhibit 3 marked for identification)
Q. This is an email from Kristian Toimil to Devin Reid about materials that you considered in preparing your report.
Doctor, have you seen that email before?
A. Not that I recall.
Q. In this email, Doctor -- and you can read along with me -- Kristian Toimil, who is with The Downs Law Group, says that your "materials considered were provided as part of our response to the subpoena production."
And we've just discussed that subpoena production.
A. Yes.

Page 28

Q. And so this email is consistent with your understanding of what was produced?
A. It is consistent with my understanding that plaintiff's counsel was responsive to that request.
Q. All right. And, Doctor, I'm now going to ask you some questions about the preparation of your report.
When were you first contacted by plaintiff's counsel to do work?
A. In 2022. I don't remember the exact date, but it was in 2022.
Q. And when plaintiff's counsel reached out to you in 2022, was it specifically for work on this case, the Boggs case?
A. No, it was not. It was more generic.
Q. And when you were first contacted by plaintiff's counsel, what was asked of you at that point?
A. Well, the initial discussion was, as I said, fairly generic. They explained to me that they were involved in more than one case involving legacy effects, potential legacy effects of the BP Horizon explosion, spill and cleanup and was I potentially interested in being an expert in cases

Page 29

with respect to that.
Q. And who was it that contacted you?
A. That's a good question. I believe it was Jason Larey, but it might have been Craig Downs.
Q. Do you know how Jason Larey or Craig Downs knew of you?
A. No, I don't. But I have a reputation that I think it would be fair to say precedes me. I get calls from law firms all the time, just so you know. So it wouldn't be unusual for me to take a call from a firm that might be interested in retaining me.
Q. And after that reach out, did you agree to do some work for Jason Larey or Craig Downs?
A. No, no, I did not. I said that I -- and again, this would be normal for me.
I said that I would need to know more about the specific cases, case or cases, and that I would need to at least see some documents in order to get a sense of what was it that they would be asking me to testify about and also to make sure that my expertise was relevant.
Because, as you have just been suggesting, you know, there are Daubert concerns. There are -- in any case involving experts, there are

Page 30

questions about whether the experts' expertise is relevant to the case.
And my reputation is very important to me. I wouldn't take a case that I didn't think I had meaningful expertise. And my expertise is quite specific and rather distinct.
As I'm sure you will probably ask me later, I'm not a toxicologist. I don't claim to be. I'm not a physician. I don't claim to be. I have a rather specific expertise relating to science and scientific evidence and data and how data are collected and how data are interpreted.
And so I'm quite selective in the cases that I take. I've been asked to take many more cases than I have agreed to take. So I would never take a case without looking at at least some preliminary documents.
And I couldn't tell you precisely which documents were shared at that time, but I do know that they shared some documents.
And at that time, I discussed with them whether or not my research assistant could also be part of this conversation. They said yes. Again, I would have signed some appropriate confidentiality agreements.

Page 31

And I remember definitely having a conversation with Nina about what this case was about and whether we together thought that it was a relevant case for -- and I say "us" because I take my students' advice very seriously. My research assistants are an important part of this process. So there was some process that involved a discussion both with plaintiff's counsel and also with my assistant as to what this case was and whether we thought we had -- whether we thought I had the relevant expertise to want to be engaged in this case.
Q. And so when did you agree to work for The Downs Law Group?
A. I don't remember that, but it would have been in 2022. Probably some weeks or a month or two maybe after they first approached me. I don't remember offhand. I'd have to look at my documents.
Q. And at that time, did you begin working on the Boggs case or was it another case?
A. No. Again, initially it was generic. It wasn't any specific case. They began to send me materials including some materials -- I'm just trying to think for a second. Well, I don't

Page 32

remember now. It's going back three years.
But it wasn't specific to the Boggs case at that time.
Q. All right. And are all of the materials that were sent to you at that time also included in your file for this case?
A. My understanding is that they are.
Q. So every document that The Downs Law Group ever sent to you was included in your file for this case?
A. My understanding is that they are.
Q. Did Downs Law Group tell you that you would be paid by them?
A. Yes.
Q. Do you know how Downs Law Group funds its work with you?
A. No, I don't. I assume they work on contingency, but I don't -- that's not my department.
Q. All right. You have produced some invoices to us in this matter, invoices that you have sent to The Downs Law Group for your work on the Boggs case. Correct?
A. I'm not aware that I produced the invoices to you. I'm aware that I actually checked the

Page 33

invoices after a conversation last week with plaintiff's counsel.
Q. They're in your file. We'll show them to you in a minute.
Let's turn to Tab 6.
A. Oh, in the file that I just presented just now? Oh, okay. I forgot I had included them.
Q. No, no, no. They're not in your file. These were in the file we received from plaintiff's counsel.
A. I see. Plaintiff's counsel as part of their response to you also supplied my invoices?
Q. That is correct.
A. Okay. I wasn't aware of that, but that's fine.
Q. So I want to direct your attention to Tab 6 in the notebook.
A. Okay. August 2023.
Q. And do you -- the document behind Tab 6 has been marked as Exhibit 6.
(Exhibit 6 marked for identification)
Q. It appears to be an invoice from you to The Downs Law Group. Is that right?
A. Yes, it is.
Q. And that invoice shows that you worked a

Page 34

total of 5.25 hours on the Downs work log in July and August of 2023. Is that correct?
A. Yes. It shows that.
Q. And I'd like to ask you to turn to Tab 7. The document behind that tab has been marked as Exhibit 7.
(Exhibit 7 marked for identification)
A. Yes.
Q. Do you recognize that as an invoice that you sent to The Downs Law Group in May of 2024 on the 15th of May?
A. Yes, I do recognize it.
Q. And that letter is addressed to Jason. That is Jason Larey at Downs Law Group. Correct?
A. That's correct.
Q. And the invoice shows 37.5 hours worked between January 11th, 2024 and May 14th, 2024. Correct?
A. Yes, it does.
Q. And then let's turn to Tab 8. And the document behind Tab 8 has been marked as Exhibit 8.
(Exhibit 8 marked for identification)
Q. And, Dr. Oreskes, do you recognize that as an invoice that you sent on June 6th, 2024, to

Page 35

Jason Larey at Downs Law Group?
A. Yes, I do recognize it.
Q. And that invoice shows 23.5 hours worked from May 26th, 2024 to June 6th, 2024. Correct?
A. Correct.
Q. Did you invoice The Downs Law Group for any work done after June 6th, 2024?
A. I believe not. I believe I have some additional hours that I have not yet invoiced.
MS. DESANTIS: All right. We'll reserve our rights, Mr. Durkee, to obtain those invoices when available.
MR. DURKEE: Absolutely.
Q. Are Exhibits 6, 7, and 8 all of the invoices that you have sent thus far to The Downs Law Group for your work on this matter?
A. I actually think they're not. I'd have to double-check. I believe that I invoiced also in 2022.
It wouldn't have been a lot because we didn't do a lot of work in those first few months. I'm sure that Nina invoiced in 2022 because I remember having a conversation with her about invoicing the preliminary work that she did, which was in 2022.

Page 36

So I -- I'd have to check, but I believe there is an invoice in 2022. So if this was supplied to you by plaintiff's counsel, then we would have to check. But it could be that something is missing from 2022.
Q. All right. So the work that you and your research assistant did in 2022 would have been relevant to your work on this case. Correct?
A. Everything I did for Downs law firm I invoiced Downs law firm. And as I said, most of the other work was genetic -- generic. Excuse me.
Most of the early work was generic, so it's not -- as you can see here, I don't invoice with respect to a specific case. It doesn't say work on expert report for the Boggs case. It's simply the work that I've done for them.
But yes, any and all work that I've done for them should be in my invoices and is relevant to this case.
Q. All right. So you're not seeing in the exhibits that we've just shown you, 6, 7, and 8, any of your generic work. Correct?
A. I'm sorry?
Q. None of your generic work that you did in 2022 is reflected in the invoices that I showed

Page 37

you, Exhibits 6, 7, and 8.
A. None of the work in 2022, correct, because these are dated 2023 and 2024. I'm saying that I think there may be a missing invoice from 2022.
Q. All right. With respect to the work that you did in 2022, approximately how many hours did you work in 2022?
A. I'd have to look that up. This is odd because I knew you'd ask about this, so I actually went back and looked at this yesterday. And this might be in my binder.
I calculated that I billed -- over the three-year period that I was working for the Boggs firm, that I billed $90,000, mas o menos. So 35 -- hold on. Let me just look here.
Q. Dr. Oreskes, you calculated that all of your work for The Downs Law Group amounted to $90,000. Correct?
A. Approximately. Yes.
Q. And does that include time spent by your research assistant in the case?
A. No. Nina billed them directly.
Q. So Nina billed them separately?
A. Correct.
Q. And Nina's invoices are not, of course,

Page 38

reflected in Exhibits 6, 7, and 8?
A. Correct. Because she invoiced them separately.
Q. Do you know approximately how much Nina invoiced The Downs Law Group?
A. I do not.
Q. Do you know approximately how many hours --
A. I do not. I would have to look that up.
Q. Was Nina working for The Downs Law Group in 2022 on this generic work?
A. Yes.
Q. All right.
MS. DESANTIS: Mr. Durkee, we're going to request that you provide to us all invoicing from Dr. Oreskes and all of her research assistants on their generic work and also on the work that she did specifically for -- that they did specifically for the Boggs case.
MR. DURKEE: Agreed. And our proffer was not restricted to Mr. Boggs. It was supposed to be all of the invoicing.
So if we missed something, we'll get it. And I'll endeavor to try to get all of that squared away before we finish today.

Page 39

MS. DESANTIS: Thank you, Mr. Durkee.
MR. DURKEE: As much as I can, I will proffer that today.
A. May I, if I may, because you keep making a distinction between the generic and this case, but that's a false distinction because all of the work that I did is essentially generic.
I mean, you'll see there's nothing in my report -- nothing about Mr. Boggs himself, nothing about his particular exposures.
My expertise, my testimony in my report is about -- is generic and it's about the broad issues related to how BP collected scientific data relevant to this case.
So the distinction that you're making between the generic and the specific is misleading in this case.
Q. Essentially, Dr. Oreskes, since you began working for The Downs Law Group in 2022, you have been working on a report that is generic. Correct?
A. Correct.
Q. And this report that you served in the Boggs case is your generic report. Correct?
A. Correct. I mean, it's possible that if in

Page 40

the future I was asked to work on a different case and if there was information that was case-specific, then it's possible that I would write a different or a revised report. But that's not the case here.
Q. And at the time that you wrote this report, you were anticipating that this report could be served in any case handled by The Downs Law Group. Correct?
A. Well, no, I wouldn't go that far. I mean, Downs could be doing all kinds of things that my work might or might not -- I mean, no, I wouldn't say that I would agree that this could be used in any case. I mean, if they wanted to use it in a future case, we would have to have a conversation about that.
Q. So when you were contacted by The Downs Law Group, was there any other case other than Boggs with which they requested your assistance?
A. It wasn't clear at that time. It was -- as I say, it was generic. They said they had more than one case, a set of cases relating to health effects potentially attributable to the legacy effects of the BP Horizon spill.
Q. Have you been asked particularly to allow

Page 41

them to serve your generic report in any case other than Boggs?
A. Not yet. We've discussed the possibility that that could arise in the future, but no decision was made on that.
Q. Are you currently planning to publish regarding your work on the Deepwater Horizon case?
A. No.
(Exhibit 5 marked for identification)
Q. I'd like to turn back to Tab 5 in your notebook, Dr. Oreskes. And we've marked the document behind Tab 5 as Exhibit 5.
A. Yup.
Q. Do you recognize Exhibit 5 as your expert report dated July 24th, 2024?
A. Yes, I do.
Q. All right. Throughout this deposition we're going to refer to your July 24th, 2024 report as "your report" or "your expert report." Fair enough?
A. Fair enough.
Q. Doctor, I'd like to ask you to look at the document behind Tab 9, please. And we've marked the document behind Tab 9 as Exhibit 9.
(Exhibit 9 marked for identification)

Page 42

Q. Do you recognize the document behind Exhibit 9 as your CV?
A. It's many pages, so let me just make sure the whole thing is my CV.
But yes, I do recognize it as my curriculum vitae.
Q. All right. And is that a complete and accurate, current CV?
A. Well, that, I don't know because, I mean, complete, as I said, it's a lot of pages. It's 67 pages.
Q. But to the best of your knowledge, is that your current CV?
A. Yeah. And again, I don't know -- I'm under oath. This was supplied to you by plaintiff's counsel.
So I don't know what date, but I do recall that I gave them an updated CV at the time that I issued my report. There's probably -- I update my CV regularly. Academics are expected to do that.
There may be a more recent version. If you would like that, I would be happy to supply it.
Q. Thank you. We'll ask you for an updated version if one does, in fact, exist.

Page 43

Dr. Oreskes, for the purposes of today, we will use what has been marked as Exhibit 9 as your CV. If you notice any inaccuracies in it as we're going through it, you'll let me know. Correct?
A. Correct.
Q. All right. Are you aware that others have submitted expert reports on behalf of the plaintiff in this matter?
A. Yes, I am aware of that.
Q. And have you communicated with any of those other experts?
A. No, I have not.
Q. Have you reviewed any of their expert reports?
A. Not in detail. Some of them were very long and I only just received them a few days ago. But I did spend a little time over the weekend looking at the reports of Adams, Haddad, and Paskewich.
Q. Those are BP's experts. I'm specifically asking you now about plaintiff's experts.
A. Oh, plaintiff's experts.
Q. Let's go back and I'll ask the question again so that it's clear.
A. My mistake.

Page 44

Q. You're aware that other experts for the plaintiff have submitted reports in this case. Correct?
A. Yes, I am aware of that.
Q. And have you reviewed any of the expert reports of other experts for the plaintiff?
A. No, I have not.
Q. All right. Have you communicated with any experts for the plaintiff about this matter?
A. No, I have not.
Q. And are you familiar with the work of any experts for BP who have submitted reports in this matter?
A. To me as an academic, "familiar with the work" would imply a larger familiarity.
Q. Let me be more specific, then.
Are you familiar with the expert reports that experts for BP have submitted in this matter?
A. Yes. So as I said mistakenly in my answer to your previous question, I was supplied with three expert reports by experts for the defense. And I didn't have time to read them in detail. Some of them are quite long. But I did over the weekend review them briefly.
Q. And which reports did you review? The

Page 45

authors were?
A. I looked at Adams, Haddad, and Paskewich.
Q. Did you look at the reports of any other experts for BP?
A. No.
Q. All right. You mentioned earlier --
A. Oh, sorry. I just realized, there's -- I did look at one thing. I made a mistake. There was one report that counsel said was a fact report, Montagner.
THE WITNESS: Do you know which report?
A. So I don't know if -- I don't know enough about how these things work to understand whether that counts as a report for plaintiffs or what.
Plaintiff's counsel sent me a report. I believe the author was Montagner. And he was a scientist attesting to what he considered to be interference in the plan he had for scientific work by agents of BP. And that -- I was told that was a report of fact or something like that. I don't know what the right term is. And I did look at that report also.
Q. All right. So you have reviewed the reports of Adams, Haddad, and Paskewich. Correct?
A. Correct.

Page 46

Q. And you have also reviewed a report by Paul Montagner. Is that correct?
A. That's the name. Thank you.
Q. And is it your understanding that Paul Montagner had a report that he intends to submit in this case?
A. I don't know what his intention is.
Q. But you were asked to review that report by Mr. Durkee?
A. No, not by Mr. Durkee. I wouldn't say I was asked to review it.
Plaintiff's counsel last week gave me some additional materials, which they suggested that I might want to look at. And in particular -- again, I'd have to consult my notes. I can't remember if it was Adams or Haddad.
One of them attacks the integrity of my report. They suggested I might want to take a look at that.
But I wouldn't say I was asked to review anything. And that came from -- that didn't come from Mr. Durkee. That came from Jason Larey and Kristian -- I don't know how to Kristian pronounces his last name.
MR. DURKEE: Toimil.

Page 47

A. Kristian Toimil.
Q. Is the report from Paul Montagner informing your testimony today?
A. No, not unless you specifically ask me about it.
Q. Did you bring the report of Paul Montagner with you?
A. No, I did not.
Q. And did you see it as a final report? Do you know? Was it a final report or a draft report?
A. I wasn't in a position to make a judgment on that.
MS. DESANTIS: Okay. I'm going to make a request to Mr. Durkee that we be provided with the report of Paul Montagner that was provided to Dr. Oreskes.
Are you able to provide that with us for the deposition today?
MR. DURKEE: I can't make a firm commitment whether it's going to be claimed as work product. But if it is something that as a matter of evidence should be produced, we will absolutely produce it.
I can't say that with absolute immunity,

Page 48

but you know us, we will do our darndest to give it to you as long as there is no legal objection, which at this time I can't think of one, but I am reserving work product.
MS. DESANTIS: Thank you, Mr. Durkee.
Q. All right. Doctor, in the course of your work on this case, did you communicate with any past or present officials of the United States government regarding the Deepwater Horizon incident?
A. No.
Q. You didn't consult with any toxicologists in researching the opinions contained in your report?
A. No.
Q. You didn't consult with any medical doctors in reaching the opinions contained in your report?
A. No.
Q. You didn't consult with any industrial hygienists in reaching the opinions contained in your report?
A. No. As I said already, I'm not passing judgment on the medical questions in this case.
Q. My question was simply, you didn't consult

Page 49

with any industrial hygienists in preparing your report. Correct?
A. No.
Q. You didn't consult with anyone who trained response workers on safety procedures. Correct?
A. No.
Q. You didn't consult with anyone who determined what PPEs should be worn or used by response workers. Correct?
A. No, I did not consult any such people.
Q. You didn't consult with anyone who performed any environmental sampling or monitoring in connection with the Deepwater Horizon incident?
A. No, I did not.
Q. You didn't consult with anyone who analyzed environmental sampling or monitoring data in connection with the Deepwater Horizon incident. Correct?
A. No, I did not.
Q. You didn't consult with anyone who performed data quality assurance work in the course of the Deepwater Horizon incident?
A. No, I did not.
Would it be possible for me to just stipulate that I didn't consult anyone involved in

Page 50

the recovery effort or cleanup effort? We could save some time.
Q. That is useful information, but I'm going to continue to go through my questions.
A. All right.
Q. So you didn't consult with anyone who performed data quality assurance work in the course of the Deepwater Horizon incident. Correct?
A. No. Correct.
Q. You didn't consult with anyone who performed data quality control work in the course of the Deepwater Horizon incident. Correct?
A. No, I did not.
Q. You didn't consult with anyone who worked in a lab analyzing samples from the Deepwater Horizon incident. Correct?
A. No, I did not.
Q. You didn't consult with anyone who compared data collected by various entities involved in the Deepwater Horizon response. Correct?
A. No, I did not.
Q. You, yourself, did not analyze any sampling or monitoring data associated with the

Page 51

Deepwater Horizon incident. Correct?
A. No, I did not.
Q. And you, yourself, did no comparison of the sampling or monitoring data collected by various entities in connection with the Deepwater Horizon incident. Correct?
A. No, I did not.
Q. Did you communicate with Mr. Boggs, the plaintiff in this case?
A. No, I did not.
Q. Did you review Mr. Boggs's claims?
A. No, I did not.
Q. Did you review his medical records?
A. No, I did not.
Q. Did you review his deposition?
A. No, I did not.
Q. Did you communicate with anyone who maintains that they suffered an illness, injury, or other health condition as a result of the Deepwater Horizon incident or response?
A. No, I did not.
Q. You didn't consult with anyone at the EPA?
A. No, I did not.
Q. You didn't consult with anyone at the CDC?
A. No, I did not.

Page 52

Q. You didn't consult with anyone at NIOSH?
A. No. Sorry. I was just thinking for a second. No, I did not.
Q. You didn't consult with anyone at OSHA?
A. That's why I was pausing because I knew you were going to ask about OSHA next. Sorry.
I have a close colleague, David Michaels. I email with him all the time about all kinds of different things, but I did not consult with him about this case.
Q. So you didn't consult with anyone at OSHA about the Deepwater Horizon incident or this case?
A. No. But I'm just raising the issue because David was at OSHA at the time. So if it were to come up that I was in communication with him, I just want to be clear that I'm in frequent communication with someone who was formerly the head of OSHA but not about the specifics of this case.
Q. Fair enough. So you didn't consult with Dr. Michaels or with anyone else at OSHA about this case. Correct?
A. Correct.
Q. You didn't consult with anyone at the FDA about this case?

Page 53

A. No, I did not.
Q. You didn't consult with anyone at ATSDR about this case. Correct?
A. No, I did not.
Q. You didn't consult with anyone at the National Institute of Environmental Health Sciences about this case. Correct?
A. No, I did not.
Q. You didn't consult with anyone at NOAA about this case. Correct?
A. No, I did not.
Q. You didn't consult with anyone at the United States Geological Survey about this case?
A. Well, my husband works for the U.S. Geological Survey, and I have on many occasions discussed my work with him. I never discuss anything confidential, obviously. But again, just full disclosure, I have a husband who works for the U.S. Geological Survey.
Q. But other than casual conversation with your husband, you have not consulted with anyone at the United States Geological Survey about this case. Correct?
A. Correct.
Q. You haven't consulted with anyone at the

Bureau of Ocean Energy Management, Regulation, and Enforcement about this case?
A. No, I have not.
Q. You haven't consulted with anyone at the United States Fish and Wildlife Service about the case?
A. No, I have not.
Q. You didn't consult with the author of any official reports about the DWH incident, the Deepwater Horizon incident?
A. I know what DWH is.
No, I did not.
Q. For shorthand, Doctor, we can refer to it as "DWH"? Is that fair?
A. That's fine with me.
Q. You did not consult with any scientists conducting any study on the DWH incident. Correct?
A. No, I did not.
Q. You didn't consult with anyone associated with GoMRI about the DWH incident. Correct?
A. No, I did not.
Q. Did you consult with anyone at GoMRI about research on the DWH incident?
A. No, I did not.



Q. Did you consult with anyone at GoMRI about publications on the DWH incident?
A. No, I did not.
Q. Did you consult with any GoMRI board members?
A. No, I did not.
Q. Are you aware whether any person or entity analyzed Deepwater Horizon environmental samples specifically for plaintiff's counsel?
A. I'm not aware.
MR. DURKEE: This might -- I don't know if it's a good breaking point, but it's about the time for our hearing.
MS. DESANTIS: Yes. Do I have time for maybe just three questions? We're at 10:53.
MR. DURKEE: Yes.
MS. DESANTIS: Thanks, Mr. Durkee. Thank you for flagging it.
Q. So, Doctor, going back to your report, Tab 5, Exhibit 5, your July 24th report, are you the author of the report?
A. Yes, I am.
Q. Are you the sole author?
A. Well, as I said, I have a research assistant who helped me in terms of the filtering



of the documents. But all the language, all the words, all the sentences, all the paragraphs are mine.
Q. Are there any errors in the report?
A. Any errors?
Q. As you sit here today, are there any errors that you know to bring to our attention?
A. No. If I knew of errors, I would have tried to correct them.
Q. Does your report set forth all of the opinions that you intend to offer in this case?
A. I believe it does.
Q. And within your report, have you identified the bases for the opinions that you intend to offer in this case?
A. Yes, I have.
Q. Are there any bases for your opinions that are not included in your report?
A. Well, again, as I think I've already stated, there are publicly available materials about the DWH disaster.
I've read the presidential commission and other publicly available materials. I believe as much as possible I've cited them in the footnotes where they were relevant.



But you know, as a historian I read a lot of materials. I can't swear under oath that every single thing that I ever read on this case was documented in a footnote.
I mean, as a historian, one normally makes an effort to read capaciously, and one's views of a situation are based on that capacious reading.
To the extent there are specific opinions expressed here or which I would express in court, I have done my best to make sure that they are supported with footnotes to documentary evidence.
Q. So to the best of your evidence, all of the bases for your opinions have been cited in your report?
A. Yes, to the best of my knowledge.
Q. Does your summary of findings on pages 20 and 21 of your report summarize your opinions in this matter?
A. Well, certainly intended to. I mean, the whole reason to have that summary was to try to put in one place what I thought were the key findings that were relevant to the documents that I reviewed and my expertise to comment on them.
Q. And does your summary of findings on pages 20 and 21 of your report summarize your

Page 58

opinions in this matter?
A. Yes, it does.
Q. So your findings are your expert opinions in this matter. Correct?
A. I'm a little confused by the question. What else would they be?
Q. You called them findings. I want to make sure you consider findings -- are your findings the same as your expert opinions?
A. I guess so. I mean, again, as a historian, when we do historical work we like to use the term "findings" because we're trying as much as possible to reflect the empirical evidence. But I think in the court of law to call them expert opinion I think would be fair enough.
Q. And do the opinions summarized on pages 20 and 21 of your report remain your opinions today?
A. Yes, I believe they do.
Q. Do you have any other findings or opinions that are not recited -- that are not recited on pages 20 and 21?
A. No.
Q. You don't intend to offer opinions that constitute causal conclusions. Correct?
A. Correct.

Page 59

Q. And you have no expert opinion as to whether exposure to any chemicals of concern associated with the DWH incident can cause human health effects. Correct?
A. Wait. Would you repeat that question?
Q. You don't have an expert opinion as to whether exposures to any chemicals of concern associated with the DWH incident can cause human health effects?
A. Well, actually, I would disagree with that.
I think as a historian of science, I'm well aware of a tremendous body of scientific evidence that suggests that the materials released in spills and their byproducts, metabolites, can cause all kinds of human harms.
But that's not what I've been asked to testify on in this case.
Q. As a historian of science, you can't say whether workers involved in the oil spill and cleanup were harmed by exposure to toxic substances. Correct?
A. Correct. And I'm not -- I've not been asked to comment on that.
Q. You're claiming expertise as an historian

Page 60

of science in this case?
A. Correct.
Q. You're not claiming expertise in any other discipline for purposes of this litigation. Correct?
A. Well, I would just qualify that slightly in part because of some of the accusations that are made in some of the expert reports on behalf of defendants.
So I'm a historian of science. My expertise has to do with the development of scientific knowledge, scientific evidence.
But I'm also a geochemist by training and an Earth scientist. And so I think it would be wrong to imply that that training and expertise played no role in my interpretation.
I actually know quite a bit about sampling. Again, I wasn't asked specifically to offer an expertise about, you know, the -- well, actually, let me stop there.
Q. I may be able to streamline this, and then we're going to go off the record.
A. Please do.
Q. For the purposes of this case, Dr. Oreskes, you are claiming expertise as a

Page 61

historian of science. Correct?
A. Correct.
Q. Your experience as a geochemist and as an Earth scientist may inform some of your opinions. Correct?
A. Yes. I think that's fair to say.
Q. But you are not specifically testifying as an expert in geochemistry or in Earth science for the purposes of this litigation. Correct?
A. Correct. I think that's a fair way of putting it.
MS. DESANTIS: Let's go off the record.
THE VIDEOGRAPHER: The time is 10:59. We're off the record.
(Recess, 10:59 a.m. to 11:29 a.m.)
THE VIDEOGRAPHER: Okay. We are back on the record. The time is 11:29.
BY MS. DESANTIS:
Q. Dr. Oreskes, right before we broke, you were telling us about materials that had been sent to you by plaintiff's counsel last week. Correct?
A. Correct.
Q. And you identified the report of Dr. Haddad --
A. Correct.

Page 62

Q. -- Frank Paskewich --
A. Correct.
Q. -- Robert Adams --
A. Correct.
Q. -- as materials sent to you. Correct?
A. Correct.
Q. And you also identified a factual report by Paul Montagner. Correct?
A. Correct.
Q. Were there any other materials that were sent to you by plaintiff's counsel last week?
A. There were, but I didn't have time to review them. Well, there was one thing I looked at very briefly, privilege logs.
Q. Okay. Do you know whose privilege logs those were?
A. I believe they were your client's. They were logs of materials that your client had declined to share on the grounds of privilege.
Q. Were there any other materials other than the privilege logs that you recall having been sent to you in addition to the reports that we've just discussed?
A. Well, like I said, there was a folder with all kinds of materials that I did not have time to

Page 63

look at.
Q. All right. So you can't identify anything in the file that was sent to you other than the Haddad, Paskewich, Montagner, Adams reports and the privilege log. Correct?
A. Correct. Those are the only ones I had time to review.
Q. All right.
MS. DESANTIS: Mr. Durkee, we're going to request that you provide us with those additional file materials that were provided to Dr. Oreskes.
MR. DURKEE: Like I said, I preserve my work product, but I believe we will be able to produce them. But I will preserve my work product, just in case.
Q. And, Doctor, you did not, of course, rely on those materials for the preparation of your July 24th report --
A. No. There's no way.
Q. -- because you didn't have them when you prepared your July 24th report. Correct?
A. Correct.
Q. I want to go back to two questions that I had asked you because the record is not clear on your response.

Page 64

You did not consult with any industrial hygienists in reaching the opinions contained in your report?
A. Correct. I did not.
Q. And you did not consult with anyone who trained response workers on safety procedures?
A. Correct. I did not.
Q. Doctor, you have not reviewed federal oil spill statutes and regulations. Correct?
A. Correct. I have not.
Q. And you have not reviewed state oil spill regulations. Correct?
A. Correct. I have not.
Q. And you have not evaluated maritime regulations relating to oil spills. Correct?
A. Correct. I have not.
Although that does remind me, there was another thing that I looked at. In Paskewich's report, he refers to the plan that BP had in advance of the spill for how they would deal with the spill.
And plaintiff's counsel did send me that, and I did look at it briefly. It's a 500-page report.
Q. Is that BP's Oil Spill Response Plan?

Page 65

A. I believe that's the correct title of it. I did look briefly at that.
Q. We'll talk about that.
Is there anything else that you can remember that you reviewed from that file?
A. Like I said, that's all I'm remembering. If something else comes to me, I'll be sure to share that with you.
Q. All right. So you've not evaluated maritime regulations relating to oil spills. Correct?
A. No. I'm not a legal expert.
Q. Okay. You've not considered in your report the national framework for oil spill responses. Correct?
A. Correct.
Q. And were you aware that the national framework for oil spill responses falls within the purview of the EPA?
A. Yes, I'm aware of that.
Q. Are you aware that the Oil Pollution Act requires oil storage facilities and vessels to submit to the federal government plans detailing how they will respond to oil spills or oil discharges?

Page 66

A. I don't know the details of the federal regulations. But in a general way -- in a general way, I am aware that there is a requirement of that type.
Q. And are you aware that the Oil Pollution Act sets forth the requirement for a National Contingency Plan, sometimes called the NCP?
A. I've seen reference to that in some of the documents that I've read.
Q. And you have not discussed the National Contingency Plan in your expert report. Correct?
A. Correct. I have not.
Q. And you have not considered the National Contingency Plan to be important to your opinions. Correct?
A. Important? No, because my concern is not with what the plan was. My concern is what actually happened after the spill itself occurred.
Q. Are you aware that the Oil Pollution Act sets forth the requirement for area contingency plans?
A. I'm not aware that I know what "area contingency plans" refers to.
Q. So that term is not familiar to you?
A. Not offhand. No.

Page 67

Q. And did you review any area contingency plans in effect for Deepwater Horizon?
A. Not that I recall.
Q. Did you review the National Contingency Plan?
A. Is this the plan you were just referring to?
Q. Yes.
A. Briefly. It is over 500 pages. I looked at it briefly just to get a generic sense of what sorts of things it discusses.
Q. If you're referring to the 500-page document that you received from Mr. Durkee, correct --
A. Not from Mr. Durkee.
Q. It was another document that you reviewed?
So you reviewed a 500-page document that you believe was called the National Contingency Plan?
A. I'm objecting to your saying it was supplied by Mr. Durkee. Mr. Durkee didn't supply me any documents. All the documents came from either Jason Larey or from Kristian Toimal.
Q. Fair enough. Did plaintiff's counsel provide you with a document called the National

Page 68

Contingency Plan?
A. I'm not sure if that was the exact title of it, but there was a document that they provided a couple of days ago, more than 500 pages, that was a plan where BP outlined what its plan was for dealing with a major spill.
Q. Okay. If it was BP's plan, then, Doctor, does it sound right to you that it was called the Oil Spill Response Plan?
A. Yes. That sounds plausible, but I'd have to check my notes to be sure.
Q. You don't know what that document was?
A. Well, I wouldn't put it that way.
Q. You don't know whether it was the National Contingency Plan or the Oil Spill Response Plan. Right?
A. You're saying there are two different plans, multiple plans?
Q. Yes.
A. Then I can't specify. I'd have to go back and look at my notes to be 100 percent clear about which of various plans I was looking at.
Q. But as you say --
A. But it was one that Captain Paskewich refers to explicitly in his report as the basis

Page 69

for his expert judgment that BP did a great job.
And so I asked specifically could I see that plan that Captain Paskewich is referring to, and that's the plan that I looked at.
Q. Okay. For the purposes of preparing your July 24th report, you did not consider the National Contingency Plan. Correct?
A. Correct.
Q. For the purposes of preparing your July 24th report, you did not consider BP's Oil Spill Response Plan. Correct?
A. Correct.
Q. For the purposes of preparing your expert report, you did not consider any area contingency plans. Correct?
A. Correct.
Q. Doctor, you're aware that at the time of the Deepwater Horizon the response operated under what is called a unified command system. Correct?
A. Correct. I'm aware of that.
Q. And are you aware that the system involves federal and state governments working with the responsible party under the direction of an on-scene coordinator?
A. Yes, I'm aware of that. Captain Paskewich

Page 70

discusses that in some detail in his report.
Q. At the time you prepared your report, were you aware that this system was working under the direction of the on-scene coordinator?
A. That's an interesting question. Was I aware of that at the time? Probably in a general way. I mean, I have a general background knowledge about oil spills.
Q. But you did not note in your report that the unified command system in place during the Deepwater Horizon response was operating under the direction of the on-scene coordinator. Correct?
A. No. I wouldn't have necessarily felt that that was salient.
Q. And at the time that you prepared your report, you did not note that the on-scene coordinator has ultimate authority and responsibility for spill responses. Correct?
A. Well, I think we know that BP is the responsible party here. All of the reports refer to the RP, the responsible party, as being BP. So that issue was not -- that wasn't at issue in my report. There would be no reason for me to address that.
Q. We're going to get there. We're going to

Page 71

get to a discussion of the RP.
But right now I'm asking you in your report, at the time that you prepared your report, you did not note that the on-scene coordinator has ultimate authority and responsibility for spill responses. Correct?
A. I would not have considered it to be salient to the questions I was being asked to address to have a conversation about that issue.
Q. And were you aware at the time of preparing your report that under federal regulation the on-scene coordinator has ultimate authority and responsibility for spill responses?
A. Well, again, the term "ultimate authority," I don't know what that means in a legal sense, so I wouldn't want to -- I wouldn't want to agree or disagree with a claim that would seem to have legal implications.
Q. At the time that you prepared your report, did you review the federal regulations pertaining to the authority and responsibility of the federal on-scene coordinator?
A. No. I did not review any federal, state, or local regulations.
Q. At the time that you prepared your report,

Page 72

were you aware that the national response system includes what is called the National Response Team under federal regulation?
A. I think that some of the documents that I looked at would have referred to that concept or to the response team.
Q. You didn't actually read the federal regulations pertaining to the National Response Team, did you?
A. I did not read any federal regulations pertinent to the spill.
Q. At the time you prepared your report, were you aware that the National Response Team is chaired by the EPA and vice-chaired by the United States Coast Guard?
A. That issue may have come up in some of the documents. I certainly saw documents that referred to the Coast Guard, EPA, NIOSH, CDC, all kinds of agencies that were involved in one way or another. So I'm certainly aware that many federal agencies played a role in the response.
Q. And you didn't cite in your report that the National Response Team was chaired by the EPA or vice-chaired by the Coast Guard. Correct?
A. Correct.

Page 73

Q. In preparation for your report, were you aware that internal Coast Guard regulations require a thorough examination by the Coast Guard of preparedness and effectiveness of national, regional, and local oil spill response plans?
MR. DURKEE: Object to the form.
THE WITNESS: Should I still answer?
MR. DURKEE: Yes.
A. Sorry. Could you restate the question, please?
Q. Did you understand my question?
A. I'm not sure I did, so if you could restate it or rephrase it that would be helpful.
Q. All right. At the time that you prepared your report, had you reviewed any internal Coast Guard regulations?
A. No. I did not review any internal Coast Guard regulations.
Q. So then at the time that you prepared your report, you were not aware that those internal Coast Guard regulations require a thorough examination of preparedness and effectiveness of national, regional, and local oil spill response plans. Correct?
MR. DURKEE: Objection to form.

Page 74

A. I wouldn't use the phrase "not aware" because, as I said, many of the documents I looked at did refer to Coast Guard involvement and Coast Guard responsibility.
But I was not being asked to pass expert judgment on the role of the Coast Guard. I was asked to pass judgment on the activities undertaken by BP, and I restricted my comments to the actions or inactions of BP and the agents that it hired, such as the consultants at ChemRisk. Well, ChemRisk is more complicated. Cardno ENTRIX. They keep changing their name. CTH.
So BP and people working -- BP -- people that BP had recruited to help and assist in its actions or inactions.
Q. So, Doctor, you were not asked to review the work of BP in the context of the work of the Coast Guard on this spill. Correct?
A. I don't really know how to answer that because obviously in some sense all of this is in the context of the Coast Guard because the Coast Guard is playing an active role in the response.
But I was not asked to comment or opine on the Coast Guard's role, whether they did or did not effectively fulfill their obligations. I was

Page 75

asked to comment on the actions and inactions of BP.
Q. And so you did not include in your report an analysis of the actions of the Coast Guard in the response. Correct?
A. Correct.
Q. And you did not include in your report an analysis of the actions of the EPA in the course of the response. Correct?
A. Well, again, it depends what you mean by "analysis."
So in my report, there are places where we see people from NOAA, NIOSH, I think the EPA -- I'd have to check my report -- responding to and in some cases complaining about BP's actions.
And I think this is an important point since you're raising the point of the federal agencies.
We see evidence that the federal agencies are in a number of cases disagreeing or raising questions about some of the choices that BP is making.
And I think that's extremely salient, particularly because the Coast Guard is not a scientific agency. The Coast Guard is essentially

Page 76

a military function. I wouldn't expect the Coast Guard to be commenting on or responding to questions having to do with science and scientific sampling.
But I might expect NIOSH or the CDC or NOAA to raise questions. And in fact, we see that in a number of cases they do.
Q. All right. Let's go back to Coast Guard regulations.
With respect to the work of the Coast Guard and specifically what we've already questioned you about, the Coast Guard regulations' requirement of a thorough examination of the preparedness and effectiveness of national, regional, and local oil spill response plans, you did not cite in your report any Coast Guard analysis about those plans. Correct?
A. Again, as I said, the Coast Guard is not a scientific agency, so it wouldn't have been appropriate for me to opine --
Q. I'm just asking you whether you did or you didn't.
A. Okay.
Q. So just back to my question --
A. I believe I've already answered.

Page 77

MR. DURKEE: You need to let her finish. Don't cut her off.
A. I believe I've already answered the questions about the review of regulations. I was not asked to review regulations nor would I consider it to be within my expertise to judge the efficacy or capaciousness of those regulations.
The Coast Guard is not a scientific agency. I would not expect them to be judging the science that would have to be done to evaluate the efficacy of the cleanup.
I've been asked to review actions and inactions relevant to the science that was done or not done in this case, which are relevant to the claims of the plaintiffs regarding exposures.
The Coast Guard, in my opinion, is irrelevant to those questions; and therefore, I was not asked to nor would I have wanted to review Coast Guard materials.
If I thought it was relevant, if I thought there was any reason why the Coast Guard had something important to say about the science, then I would have asked for relevant documents.
And I did in some cases follow up with plaintiff's counsel. In fact, the specific case

Page 78

that is in the documents that I provided you involving Ian Zelo, I don't know how to pronounce it, Zelo, at NOAA who raised questions and concerns about BP sampling plans.

When I saw things like that on more than one occasion, I asked plaintiff's counsel to supply any additional documents that they might have had.

And this is relevant to the question you asked at the start about my process: Were there other emails from this particular person, was there an email chain that predated or postdated the email that I was looking at.

So I believe I was highly conscientious about pursuing evidence related to the science.

You're asking me about a lot of things that had nothing to do with the science. I'm happy to answer those questions, but I simply want to make the point that I didn't review them because they weren't relevant to the science.

Q. All right. Doctor, so in preparation for your report, did you review the CD [sic] "Response to the Gulf of Mexico Oil Spill"?

A. I'm sorry. The which response?

Q. The CDC Response to the Gulf of Mexico Oil

Page 79

Spill.

A. I'm not exactly sure what you mean by "the CDC response."

Q. A document entitled, "The CDC Response to the Gulf of Mexico Oil Spill."

A. Not that I'm aware of.

Q. You're not recalling that in preparation of your report you reviewed The CD [sic] Response to the Gulf of Mexico Oil Spill. Correct?

A. I don't recall. It's possible that I did, but I don't recall.

Q. And you did not consider The CDC Response to the Gulf of Mexico Oil Spill in preparation your report. Correct?

A. Not that I recall.

Q. And you did not review the CDC/ATSDR Guidance on the Interpretation and Use of Blood Laboratory Analyses for Volatile Organic Compounds in preparation of your report. Correct?

A. Correct. I did not.

Q. And you did not cite to that guidance in your report. Correct?

A. Not as far as I recall.

Q. And you did not review a document entitled, "OSHA's Role in the Response" in

Page 80

preparation of your report. Correct?

A. I'd have to say that title sounds faintly familiar, but I don't recall reviewing that document.

Q. You didn't cite to a document titled "OSHA's Role in the Response" in your report. Correct?

A. Not that I recall.

Q. And you did not cite in your report to a document entitled, "The On-Scene Coordinator Report, Deepwater Horizon Spill." Correct?

A. Correct.

Q. And you did not cite in your report to the OSAT 1 report, the report of the Operational Science Advisory Team. Correct?

A. Well, I know there were a number of documents that referred to OSAT.

Q. I just want to know whether you cited to it in your report.

A. I don't recall citing that document.

Q. You did not cite in your report to the OSAT 2 report of the Operational Science Advisory Team. Correct?

A. I don't recall citing that report.

Q. Does that mean you don't recall that you

Page 81

did cite it? You don't think you did?

A. Well, you're saying I didn't cite it. So if you say you read my report and I didn't cite it, then I would have no reason to disagree with that statement.

Q. All right. So you don't disagree that you didn't cite either the OSAT 1 or OSAT 2 reports in your report. Correct?

A. I don't disagree.

Q. In your report, you didn't cite a document called, "NIOSH, Lessons Learned from the Deepwater Horizon Response." Correct?

A. Again, I don't recall citing that document.

Q. And in your report, you didn't cite to the health hazard evaluation of Deepwater Horizon response workers, the final report. Correct?

A. Correct.

Q. And in your expert report, you didn't cite to the final action memorandum, the incident-specific preparedness review. Correct?

A. Correct.

Q. And in your report, you didn't cite to the OSHA fact sheet, the current training requirements for Gulf oil spill. Correct?

Page 82

A. Correct.
Q. And in your report, you didn't cite to the report of Dr. Michaels and Dr. Howard, review of the OSHA and NIOSH response to the Deepwater Horizon oil spill. Correct?
A. Correct.
Q. In your report, you didn't cite to 40 CFR Section 300, which is federal regulations concerning national oil spill and hazardous substance pollution contingency plan. Correct?
A. Correct.
Q. You didn't cite to the unified command technical assistance document. Correct?
A. Correct.
Q. You didn't cite to the BP Gulf of Mexico Regional Oil Spill Response Plan. Correct?
A. Say that again.
Q. You didn't cite to the BP Gulf of Mexico Regional Oil Spill Response Plan. Correct?
A. Correct.
Q. And you didn't cite to the NIOSH interim guidance for protecting Deepwater Horizon response workers and volunteers. Correct?
A. Correct.
Q. Doctor, with respect to all of the reports

Page 83

that you've not cited in your report, those reports were not considered for the purposes of your final opinions, as you've said to me previously. Correct?
A. Correct.
Q. And those reports did not inform your opinions, did they? Correct?
A. Correct.
Q. All right. So, Doctor, you maintain that BP alone made choices that compromised available spill data. Correct?
A. No. I don't say BP alone.
In many of the cases, we do see evidence that BP is communicating with other agencies. But in the end, BP is making many of these decisions or/and BP is making arguments which in some case we see federal agencies such as NIOSH accepting.
So I'm not making the claim that BP alone did all these things. I think we know and you've underscored that many other parties and agencies are involved in this process.
But my focus here, because the focus of this case -- the federal government is not on trial in this case. The Coast Guard is not on trial. NIOSH is not on trial. OSHA is not on

Page 84

trial. CDC is not on trial.
The defendant here, if I may continue, is BP, and I've been asked to comment on BP's actions and inactions. And that's what I've done.
Q. All right. Doctor, with respect to BP, your understanding is that BP was what is called "the responsible party." Correct?
A. Correct. And it's referred to as "the responsible party" even in its own experts' reports.
Q. And are you aware that even though the responsible party participated in the unified area command structure, the federal on-scene coordinator and the federal on-scene coordinator's representatives directed the actions of the responsible party?
MR. DURKEE: Object to the form.
You can answer.
A. Okay. Well, again, I think the word "directed" is questionable because I think one of the important things about this case and probably many cases is that a lot of decisions, a lot of actions are being made behind the scenes, which a coordinator might or might not have been aware of.
And many of the actions and inactions that

Page 85

are under discussion in this case are things that we are aware of only because of discovery: Emails between people at BP, emails between BP and contractors that they hired, emails between BP employers about how they're going to respond to NIOSH, for example in the case of biomonitoring.
So the fact that there's a federal on-scene coordinator, again, I'm not a lawyer. I'm not opining about the legal responsibility of the federal on-scene coordinator. But I would say that's not -- it's not salient to the questions that I'm addressing here.
Q. Okay. Dr. Oreskes, we're going to hand you another notebook. It's going to be Binder 2.
A. Sure. Thank you.
And my students complain about how much reading I assign.
Q. I'm going ask you to turn to Tab 14 in that notebook, Doctor.
A. Okay.
Q. We're going to mark the document behind Tab 14 as Exhibit 10.
(Exhibit 10 marked for identification)
A. Okay. It's not marked here.
Q. So, Doctor, I'm going to ask you to turn

Page 86

to page 5 of that document. This is the report of the federal on-scene coordinator in the Deepwater Horizon spill response.
A. So in Roman v?
Q. Page 5.
A. Well, there's Roman numeral v.
Q. Roman numeral v, in the executive summary.
A. Okay.
Q. If you look at the executive summary, you'll see the report writing team for the FOSC report consisted of the deputy FOSC, four Coast Guard officers, a petty officer, and then they go on. Do you see that? It's on Roman v, section --
A. I know. I'm trying to get a sense. Just going back to see. Roman numeral v, yes. Okay.
Q. Do you see that the authors of the FOSC report included the deputy FOSC and four other Coast Guard officers, among others. Correct?
A. Yes. I see that.
Q. All right. Now if you could turn to page 5 of this report.
A. Arabic 5?
Q. Bates Number 020711.
A. Okay.
Q. Last paragraph on the page.

Page 87

A. Uh-hmm.
Q. Do you see that the authors of this report, the deputy FOSC and Coast Guard officers, write that, "Even though the RP," meaning responsible party, "participated in the UAC structure at every level of the response" --
A. Sorry. I'm not clear where you are on the page.
Q. You don't see where I am? Start again. Page 5, last paragraph.
A. Arabic 5? We're still on Roman numeral v?
Q. We're on the page that's Bates-numbered 020711. You are on the correct page, last paragraph beginning with "For the Deepwater Horizon spill."
"For the Deepwater Horizon spill, BP accepted its responsibility as an RP under OPA 90 and the NCP to respond to the oil spill." Do you see that?
A. Yes.
Q. And your understanding is that the "RP" is the responsible party. Correct?
A. Correct.
Q. And even though -- it goes on to say, "Even though the RP participated in the UAC

Page 88

structure at every level of the response, the FOSC and the FOSC's representatives directed RP actions." Do you see that?
A. Yes, I do.
Q. Do you have any reason to disagree with what is written there?
A. Well, I would have to do a lot more, read the whole report to understand what they mean by directing RP actions.
But my understanding of this is that directing actions could involve an agreement about a sampling program, but they still wouldn't necessarily know exactly how all that sampling was being done.
For example, we have documents in which there's evidence that in some cases samples came back with high levels of detection of hydrocarbons. And what we see is that the contractors who have been employed by BP are saying oh, wait, don't report that until we have a chance to check it.
And the point I'm making is that when that kind of behavior takes place, it offers the opportunity for bias.
They're not doing a random sampling of

Page 89

both high and low detects just to make sure the whole process is reliable. They're specifically targeting high detects and saying don't report those until we can check on them.
In fact, we even see places where their own people complain that by delaying reporting it introduces the opportunity for error.
So all I'm saying is I'm not denying that the federal government plays a role in the cleanup nor am I denying that the Coast Guard plays a role or any of the agencies that you've mentioned.
I'm simply saying that the fact that there's a unified command structure with a distribution of responsibilities and obligations, even if the definition of roles and responsibilities is crystal clear, nevertheless there are activities taking place that I think the evidence shows raise questions about the quality of the data on which BP is now relying to say that no one could have been harmed.
Q. But you are not disputing the statement of the federal on-scene coordinator and the federal on-scene coordinator's report that "Even though the RP participated in the UAC structure" . . . "the FOSC and the FOSC's representatives directed

Page 90

the RP actions." Correct?
MR. DURKEE: Objection to form.
You can answer.
A. I am objecting to that. I'm not agreeing because -- and at the risk of sounding like a pedantic academic, it really depends on what you mean by "directed" and without more details to know how involved are they actually.
But I can say that when -- I mean, one of the things that I find disturbing about BP's actions, since you raised the question, we see evidence where they're discussing technical matters about sampling programs.
No one from the Coast Guard is being cc'd on that but lawyers for Arnold & Porter are being cc'd. And I find that disturbing.
Q. So with respect to the report of the federal on-scene coordinator, you are not in agreement with the FOSC's report on how the response was conducted. Correct?
A. No. That's not what I said.
What I'm objecting to is your implication that the word "directed" would seem to imply that everything that BP did was approved by the on-scene coordinator.

Page 91

And I'm saying that the levels on which these kinds of activities would operate -- I mean, maybe I can give you a metaphor, an example that would be clearer.
So imagine a very large scientific research laboratory -- well, I don't know. Maybe it's not a good metaphor.
Let me just -- I'll just stick to what I had before.
We understand from these various reports that there is a command structure and there are roles and responsibilities and that there are people in charge of directing the whole operation.
But that does not tell us what is happening in detail in terms of the sampling programs, the analysis, and the reporting of the data.
And so I'm simply objecting to the use of the word "directed" to somehow imply, which it seems to me is what you're doing, that somehow everything BP did was fine because it was directed by the on-scene coordinator.
Q. So a number of the reports that we have questioned you about that you do not cite in your report are reports that were drafted in the

Page 92

aftermath of the response. Correct?
A. I believe so. I haven't read them, but I'll take your word for it.
Q. And in the aftermath of the response, a number of persons who operated within the federal government drafted reports on the conduct of the response. Correct?
A. Correct.
Q. And you don't refer to those reports in your report. Correct?
A. Correct.
Q. With respect to the conclusions reached by the authors of those reports, you have no reason to dispute the conclusions of someone who was actually active in the response working the response. Correct?
MR. DURKEE: Objection to form.
A. No. Incorrect. Because many of those people would not have had access to the documents that we have access to today.
Q. And with respect to the conclusions in particular of federal officials that you believe are flawed, whose conclusions are flawed?
A. Well, I would have to read the reports to say that. But I will just give one example that's

Page 93

in my report.
So we saw in the documentary evidence that there was a large discussion that took place in June and into July about the possibility of biomonitoring.
And we know scientifically that no sampling, no mechanism of measuring anything is perfect and choices always have to be made about expense and convenience, accuracy, replicability.
But by and large, most toxicologists would say that biomonitoring is the most accurate way to know what a particular individual has been exposed to.
Because if you do environmental monitoring like air monitoring, you have a general sense of what's in the air. But you still don't know what that particular person was exposed to or absorbed into their body either through respiration or through other routes of exposure such as dermal exposure. We --
Q. Doctor, wait --
A. I know, but this is important.
MR. DURKEE: Let her finish.
MS. DESANTIS: Mr. Durkee, this is nonresponsive. We've got to get to a --

Page 94

MR. DURKEE: You can claim it is not responsive. It's her answer --

MS. DESANTIS: She has to answer the question asked.

MR. DURKEE: She's got to finish her answer and then you can ask another one.

Q. We're going to let you answer the question --

A. I think it is responsive. I know you guys get paid a lot of money. I don't want to waste anybody's time.

Q. I want to go back to the question, though. Let's just go back to the question.

A. I think my answer is responsive, and I'd like to finish.

MR. DURKEE: Yes, you can.

A. We know that there was a conversation that took place between NIOSH officials, CDC, and BP toxicologists and others about whether biomonitoring was necessary.

We also know that in the initial stages, in June, after a meeting at the Institute of Medicine, Margaret Kitt from NIOSH was developing a plan for biomonitoring.

And we also know she shared that plan with

Page 95

BP, seemingly in good faith -- the correspondence is all friendly -- asking for their input.

And what we also know is that BP toxicologists Richard Heron, Mark Saperstein, I believe his first name was David Keller, have a conversation about it.

And with the exception of Flowers, who thinks that biomonitoring is a good idea, the BP people are all coming up with reasons why there shouldn't be biomonitoring, reasons that in my opinion read like excuses.

They then tried to persuade NIOSH that biomonitoring is not needed. And we know because this is in the documentary evidence that when the well is finally capped in July after 87 days of leaking, they represent to NIOSH that because the well is now capped the biomonitoring is no longer necessary.

And we know that John Howard at NIOSH accepts the BP representation.

So that's an example where, yes, NIOSH was involved. And yes, you could blame John Howard. You could say, well, he shouldn't have let BP persuade him of that.

My point is simply that there was an

Page 96

opportunity to do a line of investigation that was likely to be more accurate than the air monitoring, that BP was aware of that, and one of their own people, David Flowers -- Flower. I think it's singular.

And they persuade NIOSH not to pursue it.

There is an email in which John Howard even explicitly says, Oh, if you look at the budget, you'll see it's twenty-five hundred thousand dollars less than we had planned because we scrapped the biomonitoring, and we did it because now that the well is capped we don't need it. And he even says, God bless the cap.

And I offer this to you because I think it is responsive because I think it shows that there is an interplay taking place between BP and federal agencies in which BP is playing a role that leads to what, in my opinion, is a situation in which the quality of the science that's collected is weaker than it could or should have been.

Q. All right. Doctor, with respect to the question that I asked you, I asked you with respect to the conclusion of federal officials that you believe are flawed, whose conclusions are

Page 97

flawed.

Are you saying today that the conclusions of John Howard are flawed?

MR. DURKEE: Objection to form.

A. I would have to look at those reports before I would be in a position to say which specific conclusions or people would be flawed.

But I would say -- again, I think this is responsive -- that if John Howard accepted the representations of BP that biomonitoring was no longer needed because the well had been capped, then I would say yes, he made an error.

Because that, to me, is illogical and kind of a non sequitur because by the time the well had been capped, millions -- hundreds of millions of gallons of oil had spilled.

And the fact that it was capped -- I mean, I actually find that a surprising conclusion on the part of Dr. Howard, because the fact that it was capped doesn't do anything. It's not like they were now able to pull back all the leaked oil. All of that leaked oil is now in the Gulf of Mexico and showing up on the shorelines.

And so the idea that somehow biomonitoring is no longer needed because the well was capped,

Page 98

yes, I would be prepared to say that I think that Dr. Howard made an error in accepting that argument.
Q. So as you sit here today, is it your opinion that the conclusions of John Howard are flawed?
A. I didn't read the whole report.
MR. DURKEE: Objection, form.
Q. So as you sit here today, because you didn't read the whole report you can't say that the opinions of John Howard are flawed. Correct?
A. I can say that that particular example as to which I have documentary evidence, I do believe that he came to a flawed conclusion in that case.
If you would want me to make a judgment on the whole report that he wrote, then I would have to read that whole report.
Q. All right. And with respect to reports that you have not read or considered for the purposes of your report, you cannot say that the conclusions in those report are flawed. Correct?
A. Obviously I'm not going to opine on a report that I didn't read.
Q. And, Doctor, you state in your report that BP knew that air monitoring was likely to have

Page 99

been inadequate. Correct?
A. Well, we have evidence of people within their own organization raising concerns with the air monitoring.
Q. I'm just asking, in your report do you state --
A. Yes.
Q. -- that air monitoring were likely to have been inadequate?
A. I state that they were aware that the air monitoring in some cases was likely to be inadequate.
Q. And is it your opinion that air monitoring data collected by BP was not reliable?
A. No, no. I'm not saying that. I'm not saying that the air monitoring data wasn't a valuable contribution to understanding the whole picture.
But I'm saying they had evidence. For example, they had instances where the air monitoring shows things are fine and yet workers are complaining about headaches, dizziness, nausea.
And this is reported back to them, and it's reported back as evidence that the air

Page 100

monitoring may be missing exposures that are actually happening.
And so it's my opinion that they are aware of that because, in fact, they are being told that by people on-site.
Q. All right. You write in your report -- and I'm looking at Opinion 1. If you want to go to page 21 of your report -- page 21 of your report where you summarize your opinions.
A. I'm sorry. Could you remind me which tab? Oh, Tab 9.
Q. Tab 5 for your report.
MR. DURKEE: Page 21.
MS. DESANTIS: Yes.
Q. You write that BP knew that its air monitoring protocols were likely to have been inadequate. Correct?
A. I'm sorry?
Q. You say that BP knew that its air monitoring protocols were likely to have been inadequate. Is that right?
A. That's correct.
Q. And that it took no steps to fix the problem. Correct?
A. As far as the documentary evidence goes.

Page 101

Q. But it is not your opinion that the air monitoring data collected by BP is not reliable?
A. Well, reliable and inadequate are two different claims.
Q. I'm asking about reliable.
A. I use my words carefully.
Q. And my question concerns reliability.
Is the air monitoring data collected by BP unreliable?
A. I think we know that air monitoring can in some cases be unreliable, and in fact some of the reports talk about wind direction, for example. So they knew that it could be unreliable.
Whether or not it was unreliable in any specific case -- I mean, I wouldn't want to make a claim about air monitoring overall.
But I do believe the evidence shows that they had evidence that at least in some cases it may have been unreliable.
And as far as the documentary evidence goes, we see no evidence of them taking steps to fix that or to supplement the air monitoring with biomonitoring, even in cases where they were advised that biomonitoring might be a useful adjunct.

Page 102

Q. Are you familiar with BP's community air monitoring data?
A. I'm aware it exists. I didn't review the air monitoring data.
Q. Do you have an opinion as to whether or not the community air monitoring data collected by BP was adequate or inadequate?
A. I do not have an opinion on that.
Q. Do you have an opinion as to whether or not the passive badge monitoring data collected by BP was adequate or inadequate?
A. Well, I guess maybe I should --
THE WITNESS: I guess you're the lawyer, so I can't object to the form of the question.
A. Adequate and inadequate I think is too broad. I mean, it may have been adequate in some cases; it may have been inadequate in other cases.
Q. Is the badge data or passive monitoring data collected by BP unreliable?
A. Well, you know, badge is -- in general, badge is -- you stressed this and I agree. I'm not an industrial hygienist.
We know that badges are in many cases not the most reliable means of figuring out exposures. And I think there was one document -- I'd have to

Page 103

go back and look at the report -- where they talk about the risk that if they're not sealed properly you could get wrong measurements.
And this is one reason why in general in science when you have the opportunity to collect multiple forms of data, in general, you would do that or you would consider it preferable to do that rather than just relying on one.
And so again, I come back to the biomonitoring because that's where we see clear evidence that people involved in the response raise the possibility that it would be good to do biomonitoring because it would produce higher quality data specific to the people at risk and because they did have evidence of workers who were suffering side effects consistent with exposure to high levels of hydrocarbons.
So if the air monitoring says everything is fine and yet people are getting sick, then yes, I would say -- at least in that case I would say that the air monitoring was inadequate. Something was going on that they were not accurately assessing.
Q. You have not identified in your report, Dr. Oreskes, any particular data set collected by

Page 104

BP that you deemed to be unreliable. Correct?
A. Correct.
Q. And you have not identified any data set collected by any other entity as being unreliable. Correct?
A. Correct.
Q. And you're aware that NIOSH collected data in the course of the response. Correct?
A. Yes, I'm aware of that.
Q. You're aware that OSHA collected data in the course of the spill response?
A. Yes, I am aware.
Q. You are aware that EPA collected data in the course of the spill response?
A. Correct.
Q. You're aware that the CDC collected data in the course of the spill response. Correct?
A. Correct. I will point out that the CDC is one of the parties involved who specifically recommended the biomonitoring should be undertaken.
Q. And the U.S. Geological Survey collected data in the course of the spill response. Correct?
A. Actually, I don't think I came across

Page 105

references to the USGS data. But I'll believe you if you tell me if it's true.
Q. And you have not identified any data set collected by any federal entity as being unreliable. Correct?
A. Correct.
Q. Are you aware that BP and its contractors were not the only entities analyzing data in the course of the spill response?
A. Yes, I'm aware of that.
Q. And in your report, you criticize only what you characterize as the BP data. Correct?
A. Well, this is a case about BP. It's not a case about the obligations of the federal government.
Q. And you're not criticizing data that was collected by federal agencies. Correct?
A. I've not been asked to review or comment on any data collected by federal agencies.
Q. And you are not criticizing data collected by state agencies. Correct?
A. I was not asked to review or comment on data collected by state agencies.
Q. And you haven't identified specifically any BP data sets that are not reliable. Correct?

Page 106

A. I have not identified specific data sets.
I have identified specific instances where there are complaints and concerns expressed even by people within the BP organization about the consistency and reliability of data.
Q. But you have not analyzed the entire data sets collected by BP. Correct?
A. I haven't analyzed any data set.
Q. And so you have not analyzed the instances that you have analyzed in the context of the complete data sets. Correct?
A. No. That's true. I have not.
Q. And you have not identified any non-BP data sets that are not reliable. Correct?
A. Again, I was not asked to review data collected by any other parties.
Q. You have not identified in your report any expert reports that rely on BP data sets and that are therefore unreliable. Correct?
A. Again, I was not asked to review such reports.
Q. And you have not questioned the reliability of expert reports that rely on non-BP data. Correct?
A. I haven't been asked to -- well, sorry.

Page 107

Can you say that again?
Q. Yeah. You have not questioned the reliability of expert reports that rely on non-BP data. Correct?
A. Well, that's a tricky question because the reports that I did look at prior to today, many of them, both the Paskewich and, if I recall correctly, the Adams -- I'd have to go back and look.
The argument of Paskewich's report is essentially that they had this plan. They had this plan which he considers to be an excellent plan in which he says the Coast Guard and the on-scene coordinator were involved in supervising.
But my point is, first of all, yes, they had a plan, but that doesn't tell us what exactly happened on the ground. Lots of people make lots of plans that then fall apart, particularly in a crisis situation, which by their own admission this was.
And it also tells us nothing about what BP and its contractors were actually doing when those samples were collected or sent for analysis.
As I already said, I think the documentary evidence raises some considerable concerns about

Page 108

that, concerns that reasonably cast doubt on BP's claims that these data reliably demonstrate that no one was hurt and no one could have been hurt because the exposure levels were too low.
Q. Can you identify any expert for BP whose report you have concluded is unreliable because of the data relied upon?
A. No.
Q. Can you identify any expert for the plaintiff whose report is unreliable because of the data relied upon?
A. Well, as I said, I didn't review any of the reports for the plaintiffs.
Q. And so it's a possibility in your mind that if you reviewed them you could find that a report by a plaintiff's expert is unreliable based on data reviewed?
A. Hypothetically. But as I've said, I have not reviewed those reports, so I wouldn't be in a position to express an opinion about them.
Q. With respect to data collection, you're aware that the Operational Science Advisory Team, OSAT, developed a strategy to assimilate available data?
A. Yes.

Page 109

Q. And you're aware that OSAT was asked to identify areas where additional sampling was necessary?
A. Yes.
Q. And are you aware that the federal on-scene coordinator concluded that OSAT's subsea and subsurface monitoring assessment was comprehensive and culminated in a rigorous set of analytical data?
A. Again, I haven't reviewed that report. I don't have any reason to doubt your characterization of it.
Q. Are you aware that OSAT membership included four NOAA representatives?
A. Well, again, I don't know the specific details of who was part of the OSAT review team. But again, I have no reason to question your characterization of it.
Q. And you're aware that the OSAT membership included six Coast Guard representatives?
A. Well, that would seem immaterial because, as I said before, the Coast Guard is not a scientific agency.
Q. And are you aware that OSAT membership included five EPA representatives?

Page 110

A. Again, I was not aware of that specifically. I believe you if you say so.
Q. So you just don't have knowledge of who was involved in the work of OSAT. Correct?
A. Correct.
Q. And were you aware that only two of the 23 members on OSAT were BP-appointed representatives?
A. Again, I'll accept that as true if you tell me so.
Q. And you're not questioning the integrity of any members of the Operational Science Advisory Team. Correct?
A. Well, again, it's not a question of integrity. It's a question of what information they had access to.
And as I've said before, I believe that we have information at hand now that was probably not available to them at that time because some of these emails, some of these conversations would not have been made available to the OSAT team. They are available now because we are in discovery.
Q. I'm simply asking whether you have reason to question the integrity of a member of OSAT?
A. No. That's an interesting question. I

Page 111

have no reason at this point in time to question the integrity of the OSAT team.
Q. Are you aware that the first OSAT report issued in December of 2010 included an assessment of data from tens of thousands of water and sediment samples?
A. Yeah. I don't know that I could give you the exact number, but I'm broadly aware of that.
Q. And are you aware that OSAT concluded that none of the water samples exceeded EPA's human health benchmark based on a child swimmer scenario. Correct?
A. Yes. But again, this is my point. But if the sample system was designed in a way that produced false negatives, then the OSAT team could have been operating in good faith and with integrity but would not have necessarily been aware that some of the negative results were, in fact, false negatives.
Q. And since you didn't read the OSAT report, you're not aware that the report states that multiple federal and state government entities conducted water sampling in the Gulf of Mexico. Right?
A. I'm sorry. I'm not sure what --

Page 112

Q. You're not aware that the OSAT report states that multiple federal and state government entities conducted water sampling in the Gulf of Mexico. Correct?
A. Again, I haven't read the OSAT report.
Q. And you didn't consider in drafting your report that multiple federal and state government entities conducted water sampling in the Gulf. Correct?
A. Well, again, my -- what I was asked to review was BP's actions and inactions. So that's the focus of my report.
Q. So you didn't consider the sampling efforts of entities other than BP. Correct?
A. Correct.
Q. And you didn't --
A. Well, BP and its contractors.
Q. All right. So you didn't consider for the purposes of rendering your report the sampling and monitoring efforts of any entities other than BP. Correct?
A. BP and its contractors.
Q. I want to make sure this is clear.
You didn't consider for the purposes of rendering your report the sampling and monitoring

Page 113

efforts of any other entities besides BP and its contractors. Correct?
A. Correct.
Q. And you didn't consider the analysis of samples done by any entities other than BP and its contractors. Correct?
A. Correct.
Q. For the purposes of your report, you considered only what you believe to be BP data. Correct? Data collected by BP?
A. No. You keep saying "BP." But BP and its contractors.
Q. And its contractors.
For the purposes of your report, you considered only the data collected by BP and its contractors. Correct?
A. Correct.
Q. For the purposes of your report, you considered only the analyses of sampling and monitoring data done by BP and its contractors. Correct?
A. Well, actually, not quite because there's also the GoMRI work. You pronounced it differently.
Q. GoMRI.

Page 114

MR. DURKEE: GoMRI.
A. So I also considered the GoMRI work. So many of the scientists who did work under the GoMRI program would not be accurately referred to as BP contractors, although some of the funding for that program did come through BP.
So I also did look at some of those -- some of that work.
Q. Doctor, you have not reviewed any analyses of the consistency or inconsistency of data collected by various entities during the response. Correct?
A. Correct. Although I did ask plaintiff's counsel about that, and they did say that other experts were reviewing that.
Q. And so you have not reviewed the consistency or inconsistency of data collected during the response. Correct?
A. Correct. I have not personally reviewed that.
Q. And you have no opinion regarding the consistency or inconsistency of the data collected during the response. Correct?
A. Well, again, it depends on what you mean by "opinions."

Page 115

So this question did come up because, again, I can't remember if it was Paskewich or one of the other reports for defendants. But one of those reports raises this issue and says and insists that the data -- the data collected by BP and its contractors are all consistent with the data collected by independent federal agencies.
And I did query that. And I was told by plaintiff's counsel that other experts in fact would dispute that claim.
Q. And so you, yourself, did no analysis with respect to the consistency or inconsistency of the data collected during the spill. Correct?
A. Correct. I myself --
Q. So as you sit here today, you have no expert opinion regarding the consistency or the inconsistency of the data collected by various entities during the spill. Correct?
A. Correct. I have no opinion one way or the other.
Q. Okay. Doctor, I want to turn to biomonitoring. And you have concluded that BP prevented the biomonitoring of response workers. Correct?
A. Well, "prevented" might be too strong a

Page 116

word. They resisted undertaking biomonitoring and they acted -- they worked to persuade NIOSH and CDC that biomonitoring was not needed.
Q. And your view is that biomonitoring could have provided more data on human health. Correct?
A. That is correct.
Q. And you are not an expert in biomonitoring. Correct?
A. No. But I'm a historian of science. I've done work on the history of toxicology, epidemiology. I'm quite well aware of what kinds of methods are used in toxicology and epidemiology.
And I'm aware of biomonitoring as an important tool that is often used in cases specifically because it has the potential to give a more accurate level of exposure and also the potential to address causation when it comes to disease because it has the potential to give you more accurate data relevant to creating a dose-response curve.
Q. And, Doctor, in your report, you did not cite to CDC/ATSDR guidelines issued during the response that did not recommend the use of laboratory testing of individuals for specific

Page 117

chemicals, did you?
A. No, I did not.
But again, as I pointed out, we see evidence at a certain point in June where CDC and NIOSH are, in fact, making plans for a biomonitoring program, reaching out to BP for feedback on the proposed plan, and then NIOSH -- I don't know what CDC did, but NIOSH backs off and decides oh, okay, we're not going to do it because they are persuaded by the BP argument that it's not necessary because the well has been capped.
Q. You did not cite to the CDC/ATSDR guidelines concerning biomonitoring during the Deepwater Horizon response, did you?
A. No, I did not.
Q. And you did not cite to the NIOSH lessons learned report in your report, did you?
A. No, I did not.
Q. And are you aware that in that report NIOSH questioned whether biomonitoring results in situations like the Deepwater Horizon spill can be interpreted meaningfully or reliably?
A. Well, that's a very interesting and tricky question.
Q. I'm simply asking whether you are aware of

Page 118

whether in those guidelines NIOSH questioned whether biomonitoring results can be interpreted meaningfully or reliably.
A. Well, I'd like to look at that report because, of course, if NIOSH was persuaded by the BP argument that it wasn't necessary, then I think it put them in a bit of a sticky situation later on.
So it wouldn't surprise me if then they subsequently sought to justify the decision that they made. But I would have to read the report to be able to comment on it.
Q. And you haven't read the report?
A. Correct.
Q. And you didn't read it before you rendered your opinions in this case. Correct?
A. No, I did not.
Q. And were you aware that in that report NIOSH questioned whether a scientific rationale exists to conduct biological monitoring in certain circumstances like the Deepwater spill?
A. Sorry. Could you repeat the question?
Q. Yeah. And were you aware that in that report NIOSH questioned whether a scientific rationale exists to conduct biological monitoring

Page 119

in certain circumstances like the Deepwater spill?
MR. DURKEE: Objection, asked and answered.
A. No, no. Well --
MS. DESANTIS: She didn't.
MR. DURKEE: You can answer.
A. Okay. So to try to be responsive, I was not aware that NIOSH said that.
But I am surprised that they would say that because it seems like an odd thing for them to say, given that it is well established scientifically that biomonitoring can be a useful tool in many circumstances.
So I guess I would have to read the report to understand why they make the case that it was the right choice here.
But as I've already said, in a way it's not surprising because once they made that case, I mean, I think John Howard is in a little bit of an awkward position. He has to justify why he made a decision which the evidence shows he made against the advice of his own people and arguably under pressure from BP and arguably for reasons that frankly don't make sense.
So the fact that NIOSH would be trying to

Page 120

justify in retrospect why they didn't do biomonitoring doesn't entirely surprise me. But I would have to read the report to have a further opinion about it.
Q. And you haven't read the report, so you really can't conclude that NIOSH was justifying its actions. Correct?
A. No. I'm speculating. But you asked me, so I'm trying to be responsive to the question.
Q. You're simply speculating that in the "NIOSH, Lessons Learned" document NIOSH was attempting to justify its actions. Correct?
MR. DURKEE: Objection to form.
A. Well, let me just put it this way. I think it was again in the Paskewich report. One of the reports cites John Howard saying -- I believe it was in a deposition -- that he thinks what they did was fine.
Well, I'm not surprised that he would say that because it's the rare person who would admit that, in fact, what they did was a mistake and that, in fact, we could have had better data about what people were actually exposed to if we had done that. That's all I'm saying.
And because it's in one of the expert

Page 121

reports, it seems to me relevant because -- well, as I said, because it is in one of the expert reports for defendants.
Q. So, Doctor, you've not done any analysis of biomonitoring conducted in any other oil spills, have you?
A. No, I have not.
Q. And you have not done any analysis of the utility of any biomonitoring conducted in other spills, have you?
A. No, I have not. But I have published on biomonitoring in relation to other toxics.
Q. You have not published on biomonitoring with respect to oil spills. Correct?
A. No, I have not.
Q. You've talked about Dr. Howard and Dr. Michaels. Correct?
A. Correct. But not -- not about Dr. Michaels in relation to this case.
Q. And you're aware that Dr. Michaels and Dr. Howard coauthored a review of the OSHA/NIOSH response to the Deepwater Horizon spill. Correct?
A. Yes.
Q. But that was a report that you did not cite in your expert report. Correct?

Page 122

A. I'm aware of it because you've been discussing it today. I did not read it or cite it in my report.
Q. And you've indicated that Dr. Michaels is a friend. Correct?
A. Yes.
Q. And a professional colleague. Correct?
A. Yes, yes.
Q. And you in your report quote from his book, "The Triumph of Doubt." Right?
A. I do.
Q. And you also cite in your report to his article titled, "Manufactured Uncertainty." Correct?
A. I do.
Q. And both you and Dr. Michaels have published about misrepresentation of science by corporations. Right?
A. I have.
Q. And you're aware that Dr. Michaels served as the leader of the Occupational Safety and Health Administration at the time of the Deepwater Horizon incident and response. Right?
A. Yes, I'm aware of that.
Q. And he served until 2017. Right?

Page 123

A. I couldn't tell you that, but . . .
Q. Now, this piece that Dr. Michaels and Dr. Howard coauthored, you've not read. Correct?
A. I believe you've already asked me that and I believe I've answered it.
Q. And so you don't know, then, that Dr. Michaels and Howard -- you don't know whether Dr. Michaels and Howard raised any concerns with BP's conduct in the course of the response in that report, do you?
A. No, I do not.
Q. And you don't know whether Drs. Michaels and Howard accused BP of any kind of manipulation of environmental data. Correct?
A. Well, I think I've answered that question. I haven't read the report, so obviously I don't know what's in it because I haven't read it.
Q. And if -- knowing Dr. Michaels, if Dr. Michaels believed that BP had been involved in manipulating data, he would have brought that to someone's attention. Correct?
A. Well, I'm going to object to the word "manipulating." I don't think my claim is that they're manipulating data. My claim is about a certain kind of approach, an attitude, that could

Page 124

lead to bias, possibly unconscious bias.
And even Zelo puts it in his own email, to increasing likelihood of false negatives.
So that's the claim. It's not a claim about manipulating data.
I also don't really know. I'd have to read the report or talk to Dr. Michaels. I don't know what his exact role was. As the head of OSHA, he probably wasn't involved in the day-to-day or nitty-gritty. And he's representing a federal agency, not himself.
Most of the work that he's done on corporate malfeasance he's done since he left federal service. And there's a reason for that.
I mean, a person who is in federal service represents the federal government. He's not really in a position to express their own personal opinions about matters or to do research beyond the scope of their federal remit.
So what Professor Michaels was doing as head of OSHA would be different from what he did subsequently.
And most of my engagements with him have to do with what he did -- I'm not sure I actually knew Professor Michaels when he was at OSHA. I

Page 125

may have done, but I don't recall.
Q. Based on what you know of Dr. Michaels, if Dr. Michaels believed that BP was engaged in any kind of misconduct in its work on the response, he'd have raised it. Correct?
A. I think -- yes. I think if he thought there was malfeasance or misconduct, he would have raised it.
But I think it's important to make the distinction of what my argument here is. I'm not accusing BP of -- I'm not accusing them of anything. I'm not accusing them or suggesting manipulation of -- that's not a word I would use.
The defense claims that no one was hurt and no one could have been hurt because the exposure levels were below any level that would do harm. That depends on the science, the science that was done, the data that was collected, how those data were analyzed and interpreted.
I believe the documentary evidence provides enough evidence to show that there are serious questions about the quality of these data.
And many of these are things that would not have been evident to an on-site coordinator who was not actually privy to these emails or

Page 126

privy to the conversations that were taking place among the contractors.
So it could be quite easy to see how Professor Michaels or anyone else in a federal agency at that time might not have been aware of some of the things that we are now -- that we are aware of now.
And my argument is about what we're aware of now. Not what people knew in 2010, not what people knew in 2011, but what we know now.
Q. Doctor, you've been helpful trying to be very clear about what you are and are not maintaining in your report. I'm going to turn to that in a minute. You're going to want to have your report in front of you for reference in case you need it.
And I do want to be very clear about what you are and are not saying about BP.
So you say on page 76 of your report that "As a historian of science, I cannot say whether workers involved in the oil spill and clean-up were harmed by exposure to toxic substances." Do you see that?
A. Correct.
Q. You would agree that you similarly cannot

Page 127

say whether any residents of Gulf Coast communities were harmed by exposure to toxic substances associated with the Deepwater Horizon incident?
A. Correct.
Q. And you would agree that you cannot say whether Mr. Boggs was harmed by exposure to toxic substances associated with the Deepwater Horizon incident. Right?
A. Correct.
Q. On pages 75 and 76 of your report, you state that "BP's claim that workers, currently suffering illness, cannot have sustained those harms because of the work related to the spill, is questionable at best." Right?
A. I'm sorry. Where on the page do I say that? Could you just --
Q. Page 75, bottom -- 75, top of 76.
A. Yes.
Q. And you don't say here that BP's claim is false, do you?
A. No, I don't say that it's false.
Q. And you don't BP's claim is a lie, do you?
A. No, I don't say it's a lie.
Q. You'd have characterized BP's statement as

Page 128

a lie if you believed you had evidence of that. Right?
A. Well, "lie" is a very strong word. It's kind of like poof. Historians rarely use the word "lie" because "lie" implies a state of mind and deliberate intent to deceive, which we do know happens in life in some cases, but I don't think the evidence supports that claim.
I think the evidence supports a different kind of claim about a systematic approach that I believe, as the NOAA representative warned of, has a high likelihood of producing false negative results.
Q. And you are not characterizing BP's claim that workers currently suffering illness can't have sustained those harms because of the work related to this spill as false or as a lie. Correct?
A. I'm saying it's without support. So you can decide how you want to interpret that.
Q. And you address here a claim made by BP with respect to response workers. Right?
A. Uh-hmm.
Q. You don't address the claim made by BP with respect to Gulf Coast residents. Correct?

Page 129

A. Correct.
Q. You've not expressed an opinion here with respect to BP's claims with respect to residents of Gulf Coast communities. Right?
A. Correct. Because the data is mostly about response workers and what they know about exposures at that time. The question of local residents doesn't really come up in the documents that I reviewed.
Q. And you understand that Mr. Boggs is a resident and --
A. Yes, I understand why you're making that distinction.
Q. On page 76 of your report in your "Conclusions" section, you state that "The available evidence -- much of it from BP's own internal correspondence -- gives substantive reason to believe that the data offered up in evidence by BP is not reliable and therefore cannot be used to sustain the 'no harm' claim." Correct?
A. Correct.
Q. You don't say that the available evidence in fact proves that the data offered up in evidence by BP is not reliable. Correct?

Page 130

A. No. I choose my words carefully, as you noted. I say "substantive reason."
Q. And you don't have proof, do you, that the data offered up in evidence by BP is not reliable. Correct?
A. Again, I feel that the question of proof is for the judge and jury to decide.
But I think we have substantive evidence of serious problems with their approach. And therefore, to claim that these data prove that no harm could be done, I'm taking issue with that.
Q. And again on page 76 of your report, your concluding section, you write with respect to your claims of intervention by BP in the data collection process and in review of technical material, "BP may have followed the path blazed by the tobacco industry." Correct?
A. Correct.
Q. You don't state that BP has, in fact, followed the path blazed by the tobacco industry. Correct?
A. No. But I think there's a lot of concerning evidence, and this gets back to that question of privilege logs.
We know that a huge amount of information

Page 131

has been shielded behind privilege, and we know that at least some of those data involve correspondence about technical matters.
And that, to me, is very, very troubling because we know -- and this has been found in a court of law -- that the tobacco industry abused attorney-client privilege as a way of hiding illegal activities from scrutiny.
And so when I see lawyers being cc'd on technical documents and people in BP even asking why are the lawyers even involved in this and it's not about a legal question, it's about a technical question, that, for me, is a big red flag.
Now, to prove it I would have to have a lot more documents, including the documents that we've asked for that your client has refused to deliver.
If you have documents that you think are exculpatory, I of course would be happy to see those documents.
But I wanted to raise this concern because I think the judge should be aware that -- let me think about the word.
It's very, very troubling to see so many documents being retained on the basis of privilege

Page 132

when it appears, based on who else is on those cc lines, that these are scientists discussing scientific matters rather than -- and therefore, not a question of questions of law, which would be -- and again, I'm not a lawyer, but this is my understanding -- questions of law that would be rightly shielded by attorney-client privilege.
Q. And with respect to this statement that we're examining, you note that "BP may have followed the path blazed by the tobacco industry, which abused attorney-client privilege to hide illegal activities, including fraud." Correct?
A. That's what I say here. Yes.
Q. You don't state that BP has, in fact, engaged in illegal activities, do you?
A. No. But we know that BP pled guilty to 14 criminal charges associated with this spill.
Q. I'm particularly asking you with respect to what you've written here about data collection. You're not stating that BP engaged in illegal data -- you're not stating that BP has engaged in illegal activities with respect to your analysis in this case. Correct?
A. I'm stating that it's possible that there was, in fact, illegal activity. But because so

Page 133

much material has been shielded behind attorney-client privilege that your client has made it extremely difficult for us to know what, in fact, the basis of all of these privilege claims are.
Q. So you have --
A. And that raises a red flag for me as a historian who has carefully studied the history of industry malfeasance with respect to tobacco.
Q. So your opinion -- as of today, you have no opinion as to any illegal activity by BP? You're not maintaining that BP was engaged in any illegal activity. Correct?
A. Well, again, I feel like you've already asked that, so I'll repeat my answer.
We know that BP did engage in illegal activity with respect to this spill. BP paid historically unprecedented fines and pled guilty to 14 criminal charges.
So there was illegal activity associated with this spill. Whether there was additional illegal activity that has been shielded behind privilege I cannot state one way or the other.
Q. And, Doctor, that's what we're talking about here today.

A. I understand.
Q. About what you're maintaining is shielded behind privilege.
A. I understand. But I think the context is relevant.
Q. You cannot state today that BP illegally shielded any information behind privilege. Correct?
A. I think I've already answered that question.
Q. I need to know. Are you saying today that BP definitively illegally shielded information --
A. Now you've added the word "definitively" so you've made it that much more complicated.
I'm a historian.
Q. I'm going to make sure the question is clear. Okay?
A. Okay.
Q. Are you stating today that BP definitively engaged in illegal activity by shielding information with attorney-client privilege?
A. I'm saying that we have evidence -- let me think about how I want to put this.
The whole first section of my report is about how historians analyze information in



context.
When we started this discussion, you asked about methodology. And a key part of methodology in history is to understand things in context.
The context of these activities, these activities that are taking place in April, May, June, July, in the immediate aftermath of the spill is the context of a company that, in fact, was found guilty of illegal activity.
So that raises a concern about whether there could have been additional illegal activity.
So no, I'm not saying anything definitively. I don't think we have the information to make a definitive judgment. And in any event, that would be a decision for a judge and a jury, not for the expert witness.
But as an expert witness, I'm raising a very severe and profound concern over the amount of material that has been shielded behind privilege, much of which, so far as we can tell -- and of course, we can't tell entirely, but we can tell in some cases who is involved in these correspondences, much of which appears to involve discussions of technical matters rather than matters of law.



And that, to me, raises a concern -- a substantive concern about the possibility that privilege has been abused in this case. And I think that is a clear statement. And I'd like to leave it at that.
Q. So you don't have information that would allow you to conclude that BP engaged in illegal activity in shielding any information behind attorney-client privilege. Correct?
A. That's a decision for the judge and jury to make.
Q. But I'm asking you.
A. But I'm an expert witness, and I've been asked to make opinions about materials that are available.
I've expressed what my opinion is based on the available materials, and I think they're very, very concerning.
Q. But you don't have the information for you to say that BP engaged in illegal activity with respect to shielding any information behind privilege. Correct?
MR. DURKEE: Objection, asked and answered at least once.
Q. You can answer.



A. I think you've asked and I've answered that now multiple times and it's starting to feel --
Q. Yes or no?
A. It's not a yes-or-no answer. You can say --
Q. Do you have the information today?
A. You can say that I'm nonresponsive if you want. I'm feeling like this is becoming haranguing.
Q. Do you have the information that allows you to conclude that BP illegally shielded information behind attorney-client privilege?
MR. DURKEE: Objection, asked and answered.
A. If you want my opinion just as a person --
Q. No. I just want to know whether you have the information that allows you to conclude as an expert that BP engaged in illegal activity shielding information behind attorney-client privilege.
MR. DURKEE: Objection, asked and answered.
A. Well, put it this way, abuse of attorney-client privilege is illegal. I mean,

Page 138

Judge Kessler found that in the Philip Morris -- U.S. versus Philip Morris. So how about if I leave you with that?
You're going to ask me again.
I don't really know how to answer your question because you're asking me to make a judgment which would really be a matter for the judge and the jury to decide.
I'm an expert witness. I've given my expert opinion based on the information available to me today. And my expert opinion based on the available information is that BP is abusing attorney-client privilege.
Q. All right. So your opinion is that BP is abusing attorney-client privilege. Your opinion expressed in your report and today is not that BP is engaging in illegal activity shielding information behind attorney-client privilege. Correct?
A. Okay. Let me put it this way. I'm not a mind reader. I don't have the information to say why they're abusing attorney-client privilege, but it's my expert opinion that they are.
Q. On page 76 of your report you write that "Overall, many of the data and scientific studies

Page 139

on which BP now relies are unlikely to be valid." Correct?
A. Yes, I wrote that.
Q. You don't write that the data and scientific studies on which BP relies in its defense are absolutely invalid. Correct?
A. No. And I wouldn't because as a historian or philosopher of science -- I mean, we didn't really talk about my training in the philosophy of science.
A phrase like "absolutely invalid" wouldn't be a phrase that a historian or philosopher would generally use -- or even a scientist, for that matter.
Because, I mean, there are very few cases short of outright fraud where we would say that data are absolutely invalid and very few situations where we would say that data are absolutely valid.
Scientific data collection is an art as much as a science. We know there are many possibilities for bias to creep in. And so as an expert, I'm trying to judge the robustness of the scientific data collection program.
And I think that there are enough examples

Page 140

of irregularities and problems, including problems that are highlighted by BP's own people, that raise this issue -- that raise the issue about the validity of the claims that are being made on the basis of these data.
Q. Okay. And you don't have the information that you need to conclude that the data and scientific studies on which BP relies in its defense are invalid. Correct?
A. Again, it's not -- I would almost never imagine any situation where I would say categorically that data are invalid.
I think what we have the evidence to show is that there is reason to suspect that many of the data may be questionable, particularly because we have evidence that they took steps that might have led to a tendency to discount or deny evidence of high levels of exposure, which is really the issue that's at stake here.
Q. And again, on page 76 of your report you state that what you maintain regarding BP influence on data and studies "casts serious doubt on the calculated 'doses' that workers would/could have received, and therefore undermines BP's claim that the doses were too low to have caused harm."

Page 141

Right?
A. Correct. I write that. I wrote that, yes.
Q. And you don't write that the calculated doses are wrong. Right?
A. No, I don't.
Q. You don't have information to conclude that the calculated doses are wrong. Right?
A. Correct. I do not say that they're wrong.
Q. And again, you write here about doses specifically with respect to workers. Correct?
A. Correct.
Q. And you render no conclusions with respect to residents of Gulf Coast communities. Right?
A. Correct.
MR. DURKEE: I hear a pause. It's 1:00 o'clock now. How much longer do you want to go before lunch?
MS. DESANTIS: This is a good break time if people want to stop for lunch.
Let's go off the record.
THE VIDEOGRAPHER: The time is 12:57. We are going off the record.
(Lunch recess, 12:57 p.m. to 1:40 p.m.)

Page 142

A F T E R N O O N S E S S I O N
THE VIDEOGRAPHER: We are back on the record. The time is 1:40.
Let's go off the record for a second.
The time is 1:41. Let's go off the record.
(Recess, 1:41 p.m. to 1:41 p.m.)
THE VIDEOGRAPHER: We are back on the record. The time is 1:41.
BY MS. DESANTIS:
Q. Good afternoon, Doctor.
A. Good afternoon.
Q. So I'd like to ask you to please turn to Tab 26 in your binder.
A. Sorry. Which binder?
Q. Binder 4.
Okay. Are you at the document behind Tab 26?
A. Yes.
Q. And that is a document that's Bates-numbered DLG_00181399. Do you see that?
A. Yes, I do.
Q. And we're going to mark that document as Exhibit 11.
(Exhibit 11 marked for identification)

Page 143

Q. Now, Doctor, as you look at that email, you recognize it? We were discussing it earlier. Correct?
A. Yes, I do.
Q. You state in your report that BP had represented to NIOSH that biomonitoring was not needed on the grounds that the well had been successfully capped, the spilled oil had largely been skimmed, and the weathered oil was not harmful. Correct?
A. I'm not sure about the second part of that sentence. But if you say that's in my report, I believe you.
Q. It's in your report at page 38.
A. Okay.
Q. And at the end of that sentence in your report on page 38, you cite to two documents. Right?
A. Uh-hmm. Okay.
Q. And one document is what we have marked as Exhibit 11.
A. Yup.
Q. Correspondence between Bruce Bernard --
A. Yup.
Q. -- the chief medical officer, and BP's --

Page 144

at NIOSH/CDC and BP's Dr. Heron, O'Shea. Correct?
A. Uh-hmm.
Q. And Fred Tremmel. Correct?
A. Yes. Correct.
Q. And that document is identified in the footnote to your report. Correct?
A. Yes, it is.
Q. You read that document. Right?
A. Yes, I did.
Q. And looking at the bottom of the document, the first email is from Bruce Bernard. Right?
A. Correct.
Q. And it's the first email in the thread?
A. Yup.
Q. And Bruce Bernard's title is chief medical officer. Right?
A. Yes.
Q. And that is for the health hazard evaluation and technical assistance division of the CDC. Right?
A. Yes, it is.
Q. And looking at the document, the subject line is "Update on HHE Activities." Right?
A. Yup.
Q. And in the second paragraph Bernard

Page 145

states, "We have decided to 'stand down' and not complete the biomonitoring protocol because of the success of the cap and the ceasing of the in-situ burns, and reduction in skimming. The protocol we shared will not be carried out. We will not be doing urine biomonitoring." Do you see that?
A. Yes, I do.
Q. And then as you look up above, Heron says, "Many thanks for the update. We are all looking forward to the next report and fully understand your decision re the biomonitoring." Right?
A. Yes. I see that.
Q. And he then goes on to talk about the last activity. Right?
A. Yes.
Q. And that reference to the last activity is a reference to an assessment of work organization and job stress factors in the context of emergency response. Right?
A. Correct.
Q. You don't see any other -- any statement by BP in this email thread stating that biomonitoring was not needed on the grounds that the well had been capped. Right?
A. Well, I mean, it's "We have decided to

Page 146

'stand down' and not complete the biomonitoring" . . . "because of the success of the cap."
Q. Bruce Bernard was not with BP. Correct?
A. No.
Q. Bernard was with the CDC. Correct?
A. Right. But there are prior emails where BP is making the case that because it is successfully capped, they don't need to do biomonitoring.
Q. You don't cite to them in the report, Doctor. Do you?
A. I don't? I thought I did.
Q. This is the document that you've cited in support.
A. I thought there was also the one from John Howard where he says "God bless the cap."
Q. You didn't cite to that report for the proposition in your report -- the proposition in your report is, on page 38, "BP represented to NIOSH that biomonitoring was not needed on the grounds that the well had been successfully capped, the spilled oil had largely been skimmed, and the weathered oil was not harmful."
Correct? That's what you state on page 38

Page 147

of your report.
A. Right. In this paragraph. But elsewhere in the report I'm sure I cite the email from Howard where he says "God bless the cap."
Q. I'm specifically talking now about what I just read to you.
A. Okay.
Q. What you stated in your report is what I just read. Right?
A. Okay.
Q. That "BP represented to NIOSH that biomonitoring was not needed on the grounds that the well had been successfully capped"?
A. I see what you're saying.
Q. And then you cite to the email thread that we just reviewed?
A. I see what you're saying.
Q. And there is nothing in that email thread indicating that BP represented to NIOSH that biomonitoring was not needed. Correct?
A. You're right. I should have cited to the earlier email where they make that representation.
Q. And that earlier email that you're referring to, will you please direct us to that in your report?

Page 148

A. I'd have to find it.
Q. We're going to ask you to do that on the next break. We're going to keep on going.
A. That's fine.
Q. With respect to John Howard -- and we've talked about him. If you could turn to Tab 25, please.
A. But if I could just add one thing, though, on that that I think is important.
When he says here the protocol we shared will not be carried out, that refers to the other emails that I do refer to with Margaret Kitt and Richard Heron in which they are developing a protocol to do this.
So it shows that NIOSH and CDC were, in fact, intending to do biomonitoring and then they changed their mind, and they changed their mind based on the argument about the success of the cap.
Q. There's no indication --
A. In this email. I agree.
Q. Let me finish my question.
A. Sorry.
Q. There is no indication in Exhibit 11 that BP made any representation to NIOSH that

Page 149

biomonitoring was not needed on the grounds that the well had been capped. Correct?
A. Correct.
Q. And, Doctor, I want to ask you to take a look at Tab 27.
A. Okay.
Q. And Tab 27 is a document that you've cited for the proposition that BP represented that biomonitoring was not needed because the well had been capped, also on page 36 of your report. Correct?
MR. DURKEE: Are you going to mark that as 12?
MS. DESANTIS: Yeah. Let's mark this as Exhibit 12.
MR. DURKEE: That will be -- the Tab 27 document is now marked as Exhibit 12.
(Exhibit 12 marked for identification)
Q. And the Bates number on that document is 0012282. I'm sorry. 731?
A. There's two. There's an upper and a lower one.
MR. DURKEE: Oh, okay.
A. There's a Boggs number and then there's a Bates number.

Q. Let's look at 003332. Is that what you have?
A. Yes.
Q. Exhibit 12 is Document 003332. And that is another document that you cite for the proposition that BP represented to NIOSH that biomonitoring was not needed on the grounds that the well had been capped. Correct?
A. Well, I'm seeing the Bates numbers here which is different than the Boggs-Oreskes number. But yes, this is cited here in Footnote 153.
Q. Your footnote reads that "Then there is a follow up memorandum closing things out roughly a month later." Do you see that?
A. I'm sorry. Where on the page?
Q. On page 36 of your report.
A. Sorry. I was looking at 37. Right. There's no discussion about Saperstein. Tremmel writes to Flower. Tremmel argues biomonitoring won't work. Flowers disagrees.
I'm sorry. So what are you asking me to look at?
Q. That there was a followup memorandum closing things out roughly a month later that you discuss on page 36 of your report.



A. Oh, on June 29th, 2010? Sorry. I'm not sure what you're referring to here. I'm confused.
You're saying I used the term "followup memo" or you're describing it as a followup memo?
Q. I think you used the term "followup memo." It's on page 38.
A. That explains why I'm not seeing it.
Q. In Footnote 162, you cite --
A. Oh, 162, "followup memo" --
Q. -- "closing things out roughly a month later."
A. Okay.
Q. And you also used that to support your proposition that BP represented to NIOSH that biomonitoring was not needed on the grounds that the well had been capped. Correct?
A. Right. What I'm doing here is showing how that argument is taken up by NIOSH. So NIOSH is saying that, but that's an argument that other documents suggested came from BP.
Q. All right. I want you to look at that closeout memorandum, which is Exhibit 12, 003332.
There is no indication in that closeout memorandum that BP had represented to NIOSH that biomonitoring should be ceased because the well



had been capped. Correct?
A. That's true.
Q. You cited it for support for the proposition that BP had represented to NIOSH that biomonitoring should be discontinued because the well had been capped. Correct?
A. Well, with -- okay. So I'm interpreting here because previously we see BP making the case that biomonitoring isn't or wouldn't be accurate. And then we see NIOSH accepting that argument where previously they had thought that biomonitoring was necessary.
So this is interpretive that I'm saying BP represented that biomonitoring wasn't necessary, would not be reliable.
And then they also make the argument that once the well is capped it's not needed. And we here see NIOSH accepting that argument and making that argument.
Q. You have not seen any direct indication that BP made a representation to NIOSH that biomonitoring should be ceased because the well had been capped. Correct?
A. Well, I have to go back. Maybe I'm misremembering.



My memory is when John Howard announces that, he says "Thank God for the cap." But I'd have to go back and look at those documents again.
Q. All right. But with respect to Exhibits 11 and 12 that you have cited in support of the proposition that BP represented to NIOSH that biomonitoring should be ceased because the well had been capped, there is no direct support for your proposition. Correct?
A. I agree. These documents show that NIOSH has accepted that argument. It doesn't show where that argument came from.
Q. It does not show any representation made by BP to NIOSH. Correct?
A. Correct.
Q. All right. Let's go back to John Howard's deposition testimony, which is at Tab 25 in your binder, and we're going to mark that as Exhibit 13.
(Exhibit 13 marked for identification)
MS. DESANTIS: Mr. Durkee, thank you for your assistance with the exhibits.
Q. Now, Doctor, I know that in your report you have cited some testimony of John Howard from this particular transcript, so you are familiar

Page 154

with this deposition transcript. Correct?
A. Yes.
Q. And I'd like to ask you to turn to page 296 of the deposition transcript.
A. Okay.
Q. About the middle -- we're going to start with the question that's towards the top. Actually, in the middle.
Do you see a question that was asked of Dr. Howard:
"QUESTION: Are you aware of any efforts of BP to impede any efforts to conduct biomonitoring of response workers?"
Do you see that question?
A. Yes, I do.
Q. And do you see Dr. Howard's answer at line 16, his answer is "No." Do you see that?
A. I do.
Q. You did not cite to this particular question and answer in your report, did you?
A. No, I did not.
Q. And you cannot disagree that Dr. Howard was unaware of any efforts of BP to conduct biomonitoring of response workers. Correct?
A. What you just said isn't the same as here.

Page 155

This is a question about impedance. So I think that word -- I wouldn't use that word. I'd say discourage, dissuade, not the same as impedance.
He may well have felt that they had an honest conversation. BP made the case that it wasn't needed. And NIOSH is persuaded. But that's my point.
BP makes an effort to persuade NIOSH that biomonitoring isn't necessary. And I'm saying that by doing that they removed an avenue of scientific investigation that could have helped us better understand what people were and were not exposed to and therefore whether the current harms were or were not related to their exposures.
Q. At the same time, Dr. Howard testified that BP did nothing to impede biomonitoring of response workers. Correct?
A. Correct. He did testify to that.
Q. And you didn't cite to that testimony in your report. Correct?
A. No, I did not.
Q. And you did not cite to any testimony of Dr. Howard indicating that biomonitoring was ceased because of BP's representation that the

Page 156

well had been capped. Correct?
A. Correct.
Q. So, Doctor, I'm going to ask you to open your report, Tab 5, and look at page 20.
A. Okay.
Q. Now, you maintain in your report "that BP actively resisted undertaking studies and/or worked to prevent the publication of data that could have established evidence of harm."
And that's on your report at page 2. Right?
A. Uh-hmm. Wait. Page 2? What? I thought you asked me to turn to page 20.
Q. I'm sorry. Page 20.
A. Okay. That's fine.
Q. And you assert in your report that "BP actively resisted undertaking studies" . . . "or worked to prevent the publication of data that could have established evidence of harm." Correct?
A. Correct. I say that. Yes.
Q. And you assert that the evidence suggests that BP steered GoMRI away from doing human health studies. Right?
A. Yes.

Page 157

Q. And you don't state in your report that you have conclusive proof that BP steered GoMRI away from health studies. Correct?
A. No. But there is an email in which they expressly use the word "steering" and they talk about how can we steer these studies.
So we know they at least had the idea or the intention to steer the study.
Q. We'll get to that email. We'll get to that email.
But you don't state in your report that you have conclusive proof that BP steered GoMRI away from doing health studies?
A. I do not. Correct.
Q. Part of the basis for your opinion that BP steered GoMRI studies away from human health studies is that, as you put it, 3 percent of BP's funding of GoMRI went to human health studies. Right?
A. Correct.
Q. All right. And for reaching that 3 percent figure, you relied on a document called "Gulf of Mexico Research Initiative Key Messages, February 2014." Right?
A. That sounds familiar. Yes.

Page 158

Q. Can you please turn to Tab 34 in Binder 6. Binder 5? Binder 6. Going to be looking at Tab 34 in Binder 6.
MR. DURKEE: Is this going to be 16?
MR. HARTFORD: No. I believe that is 14.
A. Tab 34 is someone's CV.
Q. After the CV, Doctor. Can you look at the end of that.
A. I see it. Yup.
MR. DURKEE: Hold on. Let me mark Tab 34, I'm going to mark that as Exhibit 14.
(Exhibit 14 marked for identification)
MR. DURKEE: It is now marked and she is turning to the last page.
Q. So, Doctor, something got attached to the front of this that we don't really need. It's a CV.
MS. DESANTIS: Mr. Durkee, I'm going to suggest, let's just take that CV out and let's mark 017105 as Exhibit 14.
MR. DURKEE: The one page?
A. Not the email?
Q. It's a two-pager -- three-pager. It's a three-page document.
A. So you want Exhibit 14 just to be the key

Page 159

messages?
Q. Yeah.
So we're marking as Exhibit 14 the Gulf of Mexico Research Initiatives Key Messages, which begins on Boggs-Oreskes Bates 017105 and it goes through -017107.
A. Yes. I see that.
Q. Okay. And you've obviously seen what we've marked as Exhibit 14 before. Correct?
A. I have. Yes.
Q. And the document states that research results from GoMRI-funded studies had already appeared in more than 470 scientific journals. Right?
A. Correct.
Q. And it states that "There have been 12 public health-related research projects." Right?
A. Sorry. Where is that?
Q. It's on the second-to-last bullet on the second page.
A. Oh, yeah. Okay. The 12 public health projects. Yup.
Q. Okay. Do you see where I am?
A. Yup. I see it.
Q. And to get the figure of 3 percent that

Page 160

you use in your report with respect to the percentage of studies that deal with public health, you divided 12 by 470. The right? You divided the 12 research projects by the 470 journal articles. Right? That's 3 percent?
A. Honestly, I'm not sure how I got that number, but that sounds plausible.
Q. And from that, you determined that 3 percent of the GoMRI funding went to human health. Right?
A. Oh, I see. Yeah. That might have been careless of me. I don't know if it's the funding. 3 percent of the studies is not necessarily 3 percent of the funding.
Q. Right. You're essentially dividing apples by oranges. Right?
A. You're right. That's a mistake.
I will stipulate I should have said 3 percent of the studies were studies of public health or human adaptive capacity, which is not really public health.
Yeah. We could argue about that. But yeah, that's an error on my part. I can stipulate that that should be 3 percent of the studies.
Q. All right. So you want to correct your

Page 161

report to state that approximately 3 percent of the studies funded by GoMRI went to human health research. Correct?
A. Yeah. I would adjust it to say human health or other human things. Because human adaptive capacity is not exactly -- in dynamics of social influence, I wouldn't really call that human health. I would call that social science.
So I would amend it to be 3 percent involve human health or social impacts or something like that.
Q. And with respect to these studies, a single study can spawn multiple articles. Correct?
A. Sure. In some cases.
Q. And so if 3 percent of the studies were with respect -- funded by GoMRI were with respect to human health, there could be multiple, multiple articles on that. Correct?
A. Yes. But there could also not be, and there could be more sponsoring other ones.
Without looking at all of the studies and all of the studies spawned by the studies, we wouldn't be able to make any conclusions about what the larger scientific world looks like from

Page 162

this. All we know is what's reported here on the number of studies GoMRI -- is that how you pronounce it?
Q. GoMRI.
A. The number of GoMRI studies. Who did or didn't pursue any of these other issues, we don't have information on that.
Q. And you don't know what percentage of the 470 scientific articles that you reference on page 58 actually concerned human health. Correct?
A. I'm sorry. 58 of my report?
Q. Yeah. On page 58 of your report, that's where you come up with this --
A. You were on page 20 before. So 58 of my report?
Q. Yeah. Where you come up with your 3 percent figure that you --
A. Sorry. I was looking at page 20 because that's what you had said to me previously.
Q. So on page 58 of your report, you're talking about 470 scientific journal articles. Correct?
A. I'm sorry. I'm not being deliberately difficult. Okay. Oh, they boasted it yielded more than 470 scientific journal articles, but

Page 163

then they say that of those only 12, less than 3 percent, dealt with public health and only two involved long-term tracking effects on women, children, hospital workers.
Sorry. What's your question?
Q. So my question is with respect to these 470 scientific journal articles, you have not assessed how many of those articles pertain to human health. Correct?
A. Well, I'm assuming that what they've written here is true. If they've misstated it, then it might not be correct. But I'm going based on the evidence that's in this document about --
Q. But you've already corrected your 3 percent figure. Correct? That is incorrect?
A. With respect to the funding. We're talking specifically about funding.
In this paragraph, we're talking about the articles. They're talking about 470 articles. And we know that there were only 12 studies -- I see. You're making another apples-and-oranges thing.
So there's 12 studies -- oh, I see what you're saying. I take your point. We have 470 articles. We don't know how many studies that is.

Page 164

So there's a units problem here. The 470 studies, it might not be 470 studies. It might be 470 articles and they involved only 12 studies. Okay. Point taken.
Q. So with respect to what you've stated on page 58 of your report, you have not assessed how many of those 470 scientific articles actually pertain to human health. Correct?
A. Okay. But I think the point is still taken. There are 470 scientific journal articles. Only 12 of the studies deal with public health and only two studies deal with long-term tracking of public health effects.
My point is, it is a very small portion of the whole. I take your point that it's a bit of an apples-to-oranges comparison. I should have done studies to studies or articles to articles.
I'd be more than happy to correct that if there is an opportunity to do that.
Q. In your report you state -- I'm again on page 58. You state that four out of five of the research points deal with diverse aspects of the spill on the nonhuman environment within the research priorities of GoMRI. Correct?
A. Correct.

Page 165

Q. And you maintain that public health is mentioned only in the final bullet. Correct?
A. Correct.
Q. And that worker health is not mentioned. Correct?
A. Correct.
Q. Still, though, Doctor, although public health and worker health are not specifically mentioned in four out of five areas of the study, is it fair to say that those areas of study may have some relevance to human health?
A. I wouldn't say that, because here is the thing about this. I remember this document very clearly because it's reminiscent of other things I've seen in other contexts.
So one of the things I've studied in my work --
Q. I'm going to stop --
A. But it is responsive because you're making an assertion about what might be the case.
I'll just say we don't know that.
MR. DURKEE: You should finish your answer.
MS. DESANTIS: David, we've got to get to a point -- it's nonresponsive. She's got to

Page 166

answer the question.
MR. DURKEE: She is answering the question. She gets to answer the question the way she sees fit. If you want to refocus it after she answers, that's fine. She gets to answer the question the way she sees fit.
MS. DESANTIS: We have a lot of questions where the answer is not directly responsive to the question.
MR. DURKEE: That's your interpretation. I think she's doing a very good job. There has been very few objections. We have been letting you-all have a nice friendly debate. I think we should continue to do that. I don't think you should restrict somebody's answers.
MS. DESANTIS: It is not an opportunity for Dr. Oreskes to give various segments of her report that are not responsive to the questions. I want to make sure we get through this today.
MR. DURKEE: And I still think the doctor has been answering the questions.
So, Doctor, do not refrain from answering the question fully and completely the way you feel fit.
If the defense attorney wants to focus in

Page 167

more after you finish your answer, she can certainly do that.
THE WITNESS: Okay. I'll try to give a shorter --
BY MS. DESANTIS:
Q. Doctor, I'm going to ask you to listen to the question. Listen to the question.
A. I think I've listened to the question. I think that's not fair for you --
Q. I'm not implying that you're not listening well. But really listen to the question.
A. Fair enough. Well, it's a subtle point. So I take your question.
But one of the things I study as an expert is how funding structures research. That's one of my areas of expertise. I wrote a whole 500-page book on that.
So when I see something like this, it's of great interest to me because one of the things I think we know, not just from my research but research of other people as well, is how you frame questions -- you know this yourself because it's part of what you do too. How you frame a question can have a strong impact and influence on what kind of answers you get.

Page 168

To me, it was highly conspicuous that we see these five areas being identified and the first four saying nothing about public health.
Now, it's true, as you suggest, it's conceivable, maybe possibly, that somewhere in that work there could have been a study that somehow was relevant to public health. But you're completely speculating when you make that suggestion.
What I see is the evidence in front of us is we have a very detailed stipulation about physical effects, about chemical effects, about environmental effects of petroleum in the sea floor, the water column, technological -- study of technology so we can do better in the future.
And then one point, so one out of five, so you can call it 20 percent if you like, about the impacts on public health.
And even that, what they put in public health includes environmental risk assessment, which I would not actually consider to be public health. Socioeconomic factors, well, maybe.
But what I see here is a set of priorities that seems to have actually placed a low focus or low degree of focus on the actual impacts of the

Page 169

spills on the health of workers or community members who could have been exposed to hydrocarbons from the spill.
Q. All right. Doctor, so if we look at the first research area, which concerns "Physical distribution, dispersion, and dilution of petroleum (oil)." Do you see that?
A. Yes, I do.
Q. Dispersion and dilution of oil are relevant to the potential for human exposure. Correct?
A. Well, they are relevant, but it doesn't tell us anything about it. You could study physical distribution and pay no attention whatsoever to the question of whether humans, animals, or anyone else was affected by that distribution.
Q. I'm simply asking you whether dispersion and dilution of oil are relevant to the potential for human exposure. And they are. Correct?
A. Yes, they are potentially relevant.
Q. And the second area of research is "Chemical evolution and biological degradation of petroleum/dispersant systems." Do you see that?
A. Yes, I do.

Page 170

Q. And biological degradation of oil is potentially relevant to human exposure. Correct?
A. It is, but it's a stress. I mean, if you wanted to understand human exposure, you would study human exposure.
I think what you're suggesting here, yes, is potentially relevant. And yes, you could imagine a downstream study that used these results in a public health study.
But I stand by my position that it's still pretty conspicuous that public health is not set as a priority.
All this physical, chemical, and environmental and technology comes first. And we have four different areas where those are identified as priorities and only one where public health is identified as a priority.
Q. Yet biological degradation of oil is relevant to --
A. Right. But they --
Q. -- for potential to human exposure. Correct?
A. Yes. But they could have said in relation to human exposure. And the fact that they don't say that to me is noteworthy.

Page 171

Q. The third area of research is "Environmental effects of the petroleum/dispersant system on the sea floor, water column, coastal waters," and a variety of other locations. Correct?
A. Correct.
Q. And the effect of petroleum on beach sediments or coastal waters where humans live or play has potential relevance to the potential impact of chemicals on human health. Correct?
A. Well, I find it interesting that you add the words "where humans play" because those words do not actually appear in this bullet point.
And in fact, as we said at the very beginning, part of the art and science of being a historian is understanding language, words, and documents in context.
This bullet point ends with the science of ecosystem recovery. I think the rational and logical read of that bullet point is that this is about ecosystems, not people. That is to say -- you could say aren't people in ecosystems? Of course they are.
When people talk about ecosystem recovery, normally in science that's not about human health.

Page 172

That's about the snails and the marshes and the manatees.
Ecosystem recovery usually refers to the nonhuman components. So it seems to me that it would be a great stretch and highly speculative to suggest that somehow that bullet point could also in some significant way involve human exposure and health. I think it's very implausible.
Q. And, Doctor, you could envision a downstream study where data on the water column or coastal waters or beach sediments pertained to human health. Correct?
A. Yes. That's correct.
Q. All right. Looking at the fourth bullet, "Technology developments for improved response, mitigation, detection, characterization, and remediation associated with oil spills." Do you see that?
A. Yes, I do.
Q. Technology developments for improved response and remediation of oil spills could have impact on human health. Correct?
A. I read that bullet to be essentially about improving technology for the next spill. Nobody it seems -- let me rephrase that.

Page 173

It seems very unlikely that any research funded through this program would occur fast enough and then develop new technology fast enough to be relevant for this cleanup.
I mean, just publishing a scientific paper in a peer-reviewed journal typically takes six months to a year if not longer.
I understand that really to be about funding technology development so that we do a better job with the next spill and not to really be relevant to what is happening to people in this spill.
Q. So, Doctor, research pertaining to technology developments for use, whether now or in the future, could have impacts on human health. Correct?
A. But not any humans affected by this spill.
Q. No. But my question is, technology development whether now or in the future research on those developments could have impact on human health. Correct?
A. Sure. And if we were worried about what happened with the next spill, then yes. But not in terms of what it means for this spill.
Q. And the fifth research area you've already

Page 174

said does have relevance to human health. Correct?
A. Yes. Correct.
Q. And you have the opinion -- and I'm looking at page 59 of your report -- that, as you put it, one might conclude that research funded by GoMRI was BP-directed research. Right?
A. I'm sorry. Where on page 59?
Q. We are on page 59, second paragraph.
A. Okay.
Q. You note at the top that the topics chosen were strongly aligned with BP's interest.
And this is in -- on page 59 in the second paragraph.
You state that "While BP stressed the independence and scientific integrity of the funded research, we see that the topics chosen were strongly aligned with the BP interest in focusing on topics "closely aligned to oil and gas industry needs." Do you see that?
A. Yes, I do.
Q. And is it your opinion, then, that the research funded by GoMRI was BP-directed research?
A. I would say it's my opinion that it was BP influenced.

Page 175

Q. All right. But not BP directed?
A. I choose my words with care.
Q. The GoMRI key messages document that we have looked at before -- and it is Exhibit 14.
A. I have it here.
Q. I'll direct you to page 11 of that document.
A. The document I'm looking at doesn't have page numbers on it.
Q. Okay. It's Bates Number 017105.
A. Okay.
Q. That document states that "The Gulf of Mexico Research Initiative" . . . "is an independent research program." Correct?
A. Yes, it does say that.
Q. And it states that "GoMRI-funded researchers are governed by the professional standards defined by the National Academy of Sciences." Correct?
A. Yes, it says that.
Q. Your expert report does not cite to any information from the GoMRI website for information on how topics for research were chosen by GoMRI. Correct?
A. Yeah, although I think I did look at that.

Page 176

Q. I'm going to direct you to a page.
A. Okay.
Q. Can you turn to Tab 35 in your notebook.
A. Okay.
Q. And this, Doctor -- and we'll mark it as Exhibit 15.
(Exhibit 15 marked for identification)
Q. This is a document entitled "GoMRI Research Program Overview" --
A. Okay.
Q. -- from the Gulf of Mexico Research Initiative. And it's a printout of the GoMRI website page, detailing the background and history of the research program. Do you see that?
A. Yes, I do.
Q. Okay. Now, you can see that scientists had a variety of discussions and meetings that were open to the public to define GoMRI intellectual themes. Right?
A. Yes.
Q. And do you see that "The first meeting was convened by the White House Office of Science and Technology Policy on" May 19th, 2010?
A. Yeah. You said open to the public. I wouldn't necessarily use the word "public" here.

Page 177

I don't know how the people were invited. Leaders of scientific research institutes. I wouldn't use the word "public" to refer to that.
Q. Okay. If you look on page 2 of what we've shown to you, about midway down, "Development of Research Themes," the first paragraph of that section.
Do you see the last line of that first paragraph that these "three important meetings were open to public participation"?
A. I'm sorry. Where are you? I don't know where you're asking me to look.
Q. Tab 35.
Are you on Tab 35? No?
A. Sorry. Wrong tab.
Q. Let's go back so the record is clear.
We're looking at the GoMRI Research Program Overview.
A. Yes.
Q. And it's Exhibit 15.
A. Yup.
Q. And if you look on page 2 of that document --
A. Yes.
Q. -- do you see "Development of Research

Page 178

Themes"?
A. Yes, I do.
Q. And it indicates there that "Numerous discussions and three important meetings open to public."
A. You're right.
Q. It indicates that "Numerous discussions and three important meetings open to public participation were held to define the GoMRI intellectual themes." Right?
A. Fair enough.
Q. So still on Tab 35, which is Exhibit 15.
A. Okay. Yup.
Q. You can see on the second page of that document that the first meeting mentioned "was convened by the White House Office of Science and Technology Policy on" May 19th, 2010. Correct?
A. I see that.
Q. And the first meeting was hosted by the EPA. Right?
A. Right.
Q. And that first meeting had 40 leaders from major ocean research institutions?
A. Right.
Q. And then you can also see that the second

Page 179

meeting was held on June 3rd, 2010, at Louisiana State University. Correct?
A. Yes.
Q. And you see that the second meeting was cosponsored by NOAA and the Consortium for Ocean Leadership. Right?
A. Yes.
Q. And that meeting had over 200 researchers present, including from academia and the government and representatives from all affected Gulf states. Right?
A. Yes. I have see that.
Q. And then you also see that the third meeting was held on the 22nd and 23rd of June in New Orleans?
A. Yes.
Q. And that third meeting was sponsored by the Institute of Medicine of the National Academy of Sciences?
A. Yes.
Q. That third meeting had over 300 participants. Right?
A. Yes.
Q. And that meeting was convened to address public health impacts and responses to them.

Page 180

Right?
A. Yes.
Q. And it included addressing monitoring and surveilling of potentially affected populations. Right?
A. Yes, it does.
Q. And GoMRI also held a workshop -- and this is on the last page of Exhibit 15.
GoMRI also held a workshop specifically on the issue of public health on July 2013 to inform public health research. Right?
A. Yes.
Q. It's clear from the first month after the spill, a variety of institutions and individuals were engaged in deciding on the research that GoMRI would pursue. Right?
A. Yes.
Q. Dr. Rita Colwell was the chair of the GoMRI research board during the spill response. Did you know that?
A. I think I did. I think I saw her.
Q. Do you know Dr. Colwell?
A. Not personally. I know who she is.
Q. Do you have any reason to believe that Dr. Colwell would allow BP to control research

Page 181

done by GoMIR?
A. Again, I wouldn't use the word "control."
I see where you're going with this line of investigation. But again, I think this is responsive to one of the things we know about influence is that it doesn't work by controlling people. That doesn't work. Credible researchers wouldn't allow themselves to be controlled.
But there are various ways in which research can be influenced, and I think we see the effect of influence even if I can't prove to you how it happened. I think we see the effects.
Q. Do you think that Dr. Colwell as chair of the GoMRI board lacks the sophistication to perceive whether or not research at her organization is being controlled by BP?
A. You keep using the word "control" and I will continue to object to the word "control."
I think one of the things we know and we've shown this in research is even quite sophisticated people can be influenced. And there are many different ways in which influence can occur.
But one can easily imagine a situation where in the immediate crisis situation of the

Page 182

spill, focusing on the spill itself, the chemical, the physical impacts, one can easily imagine representations being made for why those would be the most important.

And in fact, it's interesting because although it is true, you know, the Institute of Medicine sponsored the third meeting, but that's the meeting that Heron and the others are talking about when they talk about biomonitoring.

That's the meeting that Margaret Kitt comes back from, saying we think we should do biomonitoring. And that's the biomonitoring that we've already established didn't actually happen.

So there can be gaps between what's discussed and what actually subsequently occurs. And that's one of the things I'm interested in. Why are there those gaps and what happens in those gaps, and we try to understand that through the documentary evidence.

And again, your client has withheld huge amounts of information that could be exculpatory, for all I know.

So I think -- I've written about very sophisticated people who were, in fact, influenced by corporations. I've written about Nobel Prize

Page 183

winning scientists who were influenced by the tobacco industry.

So yes, Rita Colwell is a famous and potentially sophisticated scientist, but that does not disprove the possibility that there could have been influence here that would help to explain why the focus.

And we know this was the focus. We're not speculating here. This is a matter of fact. The focus is not on public health.

Q. Okay. Doctor, with respect to the meeting that you just mentioned, you said there was a public meeting that we discussed having been held by GoMRI. Correct? Pertaining to human health?
A. Yes.
Q. And it was that meeting from which --
A. I think so. I'm not positive. But that meeting that Margaret Kitt refers to is a meeting in June sponsored by IOM.
Q. All right. You're saying that it is possible that that meeting that Margaret Kitt is referring to in the email you're discussing was one of these GoMRI meetings and in fact it was one that we've discussed held on July 30th, 2013. Correct?

Page 184

A. Well, I'm not sure. If you have information to the contrary, then I'd be interested.

But it just occurred to me when I saw this was June in IOM, because it says they were looking at monitoring and surveillance. That's what made me think this.
Q. Doctor, this particular workshop was held -- this GoMRI workshop on public health was held on July 30th, 2013. Correct?
A. I was referring to the meeting in New Orleans on December 22nd. That's the one I'm saying the timing seemed to fit with the Kitt meeting, but I -- but you're referring to this July meeting. That's obviously different. That's subsequent to the discussion of biomonitoring.
Q. All right. I want to take you to Tab 36 of your notebook. And we're going to mark this as Exhibit 16.

(Exhibit 16 marked for identification)
Q. And Exhibit 16 is a document from the GoMRI website titled "Project Member Institutions, GoMRI Research Board."
A. Okay.
Q. Do you see that document?

Page 185

A. Yes, I do.
Q. And it's a list of the members of the GoMRI research board. Right?
A. Yes.
Q. Do you have any reason to believe that any of these individuals would knowingly allow BP to influence the research done by GoMRI?
A. Well, again, the word "knowingly" --
Q. That's my question. That's the only question I'm asking you. I don't need a diatribe on the meaning of the word "knowingly." I'm asking the question.
A. Okay. I object to the use of the word "diatribe." I don't think my answers are diatribes.

I don't know who most of these people are and I don't know what their roles are. So it would be difficult for me to judge.

But I can say one thing, that the vice-chair of the board, Margaret Leinen, is someone I know well. And I know that her institution has taken a lot of money for research from fossil fuel companies, and therefore I would say that she has a conflict of interest in a case like this.

Page 186

And so although -- I guess she wasn't head of Scripps yet when she did this.

Many people who work at research institutions -- again, I would need to know exactly who these people are and institutions they're familiar with.

Many oceanographic institutions, including Scripps and Woods Hole, accept research and institutional support from fossil fuel companies that create potential conflicts of interest.

Q. With respect to people on the GoMRI board that you believe were capable of knowingly allowing BP to influence GoMRI research, it includes Margaret Leinen. Correct?

A. Everyone is capable of being influenced, whether they think they are or not.

Q. You believe that every member of the GoMRI board was capable of being influenced by BP with respect to GoMRI research?

A. Actually, I do believe that. Yes.

Q. And you believe that Dr. Rita Colwell as chair of the GoMRI board was capable of being influenced by BP with respect to GoMRI research?

A. As I said, I believe we are all capable of being influenced.

Page 187

Q. And do you have proof that Dr. Colwell or any of the board members were actually influenced by BP in conducting GoMRI research?

A. No. But that's not my claim. My claim is not --

Q. My question --

MR. DURKEE: Let her answer the question.

Q. All I'm asking is to answer my question. I'm not asking what your claim is. I'm simply asking for the answer to my question.

A. I think it's important that you not put words in my mouth. I'm not claiming that any one of these people or even all of them were knowingly influenced.

What I'm saying is we have an outcome, a factual outcome that is documented. It's not my opinion. These are the facts of what the research parties were.

My suggestion is that this implies BP influence and, further, that we know from BP's own emails that they were trying to steer GoMRI studies. They use the word "steering." That's all. I'm not saying any more or any less than that.

Q. And, Doctor, I just want to make sure the record is clear, because you were holding up a document to illustrate your testimony. You said, "This document makes it clear."

Page 188

What document were you using? I can't see it across the table.

A. I picked up the page in my report that quotes from the document you just gave me, which is -- I don't know. There are so many tabs here. I believe it was Exhibit 14. What you gave as Exhibit 14, which I also cite in my report. So it's --

Q. You were referring to Exhibit 14, which is the "GoMRI Key Messages" document?

A. Correct.

Q. You're saying that the "GoMRI Key Messages" document is supportive of your opinion that GoMRI was influenced by BP in its selection of research topics. Correct?

A. Correct. That is what I'm saying.

Q. All right. And you're not saying that you have proof -- other proof, any other proof that any of these GoMRI board members were influenced by BP with respect to the topics of BP research?

A. No. But we do have proof that BP was trying to influence GoMRI.

Page 189

Q. I want to turn to an email --

A. Could we take a bathroom break, just five minutes?

MR. DURKEE: Sure.

A. Would that be all right?

MS. DESANTIS: We can go off the record.

THE VIDEOGRAPHER: The time is 2:32. We're off the record.

(Recess, 2:32 p.m. to 2:43 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:43.

BY MS. DESANTIS:

Q. Okay. Doctor, looking at Tab 5, Exhibit 5, your expert report, I'm going to direct you to page 60 of your expert report.

A. Hold on. I'm tangled. You warned me about getting tangled in my glasses.

Can you hear me?

Okay. Page 60. Yes.

Q. In the third paragraph, it's actually the second paragraph if you count the carryover, you write about a July 5th, 2010 email sent by Richard Heron to BP colleagues.

And in your report, you allege that that email sent by Richard Heron suggests that he was

managing to shape the direction of the GoMRI program by influencing the CDC and NIOSH officials who were helping to organize the program. Right?
A. Yes.
Q. And to support this, you quote right there in your report from Dr. Heron's email where he says, and I quote because you have quoted it, "'I have managed to secure early release of significant funding from GRI....I am also at a relatively good stage with CDC/NIOSH in helping them shape a programme which can be run (with funding) from their charitable foundation.'" Right?
A. Yes. I see that.
Q. And you understand GRI to be the same as GoMRI. Correct?
A. I was assuming it was. But if that's not correct, then you can correct me.
Q. Well, let's just assume that "GRI" means GoMRI there for the purposes of this questioning.
In that quote, he doesn't say that he was managing to shape the direction of the GoMRI program. Correct? You don't see that there. Correct?
A. He says he's in a good stage in helping



them shape.
Q. Exactly. He says he was "'helping them shape a program which can be run (with funding) from their charitable foundation.'" Correct?
A. Correct.
Q. And that does not indicate that Dr. Heron was controlling the work of GoMRI. Correct?
A. Well, again, I would take issue with the word "controlling." At no point did I assert that they controlled it.
But I do say -- and if you read the previous paragraphs here, there's other evidence that you haven't read to me but which I think might be stronger of attempts that people associated with BP are making in which they talk about influencing the project to undertake studies we believe would be useful, can we steer research in support of restoration. That's exactly what we're talking about here.
So they're making an effort to steer the research towards restoration ecology as opposed to other things.
Q. And so you believe that this email proves that Dr. Heron was trying to direct research towards restoration ecology and away from health.



Correct?
A. I didn't say "prove." Again, you're putting words in my mouth.
I think this whole set of paragraphs here leading up to the one that you quoted, I'll bring your attention to the previous paragraph, "BP's Russell Putt" . . . "suggested that it would be desirable to direct the GoMIR research. He recognizes that this is a delicate matter, putting the word 'direct' in quotes: 'Can we "direct" GRI funding to a specific study'" . . . "'What influence do we have over the vessels/equipment,'" etc., "'driving the studies vs the questions?'"
So I think the context of this is pretty clear. The very fact that he puts the word "direct" in scare quotes indicates they understand not only that they probably can't direct it but if they were seen to be directing it, that would actually not serve their interest.
So this is about steering, influencing in various ways to try to come up with research which, as they say in their own words, would be useful to them.
Q. Doctor, with respect to the overall work of BP in GoMRI, you've stated today that you have



information leading you to conclude that BP was influencing GoMRI research. Correct?
A. Well, again, I'm not claiming it's influencing the individual specific studies. That's not my claim. My claim is about how the overall research program is defined.
Q. And so you are testifying today that you conclude that BP was influencing the overall design of GoMRI research. Correct?
A. Correct.
Q. You are not testifying today that BP controlled the overall design of GoMRI research. Correct?
A. Well, they may have done, but I wouldn't say that I have evidence to make that claim.
Q. All right. Let's go to Tab 37 in your notebook, please.
A. Sorry. Which notebook? Because I have multiple notebooks in front of me now. This one? The smaller one?
Q. This is going to be Binder 6.
A. Okay. Yup.
Q. And we're going to mark the document behind Tab 37 as Exhibit 17.
(Exhibit 17 marked for identification)

Page 194

MS. DESANTIS: Thank you for your help, Mr. Durkee.
MR. DURKEE: Yup.
Q. Doctor, Tab 37 is a document entitled, "NIH to launch Gulf oil spill health study," dated September 7th, 2010.
Do you see that?
A. Yes, I do.
Q. Are you familiar with the Gulf long-term followup study, sometimes called the "Gulf Study"?
A. I don't believe I've reviewed the materials associated with this.
Q. All right. So you are not familiar with the Gulf Study that was done by the National Institute of Environmental Health Sciences. Correct?
A. Correct.
Q. And were you aware that GoMRI helped fund the National Institute of Environmental Health Sciences Gulf Study?
A. I am now because I'm looking at this document.
Q. This is a press release -- it is a press release by NIH about launching its research into the spill response. Correct?

Page 195

A. Yes.
Q. And it states that BP contributed $10 million to NIH for an oil spill health study. Correct?
A. Correct.
Q. And you don't mention any NIH study in your report. Right?
A. Correct. But I would point out that what's concerning here is that this press release is September 2010, so we're now several months after the immediate response.
So to me, this seems like late, that they didn't immediately take steps to do this kind of work right away when the highest levels of exposures would have been occurring.
Q. So this is a particular study that was to be a multiyear study. Do you see that?
A. Yes, I do.
Q. And you have not reviewed the parameters for the NIH study, have you?
A. No, I have not.
Q. And you have not read the methodology for the NIH study. Correct?
A. Correct.
Q. And you've not read any of the scientific

Page 196

papers that have been spawned by the NIH study. Correct?
A. Well, I couldn't swear I never read any of them because I read a lot of science. But yes, I didn't specifically read any of the papers from this.
Q. And you've not cited to any of the NIH scientific papers in your report that were spawned from the Gulf Study. Correct?
A. Correct.
Q. And you don't -- you have not expressed the opinion that BP was influencing the National Institutes of Health in this study. Correct?
A. I didn't look at the materials that would be relevant to pass judgment on that.
Q. I'm simply asking you --
A. Correct.
Q. Let me repeat the question. You have not expressed the opinion that BP was influencing the National Institutes of Health through funding this study. Correct?
A. Correct.
Q. And you have not expressed the opinion that the National Institutes of Health would let BP control its research?

Page 197

A. No, I have not expressed that opinion.
Q. And do you see in the second paragraph of this press release that the NIH press release writes, "The NIH will have full autonomy regarding the distribution of the $10 million." Correct?
A. Yes, I see that. Correct.
Q. And you have no information allowing you to dispute that the NIH had full autonomy regarding the distribution of the $10 million. Correct?
A. Well, that would depend upon your definition of "information."
I think there is information. We have many examples from other studies where people claim they were independent and autonomous but, in fact, we see they are not entirely independent or autonomous.
Without reviewing the evidence regarding this study, I wouldn't be in a position to judge one way or the other.
Q. All right. So you don't have any evidence that the NIH was not fully autonomous regarding the distribution of the $10 million. Correct?
A. I'm not expressing an opinion with respect to that.

Q. I'm not asking for an opinion. I'm asking for what evidence you have.
A. I did not --
Q. Let me finish the question.
Because you haven't reviewed the evidence, you do not have any evidence that allows you to conclude that the NIH was not fully autonomous distributing the $10 million. Correct?
A. Put it that way, it's a tautology. But yes, because I have not reviewed the evidence I do not have evidence that would speak to this one way or the other.
Q. And you have not cited papers published by scientists regarding the Gulf Study in your report. Correct?
A. Correct.
Q. And you have not maintained in your report that the conclusions are accurate or inaccurate. Correct?
A. Correct.
Q. With respect to the air monitoring data that you have questioned in your report, you have not opined that Gulf studies that relied on BP air monitoring data are compromised, have you?
A. No, I have not opined to that effect.



Q. And you do not have information that would permit you to opine that Gulf studies that relied on BP air monitoring data are invalid. Correct?
A. I'm sorry. Isn't that the same as what you asked me a minute ago?
Q. No. I'm specifically asking you about air monitoring data.
A. But the previous question was about air monitoring also, wasn't it?
Q. Yes. That's fair, Doctor. I think I have my answer to that question. We're going to move on.
Are Gulf studies that relied on BP community air monitoring data valid studies?
A. I would say that we don't know.
But they could be compromised. If they relied on data similar to what I've discussed in my report, then it's possible that those studies could be compromised by the quality of those data if they relied on them without reviewing them or -- yeah, they could be compromised.
Q. So in your opinion, the BP community air monitoring data could be a compromised data set. Correct?
A. Correct.



Q. Actually --
A. I think what I just said -- you asked about the studies. You asked about the data.
What I'm saying is if the studies relied on data that were inadequate or insufficient or otherwise compromised, then those studies would be compromised.
Q. Correct.
A. Okay.
Q. Right. I know what you're saying.
So in your opinion -- I just want to make sure the record is clear.
A. Sure.
Q. In your opinion, the BP community air monitoring data could be a compromised data set. Correct?
A. Yes, it could be.
Q. And if Gulf studies relied on BP community air monitoring data, those studies could be compromised if that data is, in fact, compromised. Correct?
A. Correct. They could be.
Q. Let's look at your report on Tab 5 in your first notebook, Exhibit 5.
THE VIDEOGRAPHER: The time is 2:57.



We're off the record.
(Off the record, 2:57 p.m. to 3:01 p.m.)
THE VIDEOGRAPHER: We are back on the record. The time is 3:01.
BY MS. DESANTIS:
Q. Okay. So, Doctor, we were asking you to look at page 20 of your expert report. And you'll see in the paragraph at the top of that report you maintain that the documentary record "suggests that BP legal counsel engaged in 'ghost-management' of the scientific work." Correct?
A. Uh-hmm.
Q. And you refer -- and I'm going to take you back to page 3 of your report. You refer to ghost-management as "akin to the practice of ghost-writing." Correct?
A. Correct. I do say that.
Q. All right. And in your report, you have not cited any publication for which you have proof that BP legal counsel ghostwrote the publication. Correct?
A. Correct. I'm not alleging ghostwriting.
Q. So you were not alleging that BP was ghostwriting any publications. Correct?

Page 202

A. No. I introduced the term "ghost-management." You'll see it's in quotation marks because I was trying to come up with a term which I thought was fair to describe what the evidence shows.

And I'm not alleging ghostwriting. I don't believe we have evidence of that. But I am saying we have evidence of something else, which is potentially problematic.

Q. But you do not have evidence that any publication was ghostwritten by BP or agents of BP. Correct?

A. Correct.

Q. And you've not identified any publications that were ghost-managed by BP or agents of BP. Correct?

A. No, that's not correct. We -- in the documentary evidence, there were documents about the publication tracker, about what the state was of scientific papers that were being submitted to a scientific conference organized by the American Chemical Society, in which there is a set of stages of what has to happen.

And one of the stages is review by legal counsel. And in several places we saw comments

Page 203

like "return to Jean for edits" or "make sure Jean sees this."

And I queried defense counsel as to who "Jean" was. And the answer was that Jean was Jean Martin, legal counsel for BP.

Q. And so your opinion is that this publication tracker that you reviewed shows that BP was ghost-managing publications. Is that correct?

A. Correct. That counsel for BP were playing a role in managing what publications -- reviewing publications prior to submission and editing them.

Q. So you just said in your response there that you had evidence that counsel for BP were playing a role in managing publications. Correct?

A. Yes. Including editing them prior to submission.

Q. You didn't say that counsel for BP were ghost-managing publications. Correct?

A. Ghost-managing. Like I said, I came up with the term "ghost-managing" to try my best to accurately describe what it seemed to me was going on.

And it's ghost-managing in the sense that when those papers get published -- and I did look

Page 204

at some of the publications that came out of this process, including, like, one particular paper where the title is there so we know what it is.

There's no acknowledgement in the paper that says oh, BP lawyers helped edit the paper. So it's ghost-management in that sense that the lawyers are playing a role in managing this publication, but it's not acknowledged in the publication. And that's why the word "ghost," that's why I think the word "ghost" is fair in this case.

As in ghostwriting, the whole idea of ghostwriting is people are writing things but they're not showing up in the authorship or the acknowledgement.

Q. You have not identified in your report any authors of publications who permitted their work to be, as you put it, ghost-managed by BP or its agents. Correct?

A. Well, no, I wouldn't say that. I'd, again, have to go back to my report.

But there were some specific documents we looked at in which it's made clear that these papers are not being approved to be submitted to the conference until they've been vetted and

Page 205

edited by this lawyer, Jean Martin.

Q. Can you identify, as you sit here today, any publication that you maintain was ghost-managed by BP or its counsel?

A. Well, I would have to go back to my report. But yes, I believe there was such a paper. And I'd have to find it.

Q. And was there only one such paper that you recall?

A. If I recall the publication tracker, there was more than one where we saw comments to the effect of "send to Jean" or "wait for Jean's edits," something like that.

There was one particular paper that I was able to identify because the title of the paper was the same in the final publication. I did look at that paper and I read it, and there was no acknowledgement in the paper that it had been edited by lawyers for BP.

Q. And that is the only paper that you're maintaining today was ghost-managed by BP?

A. No, that's not what I'm saying.

I think there's evidence that this was a broad procedure or the fact that they have these publication chapters implies that all of the

Page 206

papers that came through that particular -- for that particular conference were vetted by BP counsel.

There's one particular one that I followed through, but there could be others. And if I had more time, I could track those as well.

Q. Okay. On your next break, we're going to ask you to take a look and see if you can identify that paper for us.

A. Sure.

Q. We're going to look back and see if we can find something in the report that seems to fit this description.

A. Okay.

Q. But as you sit here today, you believe there's one paper that you mention in your report that was, as you say, ghost-managed by BP or its agents?

A. Well, again, that's not what I said.

I believe the evidence was this was a routine practice. But there was one particular paper that I followed through in order to ask the question, well, did they acknowledge it? Did they say oh, this paper was edited by lawyers for BP? And they did not.

Page 207

Q. Is that the only paper --

A. That's the only one I followed through.

Q. Is that the only one you recall citing in your report?

A. Correct.

Q. So there's only one paper that you actually cited in your report that you believe was ghost-managed by BP or its agents?

A. No. Because I cited the publication tracker that looks at -- there's multiple articles that are being referred to in this --

Q. Right. But with particularity, you did not cite more than one publication in your report that you maintain was ghost-managed by BP. Right?

A. Again, I would have to go back. But the point I'm trying to make here isn't that I'm saying there is only one paper.

The point I'm saying is if these people when they published the paper had in the acknowledgements said this paper was edited by BP lawyers, then I wouldn't be able to say that was ghost-management. Then I would say, okay, it's there. It's acknowledged. It might be bad, but it's acknowledged.

So largely because of time constraints,

Page 208

that was the only paper I followed through just to establish that, in fact, lawyers were making edits but that was not acknowledged when the paper was published.

There could well be more. It's my opinion that there are more. That's the one I followed through to the endpoint.

Q. So it's your opinion that there are more, but you haven't had time to confirm that there are more. Correct?

A. Yes, it is my opinion that there are very likely more.

Q. But you have not yet been able to confirm that there are, in fact, more than one publication that you maintain has been ghost-managed by BP or its agents?

A. No. Again, that's not what I'm saying. I think the publication tracker shows there are multiple papers in which legal vetting was taking place.

There's only one that I followed through to the point of seeing whether or not they acknowledged that when they published the paper. But I think the evidence from the publication tracker points to multiple papers being reviewed

Page 209

by legal counsel and edited.

Q. With respect to Mr. Boggs and his case, we've previously discussed your awareness that Mr. Boggs was a resident and not a response worker. Correct?

A. Correct.

Q. And that your report contains analysis specific to response workers because it was drafted as a generic report. Correct?

A. Correct. Although I think many of the things that I have written could be applicable as well to community residents. But it is true that documents that I was looking at were specifically with respect to the cleanup operation.

Q. And you don't have any sections in your report focused on claims of residential exposure. Correct?

A. Correct.

Q. And you don't have any sections in your report about Mr. Boggs, the plaintiff. Correct?

A. Correct. My report is not case-specific.

Q. And in fact, his name doesn't even appear in your report. Right?

A. I believe that's correct.

Q. You've made it clear that you base your

Page 210

opinions in this case on a review of documents supplied to you by plaintiff's counsel. Correct?
A. And publicly available materials related to the spill.
Q. And to the extent that you are relying on documents to support your opinions that are publicly available, you have cited those materials in your report. Correct?
A. Correct. To the best of my ability and knowledge.
Q. And you have stated that methodologically, historians do their work primarily through critical reading and interpretation of documents. Correct?
A. Correct.
Q. Critical reading is part of your methodology as a historian of science. Right?
A. Correct.
Q. And interpretation of documents is part of your methodology. Correct?
A. Correct.
Q. And you've stated that, like most historians, your methodology relies primarily on the finding, reading, and interpretation of historical documents. Right?

Page 211

A. Correct.
Q. It's true that you maintain that your methodology is consistent with standards and practices in your discipline. Correct?
A. Correct. I think it would be fair to say I wouldn't be hired as a Harvard professor if they weren't.
Q. And are there written standards for work in your discipline?
A. That's a good question.
So as I suggested before, interestingly enough, not really. History isn't like biochemistry where there are methods sections or, like, risk analysis where the National Academy of Sciences has published guidelines for risk assessment, or model validation where the National Academy of Science has published guidelines.
We don't have that kind of formal written guidelines for historical research. Maybe we should, but we don't.
Q. And there's no one single methodology in your discipline as an historian of science. Right?
A. True. But I would argue that's true of all sciences as well, that we talk about the

Page 212

scientific method, but that's false and misleading.
Scientific methods are very varied even within individual disciplines. There often is more than one method that could be used.
Q. You've actually stated it in your report on page 11. There is no one single methodology in your discipline as an historian of science. Right?
A. That's correct.
Q. And the exact methodologies used by historians of science in diverse cases will vary. Right?
A. That's correct.
Q. And you've said that historians like yourself must conform their testimony to the historical method requiring them to respect the pastness of the past by grappling with the complexity and inconsistency of the historical record and dealing appropriately with contrary evidence. Correct?
A. That is correct.
Q. And your method requires you to respect the pastness of the past. Right?
A. That is correct.

Page 213

Q. And your method requires you to grapple with the complexity of the historical record. Right?
A. That is correct.
Q. You write that your skills as a professional historian are special skills in which historians are trained. Right?
A. Correct.
Q. And are these special skills in which professional historians are trained itemized in any methodological document that you can think of?
A. No. The only thing I can think about is, again -- I mean, it's interesting. So one of the methods of history is oral history, doing interviews with people after the fact.
In general, that's not a method that I prefer because I think we know that there's a high level of fallibility because people's memories are highly fallible.
It's one reason I wouldn't interview people today about an event that happened 14 years ago unless I had no alternative or there was some particular reason why I thought it would be useful in that case.
Other historians would disagree with me,

Page 214

and I have students who do oral history as part of their work.
There are books that have been written about oral history for exactly this reason. Because oral history is controversial and because some historians think it is a really important tool and others are skeptical, there are books written about oral history. And I believe there might be guidelines for doing good oral history, about getting around faulty memory and actual reconstruction.
So there are some documents written for that specific aspect. I would have to look that up, if you wanted to know what those were.
But I would say that's kind of the exception. Because it is a controversial area, there is writing about it.
Q. There's no written document explaining the skill set that an historian of science must possess. Correct?
A. Correct. But you know, there would be no written document like that for most sciences.
Q. And there's no written document specifying the training required of an historian of science. Correct?

Page 215

A. A written document? Well, no.
I mean, I suppose in academic life there is a lot of unwritten rules, like you wouldn't be hired at a university if you didn't have a Ph.D. from a reputable university.
But again, that's no different than science. I was a geologist before I became a historian of science. There is no written document that tells you what the methods of geology are or what the qualifications are to be a geologist either. In that respect, history is not that different.
Q. But there's no written document specifying the training specifically required of an historian of science?
A. No. And again, there is no written document specifying the training of a geologist either.
Q. Your field requires rigor in reading and research. Correct?
A. All academic fields require rigor.
Q. And are there any written standards for rigor to be exercised by historians of science?
A. That's interesting. I'd have to think about it.

Page 216

I mean, there are handbooks like the University of Chicago Manual of Style that talks about how you should do your footnotes, stuff like that. So I'm not sure if that would count as rigor, according to your question.
But I think it is fair to say and I think my introduction tries to get at this, I mean, there is a lot of things in academic life and even in the natural sciences that are sort of unwritten. There are unwritten expectations, meaning -- I suppose if you see a job advertisement for a historian of science it would probably say, you know, Ph.D. in hand. But that would be the same for biochemists or toxicologists.
So if you're trying to suggest that history is uniquely weird by not having written guidelines, I would say I wouldn't agree with that.
Q. Are there particular certifications for historians of science?
A. Well, having a Ph.D. is a certification from an accredited university.
Q. And so other than the Ph.D. in history of science, no other type of accreditation process.

Page 217

Correct?
A. Well, it's typical that most professional historians would be a member of a historical society like the History of Science Society or a scientific society of the relevant science.
I am a member of the American Geophysical Union, American Association for the Advancement of Science, Geological Society of America, et cetera.
So membership in those organizations is a kind of signal of achieving a certain level. If you become a fellow, to be a fellow of those organizations you generally have to be elected, and there is a vetting process that has to do with your qualifications and accomplishments.
I am a fellow of the American Geophysical Union.
There are various processes that people go through in which their qualifications are vetted. There's not a formal exam. It's not like passing the bar, so it's not like law in that regard.
Q. So with respect to the history of science, are there scientific societies specifically for historians of science?
A. Yes, there are.
Q. And are you a member of some of those

Page 218

societies?
A. Yes, I am.
Q. All right. Your field has, as you've described it, high standards for critical thinking. Correct?
A. We like to think so.
Q. And are there any written standards regarding specifically the critical thinking to be exercised by historians of science?
A. Well, there are books. People have written books about interpreting the past. There are books -- I mean, the most famous one is Herbert Butterfield. There's a whole debate in history, particularly in history of science, about the problem with what's known as Big History, interpreting history as a progress tale.
So there are books, there are articles, there are written discussions about these issues.
They're not offered as rules. I wouldn't think of history as a rule-bound profession. But again, you passed the bar. I don't know. Are there rules for practicing law?
Most professions aren't really rule-based because for most fields, with some exceptions, life is too complicated.

Page 219

I mean, even if you think about epidemiology, someone asked me the other day about the Bradford Hill criteria. I mean, there are criteria. They're one man's ideas about the best ways to go about establishing causation, epidemiology. But they're not rules. They're guidelines. They're principles. They're criteria.
I think most fields don't actually have rules. They have guidelines. They have practices. They have principles. So again, history is not that dissimilar from other fields.
And again, I was a geologist for quite a few years before I became a professor of history of science. There is no rule book for how you do geology.
Q. So Doctor, we're talking about the history of science here.
A. I know, but I'm just making a comparison.
MS. DESANTIS: Mr. Durkee, at this stage I'm going to have to ask you to ask your witness to please be directly responsive to the question.
MR. DURKEE: I think she did. She was giving an analogy.
MS. DESANTIS: No, no, no. Let me finish.

Page 220

We started with the question are there written standards regarding critical thinking to be used by historians of science, and we ended up with Bradford Hill discussion and a lot of things that were not directly relevant to the question.
I do not want to have to go to the court to ask to reopen the deposition, so I'm going to ask you to please ask her to be directly responsive to the questions.
MR. DURKEE: I think the last answer is a good example of you-all just talking past each other. I think she did give a very good example and gave several examples in geology and in the Bradford Hill factors where there are guidelines or criteria and not necessarily rules.
She was making that distinction and I think she did it well. I think she was being responsive to your question.
BY MS. DESANTIS:
Q. Dr. Oreskes, I want to make sure that I'm clear on the answer. And you've given me a number of examples of fields where there are no written standards for actually practicing within the field or critical thinking within the field. Right? Correct?

Page 221

A. Correct.
Q. You have to do more than nod your head.
A. Sorry. Yes. Correct. Yes. Correct.
Q. And so in your field for the history of science, there are not written standards regarding critical thinking to be used. Correct?
A. Well, as I said, there are books that discuss what the standards of history are. If by "written standards" you mean formalized standards that everyone agrees to or that have been voted upon by some absolute authority, then correct, there is no such written standard of that type.
Q. Your methodology is not peer-reviewed, is it?
A. I'm sorry. What do you mean by --
Q. The methods that you use as a historian of science.
A. Of course it is. Every time I submit a paper for peer review, the method is implicitly being reviewed.
Q. There is not a method that is written for historians of science describing your methodology. Correct?
A. I'm sorry. I'm really not being deliberately obtuse, but I really don't understand

Page 222

that question.
Q. So you've previously said in your deposition that you, yourself, have not written a peer-reviewed article describing your methodology as an historian of science. Correct?
A. Correct. Because we don't do that as historians. Historians don't do that.
Q. And to your knowledge, there is not a peer-reviewed article describing the methodology of an historian of science. Correct?
MR. DURKEE: Objection, asked and answered.
You can answer.
A. As far as I'm aware. It's possible that such an article exists. But if it does, I'm not aware of it.
Q. And your methodology as an historian of science doesn't have objectively defined metrics. Right? It's not that kind of work?
A. Again, I don't really know what you mean by "objectively defined methods."
Q. So you don't have metrics that govern your particular kind of work? It's not math. Right?
A. No. History is not math. We can agree on that.

Page 223

Q. Right. And would you say that there is a generally accepted method for determining scientific dishonesty in your field of the history of science?
A. Oh, in history of science. That's an interesting question.
Well, again, I would say there are practices. I mean, when you said "metrics" a minute ago what came to mind was footnotes. Because rightly or wrongly, sometimes historians judge each other by the quantity of footnotes.
And I would say if there's a concern about fraud in history, most commonly that would center on the sources and whether or not a person had made up the sources or claimed sources that weren't really there or claimed the sources said things they didn't say.
I mean, there would be a set of practices that people would pursue. But again, I'm not aware of any written documents that would stipulate how one would establish that.
Q. Okay. So you're not aware of a written document that sets forth a generally accepted method for determining scientific dishonesty in your field. Right?

Page 224

A. I'm not aware of any such document.
Q. In your testimony in the case of Mann versus National Review, you were retained by the plaintiff in that case. Is that correct?
A. Correct.
Q. And your testimony was excluded by the court. Am I correct?
A. No, not correct. I testified in that case.
Q. And was your testimony limited in that case?
A. Yeah. It was limited because my original report involved a defendant who later was excluded from the case. So the portions of my report and my testimony that involved that defendant were excluded from the case.
Q. Okay. So you state in your report that historical analysis is an exercise in, above all, context-sensitive analysis. Right?
A. Uh-hmm.
Q. I need you to say "yes" or "no."
A. I'm sorry. I'm sorry. Yes, I said that. Correct.
Q. And you maintain that proper contextualization is essential to interpreting the

Page 225

meaning and significance of historical events. Right?
A. Yes.
Q. So, Doctor, the file of documents that plaintiff's counsel provided to you and that was then provided to us responsive to the subpoena request totals 1,491 documents. We've counted them.
Have you-all counted them?
A. No, I have not counted them, but I'm willing to take your word that it's 1,491.
Q. Okay. And we know you've not read all 1,491 documents. Right?
A. Yes. Sorry. I'm sorry. It's getting late. I'm getting tired. I apologize.
Q. That's okay. Let's make sure we're clear on the record.
You did not read all 1,491 documents that were provided to you by plaintiff's counsel. Right?
A. No, I did not. I read many hundreds, but I did not read every one of the 1,491.
Q. And in your report you cite to 118 of the documents that were provided to you by plaintiff's counsel. Again, we counted.

Page 226

A. Okay.
Q. Did you count?
A. No, I didn't count.
Q. You know, of course, that there are many more documents about the Deepwater Horizon incident and response than the 1,491 that were provided to you by plaintiff's counsel. Right?
A. Yes, I'm aware of that.
Q. And we've mentioned today in questioning some of the documents that were not provided to you by plaintiff's counsel. Right? We went through some reports?
A. Yeah. Some of the public reports. Yes.
Q. And we've talked to you about some documents today that you've not reviewed whether or not they were provided to you by plaintiff's counsel. Correct?
A. Correct.
Q. And you're aware that what you have in your file and what you've cited in your report is a small fraction of the documentary evidence on the Deepwater Horizon spill and response. Right?
A. Yes. But I would point out there were many more documents that I asked to look at that I thought were relevant based on email chains and

Page 227

other information that I was told were requested but denied by your clients on grounds of attorney-client privilege.
So I would have looked at and wanted to look at a lot more documents, many more documents.
But those were not denied by my unwillingness to look at them or plaintiff's counsel's unwillingness to supply them but defense -- the defense or the client -- the defendant refusing to supply them.
Q. Okay. Doctor, we're going to hand you another document to take a look at. And I'm going to ask you to turn to Tab 42.
A. There's no tabs here. I'm sorry. There is one tab. The whole thing is 42. Okay.
Q. And you'll see that behind -- we're going to mark Tab 42, the document behind Tab 42, as Exhibit 18.
(Exhibit 18 marked for identification)
MS. DESANTIS: Thank you, Mr. Durkee, for helping.
MR. DURKEE: Placing it under Exhibit B, Exhibit 18.
Q. And you are going to see that what has been marked as Exhibit 18 is the Declaration of

Page 228

Vanessa Barsanti submitted in the case of Gremillion versus BP entities. Do you see that?
A. Yes, I do.
Q. And you will see that this declaration was executed on June 18th, 2024. Do you see that?
A. Yes, I do.
Q. And you've not seen this particular declaration before, have you?
A. No, I have not.
Q. But you do see that the declaration was made under penalty of perjury. Correct?
A. Yes. I see that.
Q. And the declaration states that -- and I'm going to refer to Paragraph 3 of the declaration -- that as of June 18th, 2024, BP had produced 188,000 documents to plaintiff's counsel directly from BP. Do you see that?
A. Yes, I do.
Q. And it states that plaintiff's counsel received another 687,000 documents from third parties, including BP's spill response contractors. Do you see that?
A. I do.
Q. And when you add that up in total, plaintiff's counsel received from BP and the

Page 229

certain third parties about 875,000 documents. Fair?
A. Yup. I see that.
Q. And you didn't receive 875,000 documents from plaintiff's counsel. Right?
A. No, I did not. And if I had, it wouldn't have been possible to review them all.
Q. You just received 1,491 documents. Right?
A. Correct.
Q. And you relied on plaintiff's counsel's judgment as to what you should review for your work on the case. Right?
A. I did, by and large, although, as I said, there was more than one occasion where I did request additional materials and when plaintiff's counsel had them they sent them. And when they didn't, they told me that they didn't. And if it was because of privilege, they told me that as well.
Q. And anything that you requested of plaintiff's counsel that they were able to send to you was included in your file in this matter. Correct?
A. Yeah. I mean, I didn't cite everything I read. I mean, sometimes I read -- it could be the

Page 230

case I read ten documents that all seemed to support the same conclusion. Maybe I cited the one that I thought was most compelling or persuasive.

So the 118 documents cited in my report is not the universe of documents that I read.

Q. Doctor, are you confident that your work on your expert report in this matter was contextualized?

A. Yeah. I knew you were going there.

This is an interesting question because, of course, a lawsuit in a legal case is different from writing a book or an academic argument article in the sense that when I write a book I have all the time in the world.

That's one of the privileges of being a university professor, and it's a privilege that I appreciate greatly and I've spent -- I mean, I have one book I spent 17 years writing.

I don't have the luxury in a case like this -- I was asked to do this work in a time frame with deadlines set by the court, not by me. So I had to rely on materials supplied to me by plaintiff's counsel.

But as I said, on more than one occasion

Page 231

if I thought that there was additional materials that seemed relevant, I asked for them.

And certainly if you or your client have documents that you believe are exculpatory, I would be very happy to look at those documents.

Q. And, Doctor, with respect to the scope of information that is available about the Deepwater Horizon incident and response, you can't confirm that you have, in fact, reviewed all of the information available that might inform your opinions. Correct?

A. Well, no one --

MR. DURKEE: Objection, form.

You can go ahead and answer.

A. No one can review all of the documents in the world because there are, as you point out, millions and millions of pages.

And in fact, one of the things I'm doing today as a historian in order to address the problem of the universe of documents, including the problem of data dumps, which we know is a real thing, I have a postdoc who has expertise in AI. And we've been using that in some other contexts to try to make sure we do have a broader access to the scope of materials.

Page 232

And I had suggested that in this case that we could do that here. But we were told that because of the confidentiality requirements of the court that that wouldn't be an option in this case.

Q. So with respect to the work that you've done here, given the small scope of the documents that you've reviewed for your work on this case, has your work met your own standards for work as an historian of science as described in your expert report?

A. That's a fair question. But I would take issue with calling it a small scope. We did look at hundreds of documents, many hundreds. And I cite 118 in this report.

But as you -- as we already discussed, my assistant looked at far more. I believe that she reviewed all or virtually all of the 1,491.

So what I'm citing is maybe 10 percent of the total universe of documents. And one of the things we look for, of course, when we do work of this kind are things that are contradictory, things that don't add up.

So -- and also the other thing I would say -- and we didn't find evidence of that. If we

Page 233

did, we would have felt we needed more time or more documents to resolve the contradictions.

We didn't see that. We saw what would seem like a pattern of behavior that actually seemed pretty consistent.

And even if that pattern didn't apply in all cases, even if there were a thousand documents where they weren't doing that, the fact that they did it at all is problematic, and the fact that we found evidence of these kinds of activities is problematic.

So even if on four days of the week everything that BP did was completely blameless, if on the fifth day they did things that were problematic, that would still be relevant. I wouldn't need to see the relevance of the four other days.

The other thing I would say is that many of the documents you've spoken about today are not documents produced by your client but documents produced by federal agencies.

But as we've already said, the federal agencies are not on trial in this case. The issue in this case is only what BP did or didn't do.

So while it could be of interest to me as

a historian if I were writing an academic book on this case, I would certainly want to read more materials.

But again, this is not an academic book. This is an expert report written to a deadline set by the court in which I did the best I could given the available time to write a report that was as accurate as possible.

Q. And so for the purposes of writing your report, you have not examined the conduct of BP in the context of the work of the federal agencies on the spill response. Correct?

A. I'm going to try to be responsive here. I understand we have time constraints and I understand your frustration, but I'm really trying here to be fair.

One of the issues I take with the expert report of Captain Paskewich, for example, is that he paints this very beautiful picture of how great BP was, how great they were to work with, how responsive.

And frankly, that picture is not plausible, given what we know from the national commission report on what happened when the explosion spill occurred.



They documented in great detail evidence of a company with a culture of complacency, I think was the phrase they used about safety issues. They documented people on the rig in the days leading up to the blowout asking for help, begging for help, saying they didn't know what authority they had.

And we have evidence that BP managers did not respond. I quoted in my report an incident from a manager who said, "I can't talk now. I'm going to dance practice. But I'm sure that we'll look back on this later as a learning experience." Only later, people were dead.

So there's a big disconnect between the way the behavior of this company is presented in the expert report --

(Interruption)

A. There is a big disconnect between the way BP's behavior is presented in the reports of the witnesses that have been retained by BP as defense experts versus what the national commission concluded about this corporation.

Now, if I had more time, if somebody were willing to pay for that time, I think it would be interesting to dig more into that contradiction.



But that wasn't my charge here.

My charge was to look at the evidence of what BP did in the days, weeks, and months after the spill. And that's what I looked at.

Q. So, Doctor, with respect to the 1,491 documents that you received from plaintiff's counsel, those were sufficient for your review for purposes of rendering your opinions. Correct?

A. I believe so.

Q. And the 118 documents that you cited in your report were sufficient to support your opinions. Correct?

A. I believe so.

Q. And you believe that citing 118 documents to reach the opinions that you did in this matter falls within your standards for work as an historian of science. Correct?

A. Well, again, I would make the distinction between academic work and legal work.

Q. So citing 118 documents to support these opinions may not suffice for academic work. Correct?

A. Well, if I were writing a book, then probably not. But as I've said, this is an expert report written under a time constraint set by the



court.

So if I had felt at any point that the evidence was ambiguous, that I didn't have sufficient evidence to come to conclusions, then I would have told counsel that I couldn't supply a report on the time scale that they were asking.

And in fact, there were questions that counsel asked about issues that I said, yeah, I don't see that or I don't see that in the evidence. And so counsel said fine and we moved on.

So I feel confident that the report that I've written is satisfactory with respect to the documentary evidence.

Q. And you feel that this report is satisfactory for litigation purposes. Correct?

A. Correct.

Q. But this is not a report that you would use for academic or scholarly purposes. Correct?

A. Well, first of all, I couldn't because it's confidential and also because it would be written in a different way. I mean, it's a different product.

Q. If you were doing academic work, you would want to more fully contextualize what you've

Page 238

written here. Correct?
A. It would depend on what the question was.
Q. And you would want to review more materials. Correct?
A. Probably.
Q. You'd want to review more materials before reaching the opinions that you reached here if this were presented in an academic context. Correct?
A. Not these opinions on these particular issues, no, because these particular issues, I think we do have enough evidence to come to these conclusions.
If I were writing an academic book, I might have wanted to look more into more questions of the roles of -- the question of the federal agencies, for example. But that's not the issue at stake in this case.
Q. So, Doctor, in terms of areas of expertise, I want to just confirm you are not a chemist. Correct?
A. Well, actually, I was originally trained as a geochemist.
Q. But you're not claiming expertise in this case as a chemist. Correct?

Page 239

A. Not in this situation.
Q. You need to let me finish my question.
A. Sorry, sorry.
Q. You're not claiming expertise as a chemist in this case. Right?
A. Correct.
Q. And you are not a toxicologist. Right?
A. Correct.
Q. You are not an industrial hygienist. Correct?
A. Correct.
Q. You're not a medical doctor. Right?
A. Correct.
Q. You're not a data scientist. Right?
A. Well, I mean, I do work -- I have formal training in statistics. I've published peer-reviewed articles in statistics.
Depending on your definition of "data science," I think I could say that I am a data scientist. But my opinions in this case are not about questions of data science.
Q. You're not claiming expertise as a data scientist in this case. Correct?
A. No.
Q. You're not claiming expertise in oil spill

Page 240

response. Correct?
A. No.
Q. You're not -- you weren't part of the spill response in the Deepwater Horizon incident. Right?
A. No, I was not.
Q. And you weren't present in any aspect of the response. Correct?
A. I was not.
Q. You held no leadership position in the response?
A. I did not.
Q. You have not participated in the response to any oil spill. Right?
A. Correct.
Q. You're not a psychologist or mental health expert. Right?
A. I am not.
Q. You are not an expert in the analysis of human exposure to toxins. Right?
A. Well, I have published papers on human exposure to lead.
Q. But you're not claiming expertise --
A. I'm not claiming expertise. My work as a geochemist, my work as a data scientist, it is

Page 241

relevant to this case. It is not the basis of my opinions, but I wouldn't say it was irrelevant.
Q. You're not claiming expertise in analysis of exposure to -- you're not claiming expertise in analysis of human exposure to toxins in this case. Correct?
A. No, I'm not testifying as an expert in those areas.
Q. And you're not claiming expertise in this case in assessing the potential toxicity of oil or constituents of oil. Right?
A. No, although there's a large body of scientific evidence of the toxicity of oil and its components. As a historian of science, it could be relevant for me to opine on that data.
Q. But you've not been specifically retained to assess the potential toxicity of oil in this case. Correct?
A. Correct.
Q. And you've not been retained to assess the potential toxicity of particulate matter 2.5 in this case. Correct?
A. Correct.
Q. And you have no expertise in assessing acute or chronic respiratory effects to community

Page 242

members or response workers after an oil spill. Right?
A. Correct.
Q. And you have no expertise in assessing potential mental health effects to response workers or community members following an oil spill. Right?
A. Correct.
Q. Doctor, have you ever been the subject of allegations of research misconduct?
A. Yes. But those allegations were found to be unsubstantiated.
Q. And can you describe the nature of those allegations?
A. Sure. So as a historian of science, I wrote a rather famous book called "Merchants of Doubt" about a group of scientists who misrepresented scientific evidence with respect to acid rain, the ozone hole, global warming, and some other issues.
The family of one of the people that I wrote about didn't like the fact that I had cast their father in an unflattering light, and so they took offense and they complained to my university about it.

Page 243

The university investigated, concluded that my work did, in fact, meet the highest academic standards, and that there was no substance to their complaint.
After I moved from the University of California to Harvard, that same family renewed the same allegations over the same book. Nothing new. Nothing had changed. But they renewed the allegations, submitted those allegations to Harvard.
Harvard concluded that there was no -- since there was no new information, no new evidence, no new actions, there was no basis for reexamining that complaint. And they stood by the findings of the University of California that I had done nothing wrong.
Q. Other than that described incident, have you ever otherwise been investigated for research misconduct?
A. No.
Q. Has the integrity of any of your work as an historian of science been questioned by your peers?
A. By my peers, no.
Q. Has the integrity of any of your work as

Page 244

an historian of science been questioned by anyone in particular?
A. Well, not anyone unless you consider a corporation to be anyone.
The integrity of my work has been questioned by ExxonMobil because I have published papers about ExxonMobil and their relationship to scientific knowledge related to climate change.
ExxonMobil disagrees with my interpretation of their actions, and they have attempted to impugn my integrity.
But that attempt has never been validated by any academic group or organization, and I think it's pretty obvious that they have a pretty big conflict of interest in that case.
Q. And in what way has ExxonMobil tried to impugn your integrity?
A. They've said things on their website about me.
And I should say all of my work with respect to ExxonMobil has been published in leading peer-reviewed papers, including Science Magazine, the most prestigious journal in the United States, one of the most prestigious journals in the world.

Page 245

ExxonMobil on their website accused me of being an activist, implied I was not being objective.
I don't spend a lot of time memorizing the accusations ExxonMobil makes about me. None of the accusations they have ever made have ever been affirmed or substantiated by any academic review, any professional review, anything like that.
Q. Has the peer-review process for any of your papers submitted for publication resulted in a recommendation by the peer-reviewers that the paper not be published?
A. You mean ever in my entire career?
Q. Yeah.
A. Well, once as a graduate student one of the first papers I submitted, they said the argument wasn't clear. But they encouraged me to rewrite it and resubmit it.
In the end I didn't because I decided I had wanted to do more work. It's a normal part of academic work that you expect -- I mean, peer review wouldn't be meaningful if papers weren't sometimes rejected. But I have a very strong track record of publication.
I've definitely had papers come back with

Page 246

revise and resubmit. That's pretty common.
Rejected outright, besides that one in grad school, I have to think. Besides the one in grad school, I can't think of any outright, outright rejection. It is possible there are some. I don't spend a lot of time dwelling on stuff like that.
Q. Can you recall a paper in the last ten years that was submitted for the peer-review process that resulted in a recommendation by the peer reviewers that the paper not be published?
A. Honestly, I can't. The way you're framing it, you don't get a recommendation that this paper should -- you could if it was really a complete mess.
The typical thing is you get a reviewer, someone would raise questions about some aspect of a paper and then you would make revisions and resubmit. And that's normal. And I've certainly had that happen. I've even written about that in my book "Why Trust Science."
Q. Have you ever retracted a paper submitted for publication?
A. No.
Q. We're going to give you another binder.

Page 247

A. Lucky me.
Q. Doctor, I want to turn to -- we're going to turn back to your CV for a minute that we marked at the beginning of the deposition. It's going to be in your first notebook, and it's Exhibit 9.
A. Sorry. I don't know which is the first notebook at this point.
Binder 1. I guess that makes sense.
Q. Exhibit 9, Tab 9.
A. My CV. Yup. Okay.
Q. So your CV contains a list of your many publications. Correct?
A. Correct.
Q. And you have published extensively regarding -- you have published extensively. Correct?
A. Correct.
Q. And you have published extensively regarding climate change. Correct?
A. Correct.
Q. Would you agree that climate change has been a significant area of scholarly focus for you?
A. Yes. Certainly especially within the last

Page 248

ten years.
Q. Does the majority of your work in the last ten years relate to climate change?
A. No, I wouldn't say that, because the last ten years I have written several books. Two of them are about the practice of science, "Why Trust Science" and "Discerning Experts" about the practice of science. "Science on a Mission" is about the history of oceanography and the issue we just discussed, how funding influences research agendas.
So actually, I would say the bulk of my publications in the last ten years have not been about climate change.
Q. Okay.
A. And even -- if I may -- this is an important distinction. Even my work on climate change, it's about science.
All of my work, including "Merchants of Doubt," which is substantially about climate change but not only about climate change, isn't about climate change per se.
It's about the scientific evidence, how that scientific evidence has been formulated and developed, how and why we can judge the quality of

Page 249

that evidence, and how and why some people reject that evidence for reasons that I consider to be nonscientific.
Q. All right. So you would agree that scientific evidence pertaining to climate change has been a significant area of scholarly focus for you in the past ten years. Right?
A. Yes. I would be comfortable with that characterization.
Q. And do you recall in 2020 that you published a piece called "Big Oil is the New Tobacco"? Do you recall that piece?
A. Yes, I do.
Q. And you published --
A. I believe that was an opinion piece, not a peer-reviewed paper.
Q. That was an opinion piece.
A. Yeah. Okay.
Q. And you've published writing that refers to -- and I'm putting it in quotations, "Big Oil." Correct?
A. That was a headline from a newspaper. That wasn't my headline. Opinion pieces, I don't control the headlines.
Q. So you don't refer to the petroleum

Page 250

industry as "big oil"?
A. Not normally. It's possible I have in certain cases, particularly -- in general, I wouldn't.
Q. You published regarding the fossil fuel industry. Correct?
A. Yes.
Q. You consider BP to be part of the fossil fuel industry. Correct?
A. Certainly.
Q. And in 2020, in this piece you wrote that today's climate chaos is big oil's legacy. Do you remember that?
A. I don't remember it offhand. But as you see, I write a lot. I don't remember everything I've said. It certainly seems plausible that that's something I would have said.
Can you remind me which page of my CV?
Q. Well, no; I just want to ask you a question.
Is it your view that BP is responsible for climate chaos?
A. It's my view that BP is one of the corporations that's responsible for the current situation with our climate.

Page 251

Q. You've written that the fossil fuel industry is responsible for buying political inaction with respect to climate change. Right?
A. Yes. I believe that the evidence supports that conclusion.
Q. And is it your view that BP has bought political inaction related to climate change?
A. Most of my work is not focused on BP. It's focused on U.S.-based corporations, particularly ExxonMobil and Chevron. Most of the evidence I have reviewed has to do with U.S. corporations.
Q. And you've written that the fossil fuel industry built a global climate denial and delay machine that has confused the public and fomented distress to science, media and the government. Do you recall that?
A. Yes, I do recall that.
Q. And is BP part of the fossil fuel industry that built a global climate denial and delay machine?
A. Yes. But could I please ask you to point out the page? Because I believe this was coauthored with Geoffrey Supran. I believe he was the first author on that, which means that the

Page 252

specific wording would have come from him, not me.
And if I were the first author, I might have phrased it slightly differently. So I would appreciate it if you could point me to where in my CV that article is referred to.
Q. I'll actually show you the article.
A. That's even better.
Q. If you look at Binder 9, at Tab 43.
A. That's what I thought. Geoffrey wrote this piece. I am a coauthor because I did the background work that this is based on. So that's why I'm a coauthor. But the specific wording is his.
I'm not saying I disagree with it. But as we already discussed today, I'm pretty careful with my language and my wording. So I would just say that in some cases if I had been the first author I might have put it slightly differently. And I do know for a fact that this headline was written by the copy editor, not by us.
Q. Okay. So let's mark this as Exhibit 19.
(Exhibit 19 marked for identification)
MR. DURKEE: Tab 43. I'm marking it Exhibit 19.
Q. This particular article that we have

Page 253

marked as Exhibit 19 you and Geoffrey Supran, your coauthor, call for Congress using its power to investigate. Is that right?
A. That is right.
Q. And you encouraged Congress to investigate the fossil fuel industry, which includes BP. Right?
A. That's correct.
Q. You've also written encouraging universities to divest their investments in the fossil fuel industry. Correct?
A. That is correct.
Q. And you've written encouraging universities to divest their investments in the fossil fuel industry including BP. Right?
A. Didn't you just say that?
Q. Does that include BP?
A. Isn't that exactly the same as the question you just asked a minute ago?
Q. No.
A. If there was a distinction, I missed it. Could you clarify?
Q. Let me clarify.
Have you encouraged universities to divest with respect to investment in BP?

Page 254

A. Well, not specifically BP but the fossil fuel industry in general, which would include also coal corporations.
Q. And would the fossil fuel industry in which you are encouraging divestment also include BP?
A. Yes, it would.
Q. You have viewed the fossil fuel industry as being in opposition to the work of scientists and educators. Right?
A. In some cases.
Q. And you have participated in the filing of six amicus briefs. Is that right?
A. That's correct.
Q. And for each of the amicus briefs that you filed, the defendants in the case were connected to the oil and gas industry. Right?
A. That's correct.
Q. You filed amicus briefs in cases where BP was a defendant?
A. That's correct.
Q. And in fact, in your CV four of the six cases that you list in which you filed amicus briefs were cases in which BP was a first named defendant. Correct?

Page 255

A. I would have to check, but that certainly sounds plausible.
Q. And you chose to participate as a submitter listed on each amicus brief. Correct?
A. I did choose. Yes.
Q. And do you agree with the information that is presented in each of those amicus briefs?
A. Do I agree with the information? Yes. Broadly.
Q. I want to look at one of those amicus briefs.
A. Again, if I could just say I don't write those briefs. I read them. I sometimes give feedback. The exact wording, the exact nuance may not be how I would put it if I were the sole author. You are familiar with amicus briefs, so you know that.
Q. You agreed to participate as a submitter on those briefs. Correct?
A. Of course. They don't do it without my permission.
Q. Let's look at one of these amicus briefs. And I'm specifically going to ask you to look at the document behind Tab 45. And we will mark that as Exhibit 20.

Page 256

(Exhibit 20 marked for identification)
MR. DURKEE: Tab 45 is now being marked Exhibit 20.
Q. And, Doctor, the document behind Tab 45, which we've marked as Exhibit 20, is a brief submitted in the United States Court of Appeals for the Fourth Circuit.
A. Correct.
Q. And it is the case of the Mayor and City Council of Baltimore versus BP P.L.C. and other defendants. Correct?
A. Correct.
Q. I'm going to ask you to take a look at page 4 of that brief.
A. Okay.
Q. And on page 4 of that brief, towards the top it indicates --
A. Sorry. You're confusing me with Roman numerals. Sorry. Arabic 4. Thank you.
Q. It indicates that "Amici submit this brief because they understand that the conduct at the core of the" . . . "Complaint is that the Defendants affirmatively and knowingly concealed and denied" . . . "hazards that they knew would result from the normal use of their fossil fuel

Page 257

products by misrepresenting those products and deliberately discrediting scientific information relating to climate change." Right?
A. Correct.
Q. And each amicus brief that you filed has been related to allegations of defendants deliberately discrediting scientific information relating to climate change. Right?
A. Broadly construed. Yes.
Q. And when you filed each of these amicus briefs, did you believe that BP was deliberately discrediting scientific information related to climate change?
A. Well, I didn't file the brief. I signed off on it. I think these were filed by the Center for Climate Integrity.
Yes. One of the things I have done in my research is to look at trade organizations, so-called third-party allies.
For example, there was a group called the Global Climate Coalition that in the early-to-mid 1990s worked to prevent the United States from ratifying the Kyoto Protocol.
And BP was a member of the Global Climate Coalition, and the Global Climate Coalition issued

Page 258

many statements that sought to undermine or discredit the scientific evidence that had gone into the UN framework convention on climate change that the Kyoto Protocol was a protocol to.
Q. Doctor, we don't have time to go through --
A. I understand.
Q. We don't have time to go through your prolific publication record on climate change today.
A. Thank goodness for that.
Q. We've only touched on a couple of the pieces.
A. Yes.
Q. But it is possible, isn't it, that your views with respect to the fossil fuel industry and climate change could affect your receptivity to alternative interpretations of facts pertaining to the Deepwater Horizon event and response. Right?
A. It's possible. But I wouldn't have taken this case if I didn't think the evidence supported the conclusions.
And if at any point in reviewing the evidence I felt that the evidence was ambiguous or I saw evidence that BP was behaving in a

Page 259

responsible manner, I would have shared that with counsel and I would have, if necessary, withdrawn myself from the case.
One of the things we know is we all have priors. We all come to any topic with previous beliefs and opinions.
But part of the job of evaluating evidence, whether you're a historian, a scientist, a member of a jury, is to do the best you can to evaluate the evidence on its own terms.
And so my views about climate change are separate and different from what I'm opining here about this case.
And moreover, I would make the point that the people who were involved in this spill and its cleanup are not the people who were involved in the activities that are discussed in these briefs.
And I'm actually very well aware of that. And I used to work for a mining company. I'm very well aware of the fact that there could be completely honest people doing the everyday job of drilling for oil or mining for coal and they're not the same people, the executives who make the decisions regarding disinformation.
So I don't assume that just because one

Page 260

part of the corporation did things that are problematic that that would necessarily imply that a different part of the corporation at a different time would do something problematic.
Q. And you're confident that you have the information that you need to determine that there were people in parts of BP who were doing something that was problematic in the context of the Deepwater Horizon response. Right?
A. Well, as I say, if you have evidence that you think is exculpatory, if you think I've misinterpreted the documents I have seen, I would welcome the opportunity to see that additional evidence.
Q. And you've not -- you, yourself, believe that you have rigorously assessed the email communications that you cite in support of your opinions in this case. Correct?
A. Correct. I do.
Q. We've already gone through an example today where you recognized it did not support the proposition for which it was cited. Correct?
A. Well, no, not exactly.
I mean, this was part of a longer discussion. And I agree that because that

Page 261

citation was in a way assuming the previous discussion which had been discussed on that page, earlier on that page of the report.
So I would agree that a better citation would have had all of the relevant emails leading up to that email. So it would have been better to have all of those emails, not just the one that I cited at the end.
But I think the overall argument is still correct and still stands, and I think the evidence to support the argument is there in the report.
Q. And, Doctor, we don't have the time today to go through every email thread that you've cited in your report.
But what I want to know today is, are you confident that you have accurately and rigorously supported your propositions in your report with correct and complete email context?
A. Again, there were additional emails I asked for that we were told were not being shared because of privilege.
So I'm confident that my conclusions are consistent with the material evidence that I have had access to.
Q. And you wouldn't have --

Page 262

A. Sorry. And that's the best that anybody could be asked to do.
Q. And you wouldn't have cited something in your report if you didn't think it cited the proposition for which it stood. Correct?
A. Right. Unless I made a mistake. And as you said at the very beginning, you asked me if I thought there were errors in my report, and I said obviously not that I was aware of.
You have now pointed out one or two, and I accept that and I would be happy to have the opportunity to correct that.
And I wish I had fact checkers as rigorous as you guys when I publish my books, you know. It's very impressive. You have a very impressive team. That's great.
So yes. And I think you were correct in pointing out the apples-to-oranges comparison and the number of studies versus the funding. That was an error on my part.
Q. And I know it's a long report, but, Doctor, it's also possible that there are other errors with respect to email analysis in that report. Correct?
A. It's possible. I'd be happy to review

Page 263

anything that you think maybe is not correct. And if you have that information, I'd be happy to receive it and look at those again.
Q. So, Doctor, I want to talk to you again about some of your publications. And you mentioned the ExxonMobil earlier.
A. Uh-hmm.
Q. You published a study of ExxonMobil's climate change communications in 2017. Right?
A. I published three papers relevant to that. I think that was the first one. Yes.
Q. Okay. And in that particular work, you used a content analysis methodology. Correct?
A. Uh-hmm.
Q. And you used content analysis methodology to quantify the consensus on AGW. Right?
A. No, that's not correct.
I published my article in 2010 on the scientific consensus on climate change before I was aware of content analysis as a methodology. And honestly, maybe before it was even developed. I'd have to go back and look.
So that 2010 paper was kind of an old-fashioned paper where I read almost a thousand scientific articles.

Page 264

Q. I'm talking about a 2017 paper.
A. I know. But you referred to the scientific consensus on AGW. So now you're confusing me.
Q. I thought that in your 2017 paper you were analyzing the consensus on AGW.
A. No. That's incorrect.
Q. What were you analyzing in that paper?
A. We were analyzing what ExxonMobil was saying both publicly and privately about the state of climate science and what was and wasn't known about climate science and what should and shouldn't be done about the issue.
Q. Okay. So you used a content analysis methodology to analyze ExxonMobil's communications. Correct?
A. To compare their own communications to each other. In other words, their own in-house communications to their own public-facing communications.
Q. Okay. So you used content analysis methodologies to analyze Exxon's communications. Correct?
A. Correct.
Q. And you didn't use any content analysis

Page 265

methodologies to analyze any work in this case. Correct?
A. No. Because it wouldn't be relevant because the point is -- content analysis is a powerful tool for comparing A with B or a body of documents A versus body of documents B. And that's why we used it in that case.
Q. So you have said -- I want to direct you to Tab 47 in your notebook.
A. Sorry. Which notebook now?
Q. Tab 47. The same notebook --
A. It's not the same notebook because I'm looking at Binder 1.
MR. HARTFORD: Binder 9.
Q. Tab 47. We're going to mark this as Exhibit 21.
(Exhibit 21 marked for identification)
MR. DURKEE: 21, Tab Number 47.
Q. And we're marking as Exhibit 21 an article, an op-ed piece in the New York Times, "What ExxonMobil Didn't Say About Climate Change." Do you see that document?
A. Yes, I do.
Q. That we've marked as Exhibit 21.
And if you look at page -- if you look at

Page 266

page 5 of that article, you write here that "any analysis of words is subject to interpretation." Do you see that?
A. Yes, I do.
Q. "It's for this reason that we used" . . . "social science methods and subjected our analysis to peer review." Do you see that?
A. Yes, I do.
Q. You subjected this particular work to peer review to verify that your claims were supported by evidence. Right?
A. Yes.
Q. So the analysis that you did for your report in the Boggs case, it's words. Correct?
A. Yes, it is words.
Q. And your work is an analysis of words. Correct?
A. Yes, it is an analysis of words.
Q. You reviewed emails and other documents. Right?
A. Yes, I did.
Q. And any analysis of words is subject to interpretation. Correct?
A. That's correct. That's why these are my opinions, which you've reiterated many times.

Page 267

Q. Your words in your expert report are based on emails and documents that are subject to interpretation. Right?
A. That's correct.
Q. And your interpretation is your interpretation. Correct?
A. That's correct.
Q. And you didn't subject your analysis in the Boggs matter to peer review. Right?
A. Well, I couldn't because it is subject to confidentiality. I would have actually been very happy to subject this work to peer review if that had been possible, but that's not possible by the constraints of this legal proceeding.
Q. And it's just not been possible for you to get verification through a peer-review process that your claims in Boggs are supported by evidence. Right?
A. I believe I just answered that question.
Q. Correct. Let's go to Tab 48. And let's mark that as Exhibit 22.
(Exhibit 22 marked for identification)
Q. We're looking at a document titled, "Rhetoric and frame analysis of ExxonMobil's climate change communications." Do you see that?

Page 268

A. Yes, I do.
Q. For this study, you conducted a computational assessment of ExxonMobil's language. Right?
A. Correct.
Q. And you used methods of computational linguistics and inductive frame analysis. Right?
A. Correct.
Q. And you didn't conduct any kind of computational assessment of BP communications that you relied on your expert report in Boggs. Right?
A. Again, because that was not permitted. I actually suggested the possibility of us doing that, but I was told because of confidentiality that wouldn't be an option in this case.
Q. And you didn't apply an inductive frame analysis to the BP communications. Right?
A. Well, not in a formal sense, but in an informal sense, yes. Because in a way, I mean -- in a way, everything we do as historians is a kind of inductive frame analysis. It is a qualitative conductive frame analysis.
Q. Doctor, we're going to hand out a document that I want to mark as Exhibit 23.
A. Is this a new document you're giving me?

Page 269

MR. DURKEE: Do you want this one marked?
A. 23, I think she said.
(Exhibit 23 marked for identification)
MR. DURKEE: Okay. Marking 23.
A. Yup. This is the article we referred to earlier.
Q. Yeah. So, Doctor, earlier -- I've handed you what's been marked as Exhibit 23. It is a Law Review article titled, "Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts."
A. Yes.
Q. And the citation is 78 --
A. Yes.
Q. -- NYU Law Review, 1518, from October 2003. Right?
A. Yes.
Q. And I asked you earlier today whether you'd ever seen an article authored by someone else in a peer-reviewed journal concerning the methodology that you followed in formulating your opinions. And this was the one article that you brought to my attention. Right?
A. Correct.
Q. And that's the only article that you could

Page 270

describe. Correct?
A. It's the only one I specifically remember consulting as part of the preparation for this case.
Q. And you actually quote from this article in your report. Correct?
A. Yes. I believe that's correct.
Q. And you cite to this article or you quote from this article for its statement that historians are often called upon to give expert testimony at trial to help the jury understand subject matter of the dispute in historical context. Correct?
A. Correct.
Q. And the sentence that follows from the quote that you included in your report beginning with the words "at trial" --
MR. DURKEE: What page?
MS. DESANTIS: This is on the first page of the article.
A. The first page of the article?
Q. Yeah. "At trial."
A. Oh, at the very bottom of the page. Yup. Okay. I see that.
Q. "At trial, however, the pressures of the

Page 271

adversary system routinely push historians toward interpretations of the past that are compressed and categorical -- toward something akin to Ambrose's 'deaf and blind' testimony." Do you see that?
A. Yes, I do.
Q. "And as a result, historians now frequently offer unreliable evidence." Do you see that?
A. Yes, I do.
Q. And do you see as we go on, on page 2 of the document, this article is arguing that "historians should be appointed by the court rather than called by the parties when cases require historical expert testimony."
A. Yes, I see that, and I remember that argument.
Q. And you do not cite those segments of the Law Review article in your report, do you?
A. Well, no, because my report is not about what courts should do in terms of expert witnesses.
I actually think that's a great suggestion, and I would love the opportunity to be an expert witness under such circumstances. But

Page 272

that's not -- those aren't the circumstances that we are facing.
MS. DESANTIS: All right. I'm going to suggest we go off the record and take an afternoon comfort break and then we'll come back.
Let's go off the record.
THE VIDEOGRAPHER: The time is 4:18. We're off the record.
(Recess, 4:18 p.m. to 4:38 p.m.)
THE VIDEOGRAPHER: We are back on the record. The time is 4:38.
BY MS. DESANTIS:
Q. All right. Doctor, we're just going to take care of a couple more exhibits before we get back to some questioning.
So counsel for the plaintiff has provided us with invoices from Nina Elkadi. And Nina is your research assistant. Correct?
A. Correct.
Q. And we have invoices for Nina Elkadi from May of -- the first one is in September of 2022 and they continue through 2024.
A. That sounds right.
MS. DESANTIS: I'm going to ask that we mark the set of invoices provided to us by

Page 273

plaintiff's counsel as Exhibit 24.
MR. DURKEE: 24, so marked.
(Exhibit 24 marked for identification)
Q. This is a five-page exhibit that includes an invoice from Nina Elkadi, dated May 15th, 2023, September 30th, 2022, August 31st, 2023, November 30th, 2023, and May 31st, 2024.
A. Okay.
Q. So, Doctor, looking at what we've marked as Exhibit 24, we've totaled the hours that Nina Elkadi spent working on this matter as 104.5 hours. Does that sound about right to you?
A. Yeah. Probably.
Q. And given what we've discussed before about your invoices in the case, you invoiced plaintiff's counsel for 76.25 hours. That sounds about right. Correct?
A. I think you're missing an invoice. As I said earlier, there should be an invoice from 2022.
Q. Mr. Durkee has agreed to provide those to us when they come in, so there will be some more.
But these invoices that you provided to date for Nina and the invoices that we have to date for you show approximately 180 hours on this

Page 274

work for you and Nina.
A. It will be an underestimate. I think I've put in about 100 hours myself, so it will be more like 200 hours, I think, total.
Q. So you think once we get the additional invoices, the total work will show approximately 200 hours for you and Nina?
A. Yeah. I think my invoices were about 90 hours for me, 100 hours for her. Sounds about right.
Q. Okay. You're saying 90 hours total for you?
A. For me.
Q. So you're saying collectively for this entire project you and Nina together have spent approximately 200 hours?
A. Yes.
Q. And so for all of the work that you did for this generic report, you and Nina collectively have spent about 200 hours?
A. Correct.
Q. All right. I want to actually give you two other documents that we're going to mark as exhibits.
THE VIDEOGRAPHER: The time is 4:42.

Page 275

We're off the record.
(Recess, 4:42 p.m. to 4:44 p.m.)
THE VIDEOGRAPHER: Okay. We are back on the record. The time is 4:44.
(Exhibit 25 marked for identification)
BY MS. DESANTIS:
Q. Okay. Doctor, we have marked as Exhibit 25 a document that begins with an email at the top from Ralph Markarian. Do you see that?
A. I do.
Q. Sent to Laura Reese and some other people. Do you see that document?
A. Yes, I see that.
Q. And an attachment to that email which is titled "NOAA, Comments on Broader Gulf of Mexico Water Column Study," June 18, 2010 draft by Deborah French McCay. Do you see that?
A. Yes, I do.
Q. And you mentioned earlier today a June 21, 2010 email from Ian Zelo, who was with NOAA, to BP and certain of its contractors. Right?
A. Correct.
Q. And this is the email that you mentioned. Is that right?
A. Yes, I believe it is.

Page 276

Q. And so Exhibit 25 and its attachment are the email that you referenced earlier. Right?
A. Correct.
Q. And you see that the attachment references a water column study for consideration in June of 2010. Correct?
A. Water column study. Oh, yeah. The acoustics? Under the heading of "Acoustics"?
Q. I just want to make sure we're on the right place.
A. The acoustics discusses mapping the water column in the seabed.
Q. And you cited Exhibit 24 -- I'm sorry -- Exhibit 25 in your report to support your opinion that BP made numerous choices that compromised the quantity and quality of data collection and prevented the collection of data that could establish health effects on cleanup workers. Right?
A. Uh-hmm. Yes.
Q. And your opinion is that this email from Ian Zelo offered suggestions for better approaches but that the available evidence shows that BP moved forward with a sampling plan contrary to those suggestions. Right?

Page 277

A. Well, he says that they're making recommendations. This email is mostly critical -- no, no. Yes. The answer is yes.
Q. It's on page 28 of your report that you indicate that your opinion is that Zelo's email offered suggestions for better approaches but that the evidence shows that BP moved forward with a sampling plan contrary to his suggestions. Right?
A. Let me go back to my report right now.
Q. It's midway down on page 28 of your report.
A. Right. Well, as I said, I did not see any evidence that BP had taken these criticisms seriously and adjusted. If there is additional evidence to show that they did, then I'm happy to look at that evidence.
Q. And you don't cite any evidence in your report that BP did not implement any of Mr. Zelo's suggestions or otherwise address his concerns. Right?
A. We didn't have evidence one way or the other. And this would have been one of the documents for which I asked if there were additional documents available.
But if you notice, this was a document

Page 278

that caused concern. And maybe my concern is misplaced. But you'll notice that on the cc list is Brian Israel at aporter.com. It is my understanding is aporter is Arnold & Porter.

Q. I'm going to hand you another document dated July 2010. And we're going to mark it as Exhibit 26.

(Exhibit 26 marked for identification)

MR. DURKEE: All right. We marked it 26.

MS. DESANTIS: Thank you.

Q. Exhibit 26 is titled "Water Column Injury Ephemeral Data Collections." Do you see that plan for adaptive water column NOAA sampling? Do you see that?

A. Yes, I do.

Q. Have you seen this document before?

A. Not that I'm -- not that I recognize.

Q. Okay. And as you can see on the next page, the title indicates that this is the final water column injury data collection plan.

A. It doesn't indicate it's final. It says it's the plan.

Q. I'm going to direct you to the signature page. It is signed by NOAA as the federal trustee representative on the front.

Page 279

A. Yes. I see that.

Q. And you see that it's signed by the Louisiana trustee representative on the front page?

A. Yes. I see that.

Q. And you see that it's signed by BP. Right?

A. Yes, I see that.

Q. And you didn't review this document in forming your opinions. Right?

A. I'm not aware that I saw this document.

Q. And so you don't have knowledge about how it may address Mr. Zelo's concerns about water column sampling. Right?

A. No, I don't.

Q. Doctor, I want to go back to just a couple of questions about your methodology.

So you cannot replicate -- someone else could not replicate your exact methodology. Correct?

A. Well, no, I don't really agree with that. I think a qualified historian looking at the same documents could broadly do the same thing that I did with them.

Q. And in order to critically read and

Page 280

interpret those documents, they'd need to have your brain. Right, Dr. Oreskes?

A. Well, then you could say that about anything. You could say that about toxicology or epidemiology. No two people will ever interpret all the data exactly the same way.

My book "Discerning Experts" is exactly on this point, but I don't think there's anything particularly idiosyncratic about my interpretation as compared to any expert that would be testifying on behalf of either plaintiffs or defendants.

Q. And because your methodology is not set forth in any kind of detail in a written methodological document, it would be very difficult for someone to replicate exactly what you do. Correct?

MR. DURKEE: Objection to form.

A. Again, I mean, I take your implication, but I think it's an unfair implication because I would say that that would be true of any expert judgment.

I've written a whole book about expert judgment. No -- and there is a huge literature on replication of science.

No science is ever exactly replicable.

Page 281

The reagents could be different. The humidity in the laboratory could be different. So the idea of an exact replication is an impossible standard in any science, including the sort of work that I do.

Q. And there's no established success rate for your methodology. Right?

A. Well, I'd say counsel would probably argue the success rate is whether we win or lose.

Q. But with respect to a success rate that you could point to for your methodology, there is no established success rate. Correct?

A. The notion of success is not a meaningful category of analysis in this case.

Q. And similarly, failure rate is not, in your opinion, a meaningful category of analysis for what you do?

A. Correct.

Q. There is no established failure rate for your methodology. Correct?

A. Again, failure rate isn't a meaningful term in this thing. But again, that would be true of most science.

Q. So, Doctor, I want to turn now to some of your opinions regarding decisions that you maintain were made by BP that failed to protect

Page 282

workers, even though Mr. Boggs himself is not a worker.
A. Let me just clarify. My claim is about may have failed to protect. I'm making a claim about the character of the science, which they're now using as crucial to their defense.
Q. Okay. So, you know, again, I appreciate your attention to the language because you're clarifying that your opinion is not that BP made decisions that failed to protect workers.
Your opinion is that BP made decisions that may have failed to protect workers. Right?
A. Yeah. That's correct.
Q. And you don't have evidence that BP made decisions that failed to protect workers? That's why you say they may have failed to protect workers. Correct?
A. I think I already answered that question.
Q. No, you didn't answer the evidentiary question.
A. Say it again, then.
Q. You don't have evidence that BP made decisions that failed to protect workers?
A. Correct. I believe the evidence supports the claim that they may have failed to protect

Page 283

workers. But more to the point, that the science which they're claiming proves that they protected workers does not, in my opinion, accurately support their claim of proof.
Q. You don't write in your report about the unified command or federal agencies and their role with respect to response worker protection. Correct?
A. Correct. I do not address that in my report.
Q. And you did not investigate or analyze the role of the unified command or federal agencies in protecting workers in the response. Correct?
A. Right. As I've already said, this case isn't about the role of the federal agencies.
Q. Were you aware that the National Institute for Occupational Safety and Health, NIOSH, received a request from BP during the response to conduct a series of HHEs or what are called health hazard evaluations?
A. I'm not sure if I saw information to that effect or not. I can't recall.
Q. And you didn't consider any of NIOSH's HHEs in rendering your opinions in this case. Correct?

Page 284

A. Correct.
Q. And you weren't aware, then, that NIOSH conducted HHEs at the request of BP for all major offshore and onshore response activities. Correct?
A. Correct.
Q. And you weren't aware that the onshore response activities and the scope of NIOSH's HHE included beach cleanup, decontamination, and other activities throughout the Gulf Coast states. Correct?
A. Correct.
Q. And you weren't aware that NIOSH's HHEs involved on-site visits to collect quantitative and qualitative data on potential worker exposures and health systems, work practices, and procedures and work organization. Correct?
A. Correct.
Q. And you weren't aware that the goal of NIOSH's HHEs were to describe acute health effects, evaluate occupational exposures, and generate hypotheses regarding symptoms. Right?
A. Correct. Although the issue of acute health effects wouldn't be relevant to the issues at stake here, which are about chronic and

Page 285

long-term effects.
Q. And you're not aware that NIOSH published a full series of reports regarding its findings from the HHEs. Right?
A. Correct.
Q. And you weren't aware that as part of these HHEs NIOSH conducted personal breathing zone or area air sampling at specific sites and during specific activities for various chemicals of concern?
A. Well, as you repeat these questions I feel like there may have been some documents that referred to NIOSH data collection. I'm not specifically aware of what those activities were.
Q. Okay. And you --
A. Again, as I've said before, this case isn't about NIOSH's activities. It's about BP's activities.
Q. And you didn't analyze for the purposes of rendering your opinions any of NIOSH's personal breathing zone or area air sampling at specific sites or during specific activities. Correct?
A. No, I did not. Correct.
Q. And you didn't consider those NIOSH breathing zone and air sampling activities in the

Page 286

course of your report. Correct?
A. Correct.
Q. And you weren't aware that NIOSH found that results for all airborne chemicals sampled were uniformly nondetectable or at levels well below applicable OELs because you didn't review --
A. Again, my understanding is other experts have reviewed that data.
Q. And you're not aware that NIOSH concluded that heat stress, not chemical exposure, was often the most pressing concern for workers on the response. Correct?
A. I've certainly seen references to heat stress in each of the documents. So I am aware that heat stress was a concern, particularly for workers in the immediate -- in the spill zone and things like that.
Q. Your report doesn't acknowledge the air sampling done by NIOSH. Correct?
A. It doesn't discuss it. That's correct.
Q. And your report does not describe NIOSH sampling strategies for validating NIOSH sampling and analytical methods. Correct?
A. Correct. I did not address that.
Q. And your report does not acknowledge

Page 287

NIOSH's efforts to protect response worker health through HHEs done at the request of BP. Correct?
A. Correct.
Q. Now, with respect to OSHA, are you aware that OSHA was involved in the training of response workers in the course of the spill response?
A. I think I saw reference to that somewhere.
Q. And you didn't analyze OSHA's role in training response workers to protect worker safety during the response. Correct?
A. No. Again, as I've said, I was asked to review BP's role in this situation, not federal agencies.
Q. And your report doesn't acknowledge the role of OSHA and NIOSH in working with BP on matters of PPE. Correct?
A. Again, I was asked to review BP's actions and inactions, not federal agencies.
Q. All right. So you're not aware that OSHA established requirements for training of all response workers. Correct?
A. Well, I'm broadly aware OSHA works in training of workers in a lot of settings. It doesn't come as a surprise. Again, that wasn't something I reviewed as part of my work for this

Page 288

case.
Q. So you didn't specifically analyze work that OSHA did in establishing requirements for training response workers on the DWH response. Correct?
A. Correct.
Q. And you didn't analyze information that showed that BP created trainings based on those requirements. Correct?
A. Correct. Although I do recall some emails that discuss the possibility of certain kinds of trainings with respect to biomonitoring that BP declined to participate in.
Q. And you didn't review information indicating that OSHA, the Coast Guard, NIOSH, and NIEHS reviewed proposed training plans together with BP for the training of response workers. Correct?
A. Again, I was asked to review BP's actions, not the actions of federal agencies.
Q. So you did not review information demonstrating that OSHA, the Coast Guard, NIOSH, and NIEHS reviewed proposed training plans for response workers. Correct?
A. Correct. But I would add that, as I said

Page 289

before, the issue at stake here really wasn't what the plans were. The issue is what actually happened.
Q. Are you aware that as early as May 7th, 2010, BP had issued a matrix identifying basic requirements for training for each job and the response?
A. I feel like I have seen reference to that in someplace.
Q. And are you aware that according to OSHA more than 130,000 workers along the Gulf Coast received training on how to work safely?
A. I would believe that that's true. I don't know specifically, but I don't have any reason to doubt that that's true.
Q. And have you seen information that all response workers had to have training credentials before being allowed to work?
A. Yes. But I've also seen documents that questioned the quality of the training that they actually received.
Q. And are you aware that during site visits OSHA personnel interviewed response workers and their training and ensured that they were credentialed?

Page 290

A. I'm not aware of that.
Q. And your report doesn't acknowledge the role of OSHA or the Coast Guard or NIOSH or NIEHS in the training of response workers. Right?
A. Again, as I've said before, I was not asked to review the actions of federal agencies. The federal agencies are not on trial in this case.
Q. We've talked before today about Dr. David Michaels and John Howard, the directors of the U.S. Occupational Health and Safety Administration and the National Institute for Occupational Safety and Health, respectively, and their article or -- I'm sorry -- their report entitled "Review of the OSHA-NIOSH Response to the Deepwater Horizon Spill, Protecting the Health and Safety of Cleanup Workers." Correct?
A. Correct.
Q. And I know that you said that you had not reviewed that document. Correct?
A. Correct.
Q. And so you have not become aware that Dr. Michaels and Howard found that overall the efforts to ensure the safety and health of cleanup workers were very effective? You haven't seen

Page 291

that. Right?
A. Yes. But I would add the point that we had access to information here that they didn't have access to when they wrote that report.
Q. You have not considered their conclusion as context for your findings? You did not quote in your report their findings that the efforts to ensure the safety and health of cleanup workers were very effective. Correct?
A. No, I did not.
Q. You didn't include in the context for your work in this report that Dr. Michaels and Howard also reported that OSHA and NIOSH had worked collaboratively with other agencies and with BP to ensure worker safety and health?
A. Well, again, as I would say, the point is we have documentary evidence here that was not available to them at the time they wrote that report.
Q. You didn't cite to or refer to this finding by Drs. Michaels and Howard --
A. No.
Q. -- regarding BP's collaboration with federal, state, and local entities to protect worker health. Correct?

Page 292

A. No. I mean yes, correct.
Q. And you didn't cite or refer to in your report that Dr. Michaels and Howard report that BP launched a multitiered training program reviewed by OSHA, NIOSH, NIEHS, and the Coast Guard. Correct? You don't cite that in your report?
A. No. But again, this is a plan for a training program. It doesn't tell us what actually happened.
Q. And you don't note in your report that Drs. Michael and Howard also wrote that OSHA verified the training through on-site visits. Correct?
A. Correct.
Q. You didn't know that when you wrote your report. Right?
A. Well, I mean, I knew there was training. That's referred to in many of the documents. But again, I didn't review that because I wasn't asked to review the role of OSHA. I was asked to review what BP did and didn't do.
Q. So at the time that you wrote your report, you didn't know that OSHA verified training of response workers through on-site visits. Right?
A. Well, I don't know. I may have done.

Page 293

There's definitely a reference to OSHA training in various documents.
I read a lot of materials that I didn't discuss in my report because they weren't salient to the issues that I was being asked to address in this case.
So I certainly was aware that OSHA was involved, and I certainly was aware there was training, and I may have come across documents having to do with OSHA verification of training. But I didn't address those in the report because it wasn't salient to the questions that I was being asked to opine on.
Q. We've talked about the report of the federal on-scene coordinator today. Correct?
A. Yes.
Q. And we've talked about the National Contingency Plan vesting responsibility in the federal on-scene coordinator in the event of an oil spill. Correct?
A. Correct.
Q. And in the report of the federal on-scene coordinator in this case, which we've marked as Exhibit 10 --
A. I'm sorry. Exhibit 10 in which binder?

Page 294

Q. Binder 2.
Looking at the FOSC report, I'm going to direct you to page 90 of the --
A. I'm sorry. You said item 10 in this binder? Item 10 is only one page long.
Q. I'm sorry. Tab 14, Exhibit 10.
A. Got it.
Q. And if you could turn to page 90. And if you look in the second column, Doctor, almost at the end, the box "Key Points on Safety." Do you see that?
A. I see it.
Q. Do you see that the FOSC concluded that the agencies charged with oversight of worker and public safety and those in command positions from the federal and state governments as well as the RPs, meaning the responsive party, made safety a priority? Do you see that?
A. Yes, I do.
Q. And at the time that you drafted your report, you were not aware of that statement, were you?
A. No, I was not.
Q. And as you continue to look at that document, down that same column on page 90, do you

Page 295

see that the FOSC reported that the safety record of the entire response operation reflected an effective and persistent safety program? Do you see that?
A. Yes, I do. But again, I would repeat what I've said, that it's not clear to me that these people were aware of some of the discussions and actions that were taking place behind the scenes to which they may or may not have been aware.
Q. You don't cite anything from the FOSC report in your report, do you?
A. No, I don't.
Q. You don't cite any conclusions of the federal on-scene coordinator. Correct?
A. No, I don't.
Q. And you don't consider the conclusions of the federal on-scene coordinator to be relevant to your work on this case. Correct?
A. No. Because of the fact, as I've already stated, that we have access to evidence, information that would not have been available to them when they wrote this report.
Q. And the conclusion of the federal on-scene coordinator on page 90 where he writes, "The efforts and commitment to ensure the safety of

Page 296

those who worked on the spill, and that of the public, is one of the single most notable accomplishments of the Deepwater Horizon response."
You don't consider that conclusion to be important to your opinions. Correct?
A. Well, I think it is interesting. And I think if I had more time I would certainly be interested in learning more about the basis for that.
But I think it doesn't disprove the concerns raised by the documents that we've reviewed for this case, documents which I've said they would not have had access to at the time they drew that conclusion.
Q. And going on, on page 90, the federal on-scene coordinator report states that "Given the immense geographic scope, maritime operations from the well site to 50 miles offshore skimming, to near-shore, aviation operations and land based cleanup, decontamination, and waste management -- and the vast mixture of people thrown together ad hoc -- the Deepwater Horizon response produced an exceptional safety record."
Do you see where that's written?

Page 297

A. Yes, I do.
Q. You didn't consider that statement in the federal on-scene investigator report to be considered in forming your opinions. Correct?
A. Well, I think it's interesting because I think this is one of the points. This was an extremely large operation because this was a spill of unprecedented magnitude and potential damage. And so a lot of things are going on all at once.
And as far as I can see from the documents I've seen both before today and today, they're not looking at the details of the science. They're looking at what's happening on the ships during the in situ burn.
And it seems to me highly likely that what's happening behind the scenes by the contractors who are doing the analysis, that there's actually a lot of opportunity for things to have been taking place that were not salient to this discussion of safety, which I take to be referring particularly to the workers who are doing the in situ burns and decontamination.
But it's not really salient to the question of the science.
And my report is about the science. It's

Page 298

about the scientific data that BP collected or supervised the collection of and whether or not that data are sufficient to sustain their claims that there could not have been long-term effects on workers or residents.
Q. Doctor, your report is also about the safety of workers that worked on the response. Correct?
A. The long-term safety, though. Not -- I'm not talking about the safety on the rig or on the ships but the potential for long-term effects.
Q. And you're maintaining that BP made choices with respect to PPE that may have compromised the safety of workers. Correct?
A. Well, that's based on the documents in which in some cases people on the vessels at the time are saying that they're concerned about whether or not the PPE is adequate.
Q. And you haven't evaluated those statements in the context of the federal on-scene coordinator's report. Correct?
A. That's true.
Q. And you haven't evaluated those statements in the context of any official report on the unified command or the engagement of others in

Page 299

protecting worker safety in the course of the response. Correct?
A. That's correct.
Q. So as you look at your report, again your expert report, Tab 5, Binder 1, you maintain in your report that BP denied workers PPE, particularly respirators. Correct?
A. We have evidence that in some cases that was true. Yes.
Q. Were you aware when you rendered that opinion that OSHA routinely attended briefings that BP and its contractors held at the beginning of every shift during the response to review health and safety issues?
A. I'm sorry. Could you repeat the question?
Q. Were you aware that OSHA routinely attended briefings that BP and its contractors held at the beginning of every work shift during the response to review safety and health issues?
A. Well, I wasn't aware they routinely attended briefings. I was certainly aware that OSHA was involved in the conversations.
But again, if there is confidential emails, if someone is reporting within the BP organization that they have concerns, it's not

Page 300

clear that OSHA would have been aware of those complaints.
Q. And with respect to the role of OSHA, were you aware that under OSHA and NIOSH guidance BP developed its PPE matrices outlining PPE that workers should use for categories of cleanup work?
A. I think I was aware of that.
Q. You don't cite or refer to a document entitled "OSHA's Role in the Response" with respect to use of respirators. Is that correct?
A. Yeah. That's correct.
Q. And you're not aware that OSHA determined that respiratory precautions were important near the source to prevent inhalation exposures but were not necessary for most shoreline cleanup operations? You're not aware of that. Correct?
A. I believe that's correct.
Q. And you're not aware that OSHA noted that respirators should be considered the protection of last resort. Correct?
A. I think I'm broadly aware of that because I know that respirators can be uncomfortable to wear.
Q. And are you aware that OSHA noted that the use of respirators with respect to this response

Page 301

could be physically taxing, especially in extreme heat?
A. Well, again, I'm not aware of a specific report that said that, but I am aware of the fact that respirators can be hot and uncomfortable.
Q. Are you aware that OSHA conducted more than 4,200 response worksite visits to assess hazards and ensure that BP was adequately protecting workers?
A. I wasn't aware of the specific number.
Q. And you weren't aware either, were you, that OSHA reviewed more than 119,000 exposure assessments conducted by BP and then validated them by performing more than 7,000 independent worker exposure response requirements both onshore and on marine vessels, were you?
A. I think I am aware of it now because I believe that was mentioned in one of the expert reports.
Q. You weren't aware of that when you drafted and rendered your opinions?
A. No, I was not.
Q. So your opinions were not rendered in the context of what OSHA did with respect to response worksite visits and reviewing exposure assessments

Page 302

collective --
A. Again, I wasn't asked to review OSHA's activities.
Q. And again, your opinions in this case were rendered without your reviewing OSHA's role and OSHA's activities. Correct?
A. Again, as I said, OSHA is not on trial here.
Q. My question, though, is were your opinions rendered without an examination of what OSHA did with respect to response worksite visits and review of exposure assessments?
A. Correct.
Q. Are you aware that OSHA has stated that their efforts included a comprehensive assessment of hazards and aggressive oversight of BP to ensure that workers had necessary training and protection?
A. Well, again, I'm not sure that I've seen a specific reference to that. I'm certainly aware that OSHA was involved. And as I said, there are all kinds of things going on that OSHA wouldn't have had access to at that time.
Q. And because you haven't reviewed the document entitled "OSHA's Role in the Response" or

Page 303

considered it in rendering your opinions, you have not seen what OSHA has concluded in that report. Correct?
A. Correct.
Q. And your report does not acknowledge OSHA's aggressive oversight of BP to ensure workers had training and protection. Correct?
MR. DURKEE: Objection to form.
A. Yeah. "Aggressive" is your interpretation. Clearly there was OSHA oversight. I assume that was stipulated and not disputed.
Again, the question was what was BP doing behind the scenes which might or might not have been evident to OSHA or other federal officials who were working with them at that time.
Q. You didn't consider in drafting your report or rendering your opinion OSHA's oversight of BP to ensure that workers had training and protection. Correct?
A. Correct.
Q. And you didn't review any characterization of that oversight as aggressive in a report called "OSHA's Role in the Response." Correct?
A. Correct.
Q. All right. Doctor, we talked earlier

Page 304

today about the OSAT 1 and OSAT 2 reports. Correct?
A. Yes, we did.
Q. All right. And you did not consider the OSAT 1 and OSAT 2 reports prior to rendering your opinions in this case. Correct?
A. I think you already asked and I already answered that question.
Q. You didn't consider them. Right?
A. Correct.
Q. And with respect to the work of CDC, at the time that you prepared your opinions in this case, were you aware that CDC's environmental health team reviewed nearly 400 packages of data from environmental samples collected at the request of the EPA?
A. No, I was not aware of that.
Q. And you weren't aware that this data consisted of sampling results for air, water, soil, sediment, and waste oil samples?
A. I was not aware of that.
Q. And you weren't aware that the CDC reviewed the sampling data to determine whether exposure to oil, oil constituents, or dispersants might cause short-term or long-term health

Page 305

effects?
A. Well, again, as I've said before, one of the issues at stake here was if the sampling program was either designed or implemented in a way that created false negatives, then it would be possible that CDC would review those data and conclude that everything was fine when in fact it wasn't fine.
Q. But at the time that you prepared your report, you weren't aware of CDC reviewing sampling data. Correct?
A. Honestly, I can't remember. There were certainly references to CDC in the materials I looked at, but I'm not specifically aware of a post hoc review.
Q. And you weren't aware that CDC found that samples collected by the EPA in places where nonresponse workers spent time showed none of those substances at levels high enough to cause long-term health effects. Right? You didn't see that?
A. This is precisely my concern. As I've said, if the sampling program was designed to implement in a manner that created false negative results, then of course they wouldn't find

Page 306

evidence of problems even though in some cases there could have been such evidence.
Q. And if the CDC review was of EPA sampling data, would you have been concerned about the review of the CDC?
A. Well, again, I wasn't asked to review the EPA work, so I'm not in a position to comment on the EPA work.
Q. So you're not in a position to comment on the CDC analysis if it relied on EPA data. Correct?
A. Correct.
Q. And you did not analyze the CDC analysis for the purposes of rendering your opinions in this case. Correct?
A. Well, I didn't analyze any of the analyses.
Q. You didn't analyze any of the analyses --
A. The word "analyze" in my world implies chemical analysis or data -- recrunching the numbers. So no, I didn't do any work of that type. It is my understanding other experts will speak to those questions.
Q. And you didn't review CDC's "Response to the Gulf of Mexico Oil Spill," that document,

Page 307

prior to rendering your opinions. Correct?
A. Correct.
Q. And so you weren't aware that CDC and EPA separately came to the conclusion that there was no direct exposure to substances reviewed at levels high enough to be expected to cause harm. Correct?
MR. DURKEE: Objection to form.
Go ahead, you can answer.
A. I feel like we've already covered this.
But my point is if the sampling program was inadequate or produced false negatives, then they would have concluded that the exposures were not sufficient to cause harm. But that might be an erroneous conclusion.
Q. Since you didn't review OSHA and NIOSH testing and analysis of samples, you weren't aware when you prepared your report that OSHA and NIOSH testing showed that 100 percent of air sampling results for BTEX compounds were below occupational exposure limits for OSHA, NIOSH, and ACGH. You didn't have that information?
MR. DURKEE: Objection to form.
A. I would say the occupational exposure levels would be not relevant for the question of

Page 308

people in the community. So that's mixing apples and oranges.
Q. Well, I'm just asking you, your report is written with respect to workers. Correct?
A. I understand. We've also been talking about community as well.
Q. Right now I'm talking about workers.
So with respect to what you had available to you when you drafted your report and rendered your opinions, you didn't have information that OSHA and NIOSH testing showed that 100 percent of air sampling results for BTEX compounds were below occupational exposure limits for OSHA, NIOSH, and ACGIH?
A. Correct. I did not review --
Q. And you weren't aware that BP's data set showed that 99.7 to 99.9 percent of the results for benzene were below all operational exposure limits, did you?
A. Well, again, that would fall into the category of what I've just been discussing.
If the sampling program was done in such a way as to produce false negatives, then they would have missed data that would have potentially been at levels that could have triggered concern.

Page 309

Q. But you don't have specific information that allows you to opine that BP's data set showing 99.7 to 99.9 percent of results for benzene being below operational exposure limits was compromised. Correct?
A. Well, I think we do have specific information. The concerns were raised about the possibility of false negatives, about chain-of-custody questions. So I think we do have specific information on that.
Q. When you prepared your report, you weren't aware of the OSHA data set showing 100 percent of air samples being nondetectable. Correct?
A. You already asked that question and I already answered it.
Q. You weren't aware of the OSHA data set?
A. Correct.
Q. Because you weren't aware of the OSHA data set, you weren't aware of an OSHA data set showing 100 percent of air samples being nondetectable. Correct?
A. Obviously if I wasn't aware of the data set --
Q. I want to specify, Doctor, nondetectable for 2-butoxyethanol. Correct?

Page 310

A. I'm sorry. What?
Q. You weren't aware of the OSHA data set showing 100 percent of air samples being nondetectable for 2-Butoxyethanol. Correct?
A. Correct.
Q. And you weren't aware that there were 1,081 air analyses for potential exposure to 2-Butoxyethanol for cleanup workers run by two government agencies and BP contractors and that not one sample approached the safety limits. Correct?
A. Correct.
Q. And because you did not analyze environmental samples collected by BP or by various state and federal agencies, you're not aware that the data collected by BP and those agencies are generally consistent. Correct?
A. My understanding is that that plaintiff's counsel will dispute that claim and other experts will speak to that.
Q. But you're not speaking to that. Correct?
A. Yes. It's not -- I'm not speaking to that in my report.
Q. And you haven't analyzed the consistency of the data for the purposes of rendering your

Page 311

opinion. Correct?
A. No, I have not.
Q. And so you did not contextualize your opinions with respect to any analysis of data showing consistency of data. Correct?
A. Again, I was told that other experts would be looking at that question.
Q. Doctor, did you ever have occasion to review the trial testimony of Damien Shea in the Clean Water Act trial?
A. No.
Q. Are you familiar with his name?
A. It's not ringing a bell.
Q. So you didn't have the opportunity to review his testimony when you rendered your opinion?
A. You already asked me that and I already answered.
Q. And then you weren't aware that Dr. Shea testified in the Clean Water Act trial that the quantity of water and sediment data that was collected in the course of the response is all available for review. Correct?
MR. DURKEE: Objection to form.
You can answer.

Page 312

A. I already said I don't think I've heard of Damien Shea until today.
Q. Okay. And you weren't aware when you prepared your report that Dr. Shea testified in the Clean Water Act trial that the Deepwater Horizon data that he analyzed is the largest and highest quality data set of its type that he had ever encountered in his career? You didn't see that. Right?
MR. DURKEE: Objection to form.
A. I don't know who he is or anything about the context, so I'm not able to judge that claim.
Q. You didn't --
A. I already said that I never even heard of him until --
Q. You didn't consider that testimony until today?
A. That seems obvious.
Q. You opined, Doctor, that it is helpful to review trial testimony?
A. Sometimes it's helpful.
Q. You didn't review any trial testimony for purposes of your work in this case?
A. No, not -- I'm not 100 percent sure. I don't believe we reviewed any previous trial

Page 313

testimony.
Q. You, yourself, have not analyzed any of the quality assurance protocols used by BP or any of the federal agencies involved in work on the response, have you?
A. No, I have not, but I would say -- I'll leave it at that.
Q. And you've not reviewed any of the independent validation of data sets done by any entities who were working in the response, have you?
A. No. And I could if I were asked to. I have actually written a fair amount about model validation verification.
I think my personal opinion is that many of the procedures that are sometimes undertaken under quality assurance or data validation, in my opinion, are often flawed.
But that wasn't something I was asked to review in this case.
Q. So you haven't reviewed any quality assurance, quality control documents that pertain to work in the Deepwater Horizon response. Correct?
A. Correct.

Page 314

MS. DESANTIS: Let's go off the record for a minute.
THE VIDEOGRAPHER: The time is 5:32. We're off the record.
(Recess, 5:32 p.m. to 6:02 p.m.)
THE VIDEOGRAPHER: Okay. We are back on the record. The time is 6:02.
MS. DESANTIS: All right. Before we get started, just a couple of housekeeping matters.
So, Mr. Durkee, have you explored whether or not Paul Montagner's fact report that Dr. Oreskes has mentioned at the start of the deposition can be made available to us?
MR. DURKEE: I have not made that decision. I'm not making that decision until I get back to my office.
MS. DESANTIS: So you're not making that decision today?
MR. DURKEE: No.
MS. DESANTIS: You're not going to provide that to us today to question Dr. Oreskes about?
MR. DURKEE: No.
MS. DESANTIS: And if you do provide it and if we do have questions for Dr. Oreskes about that --

Page 315

MR. DURKEE: We'll certainly open it back up and let you have a quick few minutes on that report.
MS. DESANTIS: All right. And I want to make sure that for our court reporter we know we are marking this deposition as confidential. So it will be marked as confidential.
You know how to handle that?
THE REPORTER: Yes.
BY MS. DESANTIS:
Q. So, Doctor, I want to talk to you again about testimony. And you've indicated before that testimony can be a valuable source of information for historians of science. Correct?
A. Correct.
Q. And you've not reviewed any deposition testimony of a man named David Dutton, have you?
A. No. I know who David Dutton is, but I have not reviewed his deposition testimony.
Q. And you know that David Dutton is BP's industrial hygiene team lead and he operated within the unified area command. Right?
A. Correct. I know that.
Q. And he testified under oath that the unified command, with the input of NIOSH and OSHA,

Page 316

concurred that risks in the use of respirators outweighed the benefits and that they would be supplied as escape respirators. You never saw that testimony. Correct?
A. I did not.
Q. And Mr. Dutton's testimony is at odds with your view that BP acting alone was not providing workers with respirators. Correct?
A. Well, I'm not sure that I said acting alone. I'm responding to documents in which the question of respirators is raised. BP doesn't provide those respirators. Who they may have consulted with, that -- I don't address that issue.
Q. And you didn't know at the time that you prepared your report that Mr. Dutton had testified under oath that OSHA and NIOSH were involved in making decisions regarding respirator use by response workers. Correct?
A. Correct.
Q. So I want to turn back to the FOSC report, which is Exhibit 10, Tab 14. And that's in Binder 2.
A. The "On Scene Coordinator Report." I still have it here.

Page 317

Q. And you have mentioned a number of times today that you maintain that various governmental agencies didn't have access to the information available as part of the litigation. Correct?
A. I'm maintaining it's likely they didn't have access to this information. Correct.
Q. And so if you look at the FOSC report, Exhibit 10. And if you particularly look at page 5.
A. Sorry. Roman numeral v?
Q. Just page 5.
A. Arabic 5?
Q. Yeah.
A. Okay.
Q. Do you see towards the end of the page, second column, where it states that "For the Deepwater Horizon spill, BP accepted its responsibility as an RP"? Do you see that paragraph?
A. Yes, I do.
Q. And then further on in the paragraph it states that "the FOSC and the FOSC's representatives directed RP actions." Do you see that?
A. Yes, I do.

Page 318

Q. And then it goes on to say, "This was done daily in the form of Incident Action Plans (IAPs) and also in the form of NIC and FOSC directives to the RP." Do you see that?
A. Yes, I do.
Q. And do you understand the NIC to be the national incident commander?
A. Yes, I do.
Q. And if you turn to page 16 in the FOSC report, in the first paragraph you'll see where it notes that the ICPs, the incident command posts, held daily all hands meetings that focused on safety, unity of effort, and discussion about the importance of each aspect of the response. Do you see that?
A. Yes, I do.
Q. And you weren't part of the response. Right?
A. We've already established that.
Q. You still have to answer the question.
You weren't part of the response. Correct?
A. I believe you asked that, and I believe I answered I was not part of the response.
Q. And you didn't participate in those daily

Page 319

meetings. Right?
A. No, I did not participate in those daily meetings.
Q. So you don't have knowledge regarding the extent of information shared between BP and the government agencies as part of those meetings. Correct?
A. Correct. But I would point out that if you read the beginning of the same paragraph, they say it was very difficult to maintain situational awareness across the entire response.
Q. And if you look at the top of that paragraph, it's also noted, "The size and complexity of the spill response presented many organizational challenges." Correct?
A. Correct.
Q. And you'd agree that ICP's holding daily meetings with all hands on board was a very good and wise effort to try to coordinate in a large and complex response. Correct?
MR. DURKEE: Object to the form.
A. I don't think I'm in a position to make that judgment.
Q. So you weren't part of those meetings, Doctor. Correct?

Page 320

A. Asked and answered.
Q. No. You can't say that. You have to answer. It's his objection if he wants to make it.
You weren't sitting there in those meetings. Correct?
A. Yes. You already asked that and I already answered it.
Q. And you don't know what was discussed in those meetings. Correct?
A. Correct. I do not.
MR. DURKEE: You've already established that.
Q. And you don't have any personal knowledge with respect to the Deepwater Horizon response at all, do you?
A. You've already established that.
Q. And the answer is no. Right?
A. I'm testifying as a historian looking at the documents after the fact to judge what did or did not transpire.
Q. And with respect to the email threads that you have cited throughout your report between various people, you don't have context to understand the relationships between those people

Page 321

and the entirety of their communications. Correct?
MR. DURKEE: Object to the form.
A. Well, I think I do have context. Whether that context is everything that transpired, that, I couldn't judge.
Q. And you haven't reviewed the entire record of email correspondence between any individuals whose email threads you've cited in your report. Correct?
A. Well, A, that would be probably impossible; and, B, as I've already stated, many of those emails have been retained by your client as privileged.
Q. Let's turn back to the declaration that we used earlier that's been marked as Exhibit 18. It is behind Tab 42 in Binder 8.
A. I don't think I have that binder anymore.
I'm sorry. Tell me again which tab.
Q. It's Tab 42.
A. The only tab there is. Okay.
Q. And again on the first page of that document -- and again, this is the "Declaration of Vanessa Barsanti" that we've referred to earlier.
A. Okay.

Page 322

Q. And do you see at the end of Paragraph 3 where it states that "Over 86,000 of the documents" produced to plaintiff's counsel "include communications and documents shared with governmental entities and representatives"?
A. Yes, I see that.
Q. And you, of course, have not reviewed 86,000 documents that include communications and documents shared with governmental entities and representatives. Correct?
A. Correct. I have not.
Q. In the documents that you did review, you never saw the government request information from BP and see BP deny the request for information, have you?
A. No. I don't think so.
Q. And with respect to the communications that you had reviewed, those communications don't provide the context that the 86,000 communications shared with governmental entities and representatives would provide. Correct?
MR. DURKEE: Objection to form.
A. That would be impossible for me to judge without looking at the 86,000.
Q. So, Doctor, when we go back again to the

Page 323

work that you've done for your case, I just want to confirm a couple of things about expertise.
You're not an expert in personal protective equipment. Correct?
A. I believe we've already established that.
Q. We haven't discussed PPE particularly.
A. Okay.
Q. We talked about industrial hygiene.
A. No, I'm not an expert.
Q. You're not an expert in personal protective equipment. Correct?
A. Correct.
Q. And you don't know what PPE would be required in various circumstances. Correct?
A. Correct. I'm responding to documents in which people on the scene are raising questions about PPE.
Q. And you'd expect industrial hygienists to make decisions about PPE. Correct?
A. Yes. But I do know from other research I've done and documents from histories that have been written that industrial hygienists working for corporations represent the interests of those corporations and not necessarily the interests of the workers.

Page 324

Q. And to the extent that decisions about PPE were made by governmental agencies, you have no reason to question the integrity of the people that were working for the government agencies. Correct?
A. No. Not unless there's evidence that they were unduly persuaded by BP.
Q. And you have no information that decisions made by government agencies with respect to work on the response were compromised or lacking in integrity. Correct?
A. Correct.
Q. And with respect to dermal monitoring, you're not an expert in dermal monitoring of response workers. Correct?
A. Correct.
Q. Let's discuss the characteristics of a good forensic report.
Would you agree that good forensic reports are objective?
A. I'm not sure I know what you mean by a forensic report.
Q. A report that evaluates evidence.
A. So anything that evaluates evidence is forensic, in your definition?

Page 325

Q. For the purposes of today, a report that evaluates evidence, would you agree should be objective?
A. Sure. I would agree as much as is humanly possible all experts and all scientists strive to be objective.
Q. And as an historian of science, you strive to be objective. Correct?
A. I do. I do.
Q. And a good report of an historian of science should be an objective report. Correct?
A. As much as is possible. Yes.
Q. And good reports of historians of science are balanced. Correct?
A. No. I don't agree with that.
I think the notion of balance is misguided in this kind of a context because the reality is not necessarily balanced.
The point of objective research is to look at the evidence and let the chips fall where they fall. And they might fall 80-20, they might fall 60-40, they might fall 99-1.
The notion of balance is, to me, not a meaningful term when it comes to doing objective historical research.

Page 326

Q. But a good report of an historian of science should know the contrary evidence. Correct?
A. This is a tricky question because we are involved in an adversarial process here.
If I saw evidence that I thought was exculpatory or that suggested that the documents we were looking at were not, in fact -- there was a different way to interpret them that made more sense, I would of course take that seriously and it may be something I wouldn't talk about in my report.
I can't remember offhand. I'm sorry. It's getting late and I'm tired.
But there were some things that early on plaintiff's counsel suggested might be things that I would cover in my report, and I didn't think I saw enough evidence to warrant a concern about them and so I didn't include those things.
So if I thought there was something for which the evidence was not robust, then I didn't address it in my report.
But this is an adversarial process. I'm hired by plaintiff's counsel just as you are hired by defendant's counsel.

Page 327

It's my job to evaluate evidence relevant to the plaintiff's complaint. It's not my job to evaluate evidence that could be exculpatory, although, as I said, if I saw evidence that I thought was exculpatory I would definitely not ignore it or discount it. I would take that seriously and I wouldn't have made the -- I wouldn't have come to the conclusions I did if I had seen exculpatory evidence.
Q. And you didn't look for what you characterized as exculpatory evidence. Correct?
A. No. I wouldn't say that. I think I actually did.
I think one of the things that Nina and I were doing, especially in the early edge stages of the process, was looking at when we saw something that seemed problematic, one of the questions we asked ourselves was, okay, this seems problematic, but what other evidence do we have here? Is there something else that would explain why they're saying these things?
And if we thought there was exculpatory evidence, then we didn't include it as part of the complaint.
Q. So a good report of an historian of

Page 328

science would not ignore relevant evidence to the inquiry. Correct?
A. Well, like I said, I haven't ignored relevant evidence that I'm aware of.
Q. You didn't review any of the federal reports that we've discussed today, Dr. Oreskes. Correct?
A. Correct. And I've already explained why. I wasn't asked to review the actions of the federal agencies. I was asked to review the actions of BP.
Q. And so for the purposes of your work as an historian of science, you limited the project to do what you were asked to do by plaintiff's counsel. Correct?
A. BP is the defendant in this case. I was asked to write a report relevant to the actions of BP and its contractors.
Q. And as an historian of science, you didn't consider the work of others in the response to be relevant to your analysis of the work of BP. Correct?
A. The federal agencies are not on trial in this case.
Q. That wasn't my question.

Page 329

My question is, as an historian of science, you didn't consider the work of others in the response to be relevant to your analysis of the work of BP. Correct?
A. Well, no, not entirely. I mean, I did. The communications with NIOSH are relevant and they're in my report.
So in cases where there were communications with federal agencies that appeared to be relevant, I engaged in looking at those communications.
Q. You didn't do a broader analysis of the work of others in the response as you analyzed BP's work in the response. Correct?
A. Correct.
Q. A good report of an historian of science would not shade facts to help support one side or another. Correct?
A. I did not shade facts.
Q. I'm not saying that. I'm asking about a report.
A. A good report would not shade facts, and I did not shade facts.
Q. And a good report would ensure that all of the documents reviewed and cited in the report

Page 330

were accurately cited and cited in context. Correct?
A. As much as possible given the constraints of time and things that are restricted by privilege.
Q. Now, with respect to the Deepwater Horizon incident and response, you're aware that the Deepwater Horizon response was the largest oil spill response in history. Correct?
A. Yes, I'm quite well aware of that.
Q. And as we near the end of your deposition today, does it remain your position that your report with its 118 citations provides sufficient backup for the opinions that you have provided?
A. Yes, it is my opinion.
Q. And are you confident that you have reviewed BP's conduct in the largest oil spill in history in appropriate context in order to render your opinion?
A. I'm confident that the materials that I reviewed support the opinions in my report.
Q. Doctor, if you had more time to devote to your analysis in this case, you'd agree that there are a number of documents that would be worthy of review. Correct?

Page 331

A. Yes, I would agree to that.
Q. And if you had more time to analyze email correspondence, it would be instructive for you to review a number of the documents that include communications and documentation shared with governmental entities by BP and its contractors. Correct?
A. Not sure about that. I think when you asked the previous question, I mean, you've referred on a few occasions to the report by John Howard and David Michaels. That's a report that I think if I had more time I'd be interested in seeing.
In terms of emails with governmental agencies, maybe. It's hard to say. If BP is steering studies or shading studies or designing studies in a way that could create false negatives, that's not something I would expect them to reveal to federal officials, so I wouldn't necessarily see that those kinds of emails would be a high priority.
But as I've said now several times today, if you have evidence that you think is exculpatory, I would be more than happy to look at those materials.

Page 332

Q. And again, Doctor, you've not searched for exculpatory evidence. Correct?
A. Well, how would I know what to look for?
As I've pointed out, I asked on multiple occasions to see additional materials that I was told we were not able to see because they were shielded behind privilege. And I think that some of those documents we don't know. I mean, they would have provided greater context.
I saw emails that I considered to be disturbing, to be suggestive of activities that in my opinion were inappropriate.
I mean, you've raised the issue of objectivity now several times. I think we saw things that call into question the objectivity of the scientists who were doing work on behalf of BP.
You have not mentioned CTEH or Exponent in any of your questions, but I'll raise it here now.
I think we had a lot of evidence that those groups were not acting in an objective manner. And many of the emails that I requested to see involve the activities of those contractors, and I was told that they were protected behind privilege.

Page 333

So it's possible that if there was a broader context, maybe those things would have not have seemed suspicious. But we were unable to review those because of the actions of your client.
Q. Dr. Oreskes, based on what you've learned today -- and I'm again referring to the Barsanti declaration -- that plaintiff's counsel has 687,000 documents totaling over 33,500,000 pages from third parties that include Stantec, the American Petroleum Institute, Battelle, ChampionX, CTEH, and Exponent, you haven't asked for additional documents in the possession of plaintiff's counsel within those 687,000 documents, have you?
A. Well, I don't know if what I've asked for is in those documents or not because I was told I couldn't review them.
But you're familiar, as I think is everyone in this room, with the notion of a data dump or a document dump.
I mean, yes, there are 1,300,000 pages. I have no way of knowing if those are meaningful or responsive or if they could be rubbish.
I've been involved in cases where I've

Page 334

seen rubbish. So I have no way of judging if those million -- more than a million pages are, in fact, relevant.
But what I know is the things that I thought could be relevant that could have helped me to do the contextualization that you've been stressing here, in quite a number of cases I was told that they were protected behind privilege.
Q. And so you maintain that anything else that you needed to put your opinions in context was protected by privilege. Correct?
A. No, that's not what I said. I'm not saying that -- anything else.
I'm saying that there were -- look, I follow threads. That's what all historians do. You have a document. It suggests something that you think should be pursued. You pursue it. You try to find additional information relevant to that.
I did that in this case. And what I'm saying is that in many cases the materials that I thought we should pursue were not available to us.
So even though there may have been 1,300,000 pages, for whatever reason particular things that I thought were important contextually

Page 335

or potentially important contextually which I asked for on more than one occasion -- I mean, you're making a point of this, so I will respond.
I do consider it important to look at things in context. And when there were email threads where there was some prior email that was relevant to understanding what we were looking at, in almost all cases I asked if there was -- if those earlier emails were available.
And as I said, in many cases I was told they were not available.
And so I feel I did due diligence to try to pursue information that was relevant that could have influenced the opinions expressed in my report. And I feel that I did do due diligence to be as comprehensive as possible within the constraints of the report.
As we've said multiple times, I did not look at the role of the federal agencies because that's not what this case is about.
Q. And with respect to your due diligence, for your purposes you did not consider it important to explore the work of the federal agencies in the context of a response. Correct?
A. Correct, because the federal agencies are

Page 336

not on trial here. If this were a lawsuit against NOAA or EPA, then that would be a different matter.
Q. And in the context of your work on this case, you didn't feel it was important to pursue analysis of the work of state authorities in the context of a response. Correct?
A. Correct.
Q. And in the context of your work on this case, you didn't feel that it was important to explore the work of local authorities in the context of work on the response. Correct?
A. Correct.
Q. And similarly, you didn't deem it to be important to consider the sampling and monitoring analysis that were done by entities other than BP. Correct?
A. As I've already said, I was led to believe from plaintiff's counsel that other experts were covering that.
MS. DESANTIS: All right. We're going to go off the record.
MR. DURKEE: Let's not stay off the record long. We've been here long enough. We've had a bunch of breaks. Let's take a five-minute break.

Page 337

THE VIDEOGRAPHER: The time is 5:27 [sic]. We're off the record.
(Off the record, 6:27 p.m. to 6:28 p.m.)
THE VIDEOGRAPHER: We're back on the record. The time is 6:28.
MS. DESANTIS: Okay. Dr. Oreskes, we have finished questioning at this point in time.
We are going to reserve the right, because we still do have time left, to reopen the deposition, if necessary, based on nonresponsiveness to some questions if we decide that we're going to address that with counsel and then potentially with the court.
We are also going to ask on the record whether Mr. Durkee intends to ask you any questions today. There was some dialogue that I heard when we were off the record between the two of you.
Is Mr. Durkee going to be asking questions today?
MR. DURKEE: I'm going to ask a couple.
MS. DESANTIS: All right. I am going to reserve the right after you're finished to take some of our time to ask follow-up questions.
MR. DURKEE: Very good.

Page 338

EXAMINATION BY COUNSEL FOR
PLAINTIFF CHARLES A. BOGGS
BY MR. DURKEE:
Q. Dr. Oreskes, you had a qualification or further explanation on a document that defense counsel asked you about. Can you refresh my recollection as to what document that was?
A. It's difficult because I've been shown multiple binders with lots and lots of tabs and documents. But it was a document referring to the GoMRI research program and a set of three meetings that had taken place that had helped to establish the agenda for that research program.
Q. Okay. Was it that you wanted to qualify or explain further?
A. Yeah. I wanted to make the point that of those three meetings, the first two, if you look at who is invited to those meetings and organizing those meetings, you have NOAA, the EPA, you have oceanographic institutions. And I think that supports the point I was trying to make earlier.
It's not that those aren't important organizations, but the focus of those meetings, clearly when you see the oceanographic institutions are playing a major role, it's about

Page 339

how the oil is being dispersed and where it's likely to end up and the ecological impacts, particularly some of the discussion about the water column.
And that's all fine. I'm not saying that's bad that that was done.
What's noticeable about that is these are not organizations primarily focused on public health.
And in particular, if you think about we know the scientific evidence is overwhelming that there are components of hydrocarbons that are carcinogenic.
But what you don't see there is the Sloan Kettering Cancer Institute or some other cancer organization which would have had public health as its primary expertise and focus.
Q. Very good. Anything else you'd like to explain about that?
A. The other thing I wanted to point out -- and again, I don't have the document in front of me. Counsel asked me about Rita Colwell.
If you look at the list of people who were on the board of that GoMRI research program, most of them are names that I have never heard of.

Page 340

I don't know who those people were except for the one that I mentioned, Margaret Leinen, who I do know and who I know now runs an oceanographic institution and has taken substantial money from the fossil fuel industry.
I also know when Margaret Leinen was president of the American Geophysical Union she not only accepted money from ExxonMobil but publicly defended it and actually publicly misrepresented the relationship that the American Geophysical Union had with ExxonMobil. That was a matter of record that was written up in Nature subsequent to that.
But I did just look up one person -- I didn't have time during the break. I looked up one person, a person named Deborah Benoit, I think it was. I would have to go back and double-check this.
But her expertise is in intellectual property. So I think that raises this question about who was actually on the board of this research program.
And if it had a very strong concern about public health, it was just curious to me that a person whose expertise is in intellectual property

Page 341

would be on this board of this research program.
So I have questions about how that board was constituted and who was making those choices about who was on that board.
Without more time to research it, I can't express a strong opinion. But I just wanted to flag that as a potential concern.
MR. DURKEE: I have no further questions.
MS. DESANTIS: Okay. I have just one follow-up question for you, Dr. Oreskes.
FURTHER EXAMINATION BY COUNSEL FOR BP ENTITIES
BY MS. DESANTIS:
Q. So you noted early in your response to Mr. Durkee that you were concerned that EPA was at these meetings and was not concerned, was not tasked with the job of focusing on public health. Correct?
A. Well, I didn't say that.
What I said was that if you look at who the major organizations are, they include groups like oceanographic institutions, NOAA, that have a primary focus on ocean and oceanographic things, which, as I said, it's not -- I'm not saying that's wrong. I'm saying that it's incomplete.
And it would help to explain why public

Page 342

health doesn't rise to a level of being, you know, equal, let's say, with the other -- remember we looked at those five areas of research and we showed that four of the five were not involved in questions of human health or well-being.
And I think if you look at the constitutions of those meetings, that would help to explain why public health didn't rise to a level of equal significance and concern.
Q. But EPA was at the meetings. Correct?
A. I'm not denying that EPA was there. EPA, of course, does both public health and environmental health.
Q. So you're not denying that part of the mission of EPA is to protect human health?
A. No, no.
Q. And the environment. Correct?
A. I'm not denying that. But it is interesting if you look at EPA's history, if you look at the expertise in EPA, I wouldn't think of EPA as a primary organization that would have expertise on something like cancer.
Q. Yet the mission of EPA is to protect human health and the environment. Correct?
A. Correct.

Page 343

MS. DESANTIS: All right. That's all I have.
MR. DURKEE: All right. No further questions, with the qualifications defense counsel put on the record.
THE VIDEOGRAPHER: The time is 6:34. We're off the record.
(Off the record at 6:34 p.m.)
MR. DURKEE: So just for the record, I am marking Exhibit Number 27. This is on a small note pad with Kirkland & Ellis letterhead. There are 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 handwritten pages. The rest of the pages are blank.
I've marked them as Exhibit 27.
(Exhibit 27 marked for identification)
MR. DURKEE: C. David Durkee, as an officer of the court, will maintain possession of these notes. I'm going to do a few minutes of research to figure out whether defense counsel is entitled to them.
If she is entitled to them, I will produce Exhibit 27 immediately. If I don't think she is entitled to them, then we will maintain these until such time as we've heard from the court.

Page 344

MS. DESANTIS: And, Mr. Durkee, you and Dr. Oreskes are leaving binders here for us, and we will take care of them.
MR. DURKEE: Very good. I appreciate it. I don't want to bring them on the plane. Thank you.
We are now formally off the record.
(Off the record at 6:38 p.m.)

Page 345

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

I, Michelle Keegan, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that NAOMI ORESKES, PH.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record, to the best of my ability, of the testimony given by the witness.
I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.
In witness whereof, I have hereunto set my hand and seal this 15th day of October, 2024.

Michelle Keegan
Notary Public
My commission expires:
May 15, 2026

E R R A T A S H E E T

I, NAOMI ORESKES, PH.D., do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true and accurate record of my testimony (with the exception of the following corrections listed below):

Page Line Correction

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Signed under the pains and penalties of perjury this day of , 2024.

NAOMI ORESKES, PH.D.

## $

**$10** 195:3 197:5,9,23 198:8

**$90,000** 37:14,18

## -

**-017107** 159:6

## 0

**0012282** 149:20

**003332** 150:1,4 151:22

**017105** 158:20 159:5 175:10

**020711** 86:23 87:13

**02138** 8:19

## 1

**1** 8:19 14:14,16,18,20 80:14 81:7 100:7 247:9 265:13 299:5 304:1,5 343:12

**1,081** 310:7

**1,300,000** 333:22 334:24

**1,491** 225:7,11,13,18,22 226:6 229:8 232:18 236:5

**10** 13:4,5 85:22,23 232:19 293:24,25 294:4,5,6 316:22 317:8 343:12

**100** 68:21 274:3,9 307:19 308:11 309:12,20 310:3 312:24

**104.5** 273:12

**10:04** 7:6

**10:53** 55:15

**10:59** 61:13,15

**11** 142:24,25 143:21 148:24 153:5 175:6 212:7 343:12

**118** 225:23 230:5 232:15 236:10,14,20 330:13

**119,000** 301:12

**11:29** 61:15,17

**11th** 34:17

**12** 149:13,15,17,18 150:4 151:22 153:5 159:16,21 160:3,4 163:1,20,23 164:3,11 343:12

**12:57** 141:22,24

**13** 153:19,20 343:12

**130,000** 289:11

**14** 85:18,22 132:17 133:19 158:5,11,12,20,25 159:3,9 175:4 188:9,10,12 213:21 294:6 316:22

**14th** 34:17

**15** 176:6,7 177:20 178:12 180:8

**1518** 269:15

**153** 150:11

**15th** 7:5 34:11 273:5

**16** 154:17 158:4 184:19,20,21 318:9

**162** 151:8,9

**17** 193:24,25 230:19

**18** 227:18,19,23,25 275:16 321:16

**180** 273:25

**188,000** 228:16

**18th** 228:5,15

**19** 252:21,22,24 253:1

**1990s** 257:22

**19th** 176:23 178:17

**1:00** 141:17

**1:40** 141:24 142:3

**1:41** 142:5,7,9

## 2

**2** 15:11,12,14 21:11 23:6 80:22 81:7 85:14 156:10,12 177:4,22 271:11 294:1 304:1,5 316:23 343:12

**2-butoxyethanol** 309:25 310:4,8

**2.5** 241:21

**20** 57:16,25 58:16,21 156:4,13,14 162:14,18 168:17 201:7 255:25 256:1,3,5

**200** 179:8 274:4,7,16,20

**2003** 269:16

**2010** 12:18 111:4 126:9 151:1 176:23 178:17 179:1 189:22 194:6 195:10 263:18,23 275:16,20 276:6 278:6 289:5

**2011** 126:10

**2013** 180:10 183:24 184:10

**2014** 157:24

**2017** 122:25 263:9 264:1,5

**2020** 249:10 250:11

**2022** 28:11,12,14 31:16 35:19,22,25 36:2,5,7,25 37:2,4,6,7 38:11 39:19 272:21 273:6,20

**2023** 33:18 34:2 37:3 273:5,6,7

**2024** 7:5 21:5 22:3,15 23:1 34:10,17,25 35:4,7 37:3 41:15,18 228:5,15 272:22 273:7

**21** 12:18 57:17,25 58:17,21 100:8,13 265:16,17,18,19,24 275:19

**22** 267:21,22

**22nd** 179:14 184:12

**23** 110:6 268:24 269:2,3,4,8

**23.5** 35:3

**23rd** 179:14

**24** 273:1,2,3,10 276:13

**24th** 21:5 22:3,15,25 41:15,18 55:20 63:18,21 69:6,10

**25** 148:6 153:17 275:5,8 276:1,14

**26** 142:14,18 278:7,8,9,11

**26th** 35:4

**27** 149:5,7,16 343:10,15,16,23

**28** 277:4,10

**296** 154:4

**29th** 151:1

**2:32** 189:7,9

**2:43** 189:9,11

**2:57** 200:25 201:2

## 3

**3** 21:13 27:9,11,12 157:17,22 159:25 160:5,9,13,14,19,24 161:1,9,16 162:17 163:2,15 201:15 228:14 322:1 343:12

**300** 82:8 179:21

**30th** 183:24 184:10 273:6,7

**31st** 273:6,7

**33,500,000** 333:9

**34** 158:1,3,6,10
**35** 37:15 176:3 177:13,14 178:12
**36** 149:10 150:16,25 184:17
**37** 150:17 193:16,24 194:4
**37.5** 34:16
**371** 8:18
**38** 143:14,17 146:20,25 151:6
**3:01** 201:2,4
**3rd** 179:1

### 4

**4** 12:25 142:16 256:14,16,19 343:12
**4,200** 301:7
**40** 22:6 82:7 178:22
**400** 304:14
**42** 227:13,15,17 321:17,20
**43** 252:8,23
**45** 255:24 256:2,4
**47** 265:9,11,15,18
**470** 159:13 160:3,4 162:9,21,25 163:7,19,24 164:1,2,3,7,10
**48** 267:20
**4:18** 272:7,9
**4:38** 272:9,11
**4:42** 274:25 275:2
**4:44** 275:2,4

### 5

**5** 41:9,10,12,14 55:20 86:1,5,21,22 87:10,11 100:12 156:4 158:2 189:13,14 200:23,24 266:1 299:5 317:9,11,12 343:12
**5.25** 34:1
**50** 296:19
**500** 67:9 68:4
**500-page** 64:23 67:12,17 167:16
**58** 162:10,11,12,14,20 164:6,21
**59** 174:5,8,9,13
**5:27** 337:1
**5:32** 314:3,5
**5th** 189:22

### 6

**6** 33:5,17,19,20,21 35:14 36:21 37:1 38:1 158:1,2,3 193:21 343:12
**60** 189:15,19
**60-40** 325:22
**67** 42:11
**687,000** 228:20 333:9,14
**6:02** 314:5,7
**6:27** 337:3
**6:28** 337:3,5
**6:34** 343:6,8
**6:38** 344:8
**6th** 34:25 35:4,7

### 7

**7** 34:4,6,7 35:14 36:21 37:1 38:1 343:12
**7,000** 301:14
**731** 149:20
**75** 127:11,18
**76** 126:19 127:11,18 129:14 130:12 138:24 140:20
**76.25** 273:16
**78** 269:13
**7th** 194:6 289:4

### 8

**8** 34:20,21,22,23 35:14 36:21 37:1 38:1 321:17 343:12
**80-20** 325:21
**86,000** 322:2,8,19,24
**87** 95:15
**875,000** 229:1,4

### 9

**9** 41:23,24,25 42:2 43:2 100:11 247:6,10 252:8 265:14 343:12
**90** 87:17 274:9,11 294:3,8,25 295:24 296:16
**99-1** 325:22
**99.7** 308:17 309:3
**99.9** 308:17 309:3

### A

**a.m.** 7:6 61:15
**ability** 210:9
**absolute** 47:25 221:11
**absolutely** 35:13 47:24 139:6,11,17,19
**absorbed** 93:17
**abuse** 137:24
**abused** 131:6 132:11 136:3
**abusing** 138:12,15,22
**academia** 179:9
**academic** 25:11 44:14 90:6 215:2,21 216:8 230:13 234:1,4 236:19,21 237:19,24 238:8,14 243:3 244:13 245:7,21
**Academics** 42:20
**Academy** 175:18 179:18 211:14,17
**accept** 110:8 186:8 262:11
**accepted** 25:10 87:17 97:9 153:11 223:2,23 317:17 340:8
**accepting** 83:17 98:2 152:10,18
**accepts** 95:20
**access** 92:19,20 110:15 231:24 261:24 291:3,4 295:20 296:14 302:23 317:3,6
**Accommodating** 269:10
**accomplishments** 217:14 296:3
**accreditation** 216:25
**accredited** 216:23
**accuracy** 93:9
**accurate** 42:8 93:11 96:2 116:17,20 152:9 198:18 234:8
**accurately** 21:1 22:11 103:22 114:4 203:22 261:16 283:3 330:1
**accusations** 60:7 245:5,6
**accused** 123:13 245:1

**accusing** 125:11,12
**ACGH** 307:21
**ACGIH** 308:14
**achieving** 217:10
**acid** 242:19
**acknowledge** 206:23 286:18,25 287:14 290:2 303:5
**acknowledged** 204:8 207:23,24 208:3,23
**acknowledgement** 204:4,15 205:18
**acknowledgements** 207:20
**acoustics** 276:8,11
**Act** 9:4 65:21 66:6,19 311:10,20 312:5
**acted** 116:2
**acting** 316:7,9 332:21
**action** 81:20 318:2
**actions** 74:9,15 75:1,4,8,15 77:12 84:3,15,23,25 88:3,9,11 90:1,11 112:11 120:7,12 243:13 244:10 287:17 288:19,20 290:6 295:8 317:23 328:9,11,17 333:4
**active** 74:22 92:15
**actively** 156:7,17
**activist** 245:2
**activities** 74:7 89:17 91:2 131:8 132:12,15,22 135:5,6 144:23 233:10 259:17 284:4,8,10 285:9,14,17,18,22, 25 302:3,6 332:11,23
**activity** 132:25 133:11,13,17,20,22 134:20 135:9,11 136:8,20 137:19 138:17 145:14,16
**actual** 168:25 214:10
**acute** 241:25 284:20,23
**ad** 296:22
**Adams** 43:18 45:2,24 46:16 62:3 63:4 107:8
**adaptive** 160:20 161:6 278:13
**add** 13:10 148:8 171:11 228:24 232:23 288:25 291:2
**added** 134:13
**addition** 62:22
**additional** 35:9 46:13 63:10 78:7 109:2 133:21 135:11 229:15 231:1 260:13 261:19 274:5 277:14,24 332:5 333:13 334:18
**address** 8:16,18 70:24 71:9 116:18 128:21,24 179:24 231:19 277:19 279:13 283:9 286:24 293:5,11 316:13 326:22 337:12
**addressed** 34:13
**addressing** 85:12 180:3
**adequate** 102:7,11,15,16 298:18
**adequately** 301:8
**adjunct** 101:25
**adjust** 161:4
**adjusted** 277:14
**Administration** 122:22 290:11
**admission** 107:19
**admit** 120:20
**advance** 12:11 64:20
**Advancement** 217:7
**adversarial** 326:5,23
**adversary** 271:1
**advertisement** 216:12
**advice** 31:5 119:22
**advised** 101:24
**Advisory** 80:15,22 108:22 110:11
**affect** 258:17
**affected** 169:16 173:17 179:10 180:4
**affirmatively** 256:23
**affirmed** 245:7
**aftermath** 92:1,4 135:7
**afternoon** 142:11,12 272:4
**agencies** 72:19,21 75:18,19 83:14, 17,20 89:11 96:17 105:17,19,21,23 115:7 233:21,23 234:11 238:17 283:6,12,15 287:13,18 288:20 290:6, 7 291:14 294:14 310:9,15,17 313:4 317:3 319:6 324:2,4,9 328:10,23 329:9 331:15 335:19,24,25
**agency** 12:9 75:25 76:19 77:9 109:23 124:11 126:5
**agenda** 338:13
**agendas** 248:11
**agents** 45:19 74:9 202:11,15 204:19 206:18 207:8 208:16
**aggressive** 302:16 303:6,9,22
**agree** 29:13 31:13 40:13 71:17 102:21 126:25 127:6 148:21 153:10 216:18 222:24 247:22 249:4 255:6,8 260:25 261:4 279:21 319:17 324:19 325:2,4,15 330:23 331:1
**agreed** 17:6 30:15 38:20 255:18 273:21
**agreeing** 90:4
**agreement** 88:11 90:19
**agreements** 17:7 30:25
**agrees** 221:10
**AGW** 263:16 264:3,6
**ahead** 13:8 231:14 307:9
**AI** 231:22
**air** 93:15,16 96:2 98:25 99:4,8,10,13, 16,20,25 100:15,19 101:1,8,10,16,22 102:1,4,6 103:18,21 198:21,23 199:3, 6,8,14,22 200:14,19 285:8,21,25 286:18 304:19 307:19 308:12 309:13, 20 310:3,7
**airborne** 286:4
**akin** 201:16 271:3
**Alan** 22:22
**aligned** 174:12,18,19
**allegations** 242:10,11,14 243:7,9 257:6
**allege** 189:24
**alleging** 201:23,24 202:6
**allies** 257:19
**allowed** 289:18
**allowing** 186:13 197:7
**alternative** 213:22 258:18
**ambiguous** 237:3 258:24
**Ambrose's** 271:4
**amend** 161:9
**America** 217:8
**American** 202:21 217:6,7,15 333:11 340:7,10
**Amici** 256:20
**amicus** 254:13,15,19,23 255:4,7,10, 16,22 257:5,10

**amount** 130:25 135:18 313:13
**amounted** 37:17
**amounts** 182:21
**analogy** 219:24
**analyses** 79:18 113:19 114:9 306:17,18 310:7
**analysis** 75:4,8,11 76:17 91:16 107:23 113:4 115:11 121:4,8 132:22 209:7 211:14 224:18,19 240:19 241:3,5 262:23 263:13,15,20 264:14, 21,25 265:4 266:2,6,13,16,18,22 267:8,24 268:7,17,21,22 281:13,15 297:17 306:10,13,20 307:17 311:4 328:21 329:3,12 330:23 336:6,16
**analytical** 109:9 286:23
**analyze** 50:24 134:25 264:15,22 265:1 283:11 285:19 287:8 288:2,7 306:13,16,18,19 310:13 331:2
**analyzed** 49:16 55:8 106:6,8,9,10 125:19 310:24 312:6 313:2 329:13
**analyzing** 50:16 105:8 264:6,8,9
**and/or** 156:7
**Andrew** 7:17
**animals** 169:16
**announces** 153:1
**answering** 166:2,21,22
**answers** 166:5,15 167:25 185:14
**anticipating** 40:7
**anybody's** 94:11
**anymore** 321:18
**apologize** 225:15
**aporter** 278:4
**aporter.com.** 278:3
**Appeals** 256:6
**appeared** 159:13 329:9
**appears** 33:22 132:1 135:23
**apples** 160:15 308:1
**apples-and-oranges** 163:21
**apples-to-oranges** 164:16 262:18
**applicable** 209:11 286:6
**apply** 233:6 268:16
**appointed** 271:13
**approach** 123:25 128:10 130:9
**approached** 31:17 310:10
**approaches** 276:22 277:6
**appropriately** 19:7 212:20
**approved** 12:11,12 90:24 204:24
**approximately** 37:6,19 38:4,7 161:1 273:25 274:6,16
**April** 135:6
**Arabic** 86:22 87:11 256:19 317:12
**area** 66:20,22 67:1 69:14 84:12 169:5,22 171:1 173:25 214:16 247:23 249:6 285:8,21 315:22
**areas** 18:4 19:6,7 109:2 165:9,10 167:16 168:2 170:15 238:19 241:8 342:3
**arguably** 119:22,23
**argue** 160:22 211:24 281:7
**argues** 150:19
**arguing** 271:12
**argument** 98:3 107:10 117:10 118:6 125:10 126:8 148:18 151:18,19 152:10,16,18,19 153:11,12 230:13 245:17 261:9,11 271:17
**arguments** 83:16
**arise** 41:4
**Arnold** 90:15 278:4
**art** 139:20 171:15
**article** 23:25 24:5,25 25:22 26:4,7, 11,25 122:13 222:4,9,15 230:14 252:5,6,25 263:18 265:20 266:1 269:5,9,19,22,25 270:5,8,9,20,21 271:12,19 290:13
**articles** 23:7,13,21 24:22,23 25:19 27:2 160:5 161:13,19 162:9,21,25 163:7,8,19,25 164:3,7,10,17 207:10 218:17 239:17 263:25
**asks** 15:1
**aspect** 214:13 240:7 246:17 318:14
**aspects** 164:22
**assert** 156:16,22 191:9
**assertion** 165:20
**assess** 241:17,20 301:7
**assessed** 163:8 164:6 260:16
**assessing** 103:23 241:10,24 242:4
**assessment** 12:17 109:7 111:4 145:17 168:20 211:16 268:3,10 302:15
**assessments** 301:13,25 302:12
**assign** 85:17
**assimilate** 108:23
**assist** 17:6 74:14
**assistance** 40:19 82:13 144:19 153:22
**assistant** 17:1 30:22 31:9 36:7 37:21 55:25 232:17 272:18
**assistants** 31:6 38:16
**Association** 217:7
**assume** 9:22 32:17 190:19 259:25 303:11
**assuming** 163:10 190:17 261:1
**assurance** 49:21 50:7 313:3,17,22
**ATSDR** 53:2
**attached** 158:15
**attachment** 275:14 276:1,4
**attacks** 13:13 46:17
**attempt** 244:12
**attempted** 244:11
**attempting** 120:12
**attempts** 13:16 191:14
**attended** 299:11,17,21
**attention** 21:12 33:16 56:7 123:21 169:14 192:6 269:23 282:8
**attesting** 45:17
**attitude** 123:25
**attorney** 166:25
**attorney-client** 131:7 132:7,11 133:2 134:21 136:9 137:13,20,25 138:13,15,18,22 227:3
**attributable** 40:23
**August** 33:18 34:2 273:6
**author** 26:18 45:16 54:8 55:21,23 251:25 252:2,18 255:16
**authored** 24:5 26:4,7 27:2 269:19
**authorities** 336:6,11
**authority** 70:17 71:5,13,15,21 221:11 235:7

**authors** 45:1 86:16 87:2 92:13 204:17

**authorship** 204:14

**autonomous** 197:15,17,22 198:7

**autonomy** 197:4,8

**avenue** 155:11

**aviation** 296:20

**aware** 24:15,16 32:24,25 33:14 43:6, 9 44:1,4 55:7,10 59:13 65:17,20,21 66:3,5,19,22 69:17,20,21,25 70:3,6 71:10 72:1,13,20 73:2,20 74:1 79:6 84:11,24 85:2 96:3 99:10 100:3 102:3 104:7,9,10,12,13,16 105:7,10 108:22 109:1,5,13,19,24 110:1,6 111:3,8,9, 18,21 112:1 116:11,14 117:19,25 118:18,23 119:8 121:20 122:1,20,24 126:5,7,8 131:22 154:11 194:18 222:14,16 223:20,22 224:1 226:8,19 259:18,20 262:9 263:20 279:11 283:16 284:2,7,13,19 285:2,6,14 286:3,9,14 287:4,19,22 289:4,10,22 290:1,22 293:7,8 294:21 295:7,9 299:10,16,20,21 300:1,4,7,12,16,18, 21,24 301:3,4,6,10,11,17,20 302:14, 20 304:13,17,18,21,22 305:10,14,16 307:3,17 308:16 309:12,16,18,19,22 310:2,6,16 311:19 312:3 328:4 330:7, 10

**awareness** 209:3 319:11

**awkward** 119:20

**B**

**back** 26:3,24 32:1 37:10 41:10 43:23 55:19 61:16 63:23 68:20 76:8,24 86:15 88:17 94:12,13 97:21 99:24,25 103:1,9 107:8 130:23 142:2,8 152:24 153:3,16 177:16 182:11 189:10 201:3,15 204:21 205:5 206:11 207:15 235:12 245:25 247:3 263:22 272:5, 10,15 275:3 277:9 279:16 314:6,16 315:1 316:21 321:15 322:25 337:4 340:17

**background** 70:7 176:13 252:11

**backs** 117:8

**backup** 330:14

**bad** 207:23 339:6

**badge** 102:10,18,20,21

**badges** 102:23

**balance** 325:16,23

**balanced** 325:14,18

**Baltimore** 256:10

**bar** 217:20 218:21

**Barsanti** 7:19,23 228:1 321:24 333:7

**base** 209:25

**based** 57:7 108:16 111:11 125:2 132:1 136:16 138:10,11 148:18 163:12 226:25 252:11 267:1 288:8 296:20 298:15 333:6 337:10

**bases** 56:14,17 57:13

**basic** 289:5

**basis** 68:25 131:25 133:4 140:5 157:15 241:1 243:13 296:9

**Bates** 20:7 21:2 86:23 149:19,25 150:9 159:5 175:10

**Bates-numbered** 87:12 142:21

**bathroom** 189:2

**Battelle** 333:11

**beach** 171:7 172:11 284:9

**beautiful** 234:19

**began** 31:23 39:18

**begging** 235:6

**begin** 31:20

**beginning** 87:14 171:15 247:4 262:7 270:16 299:12,18 319:9

**begins** 159:5 275:8

**behalf** 7:13,16,17,19 8:11 13:13 15:24 43:7 60:8 280:11 332:16

**behaving** 258:25

**behavior** 88:23 233:4 235:15,19

**beliefs** 259:6

**believed** 123:19 125:3 128:1

**bell** 311:13

**benchmark** 111:11

**benefits** 316:2

**Benoit** 340:16

**benzene** 308:18 309:4

**Bernard** 143:23 144:11,25 146:4,6

**Bernard's** 144:15

**bias** 88:24 124:1 139:22

**big** 131:13 218:15 235:14,18 244:14 249:11,20 250:1,12

**billed** 37:12,14,22,23

**binder** 14:16 37:11 85:14 142:14,15, 16 153:18 158:1,2,3 193:21 246:25 247:9 252:8 265:13,14 293:25 294:1, 5 299:5 316:23 321:17,18

**binders** 338:9 344:2

**biochemistry** 24:21 25:4,17 211:13

**biochemists** 216:14

**biological** 118:20,25 169:23 170:1, 18

**biomonitoring** 85:6 93:5,11 94:20, 24 95:8,10,13,17 96:11 97:10,24 101:23,24 103:10,13 104:20 115:22, 23 116:1,3,4,8,14 117:6,13,20 118:2 119:12 120:2 121:5,9,12,13 143:6 145:2,6,11,23 146:2,10,21 147:12,20 148:16 149:1,9 150:7,19 151:15,25 152:5,9,12,14,22 153:7 154:13,24 155:10,17,24 182:9,12 184:16 288:12

**bit** 60:17 118:7 119:19 164:15

**blame** 95:22

**blameless** 233:13

**blank** 343:14

**blazed** 130:16,20 132:10

**bless** 96:13 146:17 147:4

**blind** 271:4

**Blood** 79:17

**blowout** 235:5

**board** 55:4 180:19 181:14 184:23 185:3,20 186:11,18,22 187:2 188:22 319:18 339:24 340:21 341:1,2,4

**boasted** 162:24

**body** 59:13 93:18 241:12 265:5,6

**Boggs** 7:9,14 28:15 31:21 32:2,23 36:15 37:13 38:19,21 39:9,24 40:19 41:2 51:8 127:7 129:10 149:24 209:2, 4,20 266:14 267:9,17 268:11 282:1 338:2

**Boggs's** 51:11

**Boggs-oreskes** 150:10 159:5

**book** 22:7 122:10 167:17 219:15 230:13,14,19 234:1,4 236:23 238:14 242:16 243:7 246:21 280:7,22

**books** 214:3,7 218:10,11,12,17 221:7 248:5 262:14

**Boston** 7:6

**bottom** 127:18 144:10 270:23

**bought** 251:6

**box** 294:10

**BP** 7:9,16,18,20 8:7,12 11:6 12:10, 13,19 15:23 28:23 39:13 40:24 44:12, 18 45:4,19 64:19 68:5 69:1 70:19,21 74:8,9,13,14,17 75:2,21 78:4 82:15, 18 83:10,12,14,15,16,18 84:3,5,6 85:3,4 87:16 88:19 89:19 90:24 91:21 94:18 95:1,3,8,20,23 96:3,16,17 97:10 98:25 99:14 100:15,19 101:2,8 102:7,11,19 104:1 105:7,12,13,25 106:4,7,18 107:21 108:5 112:14,17, 20,22 113:1,5,9,10,11,15,20 114:5,6 115:5,22 117:6,10 118:6 119:23 123:13,19 125:3,11 126:18 128:21,24 129:19,25 130:4,14,16,19 131:10 132:9,14,16,20,21 133:11,12,16,17 134:6,12,19 136:7,20 137:12,19 138:12,14,16 139:1,5 140:8,21 143:5 145:22 146:4,8,20 147:11,19 148:25 149:8 150:6 151:14,20,24 152:4,8,13, 21 153:6,14 154:12,23 155:6,9,17 156:6,16,23 157:2,12,15 174:15,18, 24 175:1 180:25 181:16 185:6 186:13,18,23 187:3,19 188:17,23,24 189:23 191:15 192:25 193:1,8,11 195:2 196:12,19,25 198:23 199:3,13, 22 200:14,18 201:10,21,24 202:11, 12,15 203:5,8,10,14,18 204:5,18 205:4,19,21 206:2,17,24 207:8,14,20 208:15 228:2,15,17,25 233:13,24 234:10,20 235:8,20 236:3 250:8,21, 23 251:6,8,19 253:6,15,17,25 254:1, 6,19,24 256:10 257:11,24 258:25 260:7 268:10,17 275:20 276:15,23 277:7,13,18 279:6 281:25 282:9,11, 14,22 283:18 284:3 287:2,15 288:8, 12,17 289:5 291:14 292:3,21 298:1, 12 299:6,12,17,24 300:4 301:8,13 302:16 303:6,12,18 310:9,14,16 313:3 316:7,11 317:17 319:5 322:14 324:7 328:11,16,18,21 329:4 331:6, 15 332:17 336:16 341:11

**BP's** 14:22 43:20 64:25 68:7 69:10 75:15 84:3 90:10 102:1 108:1 112:11 123:9 127:12,20,23,25 128:14 129:3, 16 140:2,24 143:25 144:1 155:25 157:17 174:12 187:20 192:6 228:21 235:19 285:17 287:12,17 288:19 291:23 308:16 309:2 315:20 329:14 330:17

**BP-APPOINTED** 110:7

**BP-DIRECTED** 174:7,23

**Bradford** 219:3 220:4,14

**brain** 280:2

**Brandt** 22:22

**break** 10:8,9 141:19 148:3 189:2 206:7 272:5 336:25 340:15

**breaking** 55:12

**breaks** 336:25

**breathing** 285:7,21,25

**Brian** 278:3

**briefings** 299:11,17,21

**briefly** 44:24 62:14 64:23 65:2 67:9, 10

**briefs** 254:13,15,19,24 255:7,11,13, 16,19,22 257:11 259:17

**bring** 10:22,25 11:8 47:6 56:7 192:5 344:5

**broad** 39:12 102:16 205:24

**broader** 231:24 275:15 329:12 333:2

**broadly** 22:18 111:8 255:9 257:9 279:23 287:22 300:21

**broke** 61:19

**brought** 11:1,2 13:21 123:20 269:23

**Bruce** 143:23 144:11,15 146:4

**BTEX** 307:20 308:12

**Budd** 7:4

**budget** 96:9

**built** 251:14,20

**bulk** 248:12

**bullet** 159:19 165:2 171:13,18,20 172:6,14,23

**bunch** 336:25

**Bureau** 54:1

**burn** 297:14

**burns** 145:4 297:22

**business** 8:16,18

**Butterfield** 218:13

**buying** 251:2

**byproducts** 59:15

**C**

**calculated** 37:12,16 140:23 141:4,8

**California** 243:6,15

**call** 29:11 58:14 161:7,8 168:17 253:2 332:15

**called** 58:7 66:7 67:18,25 68:8 69:19 72:2 81:11 84:6 157:22 194:10 242:16 249:11 257:20 270:10 271:14 283:19 303:22

**calling** 232:13

**calls** 29:9

**Cambridge** 8:19

**cancer** 339:15 342:22

**cap** 96:13 145:3 146:3,17 147:4 148:19 153:2

**capable** 186:12,15,18,22,24

**capacious** 57:7

**capaciously** 57:6

**capaciousness** 77:7

**capacity** 160:20 161:6

**capped** 95:15,17 96:12 97:11,15,17, 20,25 117:11 143:8 145:24 146:9,23 147:13 149:2,10 150:8 151:16 152:1, 6,17,23 153:8 156:1

**Captain** 68:24 69:3,25 234:18

**carcinogenic** 339:13

**Cardno** 74:11

**care** 175:2 272:14 344:3

**career** 245:13 312:8

**careful** 252:15

**carefully** 101:6 130:1 133:8

**careless** 160:12

**carried** 145:5 148:11

**carryover** 189:21

**case** 11:2,7 16:4 17:5,19 19:20 21:1, 7 22:2,14 23:2,11,17 24:2,8 25:17 26:10,17 27:7 28:15,22 29:18,25 30:2,4,16 31:2,4,9,12,21,23 32:2,6, 10,23 36:8,14,15,19 37:21 38:19 39:5,14,17,24 40:1,5,8,14,15,18,22 41:1,7 44:2 46:6 48:7,24 51:9 52:10, 12,19,22,25 53:3,7,10,13,23 54:2,6 56:11,15 57:3 59:18 60:1,24 63:15 77:14,25 83:16,23,24 84:21 85:1,6 98:14 101:15 103:20 105:13,14 118:16 119:15,18 121:19 126:15 132:23 136:3 146:8 152:8 155:6 165:20 185:24 204:11 209:2 210:1

213:24 224:2,4,9,11,14,16 228:1 229:12 230:1,12,20 232:1,5,8 233:23, 24 234:2 238:18,25 239:5,20,23 241:1,5,10,18,22 244:15 254:16 256:9 258:21 259:3,13 260:18 265:1, 7 266:14 268:15 270:4 273:15 281:13 283:14,24 285:16 288:1 290:8 293:6, 23 295:18 296:13 302:4 304:6,13 306:15 312:23 313:20 323:1 328:16, 24 330:23 334:20 335:20 336:5,10

**case-specific** 40:3 209:21

**cases** 9:11,15 17:16 25:7 28:25 29:18 30:13,15 40:22 75:15,20 76:7 77:24 83:13 84:22 88:16 99:11 101:11,18,23 102:17,23 116:15 128:7 135:22 139:15 161:15 212:12 233:7 250:3 252:17 254:11,19,23,24 271:14 298:16 299:8 306:1 329:8 333:25 334:7,21 335:8,10

**cast** 108:1 242:22

**casts** 140:22

**casual** 53:20

**catch** 20:9

**categorical** 271:3

**categorically** 140:12

**categories** 300:6

**category** 281:13,15 308:21

**causal** 58:24

**causation** 116:18 219:5

**caused** 140:25 278:1

**cc'd** 90:14,16 131:9

**CD** 78:22 79:8

**CDC** 51:24 72:18 76:5 78:25 79:3,4, 12 84:1 94:18 104:16,18 116:3 117:4, 8 144:20 146:6 148:15 190:2 304:11, 22 305:6,10,13,16 306:3,5,10,13 307:3

**CDC's** 304:13 306:24

**CDC/ATSDR** 79:16 116:23 117:12

**CDC/NIOSH** 190:10

**ceased** 151:25 152:22 153:7 155:25

**ceasing** 145:3

**center** 8:18 223:13 257:15

**certification** 216:22

**certifications** 216:20

**cetera** 217:8

**CFR** 82:7

**chain** 78:12

**chain-of-custody** 309:9

**chains** 226:25

**chair** 180:18 181:13 186:22

**chaired** 72:14,23

**challenges** 24:16 319:15

**Championx** 333:11

**chance** 88:21

**change** 244:8 247:20,22 248:3,14, 18,21,22 249:5 251:3,7 257:3,8,13 258:3,9,17 259:11 263:9,19 265:21 267:25

**changed** 148:17 243:8

**changing** 74:12

**chaos** 250:12,22

**chapters** 205:25

**character** 13:14 282:5

**characteristics** 324:17

**characterization** 109:12,18 172:16 249:9 303:21

**characterize** 105:12

**characterized** 127:25 327:11

**characterizing** 128:14

**charge** 91:13 236:1,2

**charged** 294:14

**charges** 132:17 133:19

**charitable** 190:12 191:4

**Charles** 7:9,14 338:2

**check** 20:13 36:1,4 68:11 75:14 88:21 89:4 255:1

**checked** 20:1,3 32:25

**checkers** 262:13

**chemical** 9:2,3 168:12 169:23 170:13 182:1 202:22 286:10 306:20

**chemicals** 9:2 59:2,7 117:1 171:10 285:9 286:4

**chemist** 238:21,25 239:4

**Chemrisk** 74:10,11

**Chevron** 251:10

**Chicago** 216:2

**chief** 143:25 144:15

**child** 111:11

**children** 163:4

**chips** 325:20

**choice** 119:16

**choices** 75:21 83:10 93:8 276:15 298:13 341:3

**choose** 130:1 175:2 255:5

**chose** 255:3

**chosen** 174:11,17 175:23

**chronic** 241:25 284:25

**Circuit** 256:7

**circumstances** 118:21 119:1,13 271:25 272:1 323:14

**citation** 261:1,4 269:13

**citations** 21:2 330:13

**cite** 25:20 72:22 76:16 79:21 80:5,9, 13,21 81:1,2,3,7,10,15,19,23 82:2,7, 12,15,18,21 91:24 116:23 117:12,16 121:25 122:2,12 143:17 146:11,18 147:3,15 150:5 151:8 154:19 155:20, 23 175:21 188:10 207:13 225:23 229:24 232:15 260:17 270:8 271:18 277:17 291:20 292:2,6 295:10,13 300:8

**cited** 19:11,15,20 20:21 21:1 25:22 56:24 57:13 80:18 83:1 146:14 147:21 149:7 150:11 152:3 153:5,24 196:7 198:13 201:20 207:7,9 210:7 226:20 230:2,5 236:10 260:22 261:8, 13 262:3,4 276:13 320:23 321:9 329:25 330:1

**cites** 21:5 120:16

**citing** 80:20,24 81:13 207:3 232:19 236:14,20

**City** 256:9

**claim** 30:8,9 71:17 83:18 94:1 101:16 115:10 123:23,24 124:4 127:12,20,23 128:8,10,14,21,24 129:20 130:10 140:24 187:4,9 193:5,15 197:15 282:3,4,25 283:4 310:19 312:12

**claimed** 47:21 223:15,16

**claiming** 59:25 60:3,25 187:12 193:3 238:24 239:4,22,25 240:23,24 241:3, 4,9 283:2

**claims** 51:11 77:15 101:4 108:2 125:14 129:3 130:14 133:5 140:4 209:16 266:10 267:17 298:3

**clarify** 253:22,23 282:3

**clarifying** 282:9

**Clean** 311:10,20 312:5

**clean-up** 126:21

**cleanup** 28:24 50:1 59:21 77:11 89:9 173:4 209:14 259:16 276:18 284:9 290:16,24 291:8 296:21 300:6,15 310:8

**clear** 17:23 25:24 26:2 40:20 43:24 52:16 63:24 68:21 87:7 89:16 103:10 112:23 126:12,17 134:17 136:4 177:16 180:13 188:1,3 192:15 200:12 204:23 209:25 220:21 225:16 245:17 295:6 300:1

**clearer** 91:4

**clerk** 25:21

**client** 62:18 131:16 133:2 182:20 227:9 231:3 233:20 321:13 333:5

**client's** 62:17

**clients** 16:11 227:2

**climate** 244:8 247:20,22 248:3,14, 17,20,21,22 249:5 250:12,22,25 251:3,7,14,20 257:3,8,13,16,21,24,25 258:3,9,17 259:11 263:9,19 264:11, 12 265:21 267:25

**close** 52:7

**closely** 174:19

**closeout** 151:22,23

**closing** 150:13,24 151:10

**coal** 254:3 259:22

**Coalition** 257:21,25

**Coast** 72:15,18,24 73:2,3,15,17,21 74:3,6,18,21,24 75:4,24,25 76:1,8,10, 12,16,18 77:8,16,19,21 83:24 86:11, 18 87:3 89:10 90:14 107:13 109:20, 22 127:1 128:25 129:4 141:14 284:10 288:15,22 289:11 290:3 292:5

**coastal** 171:3,8 172:11

**coauthor** 252:10,12 253:2

**coauthored** 121:21 123:3 251:24

**collaboration** 291:23

**collaboratively** 291:14

**colleague** 22:22 52:7 122:7

**colleagues** 189:23

**collect** 103:5 284:14

**collected** 30:12 39:13 50:20 51:4 96:20 99:14 101:2,8 102:6,10,19 103:25 104:4,7,10,13,16,22 105:4,17, 19,20,23 106:7,16 107:23 113:10,15 114:11,17,22 115:5,7,13,17 125:18 298:1 304:15 305:17 310:14,16 311:22

**collection** 108:21 130:15 132:19 139:20,24 276:16,17 278:20 285:13 298:2

**Collections** 278:12

**collective** 302:1

**collectively** 274:14,19

**column** 168:14 171:3 172:10 275:16 276:5,7,12 278:11,13,20 279:14 294:9,25 317:16 339:4

**Colwell** 180:18,22,25 181:13 183:3 186:21 187:1 339:22

**comfort** 272:5

**comfortable** 249:8

**command** 69:19 70:10 82:12 84:13 89:13 91:11 283:6,12 294:15 298:25 315:22,25 318:11

**commander** 318:7

**comment** 17:22 18:4 19:7 57:23 59:24 74:23 75:1 84:3 105:18,22 118:12 306:7,9

**commenting** 76:2

**comments** 13:16 74:8 202:25 205:11 275:15

**commission** 16:14 56:22 234:24 235:21

**commitment** 47:21 295:25

**common** 246:1

**commonly** 223:13

**communicate** 48:7 51:8,17

**communicated** 43:10 44:8

**communicating** 83:14

**communication** 52:15,17

**communications** 260:17 263:9 264:16,17,19,20,22 267:25 268:10,17 321:1 322:4,8,17,18,19 329:6,9,11 331:5

**communities** 127:2 129:4 141:14

**community** 102:1,6 169:1 199:14,22 200:14,18 209:12 241:25 242:6 308:1,6

**companies** 9:2,3 185:23 186:9

**company** 135:8 235:2,15 259:19

**compare** 264:17

**compared** 50:20 280:10

**comparing** 265:5

**comparison** 51:3 164:16 219:19 262:18

**compelling** 230:3

**complacency** 235:2

**complain** 85:16 89:6

**complained** 242:24

**complaining** 75:15 99:22

**complaint** 243:4,14 256:22 327:2,24

**complaints** 106:3 300:2

**complete** 16:4 42:7,10 106:11 145:2 146:1 246:14 261:18

**completely** 166:23 168:8 233:13 259:21

**complex** 319:20

**complexity** 212:19 213:2 319:14

**complicated** 74:11 134:14 218:25

**components** 172:4 241:14 339:12

**compounds** 79:18 307:20 308:12

**comprehensive** 109:8 302:15 335:16

**compressed** 271:2

**compromised** 83:10 198:24 199:16, 19,21,23 200:6,7,15,20 276:15 298:14 309:5 324:10

**computational** 268:3,6,10

**concealed** 256:23

**conceivable** 168:5

**concept** 72:5

**concern** 20:20 59:2,7 66:16,17 131:21 135:10,18 136:1,2 223:12 278:1 285:10 286:11,15 305:22 308:25 326:18 340:23 341:7 342:9

**concerned** 162:10 298:17 306:4 341:14,15

**concerns** 29:24 78:4 99:3 101:7 106:3 107:25 108:1 123:8 169:5 277:19 279:13 296:12 299:25 309:7

**conclude** 120:6 136:7 137:12,18 140:7 141:7 174:6 193:1,8 198:7 305:7

**concluded** 108:6 109:6 111:9 115:22 235:22 243:1,11 286:9 294:13 303:2 307:13

**concluding** 130:13

**conclusion** 96:24 97:18 98:14 230:2 251:5 291:5 295:23 296:5,15 307:4,15

**conclusions** 58:24 92:12,14,21,23 96:25 97:2,7 98:5,21 129:15 141:13 161:24 198:18 237:4 238:13 258:22 261:22 295:13,16 327:8

**conclusive** 157:2,12

**concurred** 316:1

**condition** 51:19

**conduct** 92:6 118:20,25 123:9 154:12,23 234:10 256:21 268:9 283:19 330:17

**conducted** 90:20 111:23 112:3,8 121:5,9 268:2 284:3 285:7 301:6,13

**conducting** 54:17 187:3

**conductive** 268:22

**conference** 202:21 204:25 206:2

**confident** 230:7 237:12 260:5 261:16,22 330:16,20

**confidential** 53:17 237:21 299:23 315:6,7

**confidentiality** 17:7 30:25 232:3 267:11 268:14

**confirm** 208:9,13 231:8 238:20 323:2

**conflict** 185:24 244:15

**conflicts** 186:10

**conform** 212:16

**confused** 58:5 151:2 251:15

**confusing** 256:18 264:4

**Congress** 253:2,5

**connected** 254:16

**connection** 49:13,17 51:5

**conscientious** 78:14

**consensus** 263:16,19 264:3,6

**considerable** 107:25

**consideration** 276:5

**considered** 17:20 19:10 27:14,21 45:17 65:13 66:13 71:7 83:2 98:19 113:9,15,19 114:2 291:5 297:4 300:19 303:1 332:10

**considers** 107:12

**consisted** 17:8 86:11 304:19

**consistency** 106:5 114:10,17,22 115:12,16 310:24 311:5

**consistent** 28:1,3 103:16 115:6 211:3 233:5 261:23 310:17

**Consortium** 179:5

**conspicuous** 168:1 170:11

**constituents** 241:11 304:24

**constitute** 58:24

**constituted** 341:3

**constitutions** 342:7

**constraint** 236:25

**constraints** 207:25 234:14 267:14 330:3 335:17

**construed** 257:9

**consult** 46:15 48:12,16,20,25 49:4,7,10,11,15,20,25 50:6,11,15,19 51:22,24 52:1,4,9,11,20,24 53:2,5,9,12 54:8,16,20,23 55:1,4 64:1,5

**consultants** 74:10

**consulted** 11:24 53:21,25 54:4 316:13

**consulting** 270:3

**contacted** 28:9,17 29:2 40:17

**contained** 48:13,17,21 64:2

**content** 263:13,15,20 264:14,21,25 265:4

**context** 74:17,21 106:10 134:4 135:1,4,5,8 145:18 171:17 192:14 234:11 238:8 260:8 261:18 270:13 291:6,11 298:20,24 301:24 312:12 320:24 321:4,5 322:19 325:17 330:1,18 332:9 333:2 334:10 335:5,24 336:4,7,9,12

**context-sensitive** 224:19

**contexts** 165:15 231:23

**contextualization** 224:25 334:6

**contextualize** 237:25 311:3

**contextualized** 230:9

**contextually** 334:25 335:1

**contingency** 32:18 66:7,11,14,20,23 67:1,4,18 68:1,15 69:7,14 82:10 293:18

**continue** 50:4 84:2 166:14 181:18 272:22 294:24

**contractors** 85:4 88:19 105:7 107:22 112:17,22 113:2,6,12,13,16,20 114:5 115:6 126:2 228:22 275:21 297:17 299:12,17 310:9 328:18 331:6 332:24

**contradiction** 235:25

**contradictions** 233:2

**contradictory** 232:22

**contrary** 184:2 212:20 276:24 277:8 326:2

**contributed** 195:2

**contribution** 99:17

**control** 50:12 180:25 181:2,17,18 196:25 249:24 313:22

**controlled** 181:8,16 191:10 193:12

**controlling** 181:6 191:7,9

**controversial** 214:5,16

**convened** 176:22 178:16 179:24

**convenience** 93:9

**convention** 258:3

**conversation** 30:23 31:2 33:1 35:23 40:15 53:20 71:9 94:17 95:6 155:6

**conversations** 110:19 126:1 299:22

**coordinate** 319:19

**coordinator** 12:17 69:24 70:4,12,17 71:4,12,22 80:10 84:14,24 85:8,10 86:2 89:22 90:18,25 91:22 107:14 109:6 125:24 293:15,19,23 295:14,17,24 296:17 316:24

**coordinator's** 84:14 89:23 298:21

**copies** 11:13 13:7 14:9 21:14 23:6

**copy** 11:1 12:21 14:9 252:20

**core** 256:22

**corporate** 124:13

**corporation** 235:22 244:4 260:1,3

**corporations** 122:18 182:25 250:24 251:9,12 254:3 323:23,24

**correct** 15:25 18:18 19:5,21,22 22:17 23:3,4 24:3,4 32:23 33:13 34:2, 14,15,18 35:4,5 36:8,22 37:2,18,24 38:2 39:21,22,24,25 40:9 43:4,5 44:3 45:24,25 46:2 49:2,5,9,18 50:9,10,13, 17,22 51:1,6 52:22,23 53:3,7,10,23, 24 54:18,21 56:9 58:4,24,25 59:4,22, 23 60:2,5 61:1,2,5,9,10,21,22,25 62:2,4,5,6,8,9 63:5,6,21,22 64:4,7,9, 10,12,13,15,16 65:1,11,15,16 66:11, 12,15 67:14 69:7,8,11,12,15,16,19,20 70:12,18 71:6 72:24,25 73:24 74:18 75:5,6,9 76:17 79:9,14,19,20,22 80:1, 7,11,12,15,23 81:8,12,17,18,21,22,25 82:1,5,6,10,11,13,14,16,19,20,23,24 83:4,5,7,8,11 84:7,8 86:18 87:13,22, 23 90:1,20 92:1,7,8,10,11,16 98:11, 21 99:1 100:17,22,24 104:1,2,5,6,8, 15,17,18,24 105:5,6,12,17,21,25 106:7,11,14,19,24 107:4 110:4,5,12 111:12 112:4,9,14,15,21 113:2,3,6,7, 10,16,17,21 114:12,13,18,19,23 115:13,14,18,19,24 116:5,6,8 118:14, 16 120:7,12 121:14,17,18,22,25 122:5,7,14 123:3,14,21 125:5 126:24 127:5,10 128:18,25 129:1,5,21,22,25 130:5,17,18,21 132:12,23 133:13 134:8 136:9,22 138:19 139:2,6 140:9 141:2,9,11,12,15 143:3,10 144:1,3,4, 6,12 145:20 146:4,6,25 147:20 149:2, 3,11 150:8 151:16 152:1,6,23 153:9, 14,15 154:1,24 155:18,19,21 156:1,2, 20,21 157:3,14,20 159:9,15 160:25 161:3,14,19 162:10,22 163:9,12,15 164:8,18,24,25 165:2,3,5,6 169:11,20 170:2,22 171:5,6,10 172:12,13,22 173:16,21 174:2,3 175:14,19,24 178:17 179:2 183:14,25 184:10 186:14 188:14,18,19 190:16,18,23,24 191:4,5,7 192:1 193:2,9,10,13 194:16,17,25 195:4,5,8,23,24 196:2, 9,10,13,17,21,22 197:5,6,10,23 198:8,15,16,19,20 199:3,24,25 200:8, 16,21,22 201:12,17,18,22,23,25 202:12,13,16,17 203:9,10,15,19 204:19 207:5 208:10 209:5,6,9,10,17, 18,20,21,24 210:2,8,9,14,15,18,20,21 211:1,4,5 212:10,14,21,22,25 213:4,8 214:20,21,25 215:20 217:1 218:5 220:25 221:1,3,6,11,23 222:5,6,10 224:4,5,7,8,23 226:17,18 228:11 229:9,23 231:11 234:12 236:8,12,17, 22 237:16,17,19 238:1,4,9,21,25 239:6,8,10,11,13,23 240:1,8,15 241:6,18,19,22,23 242:3,8 247:13,14, 17,18,20,21 249:21 250:6,9 253:8,11, 12 254:14,18,21,25 255:4,19 256:8, 11,12 257:4 260:18,19,22 261:10,18 262:5,12,17,24 263:1,13,17 264:16, 23,24 265:2 266:14,17,23,24 267:4,6, 7,20 268:5,8 269:24 270:1,6,7,13,14 272:18,19 273:17 274:21 275:22 276:3,6 279:20 280:16 281:11,17,19 282:13,17,24 283:8,9,13,25 284:1,5, 6,11,12,17,18,23 285:5,22,23 286:1, 2,12,19,20,23,24 287:2,3,10,16,21 288:5,6,9,10,18,24,25 290:17,18,20, 21 291:9,25 292:1,6,13,14 293:15,20, 21 295:14,18 296:6 297:4 298:8,14, 21 299:2,3,7 300:10,11,16,17,20 302:6,13 303:3,4,7,19,20,23,24 304:2,6,10 305:11 306:11,12,15 307:1,2,7 308:4,15 309:5,13,17,21,25 310:4,5,11,12,17,21 311:1,5,23 313:24,25 315:14,15,23 316:4,8,19, 20 317:4,6 318:22 319:7,8,15,16,20, 25 320:6,10,11 321:2,10 322:10,11, 21 323:4,11,12,14,15,19 324:5,11,12, 15,16 325:8,11,14 326:3 327:11 328:2,7,8,15,22 329:4,14,15,18 330:2,9,25 331:7 332:2 334:11 335:24,25 336:7,8,12,13,17 341:17 342:10,17,24,25

**corrected** 20:15 163:14

**correcting** 20:5

**correctly** 107:8

**correspondence** 95:1 129:17 131:3 143:23 321:8 331:3

**correspondences** 135:23

**cosponsored** 179:5

**Council** 256:10

**counsel** 7:11 8:7 15:19,22,23 16:3,7, 19 17:5,24 18:16,22 20:17,18,22 28:4,10,13,18 31:8 33:2,10,11 36:3 42:16 45:9,15 46:12 55:9 61:21 62:11 64:22 67:24 77:25 78:6 114:14 115:9 201:10,21 202:25 203:3,5,10,14,18 205:4 206:3 209:1 210:2 225:5,19,25 226:7,11,17 228:16,19,25 229:5,16, 21 230:24 236:7 237:5,8,10 259:2 272:16 273:1,16 281:7 310:19 322:3 326:16,24,25 328:15 333:8,14 336:19 337:12 338:1,6 339:22 341:11 343:4, 20

**counsel's** 227:8 229:10

**count** 189:21 216:4 226:2,3

**counted** 225:7,9,10,25

**counts** 45:14

**couple** 14:8 20:9 68:4 258:12 272:14 279:16 314:9 323:2 337:21

**court** 7:25 9:24 10:17 57:9 58:14 131:6 220:6 224:7 230:22 232:4 234:6 237:1 256:6 271:13 315:5 337:13 343:18,25

**courts** 24:17 269:11 271:21

**cover** 326:17

**covered** 307:10

**covering** 336:20

**Craig** 29:4,5,14

**create** 18:7 186:10 331:17

**created** 288:8 305:5,24

**creating** 116:20

**credentialed** 289:25

**credentials** 289:17

**Credible** 181:7

**creep** 139:22

**criminal** 132:17 133:19

**crisis** 107:19 181:25

**criteria** 18:6 219:3,4,8 220:15

**critical** 210:13,16 218:4,8 220:2,24 221:6 277:2

**critically** 279:25

**criticisms** 277:13

**criticize** 105:11

**criticized** 12:19

**criticizing** 105:16,20

**crucial** 282:6

**crystal** 89:16

**CTEH** 332:18 333:12

**CTH** 74:12

**cull** 18:6

**culminated** 109:8

**culture** 235:2

**curious** 340:24

**current** 42:8,13 81:24 155:14 250:24

**curriculum** 42:6

**curve** 116:21

**cut** 77:2

**CV** 42:2,4,8,13,18,20 43:3 158:6,7,17,19 247:3,11,12 250:18 252:5 254:22

**D**

**D.C.** 9:9

**daily** 318:2,12,25 319:2,17

**damage** 297:8

**Damien** 311:9 312:2

**dance** 235:11

**darndest** 48:1

**data** 30:11,12 39:13 49:16,21 50:7,12,20,25 51:4 83:11 89:19 91:17 99:14,16 101:2,8 102:2,4,6,10,18,19 103:6,14,25 104:3,7,10,13,16,23 105:1,3,8,12,16,19,20,23,25 106:1,5,6,8,11,14,15,18,24 107:4 108:2,7,11,17,21,24 109:9 111:5 113:9,10,15,20 114:10,17,22 115:5,7,13,17 116:5,20 120:22 123:14,20,24 124:5 125:18,19,22 129:5,18,24 130:4,10,14 131:2 132:19,21 138:25 139:4,17,18,20,24 140:5,7,12,15,22 156:8,18 172:10 198:21,24 199:3,7,14,17,19,23 200:3,5,15,19,20 231:21 239:14,18,19,21,22 240:25 241:15 276:16,17 278:12,20 280:6 284:15 285:13 286:8 298:1,3 304:14,18,23 305:6,11 306:4,10,20 308:16,24 309:2,12,16,18,19,22 310:2,16,25 311:4,5,21 312:6,7 313:9,17 333:20

**date** 7:5 28:11 42:17 273:24,25

**dated** 22:3,15,25 37:3 41:15 194:5 273:5 278:6

**Daubert** 24:15,16 29:24

**David** 7:13 52:7,14 95:5 96:4 165:24 290:9 315:17,18,20 331:11 343:17

**day** 219:2 233:14

**day-to-day** 124:10

**days** 43:16 68:4 95:15 233:12,17 235:5 236:3

**dead** 235:13

**deadline** 234:5

**deadlines** 230:22

**deaf** 271:4

**deal** 23:22 64:20 160:2 164:11,12,22

**dealing** 68:6 212:20

**dealt** 163:2

**debate** 166:13 218:13

**Deborah** 275:17 340:16

**deceive** 128:6

**December** 111:4 184:12

**decide** 128:20 130:7 138:8 337:11

**decided** 145:1,25 245:19

**decides** 117:9

**deciding** 180:15

**decision** 41:5 118:10 119:21 135:15 136:10 145:11 314:15,18

**decisions** 83:15 84:22 259:24 281:24 282:10,11,15,23 316:18 323:19 324:1,8

**declaration** 227:25 228:4,8,10,13,15 321:15,23 333:8

**declined** 62:19 288:13

**decontamination** 284:9 296:21 297:22

**deem** 336:14

**deemed** 104:1

**Deepwater** 41:7 48:9 49:13,17,22 50:8,13,16,21 51:1,5,20 52:12 54:10 55:8 67:2 69:18 70:11 80:11 81:11,16 82:4,22 86:2 87:14,16 117:14,21 118:21 119:1 121:22 122:22 127:3,8 226:5,22 231:7 240:4 258:19 260:9 290:15 296:3,23 312:5 313:23 317:17 320:15 330:6,8

**defamation** 9:4,7

**defendant** 84:2 224:13,15 227:10 254:20,25 328:16

**defendant's** 326:25

**defendants** 12:8 60:9 115:3 121:3 254:16 256:11,23 257:6 280:11

**defended** 340:9

**defense** 13:13 44:21 125:14 139:6 140:9 166:25 203:3 227:9 235:20 282:6 338:5 343:4,20

**define** 176:18 178:9

**defined** 175:18 193:6 222:18,21

**definition** 22:4 89:15 197:12 239:18 324:25

**definitive** 135:14

**definitively** 134:12,13,19 135:13

**degradation** 169:23 170:1,18

**degree** 168:25

**delay** 251:14,20

**delaying** 89:6

**deliberate** 128:6

**deliberately** 162:23 221:25 257:2,7,11

**delicate** 192:9

**deliver** 131:17

**demonstrate** 108:2

**demonstrating** 288:22

**denial** 251:14,20

**denied** 227:2,6 256:24 299:6

**deny** 140:17 322:14

**denying** 89:8,10 342:11,14,18

**department** 32:19

**depend** 22:4 197:11 238:2

**Depending** 239:18

**depends** 75:10 90:6 114:24 125:17

**deposition** 7:7 8:20 11:20,22,23 13:22 14:5,23 15:10 41:17 47:19 51:15 120:17 153:17 154:1,4 220:7 222:3 247:4 314:13 315:6,16,19 330:11 337:10

**depositions** 8:25 9:19

**deputy** 86:11,17 87:3

**dermal** 93:19 324:13,14

**Desantis** 7:15 8:8,10 13:6 35:10 38:14 39:1 47:14 48:5 55:14,17 61:12,18 63:9 93:24 94:3 100:14 119:5 141:19 142:10 149:14 153:21 158:18 165:24 166:7,16 167:5 189:6,12 194:1 201:5 219:20,25 220:19 227:20 270:19 272:3,12,24 275:6 278:10 314:1,8,17,20,23 315:4,10 336:21 337:6,22 341:9,12 343:1 344:1

**describe** 21:15 22:11 202:4 203:22 242:13 270:1 284:20 286:21

**describes** 23:1

**describing** 151:4 221:22 222:4,9

**description** 21:23,25 206:13

**design** 193:9,12
**designed** 111:14 305:4,23
**designing** 331:16
**desirable** 192:8
**detail** 17:11 43:15 44:22 70:1 91:15 235:1 280:13
**detailed** 168:11
**detailing** 65:23 176:13
**details** 20:19,23 66:1 90:7 109:16 297:12
**detection** 88:17 172:16
**detects** 89:1,3
**determine** 260:6 304:23
**determined** 49:8 160:8 300:12
**determining** 223:2,24
**develop** 173:3
**developed** 108:23 248:25 263:21 300:5
**developing** 94:23 148:13
**development** 60:11 173:9,19 177:5, 25
**developments** 172:15,20 173:14,20
**Devin** 27:14
**devote** 330:22
**dialogue** 337:16
**diatribe** 185:10,14
**diatribes** 185:15
**differently** 113:24 252:3,18
**difficult** 133:3 162:24 185:18 280:15 319:10 338:8
**dig** 235:25
**diligence** 20:25 335:12,15,21
**dilution** 169:6,9,19
**direct** 21:12 33:16 147:24 152:20 153:8 175:6 176:1 189:14 191:24 192:8,10,16,17 265:8 278:23 294:3 307:5
**directed** 84:15,20 88:2 89:25 90:7, 23 91:19,21 175:1 317:23
**directing** 88:9,11 91:13 192:18
**direction** 69:23 70:4,12 101:12 190:1,22
**directives** 318:3
**directly** 37:22 166:8 219:22 220:5,8 228:17
**directors** 290:10
**disagree** 59:10 71:17 81:4,6,9 88:5 154:22 213:25 252:14
**disagreeing** 75:20
**disagrees** 150:20 244:9
**disaster** 56:21
**Discerning** 248:7 280:7
**discharges** 65:25
**discipline** 60:4 211:4,9,22 212:8
**disciplines** 212:4
**disclosure** 53:18
**disconnect** 235:14,18
**discontinued** 152:5
**discount** 140:17 327:6
**discourage** 155:3
**discovery** 85:2 110:22
**discredit** 258:2
**discrediting** 257:2,7,12
**discuss** 53:17 150:25 221:8 286:20 288:11 293:4 324:17
**discussed** 27:23 30:21 41:3 53:16 62:23 66:10 182:15 183:13,24 199:17 209:3 232:16 248:10 252:15 259:17 261:2 273:14 320:9 323:6 328:6
**discusses** 67:11 70:1 276:11
**discussing** 23:8,14 90:12 122:2 132:2 143:2 183:22 308:21
**discussion** 28:20 31:8 71:1 85:1 93:3 135:2 150:18 184:16 220:4 260:25 261:2 297:20 318:13 339:3
**discussions** 25:15 135:24 176:17 178:4,7 218:18 295:7
**disease** 116:19
**dishonesty** 223:3,24
**disinformation** 259:24
**dispersants** 304:24
**dispersed** 339:1
**dispersion** 169:6,9,18
**disprove** 183:5 296:11
**dispute** 92:14 115:10 197:8 270:12 310:19
**disputed** 303:11
**disputing** 89:21
**dissimilar** 219:12
**dissuade** 155:3
**distinct** 30:6
**distinction** 39:5,6,15 125:10 129:13 220:16 236:18 248:17 253:21
**distress** 251:16
**distributing** 198:8
**distribution** 89:14 169:6,14,17 197:5,9,23
**disturbing** 90:10,16 332:11
**diverse** 164:22 212:12
**divest** 253:10,14,24
**divestment** 254:5
**divided** 160:3,4
**dividing** 160:15
**division** 12:18 144:19
**dizziness** 99:22
**DLG_00181399** 142:21
**doctor** 11:14 23:5 27:16,18 28:6 41:22 48:6 54:13 55:19 63:16 64:8 68:7 69:17 74:16 78:21 82:25 83:9 84:5 85:19,25 93:21 96:22 98:24 114:9 115:21 116:22 121:4 126:11 133:24 142:11 143:1 146:12 149:4 153:23 156:3 158:7,15 165:7 166:20, 22 167:6 169:4 172:9 173:13 176:5 183:11 184:8 187:25 189:13 192:24 194:4 199:10 201:6 219:17 225:4 227:11 230:7 231:6 236:5 238:19 239:12 242:9 247:2 256:4 258:5 261:12 262:22 263:4 268:23 269:7 272:13 273:9 275:7 279:16 281:23 294:9 298:6 303:25 309:24 311:8 312:19 315:11 319:25 322:25 330:22 332:1
**doctors** 48:17
**document** 12:7,15,20 13:19 14:17, 18,24 15:1,4,6,15 16:25 18:10 19:14 21:1 27:10 32:8 33:19 34:5,21 41:12, 23,24 42:1 67:13,16,17,25 68:3,12 79:4,24 80:4,5,10,20 81:10,14 82:13 85:21 86:1 102:25 120:11 142:17,20, 23 143:20 144:5,8,10,22 146:14 149:7,17,19 150:4,5 157:22 158:24

159:11 163:13 165:13 175:3,7,8,12 176:8 177:23 178:15 184:21,25 188:2,3,4,7,13,16 193:23 194:4,22 213:11 214:18,22,23 215:1,9,13,17 223:23 224:1 227:12,17 255:24 256:4 265:22 267:23 268:23,25 271:12 275:8,12 277:25 278:5,16 279:9,11 280:14 290:20 294:25 300:8 302:25 306:25 321:23 333:21 334:16 338:5,7,10 339:21

**documentary** 57:11 93:2 95:14 98:13 100:25 101:20 107:24 125:20 182:19 201:9 202:18 226:21 237:14 291:17

**documentation** 331:5

**documented** 16:15 57:4 187:16 235:1,4

**documents** 10:22 11:24 12:2,24 13:21 14:4,7,8,11 15:13,17,23 16:4,18,21 17:12,14,16,20 18:6,7,9,16,21,22 19:8,9,18 20:4,7 21:5,15,21 29:19 30:17,19,20 31:19 56:1 57:22 66:9 67:22 72:4,17 74:2 77:23 78:1,7 80:17 88:15 92:19 129:8 131:10,15,18,20,25 143:17 151:20 153:3,10 171:17 202:18 204:22 209:13 210:1,6,13,19,25 214:12 223:20 225:4,7,13,18,24 226:5,10,15,24 227:5 228:16,20 229:1,4,8 230:1,5,6 231:4,5,15,20 232:7,14,20 233:2,7,19,20 236:6,10,14,20 260:12 265:6 266:19 267:2 274:23 277:23,24 279:23 280:1 285:12 286:14 289:19 292:18 293:2,9 296:12,13 297:10 298:15 313:22 316:10 320:20 322:3,4,8,9,12 323:15,21 326:7 329:25 330:24 331:4 332:8 333:9,13,15,17 338:10

**dollars** 96:10

**dose-response** 116:21

**doses** 140:23,25 141:5,8,10

**double-check** 20:14 26:23 35:18 340:17

**double-checked** 20:2

**doubt** 108:1 109:11 122:10 140:22 242:17 248:20 289:15

**Downs** 27:20 29:4,5,14 31:14 32:8,12,15,22 33:23 34:1,10,14 35:1,6,15 36:9,10 37:17 38:5,10 39:19 40:8,11,17

**downstream** 170:8 172:10

**draft** 47:10 275:16

**drafted** 91:25 92:6 209:9 294:20 301:20 308:9

**drafting** 18:17 112:6 303:16

**drew** 296:15

**drilling** 259:22

**driving** 192:13

**Drs** 123:12 291:21 292:11

**due** 20:25 335:12,15,21

**duly** 8:4

**dump** 333:21

**dumps** 231:21

**Durkee** 7:13 12:23 13:2,5 35:11,13 38:14,20 39:1,2 46:9,10,22,25 47:15,20 48:5 55:11,16,17 63:9,12 67:13,15,21 73:6,8,25 77:1 84:17 90:2 92:17 93:23,24 94:1,5,16 97:4 98:8 100:13 114:1 119:2,6 120:13 136:23 137:14,22 141:16 149:12,16,23 153:21 158:4,10,13,18,21 165:22 166:2,10,20 187:7 189:4 194:2,3 219:20,23 220:10 222:11 227:20,22 231:13 252:23 256:2 265:18 269:1,4 270:18 273:2,21 278:9 280:17 303:8 307:8,23 311:24 312:10 314:10,14,19,22 315:1 319:21 320:12 321:3 322:22 336:23 337:15,19,21,25 338:3 341:8,14 343:3,9,17 344:1,4

**Dutton** 315:17,18,20 316:16

**Dutton's** 316:6

**dwelling** 246:6

**DWH** 54:9,11,14,17,21,24 55:2 56:21 59:3,8 288:4

**dynamics** 161:6

**E**

**earlier** 45:6 143:2 147:22,23 261:3 263:6 269:6,7,18 273:19 275:19 276:2 303:25 321:16,24 335:9 338:21

**early** 36:12 190:8 289:4 326:15 327:15 341:13

**early-to-mid** 257:21

**Earth** 60:14 61:4,8

**easily** 181:24 182:2

**easy** 126:3

**ecological** 339:2

**ecology** 191:21,25

**ecosystem** 171:19,24 172:3

**ecosystems** 171:21,22

**edge** 327:15

**edit** 204:5

**edited** 205:1,19 206:24 207:20 209:1

**editing** 203:12,16

**editor** 252:20

**edits** 203:1 205:13 208:2

**educators** 254:10

**effect** 67:2 171:7 181:11 198:25 205:12 283:22

**effective** 290:25 291:9 295:3

**effectively** 74:25

**effectiveness** 73:4,22 76:14

**effects** 28:23 40:23,24 59:4,9 103:16 163:3 164:13 168:12,13 171:2 181:12 241:25 242:5 276:18 284:21,24 285:1 298:4,11 305:1,20

**efficacy** 77:7,11

**effort** 20:24 21:9 50:1 57:6 155:9 191:20 318:13 319:19

**efforts** 112:14,20 113:1 154:11,12,23 287:1 290:24 291:7 295:25 302:15

**elected** 217:12

**Elkadi** 17:1 272:17,20 273:5,11

**Ellis** 343:11

**email** 12:16 13:20 14:3,10 27:13,16,18 28:1 52:8 78:12,13 96:7 124:2 143:1 144:11,13 145:22 147:3,15,18,22,23 148:21 157:4,9,10 158:22 183:22 189:1,22,25 190:6 191:23 226:25 260:16 261:6,13,18 262:23 275:8,14,20,23 276:2,21 277:2,5 320:22 321:8,9 331:2 335:5,6

**emails** 78:11 85:2,3,4 110:19 125:25 146:7 148:12 187:21 261:5,7,19 266:19 267:2 288:10 299:24 321:13 331:14,20 332:10,22 335:9

**embedded** 25:14

**emergency** 145:18

**empirical** 58:13

**employed** 88:19

**employers** 85:5

**encountered** 312:8

**encouraged** 245:17 253:5,24

**encouraging** 253:9,13 254:5

**end** 83:15 143:16 158:8 245:19 261:8 294:10 317:15 322:1 330:11 339:2

**endeavor** 38:24

**ended** 220:3

**endpoint** 208:7

**ends** 171:18

**Energy** 54:1

**Enforcement** 54:2

**engage** 133:16

**engaged** 31:12 125:3 132:15,20,21 133:12 134:20 136:7,20 137:19 180:15 201:10 329:10

**engagement** 298:25

**engagements** 124:23

**engaging** 138:17

**ensure** 290:24 291:8,15 295:25 301:8 302:17 303:6,18 329:24

**ensured** 289:24

**entire** 106:6 245:13 274:15 295:2 319:11 321:7

**entirety** 321:1

**entities** 7:16,18,20 8:7,12 15:23 50:20 51:5 105:8 111:22 112:3,8,14, 20 113:1,5 114:11 115:18 228:2 291:24 313:10 322:5,9,20 331:6 336:16 341:11

**entitled** 79:4,25 80:10 176:8 194:4 290:14 300:9 302:25 343:21,22,24

**entity** 55:7 104:4 105:4

**ENTRIX** 74:12

**environment** 164:23 342:17,24

**environmental** 49:12,16 53:6 55:8 93:14 123:14 168:13,20 170:14 171:2 194:15,19 304:13,15 310:14 342:13

**envision** 172:9

**EPA** 51:22 65:19 72:14,18,23 75:8,13 104:13 109:25 178:20 304:16 305:17 306:3,7,8,10 307:3 336:2 338:19 341:14 342:10,11,15,20,21,23

**EPA's** 111:10 342:19

**Ephemeral** 278:12

**epidemiology** 116:11,13 219:2,6 280:5

**equal** 342:2,9

**equipment** 323:4,11

**erroneous** 307:15

**error** 19:13,22 20:16 89:7 97:12 98:2 160:23 262:20

**errors** 20:9,14 56:4,5,7,8 262:8,23

**escape** 316:3

**essential** 224:25

**essentially** 39:7,18 75:25 107:11 160:15 172:23

**establish** 208:2 223:21 276:18 338:12

**established** 119:11 156:9,19 182:13 281:5,11,18 287:20 318:19 320:12,17 323:5

**establishing** 219:5 288:3

**et al** 7:10

**evaluate** 77:10 259:10 284:21 327:1, 3

**evaluated** 64:14 65:9 298:19,23

**evaluates** 324:23,24 325:2

**evaluating** 259:7

**evaluation** 81:16 144:19

**evaluations** 283:20

**event** 135:15 213:21 258:19 293:19

**events** 225:1

**everyday** 259:21

**evidence** 30:11 47:23 57:11,12 58:14 59:14 60:12 75:19 78:15 83:13 88:16 89:18 90:12 93:2 95:14 98:13 99:2,19,25 100:25 101:17,18,20,21 103:11,15 107:25 117:4 119:21 125:20,21 128:1,8,9 129:16,19,23,25 130:4,8,23 134:22 140:13,16,18 156:9,19,22 163:13 168:10 182:19 191:12 193:15 197:18,21 198:2,5,6, 10,11 202:5,7,8,10,18 203:14 205:23 206:20 208:24 212:21 226:21 232:25 233:10 235:1,8 236:2 237:3,4,10,14 238:12 241:13 242:18 243:13 248:23, 24 249:1,2,5 251:4,11 258:2,21,24,25 259:8,10 260:10,14 261:10,23 266:11 267:18 271:8 276:23 277:7,13,15,16, 17,21 282:14,22,24 291:17 295:20 299:8 306:1,2 324:6,23,24 325:2,20 326:2,6,18,21 327:1,3,4,9,11,19,23 328:1,4 331:23 332:2,20 339:11

**evident** 125:24 303:14

**evidentiary** 282:19

**evolution** 169:23

**exact** 20:19 26:9 27:5 28:11 68:2 111:8 124:8 212:11 255:14 279:19 281:3

**exam** 217:19

**examination** 8:7 73:3,22 76:13 302:10 338:1 341:11

**examined** 8:5 234:10

**examining** 132:9

**examples** 139:25 197:14 220:13,22

**exceeded** 111:10

**excellent** 107:12

**exception** 95:7 214:16

**exceptional** 296:24

**exceptionally** 17:3

**exceptions** 218:24

**excerpted** 12:20

**excluded** 224:6,13,16

**exculpatory** 131:19 182:21 231:4 260:11 326:7 327:3,5,9,11,22 331:24 332:2

**Excuse** 36:11

**excuses** 95:11

**executed** 228:5

**executive** 86:7,9

**executives** 259:23

**exercise** 224:18

**exercised** 215:23 218:9

**exhibit** 11:15 14:14,19,20 15:12,14 23:6 27:11,12 33:20,21 34:6,7,22,23 41:9,12,14,24,25 42:2 43:2 55:20 85:22,23 142:24,25 143:21 148:24 149:15,17,18 150:4 151:22 153:19,20 158:11,12,20,25 159:3,9 175:4 176:6, 7 177:20 178:12 180:8 184:19,20,21 188:9,10,12 189:14 193:24,25 200:24 227:18,19,22,23,25 247:6,10 252:21, 22,24 253:1 255:25 256:1,3,5 265:16, 17,19,24 267:21,22 268:24 269:3,8 273:1,3,4,10 275:5,8 276:1,13,14 278:7,8,11 293:24,25 294:6 316:22

317:8 321:16 343:10,15,16,23

**exhibits** 13:9 35:14 36:21 37:1 38:1 153:5,22 272:14 274:24

**exist** 25:2 42:25

**exists** 102:3 118:20,25 222:15

**expect** 76:1,5 77:9 245:21 323:18 331:18

**expectations** 24:17 216:10

**expected** 42:20 307:6

**expense** 93:9

**experience** 61:3 235:12

**expert** 11:1 12:8 13:12 18:4,17 19:11,19 21:4,24 22:2,24,25 28:25 36:15 41:14,19 43:7,13 44:5,17,21 58:3,9,15 59:1,6 60:8 61:8 65:12 66:11 69:1,13 74:5 81:19 106:18,23 107:3 108:5,9,16 115:16 116:7 120:25 121:2,25 135:16,17 136:13 137:19 138:9,10,11,23 139:23 167:14 175:21 189:14,15 201:7 230:8 232:11 234:5,17 235:16 236:24 240:17,19 241:7 267:1 268:11 269:10 270:10 271:15,21,25 280:10,20,22 299:5 301:18 323:3,9,10 324:14

**expertise** 17:19,21,24 19:6 29:22 30:1,5,10 31:11 39:11 57:23 59:25 60:3,11,15,19,25 77:6 167:16 231:22 238:20,24 239:4,22,25 240:23,24 241:3,4,9,24 242:4 323:2 339:17 340:19,25 342:20,22

**experts** 29:25 43:11,20,21,22 44:1,6, 9,12,18,21 45:4 114:15 115:9 235:21 248:7 280:7 286:7 306:22 310:19 311:6 325:5 336:19

**experts'** 30:1 84:9

**explain** 25:5 27:5 183:6 327:20 338:15 339:19 341:25 342:8

**explained** 28:21 328:8

**explaining** 214:18

**explains** 151:7

**explanation** 338:5

**explicit** 25:15

**explicitly** 68:25 96:8

**Exploration** 7:9

**explore** 335:23 336:11

**explored** 314:10

**explosion** 28:24 234:25

**Exponent** 332:18 333:12

**exposed** 93:12,17 120:23 155:14 169:2

**exposure** 59:2,21 93:19,20 103:16 108:4 116:17 125:16 126:22 127:2,7 140:18 169:10,20 170:2,4,5,21,24 172:7 209:16 240:20,22 241:4,5 286:10 301:12,15,25 302:12 304:24 307:5,21,24 308:13,18 309:4 310:7

**exposures** 39:10 59:7 77:15 100:1 102:24 129:7 155:15 195:15 284:15, 21 300:14 307:13

**express** 57:9 108:20 124:17 341:6

**expressed** 57:9 106:3 129:2 136:16 138:16 196:11,19,23 197:1 335:14

**expressing** 197:24

**expressly** 157:5

**extensively** 247:15,16,19

**extent** 57:8 210:5 319:5 324:1

**extreme** 301:1

**extremely** 75:23 133:3 297:7

**Exxon's** 264:22

**Exxonmobil** 244:6,7,9,16,21 245:1, 5 251:10 263:6 264:9 265:21 340:8, 11

**Exxonmobil's** 263:8 264:15 267:24 268:3

F

**facilities** 65:22

**facing** 272:2

**fact** 11:2,9,16 13:18 14:2 20:4,6 42:25 45:9,20 76:6 77:25 81:24 85:7 89:5,12 97:17,19 100:4 101:11 111:19 115:9 117:5 119:25 120:21,22 129:24 130:19 132:14,25 133:4 135:8 148:16 170:24 171:14 182:5,24 183:9,23 192:15 197:16 200:20 205:24 208:2,14 209:22 213:15 231:9,18 233:8,9 237:7 242:22 243:2 252:19 254:22 259:20 262:13 295:19 301:4 305:7 314:11 320:20 326:8 334:3

**factors** 145:18 168:22 220:14

**facts** 11:4 13:11,15 187:17 258:18 329:17,19,22,23

**factual** 62:7 187:16

**failed** 281:25 282:4,10,12,15,16,23, 25

**failure** 281:14,18,20

**faintly** 80:2

**fair** 10:12 19:9 29:8 41:20,21 52:20 54:14 58:15 61:6,10 67:24 165:10 167:9,12 178:11 199:10 202:4 204:10 211:5 216:6 229:2 232:12 234:16 313:13

**fairly** 28:21

**faith** 95:1 111:16

**fall** 107:18 308:20 325:20,21,22

**fallibility** 213:18

**fallible** 213:19

**falls** 65:18 236:16

**false** 39:6 111:15,19 124:3 127:21,22 128:12,17 212:1 305:5,24 307:12 308:23 309:8 331:17

**familiar** 44:11,14,17 66:24 80:3 102:1 153:25 157:25 186:6 194:9,13 255:16 311:12 333:19

**familiarity** 44:15

**family** 242:21 243:6

**famous** 183:3 218:12 242:16

**fast** 173:2,3

**father** 242:23

**faulty** 214:10

**FDA** 52:24

**February** 157:24

**federal** 12:9 64:8 65:23 66:1 69:22 71:11,20,21,23 72:3,7,10,20 75:17,19 82:8 83:17,23 84:13,14 85:7,10 86:2 89:9,22 90:18 92:5,22 96:17,24 105:4,14,17,19 109:5 111:22 112:2,7 115:7 124:11,14,15,16,19 126:4 233:21,22 234:11 238:16 269:11 278:24 283:6,12,15 287:12,18 288:20 290:6,7 291:24 293:15,19,22 294:16 295:14,17,23 296:16 297:3 298:20 303:14 310:15 313:4 328:5,10,23 329:9 331:19 335:19,23,25

**feedback** 117:7 255:14

**feel** 130:6 133:14 137:3 166:23 237:12,15 285:11 289:8 307:10 335:12,15 336:5,10

**feeling** 137:9
**fellow** 217:11,15
**felt** 70:13 155:5 233:1 237:2 258:24
**field** 24:20 25:11 215:19 218:3 220:23,24 221:4 223:3,25
**fields** 215:21 218:24 219:9,12 220:22
**figure** 157:22 159:25 162:17 163:15 343:20
**figuring** 102:24
**file** 16:4,7,18 18:15,20,22 32:6,9 33:3,6,8,9 63:3,11 65:5 225:4 226:20 229:22 257:14
**filed** 254:16,19,23 257:5,10,15
**files** 18:7
**filing** 254:12
**filtering** 55:25
**final** 20:7 47:9,10 81:17,20 83:3 165:2 205:16 278:19,21
**finally** 95:15
**find** 25:16 90:10,16 97:18 108:15 148:1 171:11 205:7 206:12 232:25 305:25 334:18
**finding** 210:24 291:21
**findings** 57:16,22,24 58:3,7,8,12,19 243:15 285:3 291:6,7
**fine** 33:15 54:15 91:21 99:21 103:19 120:18 148:4 156:15 166:5 237:10 305:7,8 339:5
**fines** 11:6 133:18
**finish** 19:1 38:25 77:1 93:23 94:5,15 148:22 165:22 167:1 198:4 219:25 239:2
**finished** 337:7,23
**firm** 29:11 36:9,10 37:14 47:20
**firms** 29:9
**Fish** 54:5
**fit** 166:4,6,24 184:13 206:12
**five-minute** 336:25
**five-page** 273:4
**fix** 100:23 101:22
**flag** 131:13 133:7 341:7
**flagging** 55:18
**flawed** 92:23 96:25 97:1,3,7 98:6,11,14,21 313:18
**floor** 168:14 171:3
**Flower** 96:4 150:19
**Flowers** 95:7 96:4 150:20
**focus** 83:22 112:12 166:25 168:24,25 183:7,8,10 247:23 249:6 338:23 339:17 341:22
**focused** 209:16 251:8,9 318:12 339:8
**focusing** 174:19 182:1 341:16
**folder** 62:24
**follow** 22:16 77:24 150:13 334:15
**follow-up** 337:24 341:10
**followup** 150:23 151:3,4,5,9 194:10
**fomented** 251:15
**footnote** 19:16 20:2,3 57:4 144:6 150:11,12 151:8
**footnotes** 19:20 22:20 56:24 57:11 216:3 223:9,11
**forensic** 324:18,19,22,25
**forgot** 33:7
**form** 73:6,25 84:17 90:2 92:17 97:4 98:8 102:14 120:13 231:13 280:17 303:8 307:8,23 311:24 312:10 318:2,3 319:21 321:3 322:22
**formal** 211:18 217:19 239:15 268:18
**formalized** 221:9
**formally** 344:7
**forming** 279:10 297:4
**forms** 103:6
**formula** 23:19
**formulae** 21:17 23:9,15
**formulate** 24:2,7
**formulated** 248:24
**formulating** 23:10,16 26:10 27:6 269:21
**forward** 18:5 145:10 276:24 277:7
**FOSC** 86:10,11,16,17 87:3 88:1 89:25 294:2,13 295:1,10 316:21 317:7,22 318:3,9
**FOSC's** 88:2 89:25 90:19 317:22
**fossil** 185:23 186:9 250:5,8 251:1,13,19 253:6,11,15 254:1,4,8 256:25 258:16 340:5
**found** 20:17 131:5 135:9 138:1 233:10 242:11 286:3 290:23 305:16
**foundation.'** 190:12 191:4
**fourth** 172:14 256:7
**fraction** 226:21
**frame** 167:21,23 230:22 267:24 268:7,16,21,22
**framework** 65:14,18 258:3
**framing** 246:12
**Frank** 62:1
**frankly** 119:24 234:22
**fraud** 132:12 139:16 223:13
**Fred** 144:3
**French** 275:17
**frequent** 52:16
**frequently** 271:8
**fresh** 11:25
**friend** 122:5
**friendly** 95:2 166:13
**front** 14:16 126:15 158:16 168:10 193:19 278:25 279:3 339:21
**frustration** 234:15
**fuel** 185:23 186:9 250:5,9 251:1,13,19 253:6,11,15 254:2,4,8 256:25 258:16 340:5
**fulfill** 74:25
**full** 8:13 21:25 22:5 53:18 197:4,8 285:3
**fully** 10:20 16:15 22:12 145:10 166:23 197:22 198:7 237:25
**function** 76:1
**fund** 194:18
**funded** 161:2,17 173:2 174:6,17,23
**funding** 114:5 157:18 160:9,12,14 163:16,17 167:15 173:9 190:9,12 191:3 192:11 196:20 248:10 262:19
**funds** 32:15
**future** 40:1,15 41:4 168:15 173:15,19

### G

**gallons** 97:16

**gaps** 182:14,17,18

**gas** 174:19 254:17

**Gate** 269:9

**gave** 42:18 46:12 188:7,9 220:13

**general** 19:25 66:2 70:6,7 93:15 102:20 103:4,6 213:16 250:3 254:2

**generally** 139:13 217:12 223:2,23 310:17

**generate** 284:22

**generic** 28:16,21 31:22 36:11,12,22, 24 38:11,17 39:5,7,12,16,20,24 40:21 41:1 67:10 209:9 274:19

**genetic** 36:11

**geochemist** 60:13 61:3 238:23 240:25

**geochemistry** 61:8

**Geoffrey** 251:24 252:9 253:1

**geographic** 296:18

**Geological** 53:13,15,19,22 104:22 217:8

**geologist** 215:7,11,17 219:13

**geology** 215:10 219:16 220:13

**Geophysical** 217:6,15 340:7,11

**get all** 38:24

**ghost** 204:9,10

**ghost-managed** 202:15 204:18 205:4,21 206:17 207:8,14 208:15

**ghost-management** 201:11,16 202:2 204:6 207:22

**ghost-managing** 203:8,19,20,21,24

**ghost-writing** 201:17

**ghostwriting** 201:23,25 202:6 204:12,13

**ghostwritten** 202:11

**ghostwrote** 201:21

**give** 24:12 48:1 91:3 92:25 111:7 116:16,19 166:17 167:3 220:12 246:25 255:13 270:10 274:22

**giving** 219:24 268:25

**glasses** 189:17

**global** 242:19 251:14,20 257:21,24, 25

**goal** 284:19

**God** 96:13 146:17 147:4 153:2

**Gomir** 181:1 192:8

**Gomri** 54:21,23 55:1,4 113:23,25 114:1,2,4 156:23 157:2,12,16,18 160:9 161:2,17 162:2,4,5 164:24 174:7,23 175:3,22,23 176:8,12,18 177:17 178:9 180:7,9,16,19 181:14 183:14,23 184:9,22,23 185:3,7 186:11,13,17,19,22,23 187:3,21 188:13,15,17,22,25 190:1,16,20,22 191:7 192:25 193:2,9,12 194:18 338:11 339:24

**Gomri-funded** 159:12 175:16

**good** 8:9 29:3 55:12 91:7 95:1,8 103:12 111:16 141:19 142:11,12 166:11 190:10,25 211:10 214:9 220:11,12 319:18 324:18,19 325:10, 13 326:1 327:25 329:16,22,24 337:25 339:18 344:4

**goodness** 258:11

**govern** 222:22

**governed** 175:17

**government** 48:9 65:23 83:23 89:9 92:6 105:15 111:22 112:2,7 124:16 179:10 251:16 310:9 319:6 322:13 324:4,9

**governmental** 317:2 322:5,9,20 324:2 331:6,14

**governments** 69:22 294:16

**grad** 246:3,4

**graduate** 17:2 245:15

**grapple** 213:1

**grappling** 212:18

**great** 69:1 167:19 172:5 234:19,20 235:1 262:16 271:23

**greater** 332:9

**greatly** 230:18

**Gremillion** 228:2

**GRI** 190:15,19 192:10

**GRI....I** 190:9

**ground** 107:17

**grounds** 62:19 143:7 145:23 146:22 147:12 149:1 150:7 151:15 227:2

**group** 12:24 27:20 31:14 32:8,12,15, 22 33:23 34:10,14 35:1,6,16 37:17 38:5,10 39:19 40:9,18 242:17 244:13 257:20

**groups** 332:21 341:20

**Guard** 72:15,18,24 73:2,3,16,18,21 74:3,4,6,18,21,22 75:4,24,25 76:2,8, 11,12,16,18 77:8,16,19,21 83:24 86:12,18 87:3 89:10 90:14 107:13 109:20,22 288:15,22 290:3 292:5

**Guard's** 74:24

**guess** 58:10 102:12,13 119:14 186:1 247:9

**guidance** 79:17,21 82:22 300:4

**guidelines** 116:23 117:13 118:1 211:15,17,19 214:9 216:18 219:7,10 220:14

**guilty** 132:16 133:18 135:9

**Gulf** 78:23,25 79:5,9,13 81:25 82:15, 18 97:22 111:23 112:3,8 127:1 128:25 129:4 141:14 157:23 159:3 175:12 176:11 179:11 194:5,9,10,14, 20 196:9 198:14,23 199:2,13 200:18 275:15 284:10 289:11 306:25

**guys** 94:9 262:14

## H

**Haddad** 43:18 45:2,24 46:16 61:24 63:4

**hand** 85:13 110:17 216:13 227:11 268:23 278:5

**handbooks** 216:1

**handed** 269:7

**handle** 315:8

**handled** 40:8

**hands** 318:12 319:18

**handwritten** 343:13

**happen** 182:13 202:23 246:20

**happened** 66:18 107:17 173:23 181:12 213:21 234:24 289:3 292:9

**happening** 91:15 100:2 173:11 297:13,16

**happy** 12:21 42:22 78:18 131:19 164:18 231:5 262:11,25 263:2 267:12 277:15 331:24

**haranguing** 137:10

**hard** 331:15

**harm** 125:17 129:20 130:11 140:25 156:9,19 307:6,14

**harmed** 59:21 89:20 126:22 127:2,7

**harmful** 143:10 146:24

**harms** 59:16 127:14 128:16 155:14

**Hartford** 7:17 158:5 265:14

**Harvard** 17:1 22:22 211:6 243:6,10, 11

**hazard** 81:16 144:18 283:20

**hazardous** 82:9

**hazards** 256:24 301:8 302:16

**head** 10:4 52:18 124:8,21 186:1 221:2

**headaches** 99:22

**heading** 276:8

**headline** 249:22,23 252:19

**headlines** 249:24

**health** 40:22 51:19 53:6 59:4,9 81:16 111:11 116:5 122:22 144:18 156:23 157:3,13,16,18 159:21 160:3,10,20, 21 161:2,5,8,10,18 162:10 163:2,9 164:8,11,13 165:1,4,8,11 168:3,7,18, 20,22 169:1 170:9,11,17 171:10,25 172:8,12,22 173:15,21 174:1 179:25 180:10,11 183:10,14 184:9 191:25 194:5,15,19 195:3 196:13,20,24 240:16 242:5 276:18 283:17,19 284:16,20,24 287:1 290:11,13,16,24 291:8,15,25 299:14,19 304:14,25 305:20 339:9,16 340:24 341:16 342:1,5,8,12,13,15,24

**health-related** 159:17

**hear** 9:19 141:16 189:18

**heard** 9:8,23 312:1,14 337:17 339:25 343:25

**hearing** 55:13

**heat** 286:10,13,15 301:2

**held** 178:9 179:1,14 180:7,9 183:13, 24 184:9,10 240:10 299:12,18 318:12

**helped** 55:25 155:12 194:18 204:5 334:5 338:12

**helpful** 73:13 126:11 312:19,21

**helping** 190:3,10,25 191:2 227:21

**Herbert** 218:13

**Heron** 95:4 144:1 145:8 148:13 182:8 189:23,25 191:6,24

**Heron's** 190:6

**HHE** 144:23 284:8

**HHES** 283:19,24 284:3,13,20 285:4,7 287:2

**hide** 132:11

**hiding** 131:7

**high** 88:17 89:1,3 103:17 128:12 140:18 213:17 218:4 305:19 307:6 331:21

**higher** 103:13

**highest** 195:14 243:2 312:7

**highlighted** 140:2

**highly** 78:14 168:1 172:5 213:19 297:15

**Hill** 219:3 220:4,14

**hired** 74:10 85:4 211:6 215:4 326:24

**historian** 22:17 23:1,18 57:1,5 58:11 59:12,19,25 60:10 61:1 116:9 126:20 133:8 134:15 139:7,12 171:16 210:17 211:22 212:8 213:6 214:19,24 215:8, 14 216:12 221:16 222:5,10,17 231:19 232:10 234:1 236:17 241:14 242:15 243:22 244:1 259:8 279:22 320:19 325:7,10 326:1 327:25 328:13,19 329:1,16

**historians** 22:19,21 25:6 128:4 134:25 210:12,23 212:12,15 213:7, 10,25 214:6 215:23 216:21 217:3,23 218:9 220:3 221:22 222:7 223:10 268:20 269:9 270:10 271:1,7,13 315:14 325:13 334:15

**historical** 58:11 210:25 211:19 212:17,19 213:2 217:3 224:18 225:1 269:10 270:12 271:15 325:25

**historically** 133:18

**histories** 323:21

**history** 22:13 24:20,24 25:3,9,13 116:10 133:8 135:4 176:13 211:12 213:14 214:1,4,5,8,9 215:11 216:17, 24 217:4,21 218:14,15,16,20 219:12, 14,17 221:4,8 222:24 223:3,5,13 248:9 330:9,18 342:19

**hoc** 296:23 305:15

**hold** 13:6 37:15 158:10 189:16

**holding** 188:1 319:17

**hole** 186:8 242:19

**honest** 155:6 259:21

**honestly** 160:6 246:12 263:21

305:12

**Horizon** 28:24 40:24 41:7 48:9 49:13,17,22 50:8,13,17,21 51:1,6,20 52:12 54:10 55:8 67:2 69:18 70:11 80:11 81:12,16 82:5,22 86:3 87:15,16 117:14,21 121:22 122:23 127:3,8 226:5,22 231:8 240:4 258:19 260:9 290:15 296:3,23 312:6 313:23 317:17 320:15 330:6,8

**hospital** 163:4

**hosted** 178:19

**hot** 301:5

**hours** 34:1,16 35:3,9 37:6 38:8 273:10,12,16,25 274:3,4,7,9,11,16,20

**House** 176:22 178:16

**housekeeping** 314:9

**Howard** 82:3 95:19,22 96:7 97:3,9, 19 98:2,5,11 119:19 120:16 121:16, 21 123:3,7,8,13 146:17 147:4 148:5 153:1,24 154:10,22 155:16,24 290:10,23 291:12,21 292:3,11 331:11

**Howard's** 153:16 154:16

**huge** 130:25 182:20 280:23

**human** 59:3,8,16 111:10 116:5 156:23 157:16,18 160:9,20 161:2,4,5, 8,10,18 162:10 163:9 164:8 165:11 169:10,20 170:2,4,5,21,24 171:10,25 172:7,12,22 173:15,20 174:1 183:14 240:20,21 241:5 342:5,15,23

**humanly** 325:4

**humans** 169:15 171:8,12 173:17

**humidity** 281:1

**hundred** 96:9

**hundreds** 97:15 225:21 232:14

**hurt** 108:3 125:14,15

**husband** 53:14,18,21

**hydrocarbons** 88:18 103:17 169:3 339:12

**hygiene** 315:21 323:8

**hygienist** 102:22 239:9

**hygienists** 48:21 49:1 64:2 323:18, 22

**hypotheses** 284:22

**Hypothetically** 108:18

## I


**Ian** 12:16 78:2 275:20 276:22

**IAPS** 318:2

**ICP's** 319:17

**ICPS** 318:11

**idea** 95:8 97:24 157:7 204:12 281:2

**ideas** 219:4

**identification** 14:14 15:14 27:12 33:21 34:7,23 41:9,25 85:23 142:25 149:18 153:20 158:12 176:7 184:20 193:25 227:19 252:22 256:1 265:17 267:22 269:3 273:3 275:5 278:8 343:16

**identified** 8:4 12:24 56:14 61:23 62:7 103:24 104:3 105:3,24 106:1,2, 13,17 144:5 168:2 170:16,17 202:14 204:16

**identify** 63:2 108:5,9 109:2 205:2,15 206:8

**identifying** 289:5

**idiosyncratic** 280:9

**ignore** 327:6 328:1

**illegal** 131:8 132:12,15,20,22,25 133:11,13,16,20,22 134:20 135:9,11 136:7,20 137:19,25 138:17

**illegally** 134:6,12 137:12

**illness** 51:18 127:13 128:15

**illogical** 97:13

**illustrate** 188:2

**imagine** 91:5 140:11 170:8 181:24 182:2

**immaterial** 109:21

**immediately** 195:13 343:23

**immense** 296:18

**immunity** 47:25

**impact** 167:24 171:10 172:22 173:20

**impacts** 161:10 168:18,25 173:15 179:25 182:2 339:2

**impedance** 155:1,4

**impede** 154:12 155:17

**implausible** 172:8

**implement** 277:18 305:24

**implemented** 305:4

**implication** 90:22 280:18,19

**implications** 71:18

**implicit** 25:14

**implicitly** 221:19

**implied** 12:9,12 245:2

**implies** 128:5 187:19 205:25 306:19

**imply** 44:15 60:15 90:23 91:19 260:2

**implying** 167:10

**importance** 318:14

**important** 9:25 10:5 12:7 25:24 30:3 31:6 66:14,16 75:16 77:22 84:21 93:22 116:15 125:9 148:9 177:9 178:4,8 182:4 187:11 214:6 248:17 296:6 300:13 334:25 335:1,4,23 336:5,10,15 338:22

**impossible** 22:9 281:3 321:12 322:23

**impressive** 262:15

**improved** 172:15,20

**improving** 172:24

**impugn** 13:17 244:11,17

**in-house** 264:18

**in-situ** 145:3

**inaccuracies** 43:3

**inaccurate** 198:18

**inaction** 251:3,7

**inactions** 74:9,15 75:1 77:13 84:4, 25 112:11 287:18

**inadequate** 99:1,9,12 100:17,21 101:3 102:7,11,15,17 103:21 200:5 307:12

**inappropriate** 332:12

**incident** 48:10 49:13,17,22 50:8,13, 17 51:1,6,20 52:12 54:9,10,17,21,24 55:2 59:3,8 122:23 127:4,9 226:6 231:8 235:9 240:4 243:17 318:2,7,11 330:7

**incident-** 81:20

**include** 37:20 75:3,7 253:17 254:2,5 291:11 322:4,8 326:19 327:23 331:4 333:10 341:20

**included** 32:5,9 33:7 56:18 86:17 109:14,20,25 111:4 180:3 229:22 270:16 284:9 302:15

**includes** 72:2 168:20 186:14 253:6 273:4

**including** 31:24 131:15 132:12 140:1 179:9 186:7 203:16 204:2 228:21 231:20 244:22 248:19 253:15 281:4

**incomplete** 341:24

**inconsistency** 114:10,17,22 115:12,17 212:19

**incorrect** 92:18 163:15 264:7

**increasing** 124:3

**independence** 174:16

**independent** 115:7 175:14 197:15, 16 301:14 313:9

**indicating** 147:19 155:24 288:15

**indication** 148:20,24 151:23 152:20

**individual** 93:12 193:4 212:4

**individuals** 116:25 180:14 185:6 321:8

**inductive** 268:7,16,21

**industrial** 48:20 49:1 64:1 102:22 239:9 315:21 323:8,18,22

**industry** 130:17,20 131:6 132:10 133:9 174:20 183:2 250:1,6,9 251:2, 14,19 253:6,11,15 254:2,4,8,17 258:16 340:5

**influence** 140:22 161:7 167:24 181:6,11,22 183:6 185:7 186:13 187:20 188:25 192:12

**influenced** 174:25 181:10,21 182:24 183:1 186:15,18,23,25 187:2,14 188:17,22 335:14

**influences** 248:10

**influencing** 190:2 191:16 192:20 193:2,4,8 196:12,19

**inform** 22:8 61:4 83:6 180:10 231:10

**informal** 268:19

**information** 40:2 50:3 110:14,17 130:25 134:7,12,21,25 135:14 136:6, 8,19,21 137:7,11,13,18,20 138:10,12, 18,21 140:6 141:7 162:7 175:22 182:21 184:2 193:1 197:7,12,13 199:1 227:1 231:7,10 243:12 255:6,8 257:2,7,12 260:6 263:2 283:21 288:7, 14,21 289:16 291:3 295:21 307:22 308:10 309:1,7,10 315:13 317:3,6 319:5 322:13,14 324:8 334:18 335:13

**informing** 47:3
**inhalation** 300:14
**initial** 18:2 28:20 94:21
**initially** 31:22
**Initiative** 157:23 175:13 176:12
**Initiatives** 159:4
**injury** 51:18 278:11,20
**input** 95:2 315:25
**inquiry** 328:2
**insists** 115:5
**instances** 99:20 106:2,9
**Institute** 53:6 94:22 179:18 182:6 194:15,19 283:16 290:12 333:11 339:15
**institutes** 177:2 196:13,20,24
**institution** 185:22 340:4
**institutional** 186:9
**institutions** 178:23 180:14 184:22 186:4,5,7 338:20,25 341:21
**instructive** 331:3
**insufficient** 200:5
**integrity** 46:17 110:10,14,24 111:2, 17 174:16 243:21,25 244:5,11,17 257:16 324:3,11
**intellectual** 176:19 178:10 340:19, 25
**intend** 56:11,15 58:23
**intended** 57:19
**intending** 148:16
**intends** 46:5 337:15
**intent** 128:6
**intention** 46:7 157:8
**interest** 167:19 174:12,18 185:24 186:10 192:19 233:25 244:15
**interested** 17:15 28:25 29:11 182:16 184:3 296:9 331:12
**interesting** 24:9,20 25:3 70:5 110:25 117:23 171:11 182:5 213:13 215:24 223:6 230:11 235:25 296:7 297:5 342:19
**interestingly** 211:11
**interests** 323:23,24
**interference** 45:18
**interim** 82:21
**internal** 73:2,15,17,20 129:17
**interplay** 96:16
**interpret** 128:20 280:1,5 326:9
**interpretation** 60:16 79:17 166:10 210:13,19,24 244:10 266:2,23 267:3, 5,6 280:9 303:10
**interpretations** 258:18 271:2
**interpreted** 30:12 117:22 118:2 125:19
**interpreting** 152:7 218:11,16 224:25
**interpretive** 152:13
**Interruption** 235:17
**intervention** 130:14
**interview** 213:20
**interviewed** 289:23
**interviews** 213:15
**introduce** 7:11,22
**introduced** 202:1
**introduces** 89:7
**introduction** 216:7
**invalid** 139:6,11,17 140:9,12 199:3
**investigate** 253:3,5 283:11
**investigated** 243:1,18
**investigation** 96:1 155:12 181:4
**investigator** 297:3
**investment** 253:25
**investments** 253:10,14
**invited** 177:1 338:18
**invoice** 33:22,25 34:9,16,25 35:3,6 36:2,13 37:4 273:5,18,19
**invoiced** 35:9,18,22 36:10 38:2,5 273:15
**invoices** 32:21,24 33:1,12 35:11,15 36:18,25 37:25 272:17,20,25 273:15, 23,24 274:6,8
**invoicing** 35:24 38:15,22
**involve** 88:11 131:2 135:23 161:10 172:7 332:23
**involved** 17:4 28:22 31:7 49:25 50:21 59:20 72:19 83:21 90:8 95:22 103:11 104:19 107:14 110:4 123:19 124:9 126:21 131:11 135:22 163:3 164:3 224:13,15 259:15,16 284:14 287:5 293:8 299:22 302:21 313:4 316:17 326:5 333:25 342:4
**involvement** 74:3
**involves** 69:21
**involving** 9:1 28:22 29:25 78:2
**IOM** 183:19 184:5
**irregularities** 140:1
**irrelevant** 23:19 77:17 241:2
**Israel** 278:3
**issue** 20:17 25:22 26:2 52:13 70:22 71:9 72:16 115:4 130:11 140:3,19 180:10 191:8 232:13 233:23 238:17 248:9 264:13 284:23 289:1,2 316:14 332:13
**issued** 15:13 42:19 111:4 116:23 257:25 289:5
**issues** 17:18 24:18 39:13 162:6 218:18 234:17 235:4 237:8 238:11 242:20 284:24 293:5 299:14,19 305:3
**item** 294:4,5
**itemized** 213:10

## J

**January** 34:17
**Jason** 29:4,5,14 34:13,14 35:1 46:22 67:23
**Jean** 203:1,4 205:1,12
**Jean's** 205:12
**job** 69:1 145:18 166:11 173:10 216:11 259:7,21 289:6 327:1,2 341:16
**John** 95:19,22 96:7 97:3,9 98:5,11 119:19 120:16 146:16 148:5 153:1, 16,24 290:10 331:10
**journal** 24:1,6 26:8 27:5 160:5 162:21,25 163:7 164:10 173:6 244:23 269:20
**journals** 23:8,14 159:13 244:25
**judge** 77:6 130:7 131:22 135:15 136:10 138:1,8 139:23 185:18 197:19 223:11 248:25 312:12 320:20 321:6 322:23
**judged** 19:5

**judges** 25:11
**judging** 77:9 334:1
**judgment** 47:12 48:24 69:1 74:6,7 98:15 135:14 138:7 196:15 229:11 280:21,23 319:23
**judgments** 17:14
**July** 21:5 22:3,15,25 34:1 41:15,18 55:20 63:18,21 69:6,10 93:4 95:15 135:7 180:10 183:24 184:10,15 189:22 278:6
**June** 12:18 34:25 35:4,7 93:4 94:22 117:4 135:7 151:1 179:1,14 183:19 184:5 228:5,15 275:16,19 276:5
**jurisdictions** 25:7,10
**jury** 130:7 135:16 136:10 138:8 259:9 270:11
**justify** 118:10 119:20 120:1,12
**justifying** 120:6

**K**

**Karen** 7:15 8:10
**Keegan** 8:1
**Keller** 95:5
**Kessler** 138:1
**Kettering** 339:15
**key** 11:3,4 13:10,15 57:21 135:3 157:23 158:25 159:4 175:3 188:13,15 294:10
**KHOSHBIN** 13:1,4
**killed** 11:6
**kind** 22:23 88:23 97:13 123:13,25 125:4 128:4,10 167:25 195:13 211:18 214:15 217:10 222:19,23 232:22 263:23 268:9,20 280:13 325:17
**kinds** 25:15 40:11 52:8 59:16 62:25 72:19 91:2 116:11 233:10 288:11 302:22 331:20
**Kirkland** 343:11
**Kitt** 94:23 148:12 182:10 183:18,21 184:13
**knew** 29:6 37:9 52:5 56:8 98:25 100:15,19 101:13 124:25 126:9,10 230:10 256:24 292:17
**knowing** 123:18 333:23
**knowingly** 185:6,8,11 186:12 187:13 256:23
**knowledge** 16:2 21:4,8 42:12 57:15 60:12 70:8 110:3 210:10 222:8 244:8 279:12 319:4 320:14
**Kristian** 27:13,19 46:23 47:1 67:23
**Kyoto** 257:23 258:4

**L**

**lab** 50:16
**laboratory** 79:18 91:6 116:25 281:2
**lacking** 324:10
**lacks** 181:14
**land** 296:20
**language** 56:1 171:16 252:16 268:3 282:8
**Larey** 29:4,5,14 34:14 35:1 46:22 67:23
**large** 91:5 93:3,10 229:13 241:12 297:7 319:19
**largely** 143:8 146:23 207:25
**larger** 44:15 161:25
**largest** 312:6 330:8,17
**late** 195:12 225:15 326:14
**Latham** 9:4
**launch** 194:5
**launched** 292:4
**launching** 194:24
**Laura** 275:11
**law** 26:12,14,21,22,25 27:20 29:9 31:14 32:8,12,15,22 33:23 34:10,14 35:1,6,16 36:9,10 37:17 38:5,10 39:19 40:9,18 58:14 131:6 132:4,6 135:25 217:20 218:22 269:8,15 271:19
**lawsuit** 9:1 230:12 336:1
**lawyer** 85:8 102:13 132:5 205:1
**lawyers** 11:21 90:15 131:9,11 204:5,7 205:19 206:24 207:21 208:2
**lead** 124:1 240:22 315:21
**leader** 122:21
**leaders** 177:2 178:22
**leadership** 179:6 240:10
**leading** 192:5 193:1 235:5 244:22 261:5
**leads** 96:18
**leaked** 97:21,22
**leaking** 95:16
**learned** 81:11 117:17 120:11 333:6
**learning** 235:12 296:9
**leave** 136:5 138:3 313:7
**leaving** 344:2
**led** 140:17 336:18
**left** 124:13 337:9
**legacy** 28:23 40:23 250:12
**legal** 7:4 48:2 65:12 71:16,18 85:9 131:12 201:10,21 202:24 203:5 208:19 209:1 230:12 236:19 267:14
**Leinen** 185:20 186:14 340:2,6
**lessons** 81:11 117:16 120:11
**letter** 34:13
**letterhead** 343:11
**letting** 166:12
**level** 87:6 88:1 116:17 125:16 213:18 217:10 342:1,9
**levels** 88:17 91:1 103:17 108:4 125:16 140:18 195:14 286:5 305:19 307:6,25 308:25
**Lexitas** 7:4
**lie** 127:23,24 128:1,3,5,17
**life** 128:7 215:2 216:8 218:25
**light** 242:23
**likelihood** 124:3 128:12
**limited** 224:10,12 328:13
**limits** 307:21 308:13,19 309:4 310:10
**lines** 132:2
**linguistics** 268:7
**list** 185:2 247:12 254:23 278:2 339:23
**listed** 255:4
**listen** 167:6,7,11
**listened** 167:8
**listening** 7:24 167:10
**literature** 280:23

**litigation** 60:4 61:9 237:16 317:4

**live** 171:8

**local** 71:24 73:5,23 76:15 129:7 291:24 336:11

**locations** 171:4

**log** 34:1 63:5

**logical** 171:20

**logs** 62:14,15,18,21 130:24

**long** 10:10 43:16 44:23 48:2 262:21 294:5 336:24

**long-term** 163:3 164:12 194:9 285:1 298:4,9,11 304:25 305:20

**longer** 95:17 97:11,25 141:17 173:7 260:24

**looked** 14:6,7 16:12 17:9,12 18:13 37:10 45:2 62:13 64:18 67:9 69:4 72:5 74:2 175:4 204:23 227:4 232:17 236:4 305:14 340:15 342:3

**lose** 281:8

**lot** 35:20,21 42:10 57:1 78:16 84:22 88:7 94:10 130:22 131:15 166:7 185:22 196:4 215:3 216:8 220:4 227:5 245:4 246:6 250:15 287:23 293:3 297:9,18 332:20

**lots** 107:17 338:9

**Louisiana** 179:1 279:3

**love** 271:24

**low** 89:1 108:4 140:25 168:24,25

**lower** 149:21

**Lucky** 247:1

**lunch** 141:18,20,24

**luxury** 230:20

**M**

**machine** 251:15,21

**made** 11:14 12:21 14:9 17:14,23 19:12,23 20:24 21:9 41:5 45:8 60:8 83:10 84:23 93:8 97:12 98:2 110:20 118:11 119:18,20,21 128:21,24 133:3 134:14 140:4 148:25 152:21 153:13 155:6 182:3 184:6 204:23 209:25 223:15 228:11 245:6 262:6 276:15 281:25 282:9,11,14,22 294:17 298:12 314:13,14 324:2,9 326:9 327:7

**Magazine** 244:23

**magnitude** 297:8

**maintain** 83:9 140:21 156:6 165:1 201:9 205:3 207:14 208:15 211:2 224:24 281:25 299:5 317:2 319:10 334:9 343:18,24

**maintained** 198:17

**maintaining** 126:13 133:12 134:2 205:21 298:12 317:5

**maintains** 51:18

**major** 68:6 178:23 284:3 338:25 341:20

**majority** 248:2

**make** 13:7 14:8 20:4,25 29:22 42:3 47:12,14,20 57:10 58:7 78:19 89:1 98:15 101:15 107:17 112:23 119:15,24 125:9 134:16 135:14 136:11,14 138:6 147:22 152:16 161:24 166:19 168:8 187:25 193:15 200:11 203:1 207:16 220:20 225:16 231:24 236:18 246:18 259:14,23 276:9 315:5 319:22 320:3 323:19 338:16,21

**makes** 25:3 57:5 155:9 188:3 245:5 247:9

**making** 39:4,15 75:22 83:15,16,18 88:22 117:5 129:12 146:8 152:8,18 163:21 165:19 191:15,20 208:2 219:19 220:16 277:1 282:4 314:15,17 316:18 335:3 341:3

**malfeasance** 124:13 125:7 133:9

**man** 315:17

**man's** 219:4

**managed** 190:8

**management** 54:1 296:21

**manager** 235:10

**managers** 235:8

**managing** 190:1,22 203:11,15 204:7

**manatees** 172:2

**manipulating** 123:20,23,24 124:5

**manipulation** 123:13 125:13

**Mann** 9:7 224:2

**manner** 259:1 305:24 332:22

**Manual** 216:2

**Manufactured** 122:13

**mapping** 276:11

**Margaret** 94:23 148:12 182:10 183:18,21 185:20 186:14 340:2,6

**marine** 301:16

**maritime** 64:14 65:10 296:18

**mark** 11:14 13:7,8 85:21 95:4 142:23 149:12,14 153:18 158:10,11,20 176:5 184:18 193:23 227:17 252:21 255:24 265:15 267:21 268:24 272:25 274:23 278:6

**Markarian** 275:9

**marked** 12:25 13:3 14:14,16,19 15:14 27:10,12 33:20,21 34:5,7,21,23 41:9,11,23,25 43:2 85:23,24 142:25 143:20 149:17,18 153:20 158:12,13 159:9 176:7 184:20 193:25 227:19,25 247:4 252:22 253:1 256:1,2,5 265:17,24 267:22 269:1,3,8 273:2,3,9 275:5,7 278:8,9 293:23 315:7 321:16 343:15,16

**marking** 159:3 252:23 265:19 269:4 315:6 343:10

**marks** 202:3

**marshes** 172:1

**Martin** 203:5 205:1

**mas** 37:14

**Massachusetts** 7:7 8:19

**material** 19:17 130:16 133:1 135:19 261:23

**materials** 16:9,12,13 27:14,20 31:24 32:4 46:13 56:20,23 57:2 59:14 61:20 62:5,10,18,20,25 63:11,17 77:19 136:14,17 194:12 196:14 210:3,7 229:15 230:23 231:1,25 234:3 238:4,6 293:3 305:13 330:20 331:25 332:5 334:21

**math** 222:23,24

**matrices** 300:5

**matrix** 289:5

**matter** 7:8 15:13 32:21 35:16 43:8 44:9,13,18 47:23 57:18 58:1,4 138:7 139:14 183:9 192:9 229:22 230:8 236:15 241:21 267:9 270:12 273:11 336:3 340:12

**matters** 8:24 90:13 124:18 131:3 132:3 135:24,25 287:16 314:9

**Mayor** 256:9

**Mccartan** 7:15

**Mccay** 275:17

**meaning** 87:4 185:11 216:11 225:1 294:17

**meaningful** 30:5 245:22 281:12,15, 20 325:24 333:23

**meaningfully** 117:22 118:3

**means** 71:15 102:24 173:24 190:19 251:25

**measurements** 103:3

**measuring** 93:7

**mechanism** 93:7

**media** 251:16

**medical** 48:16,24 51:13 143:25 144:15 239:12

**Medicine** 94:23 179:18 182:7

**meet** 243:2

**meeting** 94:22 176:21 178:15,19,22 179:1,4,8,14,17,21,24 182:7,8,10 183:11,13,16,18,21 184:11,14,15

**meetings** 176:17 177:9 178:4,8 183:23 318:12 319:1,3,6,18,24 320:6, 10 338:11,17,18,19,23 341:15 342:7, 10

**member** 110:24 184:22 186:17 217:3,6,25 257:24 259:9

**members** 55:5 110:7,11 169:2 185:2 187:2 188:22 242:1,6

**membership** 109:13,19,24 217:9

**memo** 151:4,5,9

**memorandum** 81:20 150:13,23 151:22,24

**memories** 213:18

**memorizing** 245:4

**memory** 12:1 153:1 214:10

**menos** 37:14

**mental** 240:16 242:5

**mention** 195:6 206:16

**mentioned** 14:1,3 27:1 45:6 89:11 165:2,4,9 178:15 183:12 226:9 263:6 275:19,23 301:18 314:12 317:1 332:18 340:2

**Merchants** 242:16 248:19

**mess** 246:15

**messages** 157:23 159:1,4 175:3 188:13,16

**met** 232:9

**metabolites** 59:15

**metaphor** 91:3,7

**method** 212:1,5,17,23 213:1,16 221:19,21 223:2,24

**methodological** 213:11 280:14

**methodologically** 210:11

**methodologies** 21:24 22:12 23:22 25:13,25 212:11 264:22 265:1

**methodology** 22:1,8,16 23:1 24:1,7 25:16 26:9,17 27:6 135:3 195:22 210:17,20,23 211:3,21 212:7 221:13, 22 222:4,9,17 263:13,15,20 264:15 269:21 279:17,19 280:12 281:6,10,19

**methodology/methodologies** 21:17 23:9,15

**methods** 24:22,23,24 25:12 116:12 211:13 212:3 213:14 215:9 221:16 222:21 266:6 268:6 286:23

**metrics** 222:18,22 223:8

**Mexico** 78:23,25 79:5,9,13 82:15,18 97:23 111:23 112:4 157:23 159:4 175:13 176:11 275:15 306:25

**Michael** 292:11

**Michaels** 52:7,21 82:3 121:17,19,20 122:4,16,20 123:2,7,8,12,18,19 124:7,20,25 125:2,3 126:4 290:10,23 291:12,21 292:3 331:11

**Michelle** 8:1

**middle** 154:6,8

**midway** 177:5 277:10

**Mike** 9:7

**miles** 296:19

**military** 76:1

**million** 195:3 197:5,9,23 198:8 334:2

**millions** 97:15 231:17

**mind** 108:14 128:5 138:21 148:17 223:9

**mine** 56:3

**mining** 259:19,22

**minute** 33:4 126:14 199:5 223:9 247:3 253:19 314:2

**minutes** 189:3 315:2 343:19

**misconduct** 125:4,7 242:10 243:19

**misguided** 325:16

**misinterpreted** 260:12

**misleading** 39:16 212:2

**misplaced** 278:2

**misremembering** 152:25

**misrepresentation** 122:17

**misrepresented** 242:18 340:10

**misrepresenting** 257:1

**missed** 38:23 253:21 308:24

**missing** 36:5 37:4 100:1 273:18

**mission** 248:8 342:15,23

**misstated** 163:11

**mistake** 19:24 43:25 45:8 120:21 160:17 262:6

**mistakenly** 44:19

**mitigation** 172:16

**mixing** 308:1

**mixture** 296:22

**model** 211:16 313:13

**moment** 24:12

**money** 94:10 185:22 340:4,8

**monitoring** 49:12,16 50:25 51:4 93:14,15 96:3 98:25 99:4,8,11,13,16, 21 100:1,16,20 101:2,8,10,16,22 102:2,4,6,10,18 103:18,21 109:7 112:20,25 113:20 118:20,25 180:3 184:6 198:21,24 199:3,7,9,14,23 200:15,19 324:13,14 336:15

**Montagner** 45:10,16 46:2,5 47:2,6, 16 62:8 63:4

**Montagner's** 314:11

**month** 31:16 150:14,24 151:10 180:13

**months** 35:21 173:7 195:10 236:3

**morning** 8:9,11

**Morris** 138:1,2

**mouth** 187:12 192:3

**move** 199:11

**moved** 237:10 243:5 276:24 277:7

**multiple** 25:10,11 68:18 103:6 111:22 112:2,7 137:2 161:13,18 193:19 207:10 208:19,25 332:4 335:18 338:9

**multitiered** 292:4
**multiyear** 195:17

N

**named** 254:24 315:17 340:16
**names** 339:25
**Naomi** 7:8 8:3,15
**narrowing** 18:3
**national** 53:6 65:14,17 66:6,10,13 67:4,18,25 68:14 69:7 72:1,2,8,13,23 73:4,23 76:14 82:9 175:18 179:18 194:14,19 196:12,20,24 211:14,16 224:3 234:23 235:21 283:16 290:12 293:17 318:7
**natural** 216:9
**nature** 242:13 340:12
**nausea** 99:23
**NCP** 66:7 87:18
**near-shore** 296:20
**necessarily** 70:13 88:13 111:17 160:13 176:25 220:15 260:2 323:24 325:18 331:20
**needed** 95:13 97:11,25 116:3 143:7 145:23 146:21 147:12,20 149:1,9 150:7 151:15 152:17 155:7 233:1 334:10
**negative** 111:18 128:12 305:24
**negatives** 111:15,19 124:3 305:5 307:12 308:23 309:8 331:18
**newspaper** 249:22
**NIC** 318:3,6
**nice** 166:13
**NIEHS** 288:16,23 290:3 292:5
**NIH** 194:5,24 195:3,6,20,23 196:1,7 197:3,4,8,22 198:7
**Nina** 17:1 18:5 20:1,3,13 31:2 35:22 37:22,23 38:4,10 272:17,20 273:5,10, 24 274:1,7,15,19 327:14
**Nina's** 37:25
**NIOSH** 52:1 72:18 75:13 76:5 81:11 82:4,21 83:17,25 85:6 94:18,23 95:12,16,19,21 96:6 104:7 116:2 117:5,7,8,16,20 118:1,5,19,24 119:8, 25 120:6,11 143:6 146:21 147:11,19 148:15,25 150:6 151:14,18,24 152:4, 10,18,21 153:6,10,14 155:7,9 190:2 283:17 284:2 285:2,7,13,24 286:3,9, 19,21,22 287:15 288:15,22 290:3 291:13 292:5 300:4 307:16,18,21 308:11,13 315:25 316:17 329:6
**NIOSH's** 283:23 284:8,13,20 285:17, 20 287:1
**NIOSH/CDC** 144:1
**nitty-gritty** 124:10
**NOAA** 53:9 75:13 76:6 78:3 109:14 128:11 179:5 275:15,20 278:13,24 336:2 338:19 341:21
**NOAA's** 12:17
**Nobel** 182:25
**nod** 10:3 221:2
**non-bp** 106:13,23 107:3
**nondetectable** 286:5 309:13,20,24 310:4
**nonhuman** 164:23 172:4
**nonresponse** 305:18
**nonresponsive** 93:25 137:8 165:25
**nonresponsiveness** 337:11
**nonscientific** 249:3
**normal** 24:24 29:16 245:20 246:19 256:25
**notable** 296:2
**Notary** 8:5
**note** 70:9,16 71:4 132:9 174:11 292:10 343:11
**notebook** 14:15,17 27:10 33:17 41:11 85:14,19 176:3 184:18 193:17, 18 200:24 247:5,8 265:9,10,11,12
**notebooks** 193:19
**noted** 130:2 300:18,24 319:13 341:13
**notes** 46:15 68:11,21 318:11 343:19
**noteworthy** 170:25
**notice** 14:22 15:8 43:3 277:25 278:2
**noticeable** 339:7
**notify** 9:21
**notion** 281:12 325:16,23 333:20
**November** 273:7
**nuance** 255:14
**number** 20:9 75:20 76:7 80:16 86:23 91:23 92:5 111:8 149:19,24,25 150:10 160:7 162:2,5 175:10 220:21 262:19 265:18 301:10 317:1 330:24 331:4 334:7 343:10
**numbering** 20:8
**numbers** 21:3 150:9 175:9 306:21
**numeral** 86:6,7,15 87:11 317:10
**numerals** 256:19
**numerous** 178:3,7 276:15
**NYU** 269:15

O

**O'SHEA** 144:1
**oath** 10:14 42:15 57:2 315:24 316:17
**object** 73:6 84:17 102:14 123:22 181:18 185:13 319:21 321:3
**objecting** 67:20 90:4,22 91:18
**objection** 48:2 73:25 90:2 92:17 97:4 98:8 119:2 120:13 136:23 137:14,22 222:11 231:13 280:17 303:8 307:8,23 311:24 312:10 320:3 322:22
**objections** 166:12
**objective** 245:3 324:20 325:3,6,8,11, 19,24 332:21
**objectively** 222:18,21
**objectivity** 13:17 332:14,15
**obligation** 10:16
**obligations** 74:25 89:14 105:14
**obtain** 35:11
**obtuse** 221:25
**obvious** 244:14 312:18
**occasion** 78:6 229:14 230:25 311:8 335:2
**occasions** 53:16 331:10 332:5
**occupational** 122:21 283:17 284:21 290:11,12 307:20,24 308:13
**occur** 173:2 181:23
**occurred** 11:5 66:18 184:4 234:25
**occurring** 195:15
**occurs** 182:15
**ocean** 54:1 178:23 179:5 341:22

**oceanographic** 186:7 338:20,24 340:3 341:21,22

**oceanography** 248:9

**October** 7:5 269:15

**odd** 23:18 37:8 119:10

**odds** 316:6

**OELS** 286:6

**offense** 242:24

**offer** 56:11,15 58:23 60:19 96:14 271:8

**offered** 129:18,24 130:4 218:19 276:22 277:6

**offers** 88:23

**offhand** 27:8 31:18 66:25 250:14 326:13

**office** 176:22 178:16 314:16

**officer** 86:12 143:25 144:16 343:18

**officers** 86:12,18 87:3

**official** 54:9 298:24

**officials** 48:8 92:22 94:18 96:24 190:2 303:14 331:19

**offshore** 284:4 296:19

**oil** 12:16 59:20 64:8,11,15,25 65:10, 14,18,21,22,24 66:5,19 68:9,15 69:10 70:8 73:5,23 76:15 78:23,25 79:5,9, 13 81:25 82:5,9,16,19 87:18 97:16,22 121:5,14 126:21 143:8,9 146:23,24 169:7,9,19 170:1,18 172:17,21 174:19 194:5 195:3 239:25 240:14 241:10,11,13,17 242:1,6 249:11,20 250:1 254:17 259:22 293:20 304:20, 24 306:25 330:8,17 339:1

**oil's** 250:12

**old-fashioned** 263:24

**on-scene** 69:24 70:4,12,16 71:4,12, 22 80:10 84:13,14 85:8,10 86:2 89:22,23 90:18,25 91:22 107:14 109:6 293:15,19,22 295:14,17,23 296:17 297:3 298:20

**on-site** 100:5 125:24 284:14 292:12, 24

**one's** 57:6

**onshore** 284:4,7 301:15

**op-ed** 265:20

**OPA** 87:17

**open** 14:16,17 156:3 176:18,24 177:10 178:4,8 315:1

**operate** 91:2

**operated** 69:18 92:5 315:21

**operating** 70:11 111:16

**operation** 91:13 209:14 295:2 297:7

**operational** 80:14,22 108:22 110:11 308:18 309:4

**operations** 296:18,20 300:16

**opine** 74:23 76:20 98:22 199:2 241:15 293:13 309:2

**opined** 198:23,25 312:19

**opining** 85:9 259:12

**opinion** 58:15 59:1,6 77:16 95:11 96:18 98:5 99:13 100:3,7 101:1 102:5,8,9 108:20 114:21 115:16,19 120:4 129:2 133:10,11 136:16 137:16 138:10,11,14,15,23 157:15 174:4,22, 24 187:17 188:16 196:12,19,23 197:1,24 198:1 199:22 200:11,14 203:6 208:5,8,11 249:15,17,23 276:14,21 277:5 281:15 282:9,11 283:3 299:11 303:17 311:1,16 313:15,18 330:15,19 332:12 341:6

**opinions** 19:19 21:6,18 22:2 23:10, 16 24:2,8 26:10 27:7 48:13,17,21 56:11,14,17 57:8,13,17 58:1,3,9,16, 17,19,23 61:4 64:2 66:14 83:3,7 98:11 100:9 114:25 118:16 124:18 136:14 210:1,6 231:11 236:8,12,15, 21 238:7,10 239:20 241:2 259:6 260:18 266:25 269:22 279:10 281:24 283:24 285:20 296:6 297:4 301:21,23 302:4,9 303:1 304:6,12 306:14 307:1 308:10 311:4 330:14,21 334:10 335:14

**opportunity** 88:24 89:7 96:1 103:5 164:19 166:16 260:13 262:12 271:24 297:18 311:14

**opposed** 191:21

**opposition** 254:9

**option** 232:4 268:15

**or/and** 83:16

**oral** 213:14 214:1,4,5,8,9

**oranges** 160:16 308:2

**order** 29:20 206:22 231:19 279:25 330:18

**Oreskes** 7:8 8:3,9,15,17 9:20 13:18 34:24 37:16 38:16 39:18 41:11 43:1 47:17 60:25 61:19 63:11 85:13 103:25 166:17 220:20 280:2 314:12, 21,24 328:6 333:6 337:6 338:4 341:10 344:2

**Organic** 79:18

**organization** 99:3 106:4 145:17 181:16 244:13 284:17 299:25 339:16 342:21

**organizational** 319:15

**organizations** 217:9,12 257:18 338:23 339:8 341:20

**organize** 190:3

**organized** 202:21

**organizing** 338:18

**original** 224:12

**originally** 238:22

**Orleans** 179:15 184:12

**OSAT** 80:14,17,22 81:7 108:23 109:1,13,16,19,24 110:4,7,20,24 111:2,3,9,15,20 112:1,5 304:1,5

**OSAT's** 109:6

**OSHA** 52:4,6,11,14,18,21 81:24 82:4 83:25 104:10 124:9,21,25 287:4,5,15, 19,22 288:3,15,22 289:10,23 290:3 291:13 292:5,11,20,23 293:1,7,10 299:11,16,22 300:1,3,4,12,18,24 301:6,12,24 302:7,10,14,21,22 303:2, 10,14 307:16,18,21 308:11,13 309:12,16,18,19 310:2 315:25 316:17

**OSHA's** 79:25 80:6 287:8 300:9 302:2,5,6,25 303:6,17,23

**OSHA-NIOSH** 290:15

**OSHA/NIOSH** 121:21

**outcome** 187:15,16

**outlined** 68:5

**outlining** 300:5

**outright** 139:16 246:2,4,5

**outweighed** 316:2

**oversight** 294:14 302:16 303:6,10, 17,22

**Overview** 176:9 177:18

**overwhelming** 339:11

**Oxford** 8:19

**ozone** 242:19

## P

**P.L.C.** 256:10

**p.m.** 141:24 142:7 189:9 201:2 272:9 275:2 314:5 337:3 343:8 344:8

**packages** 304:14

**pad** 343:11

**pages** 21:3 42:3,10,11 57:16,25 58:16,21 67:9 68:4 127:11 231:17 333:9,22 334:2,24 343:13

**paid** 11:6 32:13 94:10 133:17

**paints** 234:19

**paper** 26:16 173:5 204:2,4,5 205:7,8,14,15,17,18,20 206:9,16,22,24 207:1,6,17,19,20 208:1,3,23 221:19 245:12 246:8,11,13,18,22 249:16 263:23,24 264:1,5,8

**papers** 26:15 196:1,5,8 198:13 202:20 203:25 204:24 206:1 208:19,25 240:21 244:7,22 245:10,16,22,25 263:10

**paragraph** 86:25 87:10,14 144:25 147:2 163:18 174:9,14 177:6,9 189:20,21 192:6 197:2 201:8 228:14 317:19,21 318:10 319:9,13 322:1

**paragraphs** 56:2 191:12 192:4

**parameters** 195:19

**part** 12:20 15:18 27:21 30:23 31:6 33:11 60:7 97:19 109:16 135:3 143:11 157:15 160:23 167:23 171:15 210:16,19 214:1 240:3 245:20 250:8 251:19 259:7 260:1,3,24 262:20 270:3 285:6 287:25 317:4 318:17,21,24 319:6,24 327:23 342:14

**participants** 179:22

**participate** 255:3,18 288:13 318:25 319:2

**participated** 84:12 87:5,25 89:24 240:13 254:12

**participation** 177:10 178:9

**particularity** 207:12

**particulate** 241:21

**parties** 83:20 104:19 106:16 187:18 228:21 229:1 271:14 333:10

**parts** 260:7

**party** 69:23 70:20,21 84:7,9,12,16 87:5,22 294:17

**Paskewich** 43:19 45:2,24 62:1 63:4 68:24 69:3,25 107:7 115:2 120:15 234:18

**Paskewich's** 64:18 107:10

**pass** 74:5,7 196:15

**passed** 19:8 218:21

**passing** 48:23 217:19

**passive** 102:10,18

**past** 48:8 212:18,24 218:11 220:11 249:7 271:2

**pastness** 212:18,24

**path** 130:16,20 132:10

**pattern** 233:4,6

**Paul** 46:2,4 47:2,6,16 62:8 314:11

**pause** 141:16

**pausing** 52:5

**pay** 169:14 235:24

**pedantic** 90:6

**peer** 26:5,13,15 221:19 245:21 246:11 266:7,9 267:9,12

**peer-review** 245:9 246:9 267:16

**peer-reviewed** 23:8,14 24:1,6,25 26:8 27:5 173:6 221:13 222:4,9 239:17 244:22 249:16 269:20

**peer-reviewers** 245:11

**peers** 243:23,24

**penalty** 228:11

**pending** 10:10

**Pennsylvania** 9:8

**people** 7:21 11:5 22:22 24:22 49:10 74:13 75:13 85:3 89:6 91:13 92:19 95:9 96:4 97:7 99:2 100:5 103:11,14,19 106:4 107:17 119:22 120:23 126:9,10 131:10 140:2 141:20 155:13 167:21 171:21,22,24 173:11 177:1 181:7,21 182:24 185:16 186:3,5,11 187:13 191:14 197:14 204:13 207:18 213:15,21 217:17 218:10 223:19 235:4,13 242:21 249:1 259:15,16,21,23 260:7 275:11 280:5 295:7 296:22 298:16 308:1 320:24,25 323:16 324:3 339:23 340:1

**people's** 213:18

**perceive** 181:15

**percent** 68:21 157:17,22 159:25 160:5,9,13,14,19,24 161:1,9,16 162:17 163:2,15 168:17 232:19 307:19 308:11,17 309:3,12,20 310:3 312:24

**percentage** 160:2 162:8

**perfect** 19:13 93:8

**performed** 49:12,21 50:7,12

**performing** 301:14

**period** 37:13

**perjury** 228:11

**permission** 255:21

**permit** 199:2

**permitted** 204:17 268:12

**persistent** 295:3

**person** 23:20 55:7 78:11 93:17 120:20 124:15 137:16 223:14 340:14,16,25

**personal** 124:17 285:7,20 313:15 320:14 323:3,10

**personally** 114:19 180:23

**personnel** 289:23

**persons** 92:5

**persuade** 95:12,24 96:6 116:2 155:9

**persuaded** 117:10 118:5 155:7 324:7

**persuasive** 230:4

**pertain** 163:8 164:8 313:22

**pertained** 172:11

**pertaining** 71:20 72:8 173:13 183:14 249:5 258:18

**pertinent** 72:11

**petroleum** 168:13 169:7 171:7 249:25 333:11

**petroleum/dispersant** 169:24 171:2

**petty** 86:12

**Ph.d.** 8:3 215:4 216:13,22,24

**Philip** 138:1,2

**philosopher** 139:8,13

**philosophy** 139:9

**phrase** 74:1 139:11,12 235:3

**phrased** 252:3

**physical** 168:12 169:5,14 170:13 182:2

**physically** 301:1

**physician** 30:9

**picked** 188:6

**picture** 99:18 234:19,22

**piece** 26:21,22 123:2 249:11,12,15, 17 250:11 252:10 265:20

**pieces** 249:23 258:13

**place** 57:21 70:10 88:23 89:17 93:3 94:18 96:16 126:1 135:6 208:20 276:10 295:8 297:19 338:12

**places** 75:12 89:5 202:25 305:17

**Placing** 227:22

**plaintiff** 11:22 43:8 44:2,6,9 51:9 108:10 209:20 224:4 272:16 338:2

**plaintiff's** 15:19,22 16:3,6,19 17:23 18:16,21 28:4,10,13,18 31:8 33:2,10, 11 36:3 42:16 43:21,22 45:15 46:12 55:9 61:21 62:11 64:22 67:24 77:25 78:6 108:16 114:13 115:9 210:2 225:5,19,24 226:7,11,16 227:7 228:16,19,25 229:5,10,15,21 230:24 236:6 273:1,16 310:18 322:3 326:16, 24 327:2 328:14 333:8,14 336:19

**plaintiffs** 45:14 77:15 108:13 280:11

**plan** 12:19 45:18 64:19,25 66:7,11, 14,17 67:5,6,19 68:1,5,7,9,15 69:3,4, 7,11 82:10,16,19 94:24,25 107:11,12, 13,16 117:7 276:24 277:8 278:12,20, 22 292:7 293:18

**plane** 344:5

**planned** 96:10

**planning** 41:6

**plans** 12:11 65:23 66:21,23 67:2 68:18,22 69:15 73:5,24 76:15,17 78:4 107:18 117:5 288:16,23 289:2 318:2

**plausible** 68:10 160:7 234:23 250:16 255:2

**play** 171:9,12

**played** 60:16 72:21

**playing** 74:22 96:17 203:10,15 204:7 338:25

**plays** 89:9,10

**pled** 132:16 133:18

**point** 22:10 26:13 28:19 55:12 75:16, 17 78:19 88:22 95:25 104:18 107:15 111:1,13 117:4 155:8 163:24 164:4,9, 14,15 165:25 167:12 168:16 171:13, 18,20 172:6 191:9 195:8 207:16,18 208:22 226:23 231:16 237:2 247:8 251:22 252:4 258:23 259:14 265:4 280:8 281:10 283:1 291:2,16 307:11 319:8 325:19 335:3 337:7 338:16,21 339:20

**pointed** 117:3 262:10 332:4

**pointing** 262:18

**points** 164:22 208:25 294:10 297:6

**Policy** 176:23 178:17

**political** 251:2,7

**pollution** 65:21 66:5,19 82:10

**poof** 128:4

**populations** 180:4

**Porter** 90:15 278:4

**portion** 164:14

**portions** 224:14

**position** 18:1 47:12 97:6 108:20 119:20 124:17 170:10 197:19 240:10 306:7,9 319:22 330:12

**positions** 294:15

**positive** 183:17

**possess** 214:20

**possession** 333:13 343:18

**possibilities** 139:22

**possibility** 41:3 93:4 103:12 108:14 136:2 183:5 268:13 288:11 309:8

**possibly** 124:1 168:5

**post** 305:15

**postdated** 78:12

**postdoc** 231:22

**posts** 318:11

**potential** 28:23 116:16,18,19 169:10,19 170:21 171:9 186:10 241:10,17,21 242:5 284:15 297:8 298:11 310:7 341:7

**potentially** 28:25 40:23 169:21 170:2,7 180:4 183:4 202:9 308:24 335:1 337:13

**power** 253:2

**powerful** 265:5

**PPE** 287:16 298:13,18 299:6 300:5 323:6,13,17,19 324:1

**PPES** 49:8

**practice** 24:24 201:16 206:21 235:11 248:6,8

**practices** 211:4 219:11 223:8,18 284:16

**practicing** 218:22 220:23

**precautions** 300:13

**precedes** 29:8

**precisely** 30:18 305:22

**predated** 78:12

**prefer** 213:17

**preferable** 103:7

**preliminary** 17:8 30:17 35:24

**preparation** 14:5 28:7 63:17 73:1 78:21 79:7,13,19 80:1 270:3

**prepare** 11:19

**prepared** 63:21 70:2,15 71:3,19,25 72:12 73:14,19 98:1 304:12 305:9 307:18 309:11 312:4 316:16

**preparedness** 73:4,22 76:14 81:21

**preparing** 19:4,10 21:18 24:14 27:15 49:1 69:5,9,13 71:11

**present** 48:8 179:9 240:7

**presented** 33:6 235:15,19 238:8 255:7 319:14

**preserve** 63:12,14

**president** 340:7

**presidential** 16:14 56:22

**press** 194:23 195:9 197:3

**pressing** 286:11

**pressure** 119:23

**pressures** 270:25

**prestigious** 244:23,24

**pretty** 170:11 192:14 233:5 244:14 246:1 252:15

**prevent** 156:8,18 257:22 300:14

**prevented** 115:23,25 276:17

**previous** 44:20 191:12 192:6 199:8 259:5 261:1 312:25 331:9

**previously** 9:18 83:4 152:8,11 162:19 209:3 222:2

**primarily** 210:12,23 339:8

**primary** 339:17 341:22 342:21

**principles** 219:7,11

**printout** 176:12

**prior** 107:6 146:7 203:12,16 304:5 307:1 335:6

**priorities** 164:24 168:23 170:16

**priority** 170:12,17 294:18 331:21

**priors** 259:5

**privately** 264:10

**privilege** 62:14,15,19,21 63:5 130:24 131:1,7,25 132:7,11 133:2,4,23 134:3,7,21 135:20 136:3,9,22 137:13, 21,25 138:13,15,18,22 227:3 229:18 230:17 261:21 330:5 332:7,25 334:8, 11

**privileged** 321:14

**privileges** 230:16

**privy** 125:25 126:1

**Prize** 182:25

**problem** 25:19 100:24 164:1 218:15 231:20,21

**problematic** 202:9 233:9,11,15 260:2,4,8 327:17,18

**problems** 130:9 140:1 306:1

**procedural** 21:16

**procedure** 205:24

**procedures** 21:23 49:5 64:6 284:16 313:16

**proceeding** 267:14

**process** 16:21 17:8 18:2 19:25 31:7 78:10 83:21 89:2 130:15 204:2 216:25 217:13 245:9 246:10 267:16 326:5,23 327:16

**processes** 26:14,15 217:17

**produce** 15:13 47:24 63:14 103:13 308:23 343:22

**produced** 22:24 28:2 32:20,24 47:23 111:15 228:16 233:20,21 296:23 307:12 322:3

**producing** 128:12

**product** 9:4 47:22 48:4 63:13,15 237:23

**production** 7:10 27:22,24

**productions** 17:13

**products** 257:1

**profession** 22:5 218:20

**professional** 122:7 175:17 213:6,10 217:2 245:8

**professions** 218:23

**professor** 9:7 124:20,25 126:4 211:6 219:14 230:17

**proffer** 38:20 39:3

**profound** 135:18

**program** 88:12 114:4,6 117:6 139:24 173:2 175:14 176:9,14 177:18 190:2, 3,23 191:3 193:6 292:4,8 295:3 305:4,23 307:11 308:22 338:11,13 339:24 340:22 341:1

**programme** 190:11

**programs** 90:13 91:16

**progress** 218:16

**project** 184:22 191:16 274:15 328:13

**projects** 159:17,22 160:4

**prolific** 258:9

**pronounce** 78:2 162:3

**pronounced** 113:23

**pronounces** 46:24

**proof** 130:3,6 157:2,12 187:1 188:21, 24 201:20 283:4

**proper** 224:24

**properly** 103:2

**property** 340:20,25

**proposed** 17:5 117:7 288:16,23

**proposition** 146:19 149:8 150:6 151:14 152:4 153:6,9 260:22 262:5

**propositions** 261:17

**protect** 281:25 282:4,10,12,15,16, 23,25 287:1,9 291:24 342:15,23

**protected** 283:2 332:25 334:8,11

**protecting** 82:22 283:13 290:16 299:1 301:9

**protection** 283:7 300:19 302:18 303:7,19

**protective** 323:4,11

**protocol** 145:2,4 148:10,14 257:23 258:4

**protocols** 100:16,20 313:3

**prove** 130:10 131:14 181:11 192:2

**proves** 129:24 191:23 283:2

**provide** 21:21 38:15 47:18 63:10 67:25 273:21 314:20,23 316:12 322:19,21

**provided** 17:13 18:21 27:21 47:15, 16 63:11 68:3 78:1 116:5 225:5,6,19, 24 226:7,10,16 272:16,25 273:23 330:14 332:9

**providing** 15:22 316:7

**psychologist** 240:16

**public** 8:5 16:13 159:17,21 160:2,19, 21 163:2 164:11,13 165:1,7 168:3,7, 18,19,21 170:9,11,16 176:18,24,25 177:3,10 178:5,8 179:25 180:10,11 183:10,13 184:9 226:13 251:15 294:15 296:2 339:8,16 340:24 341:16,25 342:8,12

**public-facing** 264:19

**publication** 156:8,18 201:20,21 202:11,19 203:7 204:8,9 205:3,10,16, 25 207:9,13 208:14,18,24 245:10,24 246:23 258:9

**publications** 55:2 201:25 202:14 203:8,11,12,15,19 204:1,17 247:13 248:13 263:5

**publicly** 19:17 56:20,23 210:3,7 264:10 340:9

**publish** 41:6 262:14

**published** 23:7,14,21,25 24:6 26:5, 8,12 27:4 121:11,13 122:17 198:13 203:25 207:19 208:4,23 211:15,17 239:16 240:21 244:6,21 245:12 246:11 247:15,16,19 249:11,14,19 250:5 263:8,10,18 285:2

**publishing** 173:5

**pull** 97:21

**pulled** 12:15

**purposes** 18:25 19:3,10 43:1 60:4, 24 61:9 69:5,9,13 83:2 98:20 112:19, 24 113:8,14,18 190:20 234:9 236:8 237:16,19 285:19 306:14 310:25 312:23 325:1 328:12 335:22

**pursue** 17:22 96:6 162:6 180:16 223:19 334:17,22 335:13 336:5

**pursued** 334:17

**pursuing** 78:15

**purview** 65:19

**push** 271:1

**put** 20:2 57:21 68:13 118:7 120:14 134:23 137:24 138:20 157:17 168:19 174:6 187:11 198:9 204:18 252:18 255:15 274:3 334:10 343:5

**puts** 124:2 192:15

**Putt** 192:7

**putting** 61:11 192:3,9 249:20

**Q**

**qualification** 338:4

**qualifications** 215:10 217:14,18 343:4

**qualified** 279:22

**qualify** 60:6 338:14

**qualitative** 268:21 284:15

**quality** 49:21 50:7,12 89:18 96:19 103:14 125:22 199:19 248:25 276:16 289:20 312:7 313:3,17,21,22

**quantify** 263:16

**quantitative** 284:14

**quantity** 223:11 276:16 311:21

**queried** 203:3

**query** 115:8

**question** 9:23 10:10 19:1 23:18,24 24:9,20 25:9 26:3 29:3 43:23 44:20 48:25 58:5 59:5 70:5 73:9,11 76:24 78:9 90:11 94:4,8,12,13 96:23 101:7 102:14 107:5 109:17 110:13,14,24,25 111:1 115:1 117:24 118:22 120:9 123:15 129:7 130:6,24 131:12,13 132:4 134:10,16 138:6 148:22 154:7,9,11,14,20 155:1 163:5,6 166:1,3,6,9,23 167:7,8,11,13,23 169:15 173:18 185:9,10,12 187:6,7,8,10 196:18 198:4 199:8,11 206:23 211:10 216:5 219:22 220:1,5,18 222:1 223:6 230:11 232:12 238:2,16 239:2 250:20 253:19 267:19 282:18,20 297:24 299:15 302:9 303:12 304:8 307:25 309:14 311:7 314:21 316:11 318:20 324:3 326:4 328:25 329:1 331:9 332:15 340:20 341:10

**questionable** 84:20 127:15 140:15

**questioned** 76:12 91:24 106:22 107:2 117:20 118:1,19,24 198:22 243:22 244:1,6 289:20

**questioning** 110:10 190:20 226:9 272:15 337:7

**questions** 7:24 8:11 9:17,20 10:1 28:7 30:1 48:24 50:4 55:15 63:23 71:8 75:21 76:3,6 77:4,17 78:3,18 85:11 89:18 125:22 132:4,6 166:7,18,21 167:22 220:9 237:7 238:15 239:21 246:17 279:17 285:11 293:12 306:23 309:9 314:24 323:16 327:17 332:19 337:11,16,19,24 341:2,8 342:5 343:4

**questions?'** 192:13

**quick** 315:2

**quotation** 20:11 202:2

**quotations** 249:20

**quote** 26:11 122:9 190:5,7,21 270:5,8,16 291:6

**quoted** 190:7 192:5 235:9

**quotes** 188:7 192:10,16

**R**

**rain** 242:19

**raise** 76:6 89:18 103:12 131:21 140:3 246:17 332:19

**raised** 78:3 90:11 123:8 125:5,8 296:12 309:7 316:11 332:13

**raises** 107:25 115:4 133:7 135:10 136:1 340:20

**raising** 52:13 75:17,20 99:3 135:17 323:16

**Ralph** 275:9

**random** 88:25

**rare** 120:20

**rarely** 128:4

**rate** 281:5,8,9,11,14,18,20

**ratifying** 257:23

**rational** 171:19

**rationale** 118:19,25

**reach** 29:13 236:15

**reached** 28:13 92:12 238:7

**reaching** 48:17,21 64:2 117:6 157:21 238:7

**read** 22:7 27:18 44:22 56:22 57:1,3,6 66:9 72:7,10 81:3 88:7 92:2,24 95:11 98:7,10,17,19,23 111:20 112:5 118:11,13,15 119:14 120:3,5 122:2 123:3,16,17 124:7 144:8 147:6,9 171:20 172:23 191:11,13 195:22,25 196:3,4,5 205:17 225:12,18,21,22 229:25 230:1,6 234:2 255:13 263:24 279:25 293:3 319:9

**reader** 138:21

**reading** 57:7 85:17 210:13,16,24 215:19

**reads** 150:12

**reagents** 281:1

**real** 231:21

**reality** 325:17

**realize** 20:11

**realized** 45:7

**reason** 10:9,19,21 57:20 70:23 77:21 81:4 88:5 92:13 103:4 109:11,17 110:23 111:1 124:14 129:18 130:2 140:14 180:24 185:5 213:20,23 214:4 266:5 289:14 324:3 334:24

**reasons** 95:9,10 119:23 249:2

**recall** 12:2 14:11 20:16 26:18 27:17 42:17 62:21 67:3 79:10,11,15,23 80:3,8,20,24,25 81:13 107:7 125:1 205:9,10 207:3 246:8 249:10,12 251:17,18 283:22 288:10

**recalling** 79:7

**receive** 229:4 263:3

**received** 33:9 43:16 67:13 140:24 228:20,25 229:8 236:6 283:18 289:12,21

**recent** 42:21

**recently** 9:6

**receptivity** 258:17

**recess** 61:15 141:24 142:7 189:9 272:9 275:2 314:5

**recited** 58:20

**recites** 22:16

**recognize** 25:23 34:9,12,24 35:2 41:14 42:1,5 143:2 278:17

**recognized** 260:21

**recognizes** 192:9

**recollection** 338:7

**recommend** 116:24

**recommendation** 245:11 246:10,13

**recommendations** 277:2
**recommended** 104:20
**reconstruction** 214:11
**record** 7:3,12 8:14 12:23 16:13 60:22 61:12,14,17 63:24 141:21,23 142:3,4,6,9 177:16 188:1 189:6,8,11 200:12 201:1,2,4,9 212:20 213:2 225:17 245:24 258:9 272:4,6,8,11 275:1,4 295:1 296:24 314:1,4,7 321:7 336:22,23 337:2,3,5,14,17 340:12 343:5,7,8,9 344:7,8
**records** 51:13
**recovery** 50:1 171:19,24 172:3
**recruited** 74:14
**recrunching** 306:20
**red** 131:13 133:7
**reduction** 145:4
**Reese** 275:11
**reexamining** 243:14
**refer** 41:18 54:13 70:20 74:3 92:9 148:12 177:3 201:14,15 228:14 249:25 291:20 292:2 300:8
**reference** 66:8 126:15 145:16,17 162:9 287:7 289:8 293:1 302:20
**referenced** 13:20 276:2
**references** 105:1 276:4 286:13 305:13
**referred** 14:7 20:10 21:11 72:5,18 80:17 84:8 114:4 207:11 252:5 264:2 269:5 285:13 292:18 321:24 331:10
**referring** 21:3 67:6,12 69:3 147:24 151:2 183:22 184:11,14 188:12 297:21 333:7 338:10
**refers** 64:19 66:23 68:25 148:11 172:3 183:18 249:19
**reflect** 58:13
**reflected** 36:25 38:1 295:2
**refocus** 166:4
**refrain** 166:22
**refresh** 338:6
**refused** 131:16
**refusing** 227:10
**regard** 217:20
**regional** 73:5,23 76:15 82:16,19
**regularly** 42:20
**regulation** 54:1 71:12 72:3
**regulations** 64:9,12,15 65:10 66:2 71:20,24 72:8,10 73:2,16,18,21 76:9 77:4,5,7 82:8
**regulations'** 76:12
**Reid** 27:14
**reiterated** 266:25
**reject** 249:1
**rejected** 245:23 246:2
**rejection** 246:5
**relate** 248:3
**related** 39:13 78:15 127:14 128:17 155:15 210:3 244:8 251:7 257:6,12
**relating** 30:10 40:22 64:15 65:10 257:3,8
**relation** 11:6 121:12,19 170:23
**relationship** 244:7 340:10
**relationships** 320:25
**release** 190:8 194:23,24 195:9 197:3
**released** 59:14
**relevance** 165:11 171:9 174:1 233:16
**relevant** 22:14 23:22,24 26:16 29:22 30:2 31:4,11 36:8,18 39:14 56:25 57:22 77:13,14,20,23 78:9,20 116:20 121:1 134:5 168:7 169:10,12,19,21 170:2,7,19 173:4,11 196:15 217:5 220:5 226:25 231:2 233:15 241:1,15 261:5 263:10 265:3 284:24 295:17 307:25 327:1 328:1,4,17,21 329:3,6,10 334:3,5,18 335:7,13
**reliability** 101:7 106:5,23 107:3
**reliable** 89:2 99:14 101:2,3,5 102:24 105:25 106:14 129:19,25 130:4 152:15
**reliably** 108:2 117:22 118:3
**relied** 19:15,19 21:6,15 108:7,11 157:22 198:23 199:2,13,17,20 200:4,18 229:10 268:11 306:10
**relies** 139:1,5 140:8 210:23
**rely** 63:16 106:18,23 107:3 230:23
**relying** 89:19 103:8 210:5
**remain** 58:17 330:12
**remediation** 172:17,21
**remedied** 20:22
**remember** 15:3,5 27:8 28:11 31:1,15,18 32:1 35:23 46:16 65:5 115:2 165:13 250:13,14,15 270:2 271:16 305:12 326:13 342:2
**remembering** 65:6
**remind** 64:17 100:10 250:18
**reminiscent** 165:14
**remit** 124:19
**removed** 155:11
**render** 22:1 141:13 330:18
**rendered** 118:15 299:10 301:21,23 302:5,10 308:9 311:15
**rendering** 112:19,25 236:8 283:24 285:20 303:1,17 304:5 306:14 307:1 310:25
**renewed** 243:6,8
**reopen** 220:7 337:9
**repeat** 59:5 118:22 133:15 196:18 285:11 295:5 299:15
**rephrase** 73:13 172:25
**replicability** 93:9
**replicable** 280:25
**replicate** 279:18,19 280:15
**replication** 280:24 281:3
**report** 11:1,4,23,25 12:4 13:24,25 14:2,7 15:18 16:16 18:18 19:4,11,15 21:5,18,24 22:2,11,15,25 24:14 25:6,20,23 26:1,19 27:15 28:8 36:15 39:9,11,20,23,24 40:4,7 41:1,15,19 42:19 45:9,10,11,14,15,20,22 46:1,5,8,18 47:2,6,9,10,11,16 48:14,18,22 49:2 55:19,20,21 56:4,10,13,18 57:14,17,25 58:17 61:23 62:7 63:18,21 64:3,19,24 65:14 66:11 68:25 69:6,10,14 70:1,2,9,16,23 71:3,11,19,25 72:12,22 73:1,15,20 75:3,7,12,14 76:16 78:22 79:8,14,19,22 80:1,6,9,11,13,14,19,21,22,24 81:3,8,10,15,17,19,23 82:2,3,7 83:1 86:1,10,11,17,21 87:3 88:8,20 89:3,23 90:17,19 91:25 92:10 93:1 98:7,10,16,17,20,21,23,24 99:5 100:6,8,9,12 103:1,24 105:11 106:17 107:10 108:6,10,16 109:10 111:3,20,21 112:1,5,7,12,19,25 113:8,14,18 116:22 117:17,19 118:4,11,13,18,24 119:14 120:3,5,15 121:24,25 122:3,9,12 123:10,16 124:7 126:13,15,19

127:11 129:14 130:12 134:24 138:16, 24 140:20 143:5,12,14,17 144:6 145:10 146:11,18,19,20 147:1,3,8,25 149:10 150:16,25 153:23 154:20 155:21 156:4,6,10,16 157:1,11 160:1 161:1 162:11,12,15,20 164:6,20 166:18 174:5 175:21 188:6,10 189:14,15,24 190:6 195:7 196:8 198:15,17,22 199:18 200:23 201:7,8, 15,19 204:16,21 205:6 206:12,16 207:4,7,13 209:7,9,16,20,21,23 210:8 212:6 224:13,14,17 225:23 226:20 230:5,8 232:11,15 234:5,7,10,18,24 235:9,16 236:11,25 237:6,12,15,18 261:3,11,14,17 262:4,8,21,24 266:14 267:1 268:11 270:6,16 271:19,20 274:19 276:14 277:4,9,11,18 283:5, 10 286:1,18,21,25 287:14 290:2,14 291:4,7,12,19 292:3,6,10,16,22 293:4,11,14,22 294:2,21 295:11,22 296:17 297:3,25 298:6,21,24 299:4,5, 6 301:4 303:2,5,17,22 305:10 307:18 308:3,9 309:11 310:23 312:4 314:11 315:3 316:16,21,24 317:7 318:10 320:23 321:9 324:18,22,23 325:1,10, 11 326:1,12,17,22 327:25 328:17 329:7,16,21,22,24,25 330:13,21 331:10,11 335:15,17

**reported** 99:24,25 162:1 291:13 295:1

**reporter** 7:25 9:24 315:5,9

**reporting** 89:6 91:16 299:24

**reports** 12:8 13:12 22:24 43:7,14,18 44:2,6,12,17,21,25 45:3,24 54:9 60:8 62:22 63:4 70:20 81:7 82:25 83:2,6 84:10 91:10,23,25 92:6,9,13,24 97:5 98:18 101:12 106:18,21,23 107:3,6 108:13,19 115:3,4 120:16 121:1,3 226:12,13 235:19 285:3 301:19 304:1,5 324:19 325:13 328:6

**represent** 95:16 323:23

**representation** 95:20 147:22 148:25 152:21 153:13 155:25

**representations** 97:10 182:3

**representative** 128:11 278:25 279:3

**representatives** 84:15 88:2 89:25 109:14,20,25 110:7 179:10 317:23 322:5,10,21

**represented** 143:6 146:20 147:11, 19 149:8 150:6 151:14,24 152:4,14 153:6

**representing** 124:10

**represents** 124:16

**reputable** 215:5

**reputation** 13:14,17 29:7 30:3

**request** 15:20 21:12 22:9 23:5,19 28:5 38:15 47:15 63:10 225:7 229:15 283:18 284:3 287:2 304:16 322:13,14

**requested** 15:24 40:19 227:1 229:20 332:22

**requests** 21:14 23:6

**require** 73:3,21 215:21 271:15

**required** 17:7 214:24 215:14 323:14

**requirement** 66:3,6,20 76:13

**requirements** 81:24 232:3 287:20 288:3,9 289:6 301:15

**requires** 65:22 212:23 213:1 215:19

**requiring** 212:17

**reread** 11:22,23

**research** 17:1 30:22 31:6 36:7 37:21 38:16 54:24 55:24 91:6 124:18 157:23 159:4,11,17 160:4 161:3 164:22,24 167:15,20,21 169:5,22 171:1 173:1,13,19,25 174:6,7,17,23 175:13,14,23 176:9,11,14 177:2,6,17, 25 178:23 180:11,15,19,25 181:10, 15,20 184:23 185:3,7,22 186:3,8,13, 19,23 187:3,17 188:18,23 191:17,21, 24 192:8,21 193:2,6,9,12 194:24 196:25 211:19 215:20 242:10 243:18 248:10 257:18 272:18 323:20 325:19, 25 338:11,13 339:24 340:22 341:1,5 342:3 343:20

**researcher** 17:3

**researchers** 175:17 179:8 181:7

**researching** 48:13

**reserve** 35:10 337:8,23

**reserving** 48:4

**resident** 129:11 209:4

**residential** 209:16

**residents** 127:1 128:25 129:3,8 141:14 209:12 298:5

**resisted** 116:1 156:7,17

**resolve** 233:2

**resort** 300:20

**respect** 15:17 18:15,20 24:17 29:1 36:14 37:5 76:10 82:25 84:5 90:17 92:12,21 96:22,24 98:18 108:21 115:12 121:14 128:22,25 129:3 130:13 132:8,18,22 133:9,17 136:21 141:11,13 148:5 153:4 160:1 161:12, 17 163:6,16 164:5 183:11 186:11,19, 23 188:23 192:24 197:24 198:21 209:2,14 212:17,23 215:11 217:21 231:6 232:6 236:5 237:13 242:18 244:21 251:3 253:25 258:16 262:23 281:9 283:7 287:4 288:12 298:13 300:3,10,25 301:24 302:11 304:11 308:4,8 311:4 320:15,22 322:17 324:9,13 330:6 335:21

**respiration** 93:18

**respirator** 316:18

**respirators** 299:7 300:10,19,22,25 301:5 316:1,3,8,11,12

**respiratory** 241:25 300:13

**respond** 65:24 85:5 87:18 235:9 335:3

**responding** 75:14 76:2 316:10 323:15

**response** 13:16 27:21 33:12 49:5,9 50:21 51:20 63:25 64:6,25 68:9,15 69:11,18 70:11 72:1,2,6,8,13,21,23 73:5,23 74:22 75:5,9 76:15 78:22,24, 25 79:3,4,8,12,25 80:6 81:12,17 82:4, 16,19,22 86:3 87:6 88:1 90:20 92:1,4, 7,15,16 103:11 104:8,11,14,17,23 105:9 114:11,18,23 115:23 116:24 117:14 121:22 122:23 123:9 125:4 128:22 129:6 145:19 154:13,24 155:18 172:15,21 180:19 194:25 195:11 203:13 209:4,8 226:6,22 228:21 231:8 234:12 240:1,4,8,11,13 242:1,5 258:19 260:9 283:7,13,18 284:4,8 286:12 287:1,5,6,9,10,21 288:4,17,24 289:7,17,23 290:4,15 292:24 295:2 296:4,23 298:7 299:2, 13,19 300:9,25 301:7,15,24 302:11, 25 303:23 306:24 311:22 313:5,10,23 316:19 318:14,17,21,24 319:11,14,20 320:15 324:10,15 328:20 329:3,13,14 330:7,8,9 335:24 336:7,12 341:13

**responses** 65:15,18 70:18 71:6,13 179:25

**responsibilities** 89:14,16 91:12

**responsibility** 70:18 71:5,13,21 74:4 85:9 87:17 293:18 317:18

**responsible** 69:23 70:20,21 84:7,9, 12,16 87:5,22 250:21,24 251:2 259:1

**responsive** 15:20 18:12 21:22 28:4 94:2,9,14 96:15 97:9 119:7 120:9 165:19 166:8,18 181:5 219:22 220:9,

18 225:6 234:13,21 294:17 333:24

**rest** 343:13

**restate** 73:9,13

**restoration** 12:17 191:18,21,25

**restrict** 166:15

**restricted** 38:21 74:8 330:4

**resubmit** 245:18 246:1,19

**result** 51:19 256:25 271:7

**resulted** 245:10 246:10

**results** 111:18 117:20 118:2 128:13 159:12 170:8 286:4 304:19 305:25 307:20 308:12,17 309:3

**retained** 131:25 224:3 235:20 241:16,20 321:13

**retaining** 29:12

**retracted** 246:22

**retrospect** 120:1

**return** 203:1

**reveal** 331:19

**review** 16:17 17:9 18:8,10 26:12,13, 14,15,21,22,25 44:24,25 46:8,11,20 51:11,13,15 62:13 63:7 67:1,4 71:20, 23 73:17 74:16 77:4,5,12,18 78:19,22 79:16,24 81:21 82:3 102:3 105:18,22 106:15,20 108:12 109:16 112:11 121:21 130:15 202:24 210:1 221:19 224:3 229:7,11 231:15 236:7 238:3,6 245:7,8,22 262:25 266:7,10 267:9,12 269:9,15 271:19 279:9 286:6 287:12, 17 288:14,19,21 290:6,14 292:19,20 299:13,19 302:2,12 303:21 305:6,15 306:3,5,6,24 307:16 308:15 311:9,15, 23 312:20,22 313:20 322:12 328:5,9, 10 330:25 331:4 333:4,18

**reviewed** 12:2,3,5 14:1,2,3,5,12 15:18 16:8,21 43:13 44:5 45:23 46:1 57:23 64:8,11 65:5 67:16,17 73:15 79:8 108:15,17,19 109:10 114:9,16, 19 129:9 147:16 194:11 195:19 198:5,10 203:7 208:25 221:20 226:15 231:9 232:8,18 251:11 266:19 286:8 287:25 288:16,23 290:20 292:4 296:13 301:12 302:24 304:14,23 307:5 312:25 313:8,21 315:16,19 321:7 322:7,18 329:25 330:17,21

**reviewer** 246:16

**reviewers** 246:11

**reviewing** 18:1 19:8 20:7 80:3

114:15 197:18 199:20 203:11 258:23 301:25 302:5 305:10

**revise** 246:1

**revised** 40:4

**revisions** 246:18

**rewrite** 245:18

**Rhetoric** 267:24

**Richard** 95:4 148:13 189:22,25

**rig** 235:4 298:10

**rightly** 132:7 223:10

**rights** 35:11

**rigor** 215:19,21,23 216:5

**rigorous** 109:8 262:13

**rigorously** 260:16 261:16

**ringing** 311:13

**rise** 342:1,8

**risk** 90:5 103:2,14 168:20 211:14,15

**risks** 316:1

**Rita** 180:18 183:3 186:21 339:22

**Robert** 62:3

**robust** 326:21

**robustness** 139:23

**role** 60:16 72:21 74:6,22,24 79:25 80:6 89:9,10 96:17 124:8 203:11,15 204:7 283:6,12,15 287:8,12,15 290:3 292:20 300:3,9 302:5,25 303:23 335:19 338:25

**roles** 89:15 91:12 185:17 238:16

**Roman** 86:4,6,7,13,15 87:11 256:18 317:10

**room** 333:20

**roughly** 150:13,24 151:10

**routes** 93:19

**routine** 206:21

**routinely** 24:22 271:1 299:11,16,20

**RP** 70:21 71:1 87:4,17,21,25 88:2,9 89:24 90:1 317:18,23 318:4

**RPS** 294:17

**rubbish** 333:24 334:1

**rule** 219:15

**rule-based** 218:23

**rule-bound** 218:20

**rules** 215:3 218:19,22 219:6,10 220:15

**run** 190:11 191:3 310:8

**runs** 340:3

**Russell** 192:7

## S

**safely** 289:12

**safety** 49:5 64:6 122:21 235:3 283:17 287:9 290:11,12,16,24 291:8, 15 294:10,15,17 295:1,3,25 296:24 297:20 298:7,9,10,14 299:1,14,19 310:10 318:13

**salient** 17:18,21 19:6 70:14 71:8 75:23 85:11 293:4,12 297:19,23

**sample** 111:14 310:10

**sampled** 286:4

**samples** 50:16 55:8 88:16 107:23 111:6,10 113:5 304:15,20 305:17 307:17 309:13,20 310:3,14

**sampling** 12:19 49:12,16 50:25 51:4 60:18 76:4 78:4 88:12,13,25 90:13 91:15 93:7 109:2 111:23 112:3,8,13, 19,25 113:19 276:24 277:8 278:13 279:14 285:8,21,25 286:19,22 304:19,23 305:3,11,23 306:3 307:11, 19 308:12,22 336:15

**Saperstein** 95:4 150:18

**satisfactorily** 8:4

**satisfactory** 237:13,16

**save** 50:2

**scale** 237:6

**scare** 192:16

**scenario** 111:12

**scene** 316:24 323:16

**scenes** 84:23 295:8 297:16 303:13

**scholarly** 237:19 247:23 249:6

**school** 246:3,4

**science** 8:18 22:13,17,19,21 23:2 30:11 59:12,19 60:1,10 61:1,8 76:3 77:10,13,22 78:15,17,20 80:15,22 96:19 103:5 108:22 110:11 116:9 122:17 125:17 126:20 139:8,10,21 161:8 171:15,18,25 176:22 178:16 196:4 210:17 211:17,22 212:8,12

214:19,24 215:7,8,15,23 216:12,21, 25 217:4,5,8,21,23 218:9,14 219:15, 18 220:3 221:5,17,22 222:5,10,18 223:4,5 232:10 236:17 239:19,21 241:14 242:15 243:22 244:1,22 246:21 248:6,7,8,18 251:16 264:11, 12 266:6 280:24,25 281:4,22 282:5 283:1 297:12,24,25 315:14 325:7,11, 13 326:2 328:1,13,19 329:2,16

**sciences** 53:7 175:19 179:19 194:15,20 211:15,25 214:22 216:9

**scientific** 21:16,24 26:15 30:11 39:13 45:18 59:13 60:12 75:25 76:3, 19 77:8 91:5 109:23 118:19,24 132:3 138:25 139:5,20,24 140:8 155:12 159:13 161:25 162:9,21,25 163:7 164:7,10 173:5 174:16 177:2 195:25 196:8 201:11 202:20,21 212:1,3 217:5,22 223:3,24 241:13 242:18 244:8 248:23,24 249:5 257:2,7,12 258:2 263:19,25 264:3 298:1 339:11

**scientifically** 93:6 119:12

**scientist** 45:17 60:14 61:4 139:14 183:4 239:14,20,23 240:25 259:8

**scientists** 54:16 114:3 132:2 176:16 183:1 198:14 242:17 254:9 325:5 332:16

**scope** 124:19 231:6,25 232:7,13 284:8 296:18

**scrapped** 96:11

**Scripps** 186:2,8

**scrutiny** 131:8

**sea** 168:13 171:3

**seabed** 276:12

**sealed** 103:2

**searched** 332:1

**second-to-last** 159:19

**section** 22:10,21 24:25 82:8 86:13 129:15 130:13 134:24 177:7

**sections** 24:23 209:15,19 211:13

**secure** 190:8

**sediment** 111:6 304:20 311:21

**sediments** 171:8 172:11

**seemingly** 95:1

**sees** 166:4,6 203:2

**segments** 166:17 271:18

**selection** 188:17

**selective** 30:13

**send** 16:6 31:23 64:22 205:12 229:21

**sense** 29:20 67:10 71:16 74:20 86:14 93:15 119:24 203:24 204:6 230:14 247:9 268:18,19 326:10

**sentence** 143:12,16 270:15

**sentences** 56:2

**separate** 259:12

**separately** 37:23 38:3 307:4

**September** 194:6 195:10 272:21 273:6

**sequitur** 97:14

**series** 283:19 285:3

**serve** 41:1 192:19

**served** 39:23 40:8 122:20,25

**service** 54:5 124:14,15

**set** 40:22 56:10 103:25 104:3 105:3 106:8 109:8 168:23 170:11 192:4 199:23 200:15 202:22 214:19 223:18 230:22 234:5 236:25 272:25 280:12 308:16 309:2,12,16,19,23 310:2 312:7 338:11

**sets** 66:6,20 105:25 106:1,7,11,14,18 223:23 313:9

**settings** 287:23

**severe** 135:18

**severely** 12:18

**shade** 329:17,19,22,23

**shading** 331:16

**shake** 10:3

**shape** 190:1,11,22 191:1,3

**share** 12:21 62:19 65:8

**shared** 30:19,20 94:25 145:5 148:10 259:1 261:20 319:5 322:4,9,20 331:5

**Shawn** 7:3

**Shea** 311:9,19 312:2,4

**sheet** 11:2,9 14:2 81:24

**sheets** 11:16

**shielded** 131:1 132:7 133:1,22 134:2,7,12 135:19 137:12 332:7

**shielding** 134:20 136:8,21 137:20 138:17

**shift** 299:13,18

**ships** 297:13 298:11

**shoreline** 300:15

**shorelines** 97:23

**short** 139:16

**short-term** 304:25

**shorter** 167:4

**shorthand** 54:13

**show** 33:3 125:21 140:13 153:10,11, 13 252:6 273:25 274:6 277:15

**showed** 36:25 288:8 305:18 307:19 308:11,17 342:4

**showing** 97:23 151:17 204:14 309:3, 12,19 310:3 311:5

**shown** 36:21 177:5 181:20 338:8

**shows** 33:25 34:3,16 35:3 89:18 96:15 99:21 101:17 119:21 148:15 202:5 203:7 208:18 276:23 277:7

**sic** 78:22 79:8 337:1

**sick** 103:19

**side** 103:16 329:17

**signal** 217:10

**signature** 278:23

**signed** 17:6 30:24 257:14 278:24 279:2,6

**significance** 225:1 342:9

**significant** 172:7 190:9 247:23 249:6

**similar** 22:19 199:17

**similarly** 126:25 281:14 336:14

**simply** 19:7 36:16 48:25 78:18 89:12 91:18 95:25 110:23 117:25 120:10 169:18 187:9 196:16

**single** 16:24 20:8 22:7 57:3 161:13 211:21 212:7 296:2

**singular** 96:5

**sit** 56:6 98:4,9 115:15 205:2 206:15

**site** 289:22 296:19

**sites** 285:8,22

**sitting** 320:5

**situ** 297:14,22

**situation** 57:7 96:18 107:19 118:7 140:11 181:24,25 239:1 250:25

287:12
**situational** 319:10
**situations** 117:21 139:18
**size** 319:13
**skeptical** 214:7
**skill** 214:19
**skills** 213:5,6,9
**skimmed** 143:9 146:23
**skimming** 145:4 296:19
**slightly** 60:6 252:3,18
**Sloan** 339:14
**small** 164:14 226:21 232:7,13 343:10
**smaller** 193:20
**snails** 172:1
**so-called** 257:19
**social** 161:7,8,10 266:6
**societies** 217:22 218:1
**society** 202:22 217:4,5,8
**Socioeconomic** 168:22
**soil** 304:20
**sole** 55:23 255:15
**somebody's** 166:15
**someone's** 123:21 158:6
**someplace** 289:9
**sophisticated** 181:21 182:24 183:4
**sophistication** 181:14
**sort** 18:3 23:20 216:9 281:4
**sorts** 67:11
**sought** 118:10 258:1
**sound** 68:8 273:12
**sounding** 90:5
**sounds** 68:10 80:2 157:25 160:7 255:2 272:23 273:16 274:9
**source** 300:14 315:13
**sources** 223:14,15,16
**spawn** 161:13
**spawned** 161:23 196:1,8
**speak** 198:11 306:23 310:20
**speaking** 7:3 310:21,22
**special** 213:6,9
**specific** 29:18 30:6,10 31:23 32:2 36:14 39:16 44:16 57:8 77:25 81:21 97:7 101:15 103:14 106:1,2 109:15 116:25 192:11 193:4 204:22 209:8 214:13 252:1,12 285:8,9,21,22 301:3,10 302:20 309:1,6,10
**specifically** 23:22 28:14 38:18 43:20 47:4 55:9 60:18 61:7 69:2 76:11 89:2 104:19 105:24 110:2 116:16 141:11 147:5 163:17 165:8 180:9 196:5 199:6 209:13 215:14 217:22 218:8 241:16 254:1 255:23 270:2 285:14 288:2 289:14 305:14
**specifics** 52:18
**speculating** 120:8,10 168:8 183:9
**speculative** 172:5
**spend** 24:19 43:17 245:4 246:6
**spent** 37:20 230:18,19 273:11 274:15,20 305:18
**spill** 11:5 12:10,16 16:14 28:24 40:24 59:20 64:9,11,20,21,25 65:14,18 66:18 68:6,9,15 69:11 70:18 71:5,13 72:11 73:5,23 74:18 76:15 78:23 79:1,5,9,13 80:11 81:25 82:5,9,16,19 83:11 86:3 87:15,16,18 104:11,14,17,23 105:9 115:13,18 117:21 118:21 119:1 121:22 126:21 127:14 128:17 132:17 133:17,21 135:8 164:23 169:3 172:24 173:10,12,17,23,24 180:14,19 182:1 194:5,25 195:3 210:4 226:22 228:21 234:12,25 236:4 239:25 240:4,14 242:1,7 259:15 286:16 287:6 290:16 293:20 296:1 297:7 306:25 317:17 319:14 330:9,17
**spilled** 97:16 143:8 146:23
**spills** 59:15 64:15 65:10,24 70:8 121:6,10,14 169:1 172:17,21
**spoke** 11:21
**spoken** 233:19
**sponsored** 179:17 182:7 183:19
**sponsoring** 161:21
**squared** 38:25
**stage** 190:10,25 219:20
**stages** 18:3 94:21 202:23,24 327:15
**stake** 140:19 238:18 284:25 289:1 305:3
**stand** 145:1 146:1 170:10
**standard** 221:12 281:3
**standards** 175:18 211:3,8 215:22 218:4,7 220:2,23 221:5,8,9 232:9 236:16 243:3
**stands** 261:10
**Stantec** 333:10
**start** 78:10 87:9 154:6 314:12
**started** 135:2 220:1 314:9
**starting** 137:2
**state** 8:13 64:11 69:22 71:23 98:24 99:6,10 105:21,23 111:22 112:2,7 127:12 128:5 129:15 130:19 132:14 133:23 134:6 140:21 143:5 146:25 157:1,11 161:1 164:20,21 174:15 179:2 202:19 224:17 264:10 291:24 294:16 310:15 336:6
**stated** 56:20 147:8 164:5 192:25 210:11,22 212:6 295:20 302:14 321:12
**statement** 81:5 89:21 127:25 132:8 136:4 145:21 270:9 294:21 297:2
**statements** 258:1 298:19,23
**states** 48:8 53:13,22 54:5 72:15 111:21 112:2 145:1 159:11,16 175:12,16 179:11 195:2 228:13,19 244:24 256:6 257:22 284:10 296:17 317:16,22 322:2
**stating** 132:20,21,24 134:19 145:22
**statistics** 239:16,17
**statutes** 64:9
**stay** 336:23
**steer** 157:6,8 187:21 191:17,20
**steered** 156:23 157:2,12,16
**steering** 157:5 187:22 192:20 331:16
**steps** 100:23 101:21 140:16 195:13
**stick** 91:8
**sticky** 118:7
**stipulate** 49:25 160:18,23 223:21
**stipulated** 303:11
**stipulation** 168:11
**stood** 243:14 262:5
**stop** 60:20 141:20 165:18
**storage** 65:22

**strategies** 286:22
**strategy** 108:23
**streamline** 60:21
**Street** 8:19
**stress** 145:18 170:3 286:10,14,15
**stressed** 102:21 174:15
**stressing** 334:7
**stretch** 172:5
**strive** 325:5,7
**strong** 115:25 128:3 167:24 245:23 340:23 341:6
**stronger** 191:14
**strongly** 174:12,18
**structure** 84:13 87:6 88:1 89:13,24 91:11
**structures** 167:15
**student** 245:15
**students** 85:16 214:1
**students'** 31:5
**studied** 133:8 165:16
**studies** 138:25 139:5 140:8,22 156:7,17,24 157:3,6,13,16,17,18 159:12 160:2,13,19,24 161:2,12,16, 22,23 162:2,5 163:20,23,25 164:2,3, 11,12,17 187:22 191:16 192:13 193:4 197:14 198:23 199:2,13,14,18 200:3, 4,6,18,19 262:19 331:16,17
**study** 54:17 157:8 161:13 165:9,10 167:14 168:6,14 169:13 170:5,8,9 172:10 194:5,10,14,20 195:3,6,16,17, 20,23 196:1,9,13,21 197:19 198:14 263:8 268:2 275:16 276:5,7
**study'** 192:11
**stuff** 216:3 246:7
**Style** 216:2
**subject** 144:22 242:9 266:2,22 267:2,8,10,12 270:12
**subjected** 266:6,9
**submission** 203:12,17
**submit** 46:5 65:23 221:18 256:20
**submitted** 13:12 43:7 44:2,12,18 202:20 204:24 228:1 243:9 245:10,16 246:9,22 256:6
**submitter** 255:4,18
**subpoena** 15:12,24 21:10 23:6 27:22,23 225:6
**subsea** 109:6
**subsequent** 184:16 340:13
**subsequently** 118:10 124:22 182:15
**substance** 82:10 243:4
**substances** 59:22 126:22 127:3,8 305:19 307:5
**substantial** 340:4
**substantially** 248:20
**substantiated** 245:7
**substantive** 129:17 130:2,8 136:2
**subsurface** 109:7
**subtle** 167:12
**success** 145:3 146:2 148:18 281:5, 8,9,11,12
**successfully** 143:8 146:9,22 147:13
**suffered** 51:18
**suffering** 103:16 127:13 128:15
**suffice** 236:21
**sufficient** 236:7,11 237:4 298:3 307:14 330:13
**suggest** 158:19 168:4 172:6 216:16 272:4
**suggested** 46:13,18 151:20 192:7 211:11 232:1 268:13 326:7,16
**suggesting** 29:23 125:12 170:6
**suggestion** 168:9 187:19 271:24
**suggestions** 276:22,25 277:6,8,19
**suggestive** 332:11
**suggests** 59:14 156:22 189:25 201:9 334:16
**suing** 9:3
**suit** 9:7
**summarize** 57:17,25 100:9
**summarized** 11:3 58:16
**summary** 57:16,20,24 86:7,9
**supervised** 298:2
**supervising** 107:14
**supplement** 101:22
**supplied** 16:9,10,25 18:11 33:12 36:3 42:15 44:20 67:21 210:2 230:23 316:3
**supply** 42:22 67:21 78:7 227:8,10 237:5
**support** 19:19 21:6 128:19 146:15 151:13 152:3 153:5,8 186:9 190:5 191:18 210:6 230:2 236:11,20 260:17,21 261:11 276:14 283:4 329:17 330:21
**supported** 57:11 258:21 261:17 266:10 267:17
**supportive** 188:16
**supports** 128:8,9 251:4 282:24 338:21
**suppose** 215:2 216:11
**supposed** 38:21
**Supran** 251:24 253:1
**surprise** 118:9 120:2 287:24
**surprised** 119:9 120:19
**surprising** 97:18 119:18
**surveillance** 184:6
**surveilling** 180:4
**Survey** 53:13,15,19,22 104:22
**suspect** 140:14
**suspicious** 333:3
**sustain** 129:20 298:3
**sustained** 127:13 128:16
**swear** 8:2 19:23 57:2 196:3
**swimmer** 111:11
**sworn** 8:5
**symptoms** 284:22
**system** 20:8 69:19,21 70:3,10 72:1 111:14 171:3 271:1
**systematic** 128:10
**systems** 169:24 284:16

## T

**tab** 14:18 15:11,12 21:11 27:9,11 33:5,17,19 34:4,5,20,21 41:10,12,23, 24 55:20 85:18,22 100:10,11,12 142:14,18 148:6 149:5,7,16 153:17 156:4 158:1,3,6,10 176:3 177:13,14, 15 178:12 184:17 189:13 193:16,24

194:4 200:23 227:13,15,17 247:10 252:8,23 255:24 256:2,4 265:9,11,15, 18 267:20 294:6 299:5 316:22 321:17,19,20,21

**table** 11:15 188:5

**tabs** 188:8 227:14 338:9

**takes** 88:23 173:6

**taking** 9:25 10:6 14:22 89:17 96:16 101:21 126:1 130:11 135:6 208:19 295:8 297:19

**tale** 218:16

**talk** 10:6 65:3 101:12 103:1 124:7 139:9 145:13 157:5 171:24 182:9 191:15 211:25 235:10 263:4 315:11 326:11

**talked** 17:10,17 121:16 148:6 226:14 290:9 293:14,17 303:25 323:8

**talking** 133:24 147:5 162:21 163:17, 18,19 182:8 191:19 219:17 220:11 264:1 298:10 308:5,7

**talks** 216:2

**tangled** 189:16,17

**targeting** 89:3

**tasked** 341:16

**tautology** 198:9

**taxing** 301:1

**team** 72:2,6,9,13,23 80:15,23 86:10 108:22 109:16 110:12,20 111:2,15 262:16 304:14 315:21

**technical** 82:13 90:12 130:15 131:3, 10,12 135:24 144:19

**technological** 168:14

**technology** 168:15 170:14 172:15, 20,24 173:3,9,14,18 176:23 178:17

**telling** 61:20

**tells** 107:21 215:9

**ten** 230:1 246:8 248:1,3,5,13 249:7

**tend** 25:13,14

**tendency** 140:17

**tens** 111:5

**term** 45:21 58:12 66:24 71:14 151:3, 5 202:1,3 203:21 281:21 325:24

**terms** 55:25 91:15 173:24 238:19 259:10 271:21 331:14

**testified** 8:6 9:13,14 25:7 155:16 224:8 311:20 312:4 315:24 316:16

**testify** 9:10 10:20 29:21 59:18 155:19

**testifying** 10:17 61:7 193:7,11 241:7 280:10 320:19

**testimony** 39:11 47:3 153:17,24 155:20,23 188:2 212:16 224:2,6,10, 15 269:10 270:11 271:4,15 311:9,15 312:16,20,22 313:1 315:12,13,17,19 316:4,6

**testing** 116:25 307:17,19 308:11

**Texas** 9:5

**themes** 176:19 177:6 178:1,10

**thing** 42:4 45:8 57:3 62:13 64:18 119:10 148:8 163:22 165:13 185:19 213:12 227:15 231:22 232:24 233:18 246:16 279:23 281:21 339:20

**things** 17:21 18:11,12 40:11 45:13 52:9 67:11 78:5,16 83:19 84:21 85:1 90:10 99:21 125:23 126:6 135:4 150:13,24 151:10 161:5 165:14,16 167:14,19 181:5,19 182:16 191:22 204:13 209:11 216:8 220:4 223:17 231:18 232:21,22,23 233:14 244:18 257:17 259:4 260:1 286:17 297:9,18 302:22 323:2 326:15,16,19 327:14,21 330:4 332:15 333:2 334:4,25 335:5 341:22

**thinking** 24:12,19 52:2 218:5,8 220:2,24 221:6

**thinks** 95:8 120:17

**third-party** 257:19

**thought** 11:3 12:7,14 17:14,18,25 18:8 31:3,10,11 57:21 77:20 125:6 146:13,16 152:11 156:12 202:4 213:23 226:25 230:3 231:1 252:9 262:8 264:5 326:6,20 327:5,22 334:5, 22,25

**thousand** 96:10 233:7 263:24

**thousands** 111:5

**thread** 13:20 144:13 145:22 147:15, 18 261:13

**threads** 320:22 321:9 334:15 335:6

**three-page** 158:24

**three-pager** 158:23

**three-year** 37:13

**thrown** 296:22

**time** 7:6 24:19 25:21 29:9 30:19,21 31:20 32:3,5 37:20 40:6,20 42:18 43:17 44:22 48:3 50:2 52:8,14 55:13, 14 61:13,17 62:12,25 63:7 69:17 70:2,6,15 71:3,10,19,25 72:12 73:14, 19 94:11 97:14 110:18 111:1 122:22 126:5 129:7 141:19,22 142:3,5,9 155:16 189:7,11 200:25 201:4 206:6 207:25 208:9 221:18 230:15,21 233:1 234:7,14 235:23,24 236:25 237:6 245:4 246:6 258:5,8 260:4 261:12 272:7,11 274:25 275:4 291:18 292:22 294:20 296:8,14 298:17 302:23 303:15 304:12 305:9,18 314:3,7 316:15 330:4,22 331:2,12 337:1,5,7, 9,24 340:15 341:5 343:6,25

**times** 8:22 137:2 265:20 266:25 317:1 331:22 332:14 335:18

**timing** 184:13

**tired** 225:15 326:14

**title** 65:1 68:2 80:2 144:15 204:3 205:15 278:19

**titled** 80:5 122:13 184:22 267:23 269:9 275:15 278:11

**tobacco** 130:17,20 131:6 132:10 133:9 183:2 249:12

**today** 8:1 9:18 10:20,23 11:20 13:22 15:2,5,9 38:25 39:3 43:1 47:3,19 56:6 58:17 92:20 97:2 98:4,9 107:6 115:15 122:2 133:10,25 134:6,11,19 137:7 138:11,16 166:19 192:25 193:7,11 205:2,21 206:15 213:21 226:9,15 231:19 233:19 252:15 258:10 260:21 261:12,15 269:18 275:19 290:9 293:15 297:11 304:1 312:2,17 314:18,21 317:2 325:1 328:6 330:12 331:22 333:7 337:16,20

**today's** 7:5 250:12

**Toimal** 67:23

**Toimil** 27:13,19 46:25 47:1

**told** 45:19 100:4 115:8 227:1 229:17, 18 232:2 237:5 261:20 268:14 311:6 332:6,24 333:17 334:8 335:10

**tool** 116:15 119:13 214:7 265:5

**top** 21:13 127:18 154:7 174:11 201:8 256:17 275:9 319:12

**topic** 259:5

**topics** 25:8 174:11,17,19 175:23 188:18,23

**total** 34:1 228:24 232:20 274:4,6,11

**totaled** 273:10
**totaling** 333:9
**totals** 225:7
**touched** 258:12
**toxic** 59:21 126:22 127:2,7
**toxicity** 241:10,13,17,21
**toxicologist** 30:8 239:7
**toxicologists** 48:12 93:10 94:19 95:4 216:15
**toxicology** 24:21 25:4 116:10,12 280:4
**toxics** 121:12
**toxins** 240:20 241:5
**track** 206:6 245:24
**tracker** 202:19 203:7 205:10 207:10 208:18,25
**tracking** 163:3 164:12
**trade** 257:18
**trained** 49:4 64:6 213:7,10 238:22
**training** 60:13,15 81:24 139:9 214:24 215:14,17 239:16 287:5,9,20, 23 288:4,16,17,23 289:6,12,17,20,24 290:4 292:4,8,12,17,23 293:1,9,10 302:17 303:7,18
**trainings** 288:8,12
**transcript** 153:25 154:1,4
**transpire** 320:21
**transpired** 321:5
**tremendous** 59:13
**Tremmel** 144:3 150:18,19
**trial** 9:10,12,13,14 83:24,25 84:1 233:23 270:11,17,22,25 290:7 302:7 311:9,10,20 312:5,20,22,25 328:23 336:1
**tricky** 107:5 117:23 326:4
**triggered** 308:25
**Triumph** 122:10
**troubling** 131:4,24
**true** 12:14 19:16 105:2 106:12 110:8 152:2 163:11 168:4 182:6 209:12 211:2,24 280:20 281:21 289:13,15 298:22 299:9
**Trust** 246:21 248:6
**trustee** 278:24 279:3
**truth** 10:17
**truthfully** 10:20
**turn** 15:11 27:9 33:5 34:4,20 41:10 85:18,25 86:20 115:21 126:13 142:13 148:6 154:3 156:13 158:1 176:3 189:1 227:13 247:2,3 281:23 294:8 316:21 318:9 321:15
**turning** 158:14
**twenty-five** 96:9
**two-pager** 158:23
**type** 20:14 22:14,24 23:23 66:4 216:25 221:12 306:22 312:7
**types** 25:8
**typical** 217:2 246:16
**typically** 173:6

**U**

**U.S.** 53:15,19 104:22 138:2 251:11 290:11
**U.s.-based** 251:9
**UAC** 87:5,25 89:24
**Uh-hmm** 87:1 128:23 143:19 144:2 156:12 201:13 224:20 263:7,14 276:20
**ultimate** 70:17 71:5,12,14
**UN** 258:3
**unable** 333:3
**unaware** 154:23
**Uncertainty** 122:13
**uncomfortable** 300:22 301:5
**unconscious** 124:1
**underestimate** 274:2
**undergraduate** 17:2
**undermine** 258:1
**undermines** 140:24
**underscored** 83:20
**understand** 9:20 10:2,14,18 26:13 45:13 73:11 88:8 91:10 119:15 129:10,12 134:1,4 135:4 145:10 155:13 170:4 173:8 182:18 190:15 192:16 221:25 234:14,15 256:21 258:7 270:11 308:5 318:6 320:25
**understanding** 15:19 16:1,5 28:2,3 32:7,11 46:4 84:6 87:21 88:10 99:17 132:6 171:16 278:4 286:7 306:22 310:18 335:7
**understood** 9:22 10:11,13 15:21 22:18
**undertake** 191:16
**undertaken** 74:8 104:21 313:16
**undertaking** 116:1 156:7,17
**unduly** 324:7
**unfair** 280:19
**unflattering** 242:23
**unified** 69:19 70:10 82:12 84:12 89:13 283:6,12 298:25 315:22,25
**uniformly** 286:5
**Union** 217:7,16 340:7,11
**uniquely** 216:17
**United** 48:8 53:13,22 54:5 72:14 244:24 256:6 257:22
**units** 164:1
**unity** 318:13
**universe** 19:18 230:6 231:20 232:20
**universities** 253:10,14,24
**university** 9:8 179:2 215:4,5 216:2, 23 230:17 242:24 243:1,5,15
**unprecedented** 133:18 297:8
**unreliable** 101:9,11,13,14,19 102:19 104:1,4 105:5 106:19 108:6,10,16 271:8
**unsubstantiated** 242:12
**unusual** 29:10
**unwillingness** 227:7,8
**unwritten** 215:3 216:10
**update** 42:19 144:23 145:9
**updated** 42:18,24
**upper** 149:21
**urine** 145:6
**USGS** 105:1
**utility** 121:9

**V**

**valid** 139:1,19 199:14

**validated** 244:12 301:13
**validating** 286:22
**validation** 211:16 313:9,14,17
**validity** 140:4
**valuable** 99:17 315:13
**Vanessa** 7:19 228:1 321:24
**varied** 212:3
**variety** 171:4 176:17 180:14
**vary** 212:12
**vast** 296:22
**verbally** 10:1
**verification** 267:16 293:10 313:14
**verified** 292:12,23
**verify** 266:10
**version** 42:21,25
**versus** 7:9 9:7 138:2 224:3 228:2 235:21 256:10 262:19 265:6
**vessels** 65:22 298:16 301:16
**vessels/equipment,'** 192:12
**vesting** 293:18
**vetted** 204:25 206:2 217:18
**vetting** 208:19 217:13
**vice-chair** 185:20
**vice-chaired** 72:14,24
**video** 7:7
**view** 116:4 250:21,23 251:6 316:7
**viewed** 254:8
**views** 57:6 258:16 259:11
**virtually** 232:18
**visits** 284:14 289:22 292:12,24 301:7,25 302:11
**vitae** 42:6
**Volatile** 79:18
**volunteers** 82:23
**voted** 221:10

**W**

**wait** 18:19,25 59:5 88:20 93:21 156:12 205:12
**wanted** 40:14 77:18 131:21 170:4 214:14 227:4 238:15 245:20 338:14,16 339:20 341:6
**warming** 242:19
**warned** 128:11 189:16
**warrant** 326:18
**Washington** 9:9
**waste** 94:10 296:21 304:20
**water** 111:5,10,23 112:3,8 168:14 171:3 172:10 275:16 276:5,7,11 278:11,13,20 279:13 304:19 311:10,20,21 312:5 339:4
**waters** 171:4,8 172:11
**ways** 181:9,22 192:21 219:5
**weaker** 96:20
**wear** 300:23
**weathered** 143:9 146:24
**website** 175:22 176:13 184:22 244:18 245:1
**week** 33:1 46:12 61:21 62:11 233:12
**weekend** 43:17 44:24
**weeks** 31:16 236:3
**weird** 216:17
**well-being** 342:5
**whatsoever** 169:15
**White** 176:22 178:16
**Wildlife** 54:5
**win** 281:8
**wind** 101:12
**winning** 183:1
**wise** 319:19
**withdrawn** 259:2
**withheld** 182:20
**witnesses** 235:20 271:22
**women** 163:3
**Woods** 186:8
**word** 84:19 90:23 91:19 92:3 116:1 123:22 125:13 128:3,4 131:23 134:13 155:2 157:5 176:25 177:3 181:2,17,18 185:8,11,13 187:22 191:9 192:10,15 204:9,10 225:11 306:19
**wording** 252:1,12,16 255:14
**words** 56:2 101:6 130:1 171:12,16 175:2 187:12 192:3,22 264:18 266:2,14,15,16,18,22 267:1 270:17
**work** 16:4,25 22:19,23 23:20,23 28:10,14 29:14 31:13 32:16,17,22 34:1 35:7,16,21,24 36:6,8,11,12,15,16,17,22,24 37:2,5,7,17 38:11,17 39:6 40:1,12 41:7 44:11,15 45:13,19 47:22 48:4,7 49:21 50:7,12 53:16 58:11 63:13,14 74:17 76:10 110:4 113:23 114:2,3,8 116:10 124:12 125:4 127:14 128:16 145:17 150:20 165:17 168:6 181:6,7 186:3 191:7 192:24 195:14 201:11 204:17 210:12 211:8 214:2 222:19,23 229:12 230:7,21 232:6,8,9,21 234:11,20 236:16,19,21 237:24 239:15 240:24,25 243:2,21,25 244:5,20 245:20,21 248:2,17,19 251:8 252:11 254:9 259:19 263:12 265:1 266:9,16 267:12 274:1,6,18 281:4 284:16,17 287:25 288:2 289:12,18 291:12 295:18 299:18 300:6 304:11 306:7,8,21 312:23 313:4,23 323:1 324:9 328:12,20,21 329:2,4,13,14 332:16 335:23 336:4,6,9,11,12
**worked** 12:10 17:2 20:13 33:25 34:16 35:3 50:15 116:2 156:8,18 257:22 291:13 296:1 298:7
**worker** 165:4,8 209:5 282:2 283:7 284:15 287:1,9 291:15,25 294:14 299:1 301:15
**workers** 49:5,9 59:20 64:6 81:17 82:23 99:21 103:15 115:23 126:21 127:12 128:15,22 129:6 140:23 141:11 154:13,24 155:18 163:4 169:1 209:8 242:1,6 276:18 282:1,10,12,15,17,23 283:1,3,13 286:11,16 287:6,9,21,23 288:4,17,24 289:11,17,23 290:4,17,25 291:8 292:24 297:21 298:5,7,14 299:6 300:6 301:9 302:17 303:7,18 305:18 308:4,7 310:8 316:8,19 323:25 324:15
**working** 31:20 37:13 38:10 39:19,20 69:22 70:3 74:13 92:15 273:11 287:15 303:15 313:10 323:22 324:4
**works** 53:14,19 287:22
**workshop** 180:7,9 184:8,9
**worksite** 301:7,25 302:11
**world** 161:25 230:15 231:16 244:25 306:19
**worn** 49:8
**worried** 173:22

**worthy** 330:24

**would/could** 140:23

**write** 19:15 24:22 40:4 87:4 100:6,15 130:13 138:24 139:4 141:2,4,10 189:22 213:5 230:14 234:7 250:15 255:12 266:1 283:5 328:17

**writes** 150:19 197:4 295:24

**writing** 11:24 15:18 86:10 204:13 214:17 230:13,19 234:1,9 236:23 238:14 249:19

**written** 88:6 132:19 163:11 182:23,25 209:11 211:8,18 214:3,8,12,18,22,23 215:1,8,13,16,22 216:17 218:7,11,18 220:2,22 221:5,9,12,21 222:3 223:20,22 234:5 236:25 237:13,22 238:1 246:20 248:5 251:1,13 252:20 253:9,13 280:13,22 296:25 308:4 313:13 323:22 340:12

**wrong** 60:15 103:3 141:5,8,9 177:15 243:16 341:24

**wrongly** 223:10

**wrote** 25:21 40:6 98:16 139:3 141:2 167:16 242:16,22 250:11 252:9 291:4,18 292:11,15,22 295:22

**Y**

**year** 173:7

**years** 22:6 32:1 213:21 219:14 230:19 246:9 248:1,3,5,13 249:7

**yes-or-no** 137:5

**yesterday** 37:10

**yielded** 162:24

**York** 265:20

**you-all** 166:13 220:11 225:9

**Yup** 41:13 143:22,24 144:14,24 158:9 159:22,24 177:21 178:13 193:22 194:3 229:3 247:11 269:5 270:23

**Z**

**Zelo** 12:16 14:10 78:2,3 124:2 275:20 276:22

**Zelo's** 277:5,18 279:13

**zone** 285:7,21,25 286:16

**Zoom** 7:22